IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-00179-MSK-KLM

GLEN LLEWELLYN,

        Plaintiff,

v.

SHEARSON FINANCIAL NETWORK, INC.,
ALLSTATE HOME LOANS, INC. dba ALLSTATE FUNDING,
EQUITY PACIFIC MORTGAGE, INC.,
KEVIN E. RIDER,
OCWEN LOAN SERVICING, LLC.,
NOMURA CREDIT AND CAPITAL, INC.,
NCC SERVICING, LLC., and
CASTLE, MEINHOLD & STAWIARSKI, LLC.,

        Defendants.

_____

## OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS
_____

      **THIS MATTER** comes before the Court pursuant to Defendant Ocwen Loan Servicing,

LLC's ("Ocwen") Motion to Dismiss (**# 47**), the Plaintiff's response (**# 75**), and Ocwen's reply

(**# 83**); Defendant Castle, Meinhold & Stawiarski, LLC's ("CM&S") Motion to Dismiss (**# 53**),

and the Plaintiff's response (**# 79**); and Defendant Nomura Credit and Capital, Inc.'s ("Nomura")

Motion to Dismiss (**# 61**), the Plaintiff's response (**# 77**), and Nomura's reply (**# 82**).

## FACTS

      According to the Complaint (**# 1**) and as relevant herein, Plaintiff Glen Llewellyn

borrowed a sum of money from Defendants Shearson and Allstate, giving a deed of trust on a

parcel of real property to secure repayment.  Mr. Llewellyn later attempted to refinance that

loan, tendering the $ 600,000 principal balance to Allstate/Shearson's agent, Defendant Equity

Pacific Mortgage, Inc. ("Equity"). However, Defendant Rider, an employee of Equity, failed to

pay the loan, and instead converted the funds to his own use.

At some point, Ocwen undertook efforts to collect on the Allstate/Shearson loan.

Because Mr. Llewellyn stopped making payments on the loan (believing it to have been repaid)

and because Ocwen's records reflected that a balance remained (due to Mr. Rider's failure to

credit the payment), Ocwen engaged its attorneys, CM&S, to begin foreclosure proceedings. The

Complaint suggests that, at some point in time, Mr. Llewellyn contacted Ocwen, and its agent

Nomura, to inform them that the loan had been paid in full. Nevertheless, Ocwen and Nomura

proceeded to provide negative credit information regarding Mr. Llewellyn's payment history to

various credit reporting agencies, thereby adversely affecting Mr. Llewellyn's credit rating.[1]

The Complaint alleges six claims for relief, although only the following are asserted

against movants here: (iii) a claim for outrageous conduct under Colorado law against Ocwen,

Nomura, and CW&S for supplying of incorrect information to the credit reporting agencies, and

against CW&S for commencement of foreclosure proceedings; (iv) a claim for violation of the

Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b) against Ocwen and Nomura for

supplying inaccurate information to credit reporting agencies and failing to conduct a reasonable

investigation into Mr. Llewellyn's dispute as to the accuracy of that information; (v) a claim for

violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e(8), against

Ocwen and Nomura for engaging in false and deceptive collection practices by threatening to

---

[1]

     Ocwen later recognized the reality of the situation, canceling the foreclosure proceedings
and rescinding the negative information reported to the credit agencies. However, Mr.
Llewellyn alleges that he had already sustained damages.

communicate false information to credit reporting agencies despite being advised that the loan had been paid off, and by failing to report to the credit reporting agencies that Mr. Llewellyn had disputed the legitimacy of the claimed debt; and (vi)[2] a claim for violation of the FDCPA, 15 U.S.C. § 1692e(5) against CW&S for threatening a foreclosure action on a nonexistent debt.

Ocwen moves to dismiss (**# 47**) the claims against it, arguing: (i) as to the FDCPA claim, the Complaint effectively admits that, because of Mr. Rider's conversion, Mr. Llewellyn never actually paid off the loan, and thus, Mr. Llewellyn has not adequately alleged that Ocwen's collection practices were false or deceptive; (ii) Mr. Llewellyn has failed to allege sufficient facts to demonstrate that Ocwen is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6)(F)(iii), insofar as the loan was not in default at the time it was obtained by Ocwen; (iii) the FDCPA claim is untimely, having been brought beyond the one-year statute of limitations in 15 U.S.C. § 1692k(d); (iv) with regard to the portion of the FCRA claim that challenges Ocwen's failure to investigate a dispute, Mr. Llewellyn does not allege the statutory predicate that the credit reporting agencies provided Ocwen with notice of the dispute as required by 15 U.S.C. § 1681s-2(b)(1); (v) because the Complaint admits that the loan was not paid off as a result of Mr. Rider's conversion, the information that Ocwen reported was correct, and thus, not in violation of the FCRA; (vi) the outrageous conduct claim is preempted by the FCRA, 15 U.S.C. § 1681h(e) and § 1681t(b)(1)(F); and (vii) the outrageous conduct claim fails to state a cause of action under Colorado law because the acts alleged are not sufficiently outrageous.

CM&S moves to dismiss (**# 53**) the claims against it, arguing: (i) as to the outrageous

_____

[2]    The Complaint numbers this claim as VII, although there is no claim numbered VI.  In the interests of numerical accuracy, the Court will hereafter refer to this claim as "claim (vi)" or the "sixth claim."

conduct claim, Mr. Llewellyn fails to state a claim because the acts were not sufficiently outrageous; (ii) the FDCPA claim is untimely; and (iii) the FDCPA claim fails to state a claim because CM&S never actually threatened litigation and, in any event, the foreclosure proceedings they initiated were legally proper because the Complaint admits that the loan had not actually been paid.

Nomura moves to dismiss (# 61) the claims against it, arguing: (i) the Complaint does not specifically allege any specific acts – much less unlawful acts – committed by Nomura; and (ii) to the extent that the claims against Nomura are predicated on Nomura's vicarious liability for the actions of Ocwen, Nomura adopts the arguments made in Ocwen's motion to dismiss.

## ANALYSIS

### A. Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). It is not necessary that the Complaint contain detailed factual allegations, but a plaintiff must provide more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *See Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007).

Both Mr. Llewellyn and the Defendants have supported their motion with a variety of exhibits. In considering a Rule 12(b)(6) motion, the Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the Complaint as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001), as well as unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001). The Court finds that none of the tendered documents are specifically referred to in the Complaint, and thus, the Court has disregarded both the tendered exhibits and the factual averments in the parties' briefs that depend upon them. Fed. R. Civ. P. 12(b) (court may disregard tendered evidentiary material).

## B. Whether the loan was repaid

Before the Court turns to specific arguments raised by the Defendants with regard to specific claims, it will address an overarching argument that informs all of the Defendants' motions. All of the Defendants argue in part that their conduct was lawful because the Complaint effectively acknowledges that the intervening act of Mr. Rider in absconding with the funds establishes that the Allstate/Shearson loan was never actually repaid.

On the surface, this argument has some appeal. In essence, Mr. Llewellyn tendered $600,000 to Mr. Rider, who was to tender the money to Allstate/Shearson, thereby paying off the loan. Although through no fault of Mr. Llewellyn, Mr. Rider did not carry out his role in the transaction, and as a consequence, Allstate/Shearson never received the money that would pay off the loan. Although Mr. Llewellyn may be perfectly justified in his belief that he paid off the loan, Allstate/Shearson (and the other Defendants whose rights and obligations flow from

5

Allstate/Shearson) are also perfectly justified in believing that the loan was not paid.

This situation raises an awkward legal issue – as between the borrower and the lender, both of whom act in good faith, who bears the burden of an intermediary absconding with the funds? The 10th Circuit recently previously considered a somewhat similar set of facts:

> In a world of instantaneous electronic fund transfers and online financial transactions, one would think that the old problems of disappearing checks, uncertain mail deliveries, and unknown thieves-long the staple of law school hypotheticals-would cease to have much practical significance. In this case, however, Defendant, the Variable Annuity Life Insurance Company ("VALIC"), opted to do it the old-fashioned way: It sent two checks via the postal service to its customer's broker in Houston, Texas. True to form, an unknown thief intercepted one of the checks and used it to open a fraudulent account in Los Angeles. . . In determining who should bear the loss, this Court has found it necessary to blow the dust off of ancient common law doctrines of negotiable instruments, bailments, and assignability of choses in action. In tribute to the enduring character of the common law, we apply these legal concepts to this twenty-first century dispute.

*See generally Dean Witter Reynolds, Inc. v. Variable Annuity Life Ins. Co.*, 373 F.3d 1100, 1103 (10th Cir. 2004). Without diminishing the thorough analysis in *Dean Witter*, this Court takes particular note of two principles articulated therein. First, the court acknowledged the general proposition that "a debt is discharged not when the debtor mails a check, but when the creditor negotiates the check." *Id.* at 1108. At the same time, it acknowledged that such a presumption may be rebutted by evidence of a specific course of dealing or express agreement by the parties to the contrary. *Id.*

In the right set of circumstances, the presumption that a debt is not satisfied until the creditor negotiates the debtor's payment might be sufficient to carry the day for the Defendants. But the facts alleged in the Complaint are not sufficient in that regard. Mr. Llewellyn alleges that Equity, the loan processor to whom the money was sent, was acting as Allstate/Shearson's

6

agent, and that Mr. Rider, in converting the funds, was an employee of Equity acting "within the course and scope of his agency." *Docket # 1*, ¶ 14, 15. Although the latter proposition, in particular, seems especially dubious and may prove difficult to establish, at this juncture the Court must take these allegations as true. In the absence of elaboration as to the scope of Mr. Llewellyn's agency, the parties' various contractual agreements or course of dealing, under general principles of agency Mr. Llewellyn's delivery of the funds to Allstate/Shearson's designated agent, Equity (and to Equity's own designated agent, Mr. Rider), could be the equivalent of Mr. Llewellyn delivering the funds to Allstate/Shearson, directly, thereby repaying the loan.

### C. Ocwen's motion

Having concluded for purposes of this motion, only, that Mr. Llewellyn repaid the loan, the Court turns to Ocwen's remaining arguments with regard to each claim. For ease of reference, the Court addresses them in the order in which the claims are asserted in the Complaint.

#### 1. Outrageous conduct

Colorado law recognizes a cause of action for outrageous conduct (sometimes called "intentional infliction of emotional distress"). In order to state a claim for outrageous conduct, a plaintiff must allege: (i) that the defendant engaged in extreme and outrageous conduct; (ii) that he did so recklessly or with the intent of causing the plaintiff severe emotional distress; and (iii) the conduct did indeed cause the plaintiff to suffer emotional distress. *Green v. Qwest Services Corp.*, 155 P.3d 383, 385 (Colo. App. 2006). Whether the conduct alleged rises to the level of sufficient outrageousness is, at least initially, a question of law for the Court. *Id.* ; *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665-66 (Colo.1999). To be actionable, the conduct must be

"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Floyd*, 978 P.2d at 666.

The Complaint is fairly succinct in its description of Ocwen's conduct. Paragraph 17 of the Complaint alleges that, although Ocwen had knowledge that Mr. Llewellyn had repaid the loan, it nevertheless made "late payment reports" regarding Mr. Llewellyn to the major credit bureaus. In paragraph 29 of the Complaint, Mr. Llewellyn alleges that the extreme and outrageous conduct committed by Ocwen consisted of "knowingly providing false credit information to several credit bureaus."

Ocwen offers two arguments with regard to the outrageous conduct claim: that it is preempted by the FCRA, and that it fails to allege sufficiently outrageous conduct. Turning to the first issue, Ocwen's argument is based on two provisions of the FCRA. 15 U.S.C. §1681h(e) provides that "no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of [credit] information . . . except as to false information furnished with malice or willful intent to injure such consumer." Ocwen's argument that this statute preempts an outrageous conduct claim is misplaced for at least two reasons. First, an outrageous conduct claim is not a claim for "defamation, invasion of privacy, or negligence," nor is it necessarily "in the nature of" such a claim. Outrageous conduct claims occupy a well-established niche in the common law, discrete from the claims specifically described in the statute. See generally Restatement (Second), Torts § 46, comment *b* (noting outrageous conduct "has been fully recognized as a separate and distinct basis of tort liability, without the presence of the elements necessary to any other tort"). If Congress had intended to preempt well-known common law claims for outrageous conduct arising from consumer credit

reporting alongside the other discrete torts listed, it was able to do so.

More importantly, a claim for outrageous conduct is cognizable within the express exception of § 1681h(e) permitting claims based on "false information furnished with malice or willful intent to injure." As recited above, a claim for outrageous conduct may lie upon a showing that the defendant acted "with the intent of causing the plaintiff severe emotional distress." *Green,* 155 P.3d at 385. Mr. Llewellyn alleges that he may "potentially" be able to show that Ocwen's acts were "done with the intent" of causing him injury. *Docket* # 1, ¶ 31. Taken in the light most favorable to Mr. Llewellyn, this allegation is sufficient to bring the outrageous conduct claim within the express exception to § 1681h(e)'s preemption rule, even if the claim would otherwise be preempted under that section. *See e.g. Morris v. Household Mortg. Sevs.*, 350 F.Supp.2d 786, 788 (N.D. Ill. 2004) (finding that §1681h(e)'s preemption did not apply to defamation claim that alleged malicious conduct).

Ocwen goes on to assert that another FCRA provision preempts a state-law outrageous conduct claim. 15 U.S.C. § 1681t(b)(1)(F) provides that "No requirement or prohibition may be imposed under the laws of any State with respect to any subject matter [ ] relating to the responsibilities of persons who furnish information to consumer reporting agencies." The precise effect of § 1681t is, to be charitable, unclear. *Gorman v. Wolpoff & Abramson, LLP*, 552 F.3d 1008, 1026-27 (9th Cir. 2009) ("Attempting to reconcile [§ 1681t and §1681h(e)] has left district courts in disarray"); *Saint Torrance v. Firstar*, 529 F.Supp.2d 836, 841 (S.D. Ohio 2007) ("there have arisen four distinct and conflicting interpretive approaches attempting to harmonize the two provisions"). This Court notes that the 10th Circuit has not expressly addressed the preemptive effect of § 1681t, but the Court does take note of a recent unpublished case, *Pinson v. Equifax Credit Information Servs.*, ___Fed.Appx. ___, 2009 WL595991 (10th Cir. March 10,

2009). In *Pinson,* the plaintiffs alleged FCRA violations and state tort claims of libel and false-light invasion of privacy, based on the defendants' alleged willful reporting of false credit information about the plaintiffs. *Id.* at *1. With regard to the tort claims, the 10th Circuit affirmed the trial court's Rule 12(b)(6) dismissal, explaining that "since the Pinsons' state-law claims were preempted by the FCRA, *see* 15 U.S.C. § 1681t(b)(1)(F), the district court was correct to grant Capital One's motion to dismiss." As an unpublished case, *Pinson* has no precedential effect. 10th Cir. R. 32.1(a). Moreover, given its abbreviated treatment – the quoted text is literally the full extent of the court's discussion of the issue – of an issue that other courts have found most difficult, this Court finds *Pinson* to provide little helpful instructive value.[3]

Instead, for reasons explained in cases such as *Gorman* and *Saint Torrance*, this Court finds that treating § 1681t as broadly preempting every common-law tort claim arising out of credit reporting disputes gives the statute a broader reach than is necessary or appropriate. *See e.g. Saint Torrance*, 529 F.Supp.2d at 841 (rejecting argument that §1681t has full preclusive effect because doing so would render §1681e(h) meaningless). The Court finds some intellectual appeal in both *Saint Torrance*'s statutory/common-law distinction – that is, that §1681e(h) describes the FCRA's preemptive effect on state tort law, and § 1681t describes the statute's preemptive effect on state statutes governing credit reporting obligations – and in the "temporal method" described in cases like *Tilley v. Global Payments, Inc.*, ___ F.Supp.2d ___,

---

[3]     *Pinson*'s persuasive value is additionally diminished by the fact that the tort claims at issue sounded in defamation and invasion of privacy – torts that were subject to the express preemptive language of the more specific § 1681e(h). The 10th Circuit's failure to note the more applicable preemption section suggests to this Court that the arguments before the 10th Circuit were not sufficiently developed, making reliance on the single, abbreviated sentence quoted above an even more dubious proposition.

2009 WL 790208 (D. Kan. March 24, 2009), citing *Aklagi v. Nationscredit Fin. Servs. Corp.,* 196 F.Supp.2d 1186, 1192 (D.Kan. 2002).[4]

Fortunately, it is not necessary for the Court at this time to weigh in squarely in favor of a particular reading of the preemptive language of the FCRA. All that is necessary at this early stage of the litigation is to address whether the language of §1681t is so sweeping in its effect as to conclusively preempt all state law tort claims touching on a credit reporting issue, notwithstanding the exception for intentional torts found in § 1681e(h). If it does, Ocwen is entitled to dismissal of the outrageous conduct claim; if it does not, and there is room for §1681e(h)'s preemptive language to express itself, the fact that Mr. Llewellyn has alleged a claim sounding in willfulness would be enough to survive a Rule 12(b)(6) motion.[5] In the absence of conclusive instruction from the 10th Circuit, this Court finds that some of the more nuanced interpretations of the § 1681t discussed above are more persuasive than a construction that gives § 1681t broad and generalized preclusive effect. Because those nuanced interpretations leave room for § 1681e(h) to operate to permit tort claims sounding in willfulness to survive, the Court declines to dismiss the outrageous conduct claim as preempted by federal law.

---

[4]     The "temporal method" deems § 1681t to have preclusive effect only over tort claims based on conduct that is specifically actionable under 15 U.S.C. § 1681s-2(b) – that is, a credit reporter's failure to correct mistaken information after being notified of a dispute – and denies preemptive effect as to claims that challenge a defendant's initial furnishing of incorrect credit information to a reporting agency.

[5]     The parties are advised to carefully consider these difficult statutory interpretation questions upon reaching the summary judgment stage. If the *sine qua non* of an outrageous conduct claim that avoids preemption under § 1681e(h) is willful conduct, the parties must focus their arguments on those actions by Ocwen that Mr. Llewellyn can show to have been done with the intended purpose of injuring him.

Thus, the Court turns to Ocwen's second argument: that Mr. Llewellyn fails to allege conduct that was sufficiently outrageous. As discussed above, a claim for outrageous conduct requires a showing of actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Floyd*, 978 P.2d at 666. The tort is intended to reach "a very narrow type of conduct," *Green*, 155 P.3d at 385, and the "level of outrageousness required to create liability is extremely high."[6] *Pearson v. Kancilia*, 70 P.3d 594, 497 (Colo. App. 2003).

In this case, taking the allegations in the Complaint in the light most favorable to Mr. Llewellyn, he has alleged that Ocwen knowingly reported false information about the Allstate/Shearson loan being in default to credit reporting agencies, and later, despite Mr. Llewellyn advising Ocwen of the inaccuracy of that information, Ocwen willfully failed to take action to correct the error.

There are no Colorado cases considering the outrageousness of this particular set of facts. Perhaps the most analogous situation is that presented by the seminal case of *Rugg v. McCarty*, 476 P.2d 753, 754 (Colo. 1970), in which the Colorado Supreme Court first recognized the tort of outrageous conduct. In *Rugg,* the plaintiff defaulted on a promissory note, and the defendant "harassed her with numerous telephone calls" about the debt and wrote to her employer about garnishing her wages, despite knowing that it could not obtain a garnishment until it had reduced the debt to judgment. *Id.* The Colorado Supreme Court found these allegations sufficient to

---

[6]     An argument could be made that the high threshold of outrageousness is lowered somewhat by the fact that Ocwen occupied a position of power relative to Mr. Llewellyn, in that its reporting of false credit information had "the power to affect [Mr. Llewellyn's] interests." *Pearson*, 70 P.3d at 598, *citing Farmers Group, Inc. v. Trimble*, 658 P.2d 1370, 1377 (Colo.App. 1982). Whether that proposition is appropriate here is a matter the Court need not take up at this time.

state a claim for outrageous conduct. *Id.* at 177. Although not squarely on point with the allegations in this case, *Rugg* provides enough guidance for the Court to conclude that the facts alleged by Mr. Llewellyn, taken in the light most favorable to him, are sufficient to state a claim for outrageous conduct. As in *Rugg*, the conduct here involves a creditor conveying information about a debtor's delinquency to a third party, with the intention of sufficiently damaging the debtor's reputation that the debtor will promptly repay the debt in order to restore his or her good name. Although *Rugg* entailed a creditor engaging in a highly-personal contact with the debtor's employer – a contact that might reasonably have led to the loss of the debtor's job – the Court cannot say that the generalized dissemination of incorrect information about Mr. Llewellyn's creditworthiness as part of his credit report is any less objectionable. Moreover, although Mr. Llewellyn does not allege repeated, harassing phone calls as did the plaintiff in *Rugg*, the widespread and permanence of the dissemination of Mr. Llewellyn's credit information serves as a reasonable counterpoint to a series of phone calls directed at a single individual. Moreover, Mr. Llewellyn has alleged repeated, unsuccessful efforts to resolve the matter with Ocwen; one might readily say that Ocwen's passive resistance is as outrageous as *Rugg*'s creditor's affirmative acts. Under these circumstances, the Court finds that Mr. Llewellyn has adequately state a claim for outrageous conduct under Colorado law. Whether he can ultimately prove sufficiently outrageous and intentional conduct is a question that will await a summary judgment motion.

2. FCRA claim

Mr. Llewellyn asserts that Ocwen violated the FCRA, 15 U.S.C. s. 1681s-2(b).

Specifically, he contends that Ocwen "furnished inaccurate credit information to several credit reporting agencies"; that "upon inquiry by [him], [Ocwen] willfully and/or negligently failed to acknowledge the dispute"; that Ocwen "willfully and/or negligently failed to conduct a reasonable or timely investigation of the contested report after being notified by [Mr. Llewellyn]"; and that Ocwen "failed to report the results of any reinvestigation to the various consumer reporting agencies." *Docket* # 1, ¶ 34-37.

Ocwen raises a single argument with regard to this claim: that § 1681s-2(b) imposes a duty to investigate and modify disputed credit information only when the request to do so comes from a credit reporting agency, not from the subject of the information him/herself. For purposes of discussion here, § 1681s-2 sets out two general obligations for persons furnishing credit information. The first set of duties are found in subsection (a) and apply to persons that report credit information to credit reporting agencies in the first instance – among other things, "A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A). The second set of duties are found in subsection (b) and relate to the obligations of persons furnishing credit information once notified that the subject of that information disputes its accuracy: "After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency," the person reporting the information conduct an investigation into the dispute and rectify any errors. 15 U.S.C. § 1681s-2(b)(1)

Courts have regularly found that although § 1681s-2(a) requires the reporting of accurate information, the FCRA creates no private right of action in situations where incorrect information has been reported in violation of that duty. *Tilley*, 2009 WL 790208 at *5, citing

*Lowe v. Surpas Res. Corp.,* 253 F.Supp.2d 1209, 1253 (D.Kan. 2003); *Pinson*, 2009 WL 595991

at *4, citing *Gorman,* 552 F.3d at 1014; *Green v. RBS Nat. Bank,* 288 Fed.Appx. 641, 642 (11th

Cir. 2008) (unpublished). Moreover, courts have nearly uniformly concluded that the duty to

investigate disputes under § 1681s-2(b) to arise only when the person furnishing the information

is notified of the dispute by a credit reporting agency, not when the borrower directly contacts

the person furnishing the information.[7] *Pinson, id.* ("notice of a dispute received directly from

the consumer does not trigger furnishers' duties under subsection (b)").

      Here, Mr. Llewellyn's Complaint does not allege that Ocwen received notice of Mr.

Llewellyn's dispute regarding the information from a credit reporting agency; indeed, the

Complaint clearly predicates the FCRA claim on the allegation that Ocwen "failed to conduct a

reasonable or timely investigation . . . after being notified <u>by the Plaintiff</u>." *Docket* # 1, ¶ 36.

Nowhere in the Complaint does Mr. Llewellyn allege that he notified a credit reporting agency

of his dispute over Ocwen's information, and that the credit reporting agency supplied Ocwen

with notice of that dispute.  Without such an allegation, Mr. Llewellyn fails to state a claim for

violation of the FCRA.  *See e.g. Downs v. Clayton Homes, Inc*., 88 Fed.Appx. 851, 853-54 (6th

Cir. 2004) (unpublished).

---

[7]     This reasoning follows from the text of the statute.  15 U.S.C. s 1681s-2(b)(1) creates a
duty to investigate "[a]fter receiving notice [of a dispute] pursuant to section 1681i(a)(2) of this
title."  15 U.S.C. § 1681i(a)(2) requires that, within 5 days of receiving notice of a dispute as to
information it is reporting, "a consumer reporting agency . . . shall provide notification of the
dispute to any person who provided any item of information in dispute."  Thus, the text of the
statute clearly provides that the notice of a dispute that creates a duty to investigate under
§1681s-2(b) is a notice that comes from a credit reporting agency, not the borrower himself.  The
logic underlying this somewhat roundabout requirement is that Congress intended the credit
reporting agencies to act as a "filter," rejecting frivolous challenges to the accuracy of reported
information, and passing on arguably meritorious disputes to the individuals providing the
information for further investigation.  *Nelson v. Chase Manhattan Mortgage Co.,* 282 F.3d 1057,
1060 (9th Cir. 2002).

3. <u>FDCPA claim</u>

Finally, Mr. Llewellyn alleges that Ocwen violated the FDCPA, 15 U.S.C. § 1692e(8), by "communicat[ing] or threaten[ing] to communicate to consumer credit reporting agencies false information" concerning his credit worthiness, and by "fail[ing] to communicate the dispute to the same consumer credit reporting agencies," despite being notified by Mr. Llewellyn that his disputed the debt.

15 U.S.C. § 1692(e)(8) provides that "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," including "communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." Ocwen raises two arguments regarding this claim: (i) that it is not a "debt collector" as that term is defined in the FDCPA, 15 U.S.C. § 1692a(a)(6)(F)(iii), and (ii) that the claim is untimely.

Turning to the first argument, the FDCPA's prohibitions apply only to persons meeting the statutory definition of "debt collector." 17 U.S.C. § 1692a(6)(F) (iii) excludes from the statutory definition "any person collecting or attempting to collect any debt owed or due [to himself or another] to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." Ocwen alleges that the Allstate/Shearson loan was not in default when Ocwen obtained it, thereby excluding Ocwen from the definition of "debt collector." In the abstract, this argument has some merit. Perhaps, Ocwen acquired the loan for servicing before Mr. Llewellyn attempted to refinance it. Alternatively, Mr. Llewellyn's underlying premise in this action is that the loan was never in default; rather, it was paid off in full at the moment of delivery of the funds to Mr. Rider. The refinancing occurred before

Ocwen engaged in any of the actions described in the Complaint. If the loan was paid off (i.e. not in default), then it matters not when Ocwen "obtained" the loan – whenever that date was, the loan was not in default, and thus, Ocwen cannot be considered a "debt collector" under 15 U.S.C. s 1692a(6)(F)(iiii).

However, as mentioned above, the Complaint is susceptible to a reading that Mr. Llewellyn contends that Ocwen never "obtained" the right to collect on the loan in any capacity – in essence, that Ocwen was engaging in entirely rogue attempts to collect a debt it had no legal right to, even if there had been a balance owing. *Docket* # 1, p. 2, third para. ("Ocwen [and others] at no time were lawful owners and holders of the Allstate loan and mortgage and failed to produce any documents validating their claimed position"); ¶ 16 (Ocwen "wrongfully claim[ed it] was owner and holder of the Allstate note"). If Mr. Llewellyn asserts that Ocwen never "obtained" the loan in any capacity, Ocwen's defense that it is not a debt collector because the loan was not in default when it "obtained" it is a non-sequitur. Because the Court reads the Complaint in the light most favorable to Mr. Llewellyn at this point, the Court finds that the Complaint adequately overcomes Ocwen's argument that it was not acting as a "debt collector."

Ocwen's remaining argument is that the FDCPA claims are untimely. The FDCPA contains a one-year statute of limitations. 15 U.S.C. s. 1692k(d). An FDCPA claim accrues at the time the false or misleading communication is made. *See e.g. McCready v. Harrison*, 67 Fed.Appx. 971, 974 (7th Cir. 2003) (unpublished); *Maloy v. Phillips*, 64 F.3d 607, 608 (11th Cir. 1995);*Schuh v. Druckman & Sinel, LLP*, ___ F.Supp.2d ___, 2009 WL 129851 (S.D.N.Y. Feb. 2, 2009). However, the Complaint does not contain any allegations as to the dates upon which Ocwen engaged in any communications, nor does it specifically refer to the contents of any particular document representing such communications. Where a complaint does not disclose

sufficient information to permit assessment of the accrual or running of the statute of limitations, the Court would be required to engage in factfinding to determine the issue. *See Cosgrove v. Kansas Dept. of Social and Rehabilitative Servs.*, 162 Fed.Appx. 823, 827-28 (10th Cir. 2006) (unpublished). As stated above, engaging in factfinding outside the contours of the Complaint itself is not permitted when adjudicating a Rule 12(b)(6) motion. To the extent Ocwen requires extrinsic evidence to establish the accrual and running of the statute of limitations, it may present that argument in an evidentiary motion under Fed. R. Civ. P. 56.[8]

Accordingly, Ocwen's Motion to Dismiss is granted with regard to the FCRA claim, and denied with regard to the outrageous conduct and FDCPA claims.

### C. Nomura's motion

Next, the Court considers Nomura's motion, which challenges Mr. Llewellyn's failure to plead specific acts by Nomura, and, in the alternative, incorporates all of Ocwen's arguments.

Ascertaining precisely what the Complaint alleges involving Nomura is complicated by the fact that, originally, a number of corporate entities with similar names were names as separate parties to this suit and the Complaint is not always clear in which entities are being identified by short form names. In addition, the Complaint appears at times to be internally inconsistent. The Complaint refers to "Nomura"[9] as a "servicing arm" of "OCWEN."[10] *Docket #*

---

[8]     The Court is confident that Mr. Llewellyn is scrupulously abiding by his obligations under Fed. R. Civ. P. 11(b)(2) and (3), and if he were to conclude that he cannot demonstrate the communication of a false or misleading statement by Ocwen occurring on or after January 29, 2007, he will immediately take appropriate action to avoid the possibility of sanctions.

[9]     Whether it means current Defendant Nomura Credit and Capital, Inc. or dismissed Defendant Nomura Securities International, Inc. is unclear.

[10]     Whether it means former Defendant Ocwen Financial Corporation or current Defendant Ocwen Loan Servicing, LLC is also unclear.

1, p. 2, second para. At other times, the Complaint offers the apparently inconsistent position that Ocwen (*i.e.* Ocwen Loan Servicing, LLC) is a "subsidiary" of Nomura. Docket # 1, ¶ 17. Many of Mr. Llewellyn's allegations appear to be directed collectively at all layers of a corporate hierarchy, holding all parent entities responsible for actions of its subsidiaries or successor corporations liable for the acts of their predecessors without adequate factual assertions explaining his decision to disregard corporate forms. In many respects, the Complaint is pled largely in conclusory terms, offering little more than labels and formulaic recitation of the elements. *Twombly*, 127 S.Ct. at 1964-65.

Nevertheless, taking the Complaint in the light most favorable to Mr. Llewellyn, the Court finds that the key allegations in the Complaint, found in paragraph 17, implicate Nomura as well as Ocwen. The paragraph expressly notes that Nomura, as well as Ocwen, sent "late payment reports" concerning Mr. Llewellyn to credit reporting agencies. That paragraph also alleges that Ocwen was notified of Mr. Llewellyn's dispute of the debt, and that Ocwen was a corporate subsidiary of Nomura. Although doing so requires a nearly Olympian leap in logic, the Court will infer from this allegation that Mr. Llewellyn asserts that Nomura, being charged with its subsidiary Ocwen's knowledge of the dispute, was under an independent obligation to take action to resolve the dispute.

In essence, the allegations against Nomura are effectively identical to the allegations against Ocwen. Accordingly, the discussion above regarding Ocwen's motion applies with equal force to Nomura's motion. Thus, Nomura's motion is denied insofar as the outrageous conduct claim and FDCPA claims are sufficiently pled, but Nomura is entitled to dismissal of the FCRA claim.

**D. CM&S's motion**

19

Finally, the Court turns to CM&S's motion.  As noted above, the Complaint asserts only that CM&S commenced foreclosure proceedings against Mr. Llewellyn on a nonexistent debt.  The Complaint alleges that such conduct constitutes outrageous conduct and constitutes a violation of the FDCPA, 15 U.S.C. § 1692e(5) (a debt collector shall not "threat[en] to take any action that cannot legally be taken").

With regard to the outrageous conduct claim, CM&S argues that Mr. Llewellyn has failed to allege sufficiently outrageous conduct.  Taken in the light most favorable to Mr. Llewellyn, the Complaint essentially alleges that CM&S attempted to foreclose upon property for which there was no debt owing.  The Court is comfortable that in light of the comparatively lesser conduct found to state a claim for outrageous conduct in *Rugg*, a reasonable factfinder could find such conduct to be intolerable and outrageous.

CM&S argues that, with regard to the FDCPA claim, the claim is untimely, that the CM&S never actually threatened litigation, and that the Complaint admits that the loan was not actually repaid.  The Court rejects the final contention out of hand for the reasons stated above.

With regard to the argument that CM&S did not actually "threaten" an improper foreclosure, but  instead, simply commenced an improper foreclosure action, the Court is reluctant to read the statute to permit a party to do the improper act that it is forbidden from threatening to do.  In any event, the operative portion of the statute is 15 U.S.C. § 1692e(a)'s prohibition of the "use [of] any false, deceptive, or misleading representation or means" to collect a debt.  By the statute's own terms, the actions listed are part of a nonexclusive catalog of conduct that contravene this general principle "[w]ithout limiting the general application of the foregoing."  Arguably, improper initiation of a foreclosure action involves a false representation that the debt is in default.

20

Thus, the Court is left with the argument that Mr. Llewellyn's FDCPA claim against CM&S is untimely. As discussed above, the FDCPA contains a one-year statute of limitations. 15 U.S.C. s. 1692k(d). Where, as here, the alleged violation is the improper commencement of a lawsuit seeking to collect the debt, the FDCPA claim accrues when the debtor is served with process in that suit. *Johnson v. Riddle*, 305 F.3d 1107, 1113-14 (10th Cir. 2002). However, the Complaint does not contain any allegations as to the dates upon which CM&S engaged in the conduct at issue, nor does it attach or incorporate by reference any documents that would clearly establish the date upon which CM&S served it with process in the foreclosure suit.[11] Once again, where a complaint does not disclosure sufficient information to permit assessment of the accrual or running of the statute of limitations, consideration of a statute of limitations defense must await a properly-supported Rule 56 motion.

Accordingly, CM&S's motion is denied in its entirety.

**E. Leave to Amend**

Mr. Llewellyn requests that, to the extent the Court grants the Defendants' motions in whole or part, he be granted leave to amend his Complaint to cure any deficiency. Mr.

---

[11]     CM&S's response contends that the only action CM&S took to foreclose on the loan was to send a letter to Mr. Llewellyn on or about September 7, 2006. The Court declines to consider the letter or its contents, insofar as the Complaint makes no specific mention of receiving correspondence from CM&S. Rather, the only allegations in the Complaint with regard to CM&S are that CM&S "initiated foreclosure proceedings," *Docket* # 1, ¶ 16, and that later, "foreclosure proceedings continued." *Id.*, ¶ 17.

     CM&S appears to allege in its response that these statements are simply untrue. Because the record is not sufficiently developed at this time, the Court makes no findings as to whether Mr. Llewellyn can show that, in fact, CM&S did indeed "commence" foreclosure proceedings. Nevertheless, the Court again advises Mr. Llewellyn that the allegations in the Complaint are subject to Fed. R. Civ. P. 11(b)(3), and if he lacks any reasonable belief that CM&S actually "initiated" and "continued" "foreclosure proceedings," and did not simply write to him threatening to do so, the Court will consider a request for imposition of Rule 11 sanctions.

Llewellyn's responds that he can allege that he also notified the credit reporting agencies of his disputes as to the accuracy of the information, and that, presumably, the reporting agencies complied with their statutory obligation to forward those disputes to Ocwen and Nomura, thereby rescuing the FCRA claim. Thus, it is appropriate to grant leave to amend. Within 14 days of the date of this Order, Mr. Llewellyn may file an Amended Complaint that adequately repleads the FCRA claim. The Court does not intend this leave to replead to permit Mr. Llewellyn to modify or amplify any of the other claims in this action; to the extent he believes that claims other than the FCRA claim could benefit from repleading, he may separately file a properly-supported motion under Fed. R. Civ. P. 15(a).

## CONCLUSION

For the foregoing reasons, Ocwen's Motion to Dismiss (# 47) is **GRANTED, IN PART**, insofar as the FCRA claim against Ocwen is **DISMISSED** for failure to state a claim, and **DENIED IN PART**, insofar as the Complaint adequately states a claim for outrageous conduct and violation of the FDCPA. CM&S's Motion to Dismiss (# 53) is **DENIED**. Defendant Nomura's Motion to Dismiss (# 61) is **GRANTED IN PART**, insofar as the FCRA claim against Nomura is **DISMISSED** for failure to state a claim, and **DENIED IN PART**, insofar as the Complaint adequately states a claim for outrageous conduct and violation of the FDCPA Mr. Llewellyn may file an Amended Complaint, on the terms set forth above, within 14 days of the date of this Order.

Dated this 30th day of March, 2009

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge

22