# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No.08-cv-00179-MSK-KLM

GLEN LLEWELLYN,

        Plaintiff,

v.

ALLSTATE HOME LOANS, INC., d/b/a ALLSTATE FUNDING;

OCWEN LOAN SERVICING, LLC;

NOMURA CREDIT AND CAPITAL, INC.;

NNC SERVICING, LLC

CASTLE, MEINHOLD & STAWIARSKI, LLC,

        Defendants.

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS OCWEN LOAN SERVICING, LLC AND NOMURA CREDIT AND CAPITAL, INC.'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Glen Llewellyn ("Mr. Llewellyn" or "Llewellyn"), by Counsel John N. McNamara, Jr., of McNamara Law Firm, P.C., hereby respectfully submits his response to Defendants Ocwen Loan Servicing, LLC ("Ocwen") and Nomura Credit and Capital, Inc.'s ("NCCI") (collectively the "Ocwen Defendants") Motion for Summary Judgment as follows:

## I.     PRELIMINARY STATEMENT

Ocwen begins its mean-spirited Motion in the same fashion Ocwen treated

Llewellyn throughout June 2006 to February 2007 -- by unjustifiably and caustically

attacking Llewellyn.  Instead of taking blame for its own colossal blunders -- blunders

that tanked Llewellyn financially, physically and mentally -- Ocwen points its

accusatory finger at him.  Indeed, Ocwen suggests that Llewellyn single-handedly

caused the demise of the entire United States banking system, in effect, labeling him as a

"poster boy" for the whole demise.  Ocwen's caustic remarks ignore that it financially

prospers by servicing chiefly subprime mortgages, but obviously not very carefully

judging by the thousands of customer complaints lodged against Ocwen as shown by a

cursory analysis of the results of a Google search of Ocwen.  Indeed, Ocwen and its

foreclosure attorneys should carry the MacBeth bloody stain of rogue loan and debt

collection tactics, the "spot" of which the Ocwen Defendants cannot simply wash away

through their Motion.

Llewellyn constitutes yet another consumer victimized by Ocwen's reckless

behavior, and then wrongfully villainized.  Specifically, on March 7, 2006, Llewellyn

purchased the Coolidge Property for $559,980. In connection with this purchase,

Llewellyn executed two notes, one in the amount of $447,984 (the "Loan").  Allstate

Home Loans, Inc., dba Allstate Funding ("Allstate") was the lender on the Loan, and

Equity Pacific, LLC ("Equity Pacific"), was the servicer on the Loan.  Llewellyn

refinanced the Loan in June 2006, and prior to the refinancing, Allstate/Equity Pacific

sold the servicing rights to the Loan to Ocwen.  The refinancing proceeds were sent to

Equity Pacific on June 14, 2006, within the 15 day grace period set forth in the Note, and

within the 60 day grace period set forth in the Federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq*. Ocwen, however, did not itself receive these refinance proceeds. When Llewellyn did not make the June 1, 2006 and subsequent payments (as the Loan had been refinanced), Ocwen consequently declared Llewellyn to be in default on the Loan. Llewellyn then provided Ocwen with documents conclusively showing that the Loan was paid off by the refinancing proceeds, including the HUD Settlement Statement. (Ocwen already had the title report on the Coolidge Property). Thus, Ocwen knew, or should have known, back in August 2006, if not June 2006, based on uncontroverted documents, that the Loan on the Coolidge Property was paid off in the refinancing.

Instead of accepting this inescapable conclusion, Ocwen reported on Llewellyn adversely to the Credit Bureaus; repeatedly insisted that Llewellyn provide still more proof of the Loan payoff; refused to correct the adverse credit reports; and proceeded to destroy Llewellyn financially, physically and mentally. Particularly egregious, Ocwen reported to the Credit Bureaus that Llewellyn was 90 days past due as of September 30, 2006, and that foreclosure have been initiated, yet at the same time retained a $10,876.38 payment from Allstate (constituting three monthly mortgage payments under the Loan), and concealed this telling information from Llewellyn. Moreover, Ocwen concealed from Llewellyn documents pertaining to Allstate's $10,876.38 payment on the Loan, and Llewellyn obtained this evidence only after the Court ordered Ocwen to produce these documents in connection with Llewellyn's motion to compel. Ocwen did not cause the adverse credit reporting to be removed until February 2007. By then, Llewellyn was damaged irreparably.

Ocwen's accusatory and venomous attacks on Llewellyn at this juncture are even more startling than they are reprehensible, considering that its own attorneys, back on December 5, 2006, represented that its "client has indicated that this loan should have been paid-in-full," and that "Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action."  Moreover, Ocwen's attacks on Llewellyn are belied by the representations made by its principal, NCC Servicing, on January 29, 2007, that it requested a correction to Llewellyn's Credit Bureau report, admitting that "we have received confirmation that this error was not a direct result of any wrongdoing on the part of Glenn Llewellyn."  Ocwen's attacks on Llewellyn also ignore its own February 15, 2007 letter to Llewellyn requesting an update to his credit report and "sincerely apologiz[ing] for any inconvenience cause."

As shown herein, because there is a genuine issue of material fact in dispute with respect to all of Llewellyn's claims against Ocwen, and with respect to Ocwen's statute of limitations affirmative defense, this Court should deny the Ocwen Defendants' Motion.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ("SOF")

**Llewellyn's Military Career Is Cut Short by Crohn's Disease.**

1.   Long before he began building his successful home real estate investment portfolio, Llewellyn served his country in the military.  Specifically, Llewellyn proudly enlisted in the United States Marine Corps in December 1979.  Deposition of Glen Llewellyn, "Llewellyn Dep.," at 28:1-8, 123:9-16.[1]  Llewellyn's service as a Marine, however, was unfortunately cut short after Llewellyn was diagnosed with Crohn's

---

[1] A copy of the pages and Exhibits of Llewellyn's Deposition cited to herein are attached hereto as **Exhibit A**.

4

disease, and he was honorably discharged from the Marine Corps in August 1981.
Llewellyn Dep., at 28:9-12, 123:17-23.  The debilitating effect of Crohn's disease not
only adversely impacted Llewellyn physically, but mentally as well, and Llewellyn
suffered depression associated with Crohn's disease.  Llewellyn Dep., at 287:4-9, 245:10-
11, 246:1-3.

2.      Unfortunately, Llewellyn's health related problems did not end with
Crohn's disease, and he developed testicular cancer in or about 1997.  The testicular
cancer moved into his lungs, and Llewellyn received chemotherapy in 1998 and 1999.
Llewellyn Dep., at 244:24-246:9, 284:19-23.  During these nauseating chemotherapy
sessions throughout 1998 and 1999, Llewellyn, predictably, suffered depression and was
prescribed psychiatric medication.  Llewellyn Dep., at 246:10-20, 247:11-13.  Llewellyn
ultimately triumphed over his two-year cancer battle.  Llewellyn's cancer-related
depression abated, and he ceased taking psychiatric medication -- until Ocwen destroyed
both his credit and real estate investments in 2006, discussed *infra*. Llewellyn Dep., at
246:10-247:18.  Also as discussed *infra*, 247:9-18, the depression resulting from Ocwen's
destruction of Llewellyn's credit and realty investments, in turn, caused Llewellyn to
suffer deleterious physical health consequences *viz*., dangerous flare-ups of his Crohn's
disease and diabetes.

## Llewellyn Overcomes His Health-Related Problems and Creates a Thriving Realty Investment Portfolio.

3.      As noted above, before Ocwen, Llewellyn's Crohn's disease stabilized, and
he overcame testicular cancer.  Llewellyn's depression resulting from the chemotherapy
and testicular cancer abated, and he ceased taking psychiatric medication.  Llewellyn

overcame his health-related problems and, without looking back, he became successful through his real estate investment portfolio.

**Llewellyn's Contracting Experience.**

4.     Llewellyn acquired his first contracting experience at an early age. Specifically, Llewellyn performed construction work in high school working for apartment buildings.  During this experience, Llewellyn did "a little bit of everything.  It was from the ground up except for the concrete." Llewellyn Dep., at 130:1-9.  Llewellyn ultimately became a foreman. Llewellyn Dep., at 130:10-15.

**Llewellyn Joins Castlebrook Construction.**

5.     In or about 1996, after his stint in the Marine Corps, and after working a number of different jobs, including work in an elevator business, a tire business, and a furniture business, Llewellyn began working for Castlebrook Construction, a home construction company formed by his brother in 1995.  Llewellyn Dep., at 61:7-21, 124:1-25, 126:20-25, 128:22-129:16, 246:13-14.  At Castlebrook Construction, Llewellyn, who had a number of certifications for construction, started off managing the construction crews.  Llewellyn Dep., 23:19-25:24, 131:8-132:16.

6.     When Llewellyn joined Castlebrook Construction, its projects were investor owned, as Llewellyn's brother did not have the financial wherewithal and credit to purchase the properties on his own. Llewellyn Dep., at 133:13-134:11.  Castlebrook Construction's investors would generally give Castlebrook Construction 50% of the profits. Llewellyn Dep., at 134:19-21.  Llewellyn's brother, however, wanted to discontinue the investor approach and, instead, use Llewellyn, who had financial clout and good credit, to purchase the various properties. Llewellyn Dep., at 135:12-136:25.

Indeed, it was chiefly because of Llewellyn's exemplary credit that Castlebrook

Construction hired Llewellyn. Llewellyn Dep., at 134:9-11,137:19-138:23.

7.       In or about 2004, Castlebrook Construction began operating without

investors, relying on Llewellyn to purchase the properties. Llewellyn Dep., at 137:6-10.

In 2004, Llewellyn received his general contractor license in the State of Colorado and

became President of Castlebrook Construction. Llewellyn Dep., at 24:10-25:21, 137:11-

13, 197:3-4.  Llewellyn quickly rose to the top of Castlebrook Construction largely

because he was able to obtain financing through his strong credit. Llewellyn Dep., at

133:17-22, 137:19-138:11.

**Llewellyn Acquires Properties Under Construction and Begins Building Equity.**

8.       Llewellyn, armed with his strong credit, began building his financing

portfolio and equity. Llewellyn Dep., at 137:2-138:9, 151:7-152:18.  Llewellyn's projects

consisted of homes under construction, with the exception of two new builds which had

unfinished basements that Llewellyn would finish and, thus, considerably increase the

price per square foot.  Llewellyn Dep., at 152:9-18.  Between 2003 and 2007, in addition

to a property on Coolidge Avenue in Denver, Colorado ("Coolidge Property") that

Llewellyn purchased on March 7, 2006, Llewellyn also purchased eight properties in his

own name, located in Denver, Colorado.[2]  Llewellyn was personally liable for the debt

---

[2] These eight properties were located at 651 Race Street (Llewellyn Dep., at 219:12-221:20, 224:1-225:10, **Exhibit 30** thereto (**Exhibit A-2** hereto) (warranty deed dated December 1, 2003 (Llewellyn purchased this property with his brother, but bought his brother out during the refinance on May 26, 2005)); 7329 S. Ukraine Street (Llewellyn Dep., at 210:8-211:6, **Exhibit 23** thereto (**Exhibit A-3** hereto) (warranty deed dated December 19, 2005); 720 S. Gaylord Street (Llewellyn Dep., at 229:1-230:8, **Exhibit 35** thereto (**Exhibit A-4** hereto) (warranty deed dated December 21, 2005); 6627 Gallup St. (Llewellyn Dep., at 237:13-239:4, **Exhibit 44** thereto (**Exhibit A-5** hereto) (warranty deed dated March 10, 2006); 572 Adams Street (Llewellyn Dep., at 198:5-199:25, **Exhibit 15** thereto (**Exhibit A-6** hereto)  (warranty deed dated January 20, 2006); 502 South Franklin (Llewellyn Dep., at 232:9-24, **Exhibit 38** thereto (**Exhibit A-7** hereto) (warranty deed dated March 29, 2006);  777 S. High Street (Llewellyn Dep., at 315-317, **Exhibit 51** thereto (**Exhibit A-**8 hereto) (warranty deed dated March 31, 2006); and 2122 S. Franklin Street (Llewellyn

associated with the purchase of each of these properties.  Llewellyn Dep., at 195:14-196:2.  The equity in all of the properties Llewellyn purchased exceeded one half million dollars.  Llewellyn Dep., at 151:7-10.[3]  Prior to purchasing the Coolidge Property, the property at issue in this case, Llewellyn had purchased four other properties in Colorado.  Deposition of Candace Saport, "Saport Dep.," at 63:8-64:7; a copy of the pages and Exhibits of Ms. Saport's Deposition cited to herein and attached hereto as **Exhibit B**.  At this time, Llewellyn was attempting to acquire investment/rental income properties.  Saport Dep., at 63:23-64:1.

## Llewellyn's Credit History Is Exemplary before Ocwen Torpedoes Both It and Llewellyn's Real Estate Investment Portfolio.

9.	Between 2004 and March 2006, when Llewellyn had purchased the five Denver properties culminating with the purchase of the Coolidge Property, Llewellyn's credit was exemplary.  During this period, the three major credit bureaus reported on Llewellyn's credit score as follows:

- February 15, 2006

    o   Equifax:	637

    o   Transunion:	702

    o   Experian:	698

        ▪   Notes:

            • Ocw 435, "Collection Accounts" – No Record Found

            • Ocw 436, "Derogatory Summary" – nothing negative

---

Dep., at 240:12-241:18, **Exhibit 46** thereto (**Exhibit A-9** hereto) (warranty deed dated September 15, 2006); *see also*, Llewellyn Dep., at 180:12-23.

[3] Before 2004, Llewellyn also purchased properties outside of Colorado, including four properties in Galveston, Texas.  Llewellyn Dep., at 183:1-24.  Llewellyn also 10 acres of recreational use property located in Plantersville, Texas. Llewellyn Dep., at 190:10-192:6.

- February 24, 2006

  - Equifax:         637

  - Transunion:    702

  - Experian:       698

    - Notes:          Nothing of interest

- July 19, 2006

  - Equifax:         744 and 628

  - Transunion:    708

  - Experion:       684

Copies of the credit reports pertaining to Mr. Llewellyn are attached as **Attachment C-2** to the Declaration of John McNamara, **Exhibit C**, hereto.

## Llewellyn Purchases the Coolidge Property in March 2006.

10.     On March 7, 2006, Llewellyn purchased the Coolidge Property as an investment for $559,980.  (*See*, Warranty Deed, dated March 7, 2006, Llewellyn Dep., at 159:6-11, **Exhibit 1** thereto (**Exhibit A-10** hereto); Saport Dep., at 127:14-16.  In connection with this purchase, Llewellyn executed an adjustable rate note dated March 7, 2006, in the amount of $447,984 (the "First Mortgage Loan" or "Loan") (Llewellyn Dep., at 49:5-12, 160:18-23, **Exhibit 2** thereto) (**Exhibit A-11** hereto), securing a first deed of trust (Llewellyn Dep., at 38:2-13, **Exhibit 3** thereto) (**Exhibit A-12** hereto); and an adjustable rate note dated March 7, 2006, in the amount of $111,996 ("Second Mortgage Loan"), securing a second deed of trust (Llewellyn Dep., at 49,:13-20161:10-18, **Exhibit 11** thereto) (**Exhibit A-13** hereto).  The Coolidge Property, which had an unfinished

basement and lacked landscaping, was priced under market by approximately $100,000.

Llewellyn Dep., at 162:3-163:10.

**In Purchasing the Coolidge Property, Llewellyn Uses the Mortgage Brokerage Services of Ms. Saport, Silver Creek Mortgage.**

11.     In purchasing the Coolidge Property, Llewellyn used the loan originating

services of Ms. Candace Saport, a mortgage broker who, along with her husband, owned

Silver Creek Mortgage and Financial Services, Inc., a mortgage brokerage company,

("Silver Creek") which, at the time, was closing approximately 40 loans a month.

Llewellyn Dep., at 44:1-5, Saport Dep., at 32:3-4, 38:15-24, 43:4-13.  Ms. Saport had

previously closed the four Colorado property loans for Llewellyn between 1999 and

2004. Saport Dep., at 63:8-13.

**Allstate Is the Lender on the Coolidge Property First and Second Mortgage Loans, and Equity Pacific Has the Servicing Rights to These Loans.**

12.     As reflected in the two adjustable rate notes and corresponding deeds of

trust (Llewellyn Dep., **Exhibits 2**, **3** and **11** thereto) (**Exhibits A-11, A-12** and **A-11**

hereto), the lender for the First and Second Mortgage Loans on the Coolidge Property

was Allstate Home Loans, Inc., dba Allstate Funding ("Allstate").  The notes further

reflect that payments under the notes were to be made to Equity Pacific Mortgage, Inc.

In connection with the First Mortgage Loan, Llewellyn and Allstate signed a RESPA

Servicing Disclosure dated March 7, 2006.  The RESPA Servicing Disclosure sets forth

the "Transfer Practices and Requirements" in connection with the securing of the Loan,

and provides, *inter alia*, that, "[i]f the servicing of the loan is assigned, sold, or

transferred to a new servicer you must be given written notice of that transfer."  The

Disclosure further provides that, "Notices must contain certain information.  They must

contain the effective date of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone number of a person or department for both your present servicer and your new servicer to answer your questions." Of particular significance here, the Disclosure provides that "[d]uring the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you." A copy of the RESPA Servicing Disclosure is attached hereto as **Attachment C-3** to the Declaration of Mr. McNamara.

13.     Allstate Funding was the mortgage banking component of Allstate Home Loans.  Deposition of Michael Barron "Barron Dep.," at 35:7-15; a copy of the pages and Exhibits of Mr. Barron's Deposition cited to herein are attached hereto as **Exhibit D**. Allstate Funding funded loans through its warehouse lines of credit *viz.*, IndyMac Bank and Impac Companies, as opposed to through its own capital or cash reserves. Barron Dep., at 39-40; Deposition of Kevin Rider, "Rider Dep.," at 39:19-23, a copy of the pages and Exhibits of Mr. Rider's Deposition cited to herein are attached hereto as **Exhibit E**. Allstate Funding would then pool the mortgage loans and sell the pooled loans to investors on the secondary market. Barron Dep., at 38:11-15.  Allstate Home Loans, in contrast, was the retail origination side of the Allstate companies, and would broker the loan. Barron Dep., at 35:9-15. Allstate Home Loans also was an interim service provider, meaning that it would only service the mortgage loans while they were on the warehouse line, that is, before Allstate Funding pooled its loans, and would not service the loans

after they were sold to investors on the secondary market. Barron Dep., at 45:25-46:10; 105:12-23.

14.     In April 2005, Allstate acquired Equity Pacific, Inc., a wholesale lender formed by Kevin Rider to serve as the marketing arm for Allstate Funding.  Rider Dep., at 23:18-24:15, 33:8-34:3, 35:3-10, 41:1-42:17.[4]  Specifically, Equity Pacific, Inc. generated business relationships with mortgage brokers on behalf of Allstate; performed underwriting, processing and funding services; and sold loans on the secondary market. Rider Dep., at 23:23-25:5; 41:10-42:1.  Equity Pacific, Inc. would serve as a platform to fund loans generated by mortgage brokers. Rider Dep., at 27:21-25.  Equity Pacific, Inc.'s funding source was Allstate Funding's warehouse lines of credit, and all loans generated by Equity Pacific, Inc. were closed in Allstate Funding's name. Rider Dep., at 39:19-23, 42:13-43:16.

15.     Rider also owned Equity Pacific Mortgage LLC ("Equity Pacific"), a company that provided interim servicing (servicing of the loan from the time it is funded until the time it is sold to the end investor). Rider Dep., at 28:1-29:1.  Allstate did not acquire Equity Pacific. Rider Dep., at 31:8-34:10. Equity Pacific provided the interim servicing for the First and Second Mortgage Loans.  Rider Dep., at 96:17-25, 150:5-25, **Exhibit 5** thereto (**Exhibit E-2** hereto) (Allstate servicing disclosure).

**Shearson Financial Network, Inc. Acquires Allstate.**

16.     In June 2006, Shearson Financial Network, Inc. ("Shearson"), a mortgage banker (a company that originates mortgage loans to borrowers and then sells those loans

---

[4] Barron testified that he did not believe that Allstate acquired Equity Pacific, Inc.  Instead, he believes that Equity Pacific, Inc. was a net branch of Allstate. Barron. Dep., at 55:2-58:8.  A net branch, according to Mr. Barron, is actually owned by the operator itself (in this case, Rider) and uses the capital facilities, such as the warehouse lines of credit, to fund its loans. Barron. Dep., at 58:5-14.

to investors on Wall Street), acquired Allstate Funding.  Rider Dep., at 36:13-25, 37:18-38:4; Barron Dep. at 24:2-15.  Barron was the CEO of Shearson from 2003 through July 2007. Barron Dep. at 23:12-24:5, 52:11-12.Shearson Home Loans was a mortgage broker and subsidiary of Shearson. Barron Dep., at 52:22-54:24.  As a mortgage broker, Shearson Home Loans originated loans from borrowers and then brokered them to various lending institutions in consideration for a brokerage fee. Barron. Dep., at 54:12-17.

**Allstate Sells the First Mortgage Loan to NCCI, and the Servicing Rights to the Loan Are Transferred from Equity Pacific to Ocwen.**

17.     On or about May 15, 2006, the servicing rights to the First Mortgage Loan were transferred from Equity Pacific to Ocwen.  Saport Dep., **Exhibit 53** thereto (**Exhibit B-2** hereto) (May 17, 2006 letter from Ocwen to Llewellyn, Notice of Assignment, Sale or Transfer of Servicing Rights).  In its May 17, 2006 letter to Llewellyn, Ocwen notes that Llewellyn's present servicer is Allstate Funding, and provides Allstate Funding's customer service department telephone number.  Notably, in its May 17, 2006 letter, Ocwen also states that it "is a debt collector attempting to collect a debt and any information obtained will be used for that purpose." [5]

**Llewellyn Refinances the Coolidge Property.**

18.     On or about April 18, 2006, Llewellyn, using Ms. Saport's mortgage broker services, initiated the refinancing of the First and Second Mortgage Loans. Saport Dep., at 181:7-182:11, Exhibit 17 thereto (Exhibit B-3 hereto) (Borrower Signature Authorization).  During this time, financing approval could be obtained as quickly as two

---

[5] Mortgage transfers are a common part of the mortgage industry, and such transfers can happen the moment after the loan closes. Saport Dep., at 62-63; 155.

weeks from the time the borrower's application materials were sent to the mortgage broker. Saport Dep., at 55:13-18; 181:10-13.

19.     There is nothing sinister in refinancing mortgage loans.  Mr. Barron, the CEO of Shearson during this time period, testified that people in the refinance business would routinely refinance mortgage loans in less than 90 days from the original loan because they could make money and could turn loans quickly.  He further testified that there are a lot of reasons why loans are refinanced.  Barron Dep., at 123:11-124:16. Here, Llewellyn refinanced the First and Second Mortgage Loans through Wyman Funding to obtain a lower interest rate and to obtain $116,000 cash proceeds which he used to purchase construction equipment from a general contractor, including scaffolding and concrete equipment.  Llewellyn Dep., at 167:12-19, 169:22-171:5.[6]

**Equity Pacific Provides Its Payoff Demand for the First and Second Mortgage Loans.**

20.     In connection with the refinancing of the First and Second Mortgage Loans, by letter dated May 16, 2006 Equity Pacific provided Llewellyn a payoff demand for the First and Second Mortgage Loans in the amount of $468,952.60, and $120,384.28. Saport Dep., at 175:15-24, **Exhibit 16** thereto (**Exhibit B-4** hereto).  The payoff demand

---

[6] A January 28, 2006 appraisal, ordered by Silver Creek Mortgage, valued the Coolidge Property at $730,000. Saport, Dep., at 163:3-164:24, **Exhibit 11** thereto (**Exhibit B-5** hereto) (Uniform Residential Appraisal Report for the Coolidge Property).  Llewellyn had attempted to use the January 28, 2006 appraisal when purchasing the Coolidge property in March 2006, but Equity Pacific, in its appraisal review, valued the property at only $570,000. Saport Dep., at 162:11-17, 180:10-181:6.  This appraisal was recertified in connection with the refinance of the Coolidge mortgage loan, valuing the property at $676,000. Saport Dep., at 199:13-200:15, **Exhibit 24** thereto (**Exhibit B-6** hereto) (Uniform Underwriting and Transmittal Summary for the Coolidge Property).  There is nothing ominous with the property appraising at a greater value after only three months.  During this period, different lenders would accept different property values. Wyman Funding, the refinance lender, accepted the recertified appraisal at $676,000 without question. Saport Dep., at 181:1-6.\

instructed that the payoff funds be wired to USB AG New York, account name UBS Real Estate Securities, Inc. *Id.*[7]

21.     Stewart Title served as the closing agent in connection with the refinancing of the First and Second Mortgage Loans.  Ms. Staci Krehbiel, an escrow officer for Stewart Title, handled the closing.  Deposition of Staci Krehbiel, "Krehbiel Dep.," at 16:7-10, 20:13-18, a copy of the pages and Exhibits of Ms. Krehbiel's Deposition cited to herein are attached hereto as **Exhibit F**.  Among other things, Ms. Krehbiel prepared a HUD Settlement Statement containing, *inter alia*, the payoff information, the fees to be collected from Llewellyn, and the title insurance fees.  Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (HUD Settlement Statement).  In preparing the HUD Settlement Statement, Ms. Krehbiel determined, through the information provided by Equity Pacific in the payoff statement, the Allstate account number to wire the payoff funds on the disbursement date. Krehbiel Dep., at 55:18-56:4.

### Llewellyn Executes the Closing Documents for the Refinancing of the First and Second Mortgage Loans.

22.     In refinancing the First and Second Mortgage Loans, Llewellyn executed two refinance deeds of trust, each dated June 1, 2006.  The first refinance deed of trust

---

[7] Ms. Saport testified that when she closed on the Llewellyn refinance of the First and Second Mortgage Loans, she was unaware that the servicing rights to the First Mortgage Loan had been transferred from Equity Pacific to Ocwen.  Instead, she prepared a payoff the day prior to closing on the refinance after receiving the payoff demand from Equity Pacific signed by Mr. Rider.  Saport Dep., at 6:7-13.  A May 23, 2006 e-mail from Tim Wyman, of Wyman Funding, to Hanna Weaver, Silver Creek Mortgage head processor, contains Ms. Moskowitz (Mr. Llewellyn's secretary) handwritten notes, inserted on or about May 26 or 27, 2006, stating "Ocwen transfer letter on 1st." Saport Dep., at 193:6-194:5, 235:23-237:13, **Exhibit 51** thereto (**Exhibit B-9** hereto).Moreover, in a May 25, 2006 facsimile from Ms. Moskowitz to Mr. Wyman, Ms. Moskowitz states "conditions attached... Transfer letter from Allstate to Ocwen on 7915 South Coolidge, plus the notes on the 1st& 2nd..." Saport Dep., at 237:14, **Exhibit 52** thereto (**Exhibit B-10** hereto).Thus, prior to the refinancing of the First Mortgage Loan, Ms. Weaver of Silver Creek Mortgage knew that the servicing rights to that loan had been transferred to Ocwen.

was secured by a fixed/adjustable rate note dated June 1, 2006, in the amount of $540,800, and the second refinance deed of trust was secured by a note dated June 1, 2006, in the amount of $135,200.  The two notes totaled $676,000. Llewellyn Dep., **Exhibit 12 (Exhibit A-14** hereto) and **13** thereto (**Exhibit A-15** hereto) (first and second deeds of trust, respectively); Saport Dep., at 165:18-166:5, **Exhibit 12** thereto (**Exhibit B-7** hereto) (note dated June 1, 2006, in the amount of $540,800), and **Exhibit 13** thereto (**Exhibit B-8** hereto) (note dated June 1, 2006, in the amount of $135,200).  Both of these deeds of trust and both of these notes show that the lender is Wyman Funding Group, Inc.

**Stewart Title and Llewellyn Execute the HUD Settlement Statement.**

23.     At the closing on June 1, 2006, Stewart Title and Mr. Llewellyn executed the HUD Settlement Statement.  The HUD Settlement Statement provides that the payoffs were made to Equity Pacific in the amounts of $473,554.45 and $122,906.47 for the First and Second Mortgage Loans, respectively.  Moreover, the HUD Settlement Statement identifies the lender for the refinance of both the First and Second Mortgage Loans as Wyman Funding Group.  Additionally, the HUD Settlement Statement provides that Stewart Title has provided title insurance in connection with the refinance. Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (June 1, 2006, HUD Settlement Statement).  Thus, the HUD Statement shows the new loans taken by Llewellyn as $540,800, and $135,200, respectively, which figures exactly match the recorded Wyman two new deeds of trust.

**Stewart Title Executes the First Lien Title Clearance Letter and Issues a Title Policy.**

24.     On June 1, 2006, Stewart Title executed its First Lien Title Clearance Letter in connection with the refinance of the First and Second Mortgage Loans,

providing, *inter alia*, "we have closed and completely dispersed the above-captioned mortgage in the amount of $540,800.  This mortgage is a valid first lien on the captioned property..." Stewart Title further notes that "[t]he usual title policy will be issued in the next few days."  McNamara Decl., **Attachment C-4** hereto.

25.     Stewart Title issued an insurance policy after the refinance of the First and Second Mortgage Loans.  Krehbiel Dep., at 82:4-6, **Exhibit 14** thereto (**Exhibit F-3** hereto) (insurance policy dated June 16, 2006).  The insurance policy is in the amount of $540,800, and identifies the insured as Wyman Funding in connection with a June 1, 2006 deed of trust executed by Llewellyn to secure an indebtedness of $540,800 in favor of Wyman, recorded on June 16, 2006.  Stewart Title treated as an exception the June 1, 2006 deed of trust securing the refinance second mortgage loan in the amount of $135,200. *Id*. at Schedule B.  Stewart Title did not treat as an exception either the Allstate First Mortgage Loan or the Second Mortgage Loan.  Krehbiel Dep., at 162:23-163:19. As of the date of issuance of the title policy, Stewart Title believed that the Allstate First Mortgage Loan and the Second Mortgage Loan had been paid off.  Krehbiel Dep., at 163:6-10.

**Stewart Title Experiences Problems in Wire Transferring the Payoff Amount on the First Mortgage Loan to Equity Pacific.**

26.     The closing date for the refinancing of the First and Second Mortgage Loans was June 1, 2006, and Llewellyn signed the loan closing documents on that date. The scheduled disbursement date was June 6, 2006. On June 6, 2006, Stewart Title received the loan proceeds from Wyman Funding, the refinance lender.  Krehbiel Dep., at 81:3-5, 87:10-24, **Exhibit 16** thereto (**Exhibit F-4** hereto) (incoming wire for receipts for the first and second mortgage refinance). Llewellyn, however, did not bring the required

$372 payment for the closing fees until June 7, 2006. Krehbiel Dep., at 79:19-81:12.

Thus, Stewart Title did not cut the payoff checks and wire the payoff funds until June 7,

2006. Krehbiel Dep., at 79:19-81:15. Ms. Krehbiel, who handles all of Stewart Title's

wire transfers, wired the payoff funds to Equity Pacific solely to pay off the First and

Second Mortgages. Krehbiel Dep., at 16:7-10,166:12-168:16.

27.     The wire transfer for the Second Mortgage Loan in the amount of

$122,906.47 went through, but the wire transfer for the First Mortgage Loan in the

amount of $473,554.45 did not.  Krehbiel Dep., at 89:20-90:2, 94:20-95:24, 105:4-5, 12-

17, 166:12-24, **Exhibit 17** thereto (**Exhibit F-5** hereto), pp. 1012-1013 (First National

Bank wire transfer log).  The wire was returned and credited back into Stewart Title's

account on June 9, 2006. Krehbiel Dep., at 103:24-104:7, **Exhibit 19** thereto (**Exhibit F-**

**6** hereto) (Stewart Title Batch Detail Report); *see also*, Krehbiel Dep., at 102:2-17,

**Exhibit 18** thereto (**Exhibit F-7** hereto) (First National Bank document showing that the

returned wire came back into Stewart Title's account on June 7, 2006, "BENEFICIARY

IS UNABLE.").  Ms. Krehbiel testified at her deposition that wire transfers are sent back

frequently. Krehbiel Dep., at 100:15-17,105.

28.     When Ms. Krehbiel learned that the wire transfer attempt for the First

Mortgage Loan did not go through, she telephoned Equity Pacific, and a representative of

Equity Pacific advised her to resend the wire transfer. Krehbiel Dep., at 100:5-7, 105:2-

11, 106:9-14.  On June 12, 2006, Ms. Krehbiel attempted again to send the wire transfer,

and it, too, was returned and the funds were again sent back to Stewart Title and credited

into its account.  Krehbiel Dep., at 106:19-107:9, **Exhibit 17** thereto (**Exhibit F-5**

hereto), pp. 116-117 (First National Bank wire transfer log, (reflecting that the wire was returned "second return"))

29.     Ms. Krehbiel was concerned that the rejection of the wire transfer would result in extra per diem interest on the unpaid First Mortgage Loan. Krehbiel Dep., at 106:9-14,109:20-25.  Therefore, she again telephoned Equity Pacific to advise it that the wire was sent and returned a second time.  Krehbiel Dep., at 106, 109:3-9.  By facsimile dated June 13, 2006, Equity Pacific provided Ms. Krehbiel new wire instructions. Krehbiel Dep., at 110:11-111:3, **Exhibit 20** thereto (**Exhibit F-8** hereto).  On June 14, 2006 in accordance with Equity Pacific's June 13, 2006 facsimile, Ms. Krehbiel sent the third wire in the amount of $473,554.45 to Washington Mutual Bank identifying Equity Pacific as the beneficiary. Krehbiel Dep., at 115:14-17, 121:1-15, **Exhibit 17** thereto (**Exhibit F-5** hereto), p. 1008 (First National Bank wire transfer log).  The third wire transfer went through. Krehbiel Dep., at 121:20-23.  Payments are not deemed late until after the fifteenth of each month.  Rider Dep., at 111:11-16.

**Equity Pacific Wire Transfers the Payoff Funds from the Refinance of the First Mortgage Loan to Allstate.**

30.     After Equity Pacific received the wire transfer on June 14, 2006, Mr. Rider, a vice president of Allstate Funding, and the owner of Equity Pacific, LLC, asked Ms. Maria Osorio, Senior Accountant of Allstate Funding, where he should wire the money he received from Stewart Title in connection with the Llewellyn refinance of the First Mortgage Loan. Rider Dep., at 44:4-6,120:23-121:15.  By e-mail dated July 10, 2006, Ms. Osorio instructed Mr. Rider to wire the money to Allstate Home Loans, dba Allstate Funding's trust account and provided him with the wire information. Rider Dep., at 120:23-121:15, **Exhibit 8** thereto (**Exhibit E-4** hereto).  Ms. Osorio copied Mr. Doug

Lawrence, the person in charge of Allstate (Barron Dep., at 88:4-15), with her July 8, 2006 e-mail.  Mr. Rider then followed Ms. Osorio's instructions and, on July 11, 2006, wired the money to Allstate's bank account. Rider Dep., at 123:15-20, Barron Dep., at 228:3-12, **Exhibit 23** thereto (**Exhibit D-2** hereto) (July 11, 2006 Washington Mutual confirmation of domestic wire transfer order, identifying the beneficiary bank as Wells Fargo Bank, and the beneficiary as Allstate Home Loans, Inc. dba Allstate Funding, wire amount $431,251, by order of Equity Pacific Mortgage, Inc.).  Mr. Rider then advised Mr. Lawrence that the wire went out the morning of July 11, 2006. Rider Dep., at 124:2-5.[8]

**Stewart Title Records the First and Second Deeds of Trust.**

31.     On June 16, 2006, Stewart Title recorded, *via* June 15, 2006 UPS, the first deed of trust in the amount of $540,800 pertaining to the refinanced First Mortgage Loan, and second deed of trust in the amount of $135,000 pertaining to the refinanced Second Mortgage Loan, thus making it a matter of public record that the lender was Wyman Funding, and that Wyman appeared to be obtaining a priority first lien on the Coolidge Property.  Wyman Funding subsequently assigned the first and second deed of trust to Long Beach Mortgage Company, and these assignments were recorded on July 10, 2006. McNamara Decl., **Attachment C-5** thereto.

**Llewellyn Advises Ocwen That the First Mortgage Loan Has Been Refinanced, but Ocwen Issues a 30 Day Past Due Notice.**

---

[8] Mr. Rider testified that between the time he received the wire from Stewart Title in June 2006 and sent the wire to Allstate in July 2006, the money was "just sitting there."  Rider Dep., at 124:6-9.  The lag between Stewart Title sending the money to Equity Pacific and Equity Pacific sending the money to Allstate resulted from "trying to find who's supposed to get the money." Rider Dep., at 120:20-22.

32.     On June 1, 2006, Llewellyn advised Ocwen that the First Mortgage Loan had been refinanced. *See*, Ocwen's Comments/History Log for the First Mortgage Loan ("Ocwen Log") June 5, 2006 entry.[9]

33.     On July 17, 2006, Ocwen issued Llewellyn a past due notice on the First Mortgage Loan.  *See*, Ocwen Log, **Exhibit H**, *supra* ("as of 07/17/2006 Past Due 7,432.19 Curr Due 3,625.46 Total Due 11,057.65 'Loan Reviewed for Late Charge' 181.27 Assessed REQUESTED 3O DAY DEMAND BE SENT").

34.     An October 10, 2006, credit report by Experian provides that in July 2006, Ocwen reported the Llewellyn Coolidge Property first mortgage "account delinquent 60 days past due date $7,432."  McNamara Decl., **Exhibit C**, *supra*, **Attachment C-6** thereto.

**Ocwen Threatens Llewellyn with Foreclosure of the Coolidge Property, and Then Initiates Foreclosure.**

35.     By letter dated August 1, 2006 Ocwen referenced its previously sent Notice of Default, and advised Llewellyn of the following alternatives to foreclosure: repayment plans, and listing your property for sale.  Ocwen further threatened Llewellyn as to the following consequences of foreclosure: loss of property, damaged credit rating, deficiency liability, and tax ramifications.  Ocwen advised Llewellyn that "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose." Declaration of Glen Llewellyn "Llewellyn Decl.," attached hereto as **Exhibit H-1,** and **Attachment H-2**.

---

[9] The Ocwen Log is attached as Tab A to Gina Johnson's Declaration, Exhibit A-12 to Ocwen's Motion. For the convenience of the Court, the Ocwen Log is attached hereto as **Exhibit G**.  Unless otherwise specified, the citation to the Ocwen Log is to the respective date referred to in the SOF.

36.     Ocwen's Log reflects that on August 4, 2006, Ocwen reported that it had sent its credit bureau report request regarding the Coolidge Prop.  Ocwen Log.

37.     Ocwen's Log further reflects that on August 7, 2006, Llewellyn advised Ocwen that he refinanced the mortgage through Kevin Rider and the account was with Washington Mutual.  Ocwen advised Llewellyn that no one asked for a payoff quote or sent any payoff funds on the account.  Ocwen further advised Llewellyn to call Washington Mutual to get details about who sold the mortgage to them and to ask that person to contact Ocwen.  Ocwen Log.

38.     Llewellyn contacted Washington Mutual inquiring as to the payout in connection with the refinancing of the First Mortgage Loan.  By letter dated August 9, 2006, Washington Mutual advised Llewellyn that the loan was closed on June 6, 2006, and the lender was Wyman Funding Group, with the first payment due on August 1, 2006.  Washington Mutual enclosed a copy of a Settlement Statement, and noted that the payoffs were sent to Equity Pacific.  Washington Mutual advised Llewellyn to contact his closing agent for research on the payoff wire if Ocwen was to be paid off during the refinancing and was not paid off.  Llewellyn Decl., **Attachment H-3** thereto (August 9, 2006 letter from Washington Mutual to Llewellyn).

39.     By letter dated August 9, 2006 Ocwen gave Llewellyn a Notice of Default, advising Llewellyn that $7,250.92 was due.  Ocwen further threatened Llewellyn that "[f]ailure to bring your account current may result in our election to exercise our right to foreclose on your property."  Additionally, Ocwen threatened Llewellyn that "[i]n foreclosure proceedings, [Ocwen] is entitled to collect your total arrearage in addition to any expenses of foreclosure, including but not limited to reasonable attorney's fees and

costs."  Moreover, Ocwen threatened: "Please be aware that, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by Ocwen to enforce the mortgage in addition to the overdue amount on the mortgage.  Any payment to reinstate the mortgage loan after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred.  Payments received that are less than the amount required to reinstate the mortgage will be returned, and will not stop any foreclosure proceedings that have begun."  Finally, Ocwen advised Llewellyn that "[t]his communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose. Llewellyn Decl., **Attachment H-4** thereto.

40.     On or about August 27, 2006, Ocwen initiated foreclosure proceedings. Ocwen's Log shows that on August 27, 2006, Ocwen requested a copy of the title policy, settlement statement, note and mortgage, and then completed section A and B foreclosure review.  Ocwen Log.  On August 29, 2006, the bailee documents were sent to foreclosure counsel, and a FCL was sent to the timeline department.  Ocwen Log.  The Ocwen Log further shows that NCCI initiated foreclosure on August 29, 2006.  Ocwen Log.  On September 19, 2006, Ocwen completed its pre-foreclosure QC.  Ocwen Log.

41.     An October 10, 2006 credit report references Ocwen's August reporting of foreclosure on the Coolidge Property, and provides that "foreclosure process started, "last report on August 2006, 90 days past due, $11,363. McNamara Decl., **Attachment C-6** thereto (credit reports from Equifax and TransUnion).  On August 29, 2006, Ocwen ordered a title search on the Coolidge Property.  Ocwen Log.

**Castle, Acting As Ocwen's Debt Collecting Agent, Threatens Llewellyn with Foreclosure Proceedings on the Coolidge Property.**

42.     By letter dated September 7, 2006, Defendant Castle, Meinhold & Stawiarski, LLC ("Castle"), acting as Ocwen's debt collecting agent, advised Llewellyn that it had been paid to initiate foreclosure proceedings. Castle further advised Llewellyn that the amount of the debt was $447,901.35, excluding interest, late charges and other charges.  Castle advised Llewellyn that the current creditor was NCCI, and that the loan was serviced by Ocwen.  Castle also advised Llewellyn that, pursuant to the Fair Debt Collection Practices Act, Castle is deemed to be a debt collector attempting to collect a debt and any information obtained will be used for that purpose.  Llewellyn Decl., **Attachment H-5** thereto.

43.     By facsimile dated September 25, 2006, Llewellyn advised Castle that he was giving his secretary, Heather Moskowitz, permission to exchange information with Castle regarding the debt dispute with Ocwen.  Llewellyn attached a copy of the August 9, 2006 letter he received from Washington Mutual, along with the accompanying Settlement Statement.  Llewellyn Decl., **Attachment H-6** thereto.

**Ocwen Advises the Credit Bureaus That Llewellyn Is 90 Days Delinquent on the Coolidge Property First Mortgage Loan and That It Has Commenced Foreclosure on the Coolidge Property.**

44.     As noted above, in August 2006, Ocwen reported to Equifax and TransUnion that Llewellyn was 90 days past due, or $11,363, and that the "foreclosure process started. "Ocwen's Log shows that on September 21, 2006, Ocwen again reported Llewellyn's account to the credit bureau, noting that as of August 31, 2006, $11,363 was past due, and that the account was delinquent three payments.  Ocwen Log.

45.     Shortly thereafter, Llewellyn received a letter from the Credit Bureau alerting Llewellyn of a negative credit entry. Saport, Dep., at 69:13-70:8.  Llewellyn advised Ms. Saport of this letter from the Credit Bureau, and she immediately pulled

Llewellyn's credit report, which revealed that Ocwen had reported Llewellyn negatively. Saport Dep., at 69:13-71:4; Declaration of Candace Saport, ("Saport Decl")., at ¶ 4, 5, attached hereto as **Exhibit I**, and **Attachment I-2** thereto (September 23, 2006 facsimile from Ms. Saport to Ms. Moskowitz showing that a credit bureau reported the Coolidge Property as late payment).  Ms. Saport testified that she then spoke with Ocwen several times over the telephone relating to Llewellyn's loan.  Saport Dep., at 70:2-15,243:11-23, Saport Decl., at ¶ 5, 9.

**Ocwen Rejects Two Payments Made by Allstate on the Coolidge First Mortgage Loan and Continues Initiating Foreclosure Proceedings on the Coolidge Property, Using Castle As Its Debt Collecting Agent.**

46.     On September 29, 2006, Ocwen received a check from Allstate dated October 28, 2006, in the amount of $7,250.92 in payment toward the First Mortgage Loan.  Ocwen Log, October 2, 2006 entry.  The face of the check contains a handwritten notation "Llewellyn 6328389." Barron Dep., at 172:3-173:25; 175:1-13, **Exhibit 13** thereto (**Exhibit D-3** hereto) (Allstate's $7,250.92 check). Ocwen's Log, however, notes that on September 29, 2006, Ocwen rejected this check because Ocwen was foreclosing on the property-- "Payment fund rejected because of stop conditions.  Account is under review.  Stop codes on loan are: FC." Ocwen Log.  Ocwen's Log further provides that on October 2, 2006, Ocwen returned the $7,250.92 to Allstate, noting "INSUFFICIENT TO CURE," and "Pmtrecd $7,250.92 on 09/29/06 is rejected as loan in fc and uncertified load source." Ocwen Log.

47.     While Allstate was attempting to make payments on the loan,[10] Llewellyn struggled to persuade Castle not to foreclose on the Coolidge Property and to cease

---

[10]Mr. Rider testified that when Shearson Financial acquired Allstate, the loan proceeds were transferred from Allstate to Shearson Financial's bank account.  Mr. Barron used the loan proceeds to pay off his

collection efforts.  By letter dated October 1, 2006, Llewellyn advised Castle that the

$447,554.45 loan was paid off to Equity Pacific on June 1, 2006, and enclosed a copy of

the HUD Settlement Statement.  Llewellyn further advised Castle that Ocwen had

completely destroyed his credit and that he could not obtain construction financing

required to conduct his business.  Moreover, Llewellyn noted his multitude of telephone

calls to Ocwen which proved futile, and observed that Ocwen seldom returned his

telephone calls for weeks at a time.  Llewellyn pleaded for Castle to take care of the issue

immediately and that time was of the essence.  Llewellyn Decl., **Attachment H-7**

thereto.

48.      Meanwhile, on October 6, 2006, notwithstanding its receipt of the

$7,250.92 check from Allstate (representing two mortgage payments), Ocwen reported to

the credit bureaus that it had started foreclosure process and that the account was 90 days

past due.  McNamara Decl., **Attachment C-7** thereto (January 22, 2007 Credit Plus

report).  Moreover, Ocwen continued initiating and threatening foreclosure.  Ocwen's

Log shows that on October 5, 2006, Ocwen's foreclosure title search bill was approved

and sent to accounting.  Ocwen Log.  By letter dated October 5, 2006, Ocwen presented

Llewellyn with alternatives to foreclosure, including repayment plans and listing his

property for sale.  Ocwen also threatened Llewellyn with consequences of foreclosure,

including property loss, damage credit rating, deficiency liability, tax ramifications.

Notably, Ocwen represented to Llewellyn that Ocwen's communications were "from a

debt collector attempting to collect a debt, [and that] any information will be used for that

purpose."  Llewellyn Decl., **Attachment H-8** thereto.

---

personal accounts.  Mr. Barron then made the payments to Ocwen to buy time so that he could to replenish
the monies he had spent that were needed to pay off the loan.  Specifically, Mr. Barron sent payments to
Ocwen so that Ocwen would not think that the loan was paid off.  Rider Dep., at 151:16-154:23, 170:3-25.

49.     While Ocwen continued threatening foreclosure, Llewellyn persisted in his efforts to convince both Ocwen and Castle that the First Mortgage Loan had been paid off to Equity Pacific.  Ocwen's Log shows that on October 9, 2006, Llewellyn telephoned Ocwen advising it again that the Loan was paid off and that a check in the amount of $573,091.59 was sent to Allstate Funding.  Ocwen submitted a research investigation request.  Ocwen Log.  Llewellyn telephoned Ocwen again later that day advising that the loan was transferred to Washington Mutual and that Ocwen was reporting the loan past due when he had made all payments.  Ocwen Log.

50.     By letters dated October 10, 2006, Llewellyn advised, *inter alia*, both Ocwen and Castle, as well as **Experian**, **Equifax** and **TransUnion**, that the First Mortgage Loan had been paid in full and that the adverse credit reporting was erroneous. Llewellyn again explained that the loan was refinanced and that a payoff was made to Equity Pacific.  Llewellyn pleaded for Ocwen not to sell the loan.[11]  Llewellyn emphasized that his business was being destroyed as a result of the false report on his credit from Ocwen.  Llewellyn included as attachments to his letter the following documents:

- August 9, 2006, Ocwen notice of default letter;

- August 9, 2006, foreclosure letter from Ocwen;

- September 7, 2006, letter from Castle threatening foreclosure;

- Ocwen's most recent account statement received;

- October 3, 2006, letter of sale from Ocwen to NCC servicing, LLC;

---

[11] By letter dated October 3, 2006, Ocwen advised Llewellyn that it was selling the servicing rights to the First Mortgage Loan to NCC servicing ("NCC") effective October 20, 2006. Llewellyn Decl., **Attachment H-10** thereto.

- August 9, 2006, letter from Washington Mutual;

- Llewellyn's FICO scores from all three credit bureaus;

- June 1, 2006, HUD settlement statement on refinance.

Llewellyn Decl., **Attachments H-9** thereto.

51.      Ocwen's Log shows that on October 10, 2006, Ms. Saport telephoned Ocwen advising it that the Loan was paid off in June 2006 through Equity Mortgage [sic Equity Pacific] and that the funds were transferred to Allstate Funding.  An Ocwen representative advised Ms. Saport to call Equity Mortgage [sic Equity Pacific] and determine whether the funds were sent to the prior servicer or original lender.  Ocwen Log.  Ms. Saport testified that she tried calling Ocwen day in and day out in an effort to conduct credit repair on Llewellyn's behalf. Saport Dep., at 14:16-21.

52.      On October 10, 2006, while Llewellyn and Ms. Saport were busy trying to convince Ocwen that the loan was paid off in June 2006, Ocwen received yet another check from Allstate dated October 5, 2006, in the amount of $3,625.46 as payment toward the First Mortgage Loan.  Ocwen Log, October 10, 2006 entry; Barron Dep., at 172:3-173:25, **Exhibit 14**, thereto (**Exhibit D-4** hereto) (Allstate's $3,625.46 check).  Ocwen's Log shows that Ocwen rejected this payment because the loan was in foreclosure and the funds were not certified.  Ocwen Log, October 10 and 11, 2006 entries (loan in FC, LS-uncertified hence rejected).  Ocwen returned this check to Allstate on October 12, 2006.  Ocwen Log, October 12, 2006 entry.  Meanwhile, Ocwen continued with its efforts to foreclose on the Coolidge Property.  Ocwen Log, October 10, 2006 entry (October 10, Foreclosure cost fee assessed).  Credit reports from Equifax and

TransUnion dated October 10, 2006, show that Ocwen had started the foreclosure process and that the loan was 90 days past due.  McNamara Decl., **Attachment C-6** thereto.

53.     Ocwen's Log shows that on October 13, 2006, Llewellyn again advised Ocwen that payoff funds in the amount of $573,191.59 were remitted to the prior servicer.  On October 13, 2006 an Ocwen representative then inquired of Ocwen whether it had received any payoff funds from the prior servicer.  Ocwen Log.  Ocwen's Log further shows that on October 13 and 16, 2006, an Ocwen representative attempted to call the prior loan servicer, noting that he could not get through and that there was no option to talk to the customer representative.  The calls were made at 1:11:50 and 1:15:49, Pacific Time, respectively (lunchtime).  Ocwen Log.

54.     Ocwen's Log also shows that on October 18, 2006, Llewellyn again telephoned Ocwen regarding the payment and that Ocwen received written dispute correspondence.  Ocwen Log.

**Ocwen Retains the $10,876.38 Received from Allstate as an Interim Payment on the First Mortgage Loan, and Recognizes That This Loan Was Paid out Prior to Being Boarded at Ocwen.**

55.     On October 18, 2006, after Ocwen returned the two checks to Allstate, an Allstate Representative telephoned Ocwen regarding "the payoff that was sent in being short."  Ocwen Log.  Ocwen provided bank wire information to the Allstate representative.  Ocwen Log.  Later that day, Ocwen received a wire transfer from Allstate in the amount of $10,876.38.  Ocwen Log.  That same day, according to Ocwen's log, Ocwen again spoke to Llewellyn regarding the loan.  Ocwen Log.

56.     Notably, Ocwen's Log further shows that on October 18, 2006, an Ocwen representative, in noting an invalid workflow request, observed that "[th]is item was paid

out prior to the loan being boarded at Ocwen.  Therefore, this is an IPAY issue and you should submit this to the IPAY workflow."  Ocwen Log

57.    Ocwen's log further shows that on October 19, 2006, Llewellyn again telephoned Ocwen, advised it that the loan had been paid in full and should not be in foreclosure, and demanded that it correct the credit reporting to the Credit Bureau. The Ocwen representative submitted a research investigation request.  Ocwen Log.  Later that same day, October 19, 2006, Ocwen acknowledges in its Log that:

INTERIM PAYMENT PENDING FROM PRIOR SERVICER/INV.

Payment Info: Paid to Equity Pacific $473,554.45 on 1st lien.

Date Sent, June 6, 2006.

Payment Amount $473,554.45

How was payment made: Wire.

     ***

Who made the payment: Stewart Title of Colorado

Where was the payment sent?: Equity Pacific Mortgage, Loan #100602061.

Interim payment pending from prior servicer/INV.  Paid to Equity Pacific $122,906.47 on second lien.  Date sent June 6, 2006.  Payment made by wire. Stewart Title of Colorado made the payment and sent the payment to Equity Pacific Mortgage, loan #1009602062.

58.    Still later that day, on October 19, 2006, Ocwen's Log shows it received written correspondence regarding the payment dispute.  Ocwen Log.

**<u>Ocwen Finally Advises Llewellyn That It Will Conduct Research Regarding Nonpayment of the First Mortgage Loan, but Continues Foreclosure Proceedings.</u>**

59.     By letter dated October 19, 2006, and again (for whatever reason) by letter dated October 20, 2006, Ocwen advised Llewellyn that it was in receipt of Llewellyn's letter requesting Ocwen to conduct research.  Ocwen noted that it has 60 days under RESPA to conduct the research, but that its policy is to perform the research in 15 days. Ocwen further noted that if the servicing of the loan was transferred to Ocwen from a prior servicer, Ocwen may be required to obtain information from the prior servicer. Notably, Ocwen admitted that "This Communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose.  Llewellyn Decl., **Attachment H-11** thereto.

60.     By letter dated October 19, 2006, Castle advised Llewellyn that Ocwen had instructed Castle to place its file on hold pending the outcome of Ocwen's investigation of his dispute.  Llewellyn Decl., **Attachment H-12** thereto.  The threat of foreclosure, however, continued, particularly in Llewellyn's mind, as the foreclosure was merely placed on hold, as opposed to abated permanently.  Llewellyn Dep., at 365:7-21. And Ocwen certainly did not erase the threat of foreclosure from its mind as shown by the October 19, 2006 Ocwen Log entry stating that foreclosure proceedings were started. Ocwen Log.  Ocwen's Log also contains an October 20 reference that the payoff amount for Llewellyn is $450,241.83, which includes foreclosure costs.  Ocwen Log.

**The Servicing Rights to the First Mortgage Loan Are Transferred from Ocwen to NCC Servicing on October 20, 2006, and Ocwen Transfers to NCC Servicing the $10,876.38 Payoff Funds Received from Allstate.**

61.     Ocwen's Log shows that October 18, 2006, it received a wire transfer from Allstate in the amount of $10,876.38.  Ocwen log, October 20 entry.  This same Log entry states that the loan is in foreclosure.

62.    On October 20, 2006, the servicing rights to the First Mortgage Loan was assigned, sold and transferred from Ocwen to NCC Servicing, LLC ("NCC").  Llewellyn Decl., **Attachment H-13** thereto.

63.    Ocwen's Log also shows that, even though the servicing rights to the loan were transferred on to NCC on October 20, 2006, Ocwen nevertheless posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006.  Ocwen Log. Notably, Ocwen's Log reflects that on October 31, 2006, a call was made to Ocwen requesting a payoff quote, and Ocwen advised the caller that the loan was service transferred.  Ocwen Log.

**After Ocwen Transfers the Servicing Rights to the First Mortgage Loan to NCC Servicing, Ocwen Reports Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.**

64.    Although Ocwen was no longer servicing the First Mortgage Loan as of October 20, 2006, Ocwen nevertheless reported negatively on Llewellyn to the Credit Bureau on October 20, 2006.  Specifically, Ocwen advised the Credit Bureau that as of September 30, 2006, Llewellyn was past due $14,988.  Ocwen Log.  Inexplicably, in an October 20, 2006 entry, Ocwen noted that it advised the Credit Bureau that $14,988 was past due, yet at the same time noted that payment in the amount of $10,876.38 was received by Ocwen on October 18, 2006. Ocwen Log, October 20, 2006 entry.  Ocwen also noted that day that the First Mortgage Loan was in foreclosure.  Ocwen Log, October 20, 2006 entry.  Along these lines, Ocwen's October 23, 2006 Log entry identifies the foreclosure costs and fees.  Ocwen Log.

65.     Ocwen's October 23, 2006 Log entry also notes that Llewellyn completed and sent electronically a form expressing his concern with the credit reporting.  Ocwen Log.

66.     Again, on October 23, 2006, even though Ocwen was no longer servicing the loan, Ocwen reported to the Credit Bureau that Llewellyn's account was 120 days past the due date as of September 30, 2006.  Ocwen Log.

**Despite Transferring the Servicing Rights to the Loan, and Despite Acknowledging in Its Log That the Loan Was Paid out Prior to Being Boarded at Ocwen, Ocwen Continued Requesting Additional Information from Llewellyn Regarding the Payoff.**

67.     Notwithstanding its earlier October 19 and 20, 2006 letters advising Llewellyn that it was conducting research on the loan payout issue raised by Llewellyn, by letter dated October 23, 2006 Ocwen inexplicably again advised Llewellyn that it has reviewed his request that Ocwen perform research relative to the interim payment issue. Like its earlier two letters emphasizing the priority of his request, Ocwen again advised Llewellyn that his request was a priority.  As with its October 19 and 20, 2006 letters, Ocwen advised Llewellyn that if the servicing of the Loan was assigned, sold or transferred to Ocwen from a prior servicer, Ocwen may be required to obtain information concerning the Loan from the prior servicer.  Ocwen again advised Llewellyn that the process of obtaining this information takes time, and that Ocwen will notify him if any additional information was required.  Llewellyn Decl., **Attachment H-14** thereto.

68.     Ocwen's October 24, 2006 Log entry shows another telephone call by Llewellyn claiming that the Loan was paid in full with Equity Pacific and the payoff amount was $447,554.45.  Notably, the Log entry further provides "our records indicate

that the loan was acquired on May 15, 2006 with the loan due for June 1, 2006 *payment from Allstate Funding*." Ocwen Log (emphasis added).

69.     During this time, Llewellyn attempted to gather information for Stewart Title to assist it in explaining to Ocwen that the Loan had been paid off to Allstate.  By letter dated October 24, 2006 in response to Ms. Krehbiel's request, Llewellyn provided "documentation for [her] to help expedite and to correct records that is ruining [his] credit and therefore destroying [his] homebuilding business."  Llewellyn noted that her "hastening of this matter is imperative."  Krehbiel Dep., at 122:8-124:6, **Exhibit 23** thereto (**Exhibit F-14** hereto).  Ms. Krehbiel testified that the records she could help Llewellyn correct was "the proof that [she] had issued the wire and that those loans were paid off." Krehbiel Dep., at 123:21-124:3.

70.     Ocwen's October 25, 2006 Log entry shows that Ms. Saport telephoned Ocwen requesting "a letter from Ocwen that his credit is not effected [sic]." Ocwen Log.

**NCC Servicing, as the Transferee of the of the Servicing Rights to the Loan, and Ocwen Double Team Llewellyn, Both Demanding Proof that the Loan was Paid Out.**

71.     By e-mail dated October 27, 2006, James George, a representative of NCC, advised Ms. Krehbiel that NCC was servicing the First Mortgage Loan for Ocwen Mortgage and acknowledged that Llewellyn had refinanced the Coolidge Property on June 1, 2006, through Wyman Funding.  Mr. George, however, requested from Ms. Krehbiel any pertinent information she had showing the original loan through Equity Pacific was paid off, including a copy of the payoff and payoff check as proof.  Mr. George also acknowledged that "this [issue] has adversely affected [Llewellyn's] credit

and that [Llewellyn] needs this resolved ASAP." Krehbiel Dep., at139:10-141:9, **Exhibit 28** thereto (**Exhibit F-9** hereto).

72.     By e-mail dated October 27, 2006 Ms. Krehbiel advised Mr. George that she had been trying to contact Mr. Rider of Equity Pacific, whom she had sent the payoff on the loan by wire transfer. Ms. Krehbiel further advised Mr. George that she would send them all of the information he had requested. McNamara Decl., **Attachment C-8** thereto.

73.     Meanwhile, by letter dated October 31, 2006, from Ocwen to Llewellyn, Ocwen referred to Llewellyn's "recent" notification regarding the payment to the prior servicer of the Loan, and requested from Llewellyn legal documents showing how the payment was made (if by wire, Llewellyn must track down the funds with a trace number), a letter specifying which monthly payment appears to be missing or misapplied, and his Ocwen loan number. Ocwen further advised Llewellyn that it would be unable to research the matter further unless it obtains this information. Significantly, even though Ocwen had transferred the servicing rights to the Loan to NCC, Ocwen threatened Llewellyn that if it did not hear from him, it "would consider this a closed item, which could lead to continuing phone calls and delinquency notices." Ocwen advised Llewellyn that "[t]his communication from a debt collector attempting to collect a debt; any information obtained we use for that purpose." Llewellyn Decl., **Attachments H-15** thereto.

74.     Shortly thereafter, by e-mail dated November 3, 2006, Ms. Krehbiel sent to Mr. McNamara, Llewellyn's counsel, the payoffs, HUD and copies of the outgoing wires that were sent to pay off the lender. She advised Mr. McNamara that she would

send him the O&E as soon as she received it. Krehbiel Dep., at 125:17-126:13, **Exhibit 25** thereto (**Exhibit F-10** hereto). Ms. Krehbiel also sent these documents to Mr. George at NCC in response to his request for proof of the payoff. Krehbiel Dep., at 143:6-17.

75.     By e-mail dated November 6, 2006, Ms. Krehbiel sent to Mr. McNamara the November 3, 2006 O&E, noting that they are "still showing two liens that were paid off through our closing." Krehbiel Dep., at 128:19-129:23, **Exhibit 26** thereto (**Exhibit F-11** hereto). Specifically, the O&E reflects the first and second deeds of trust, both dated March 15, 2006, in the amounts of $447,984 and $111,996, respectively, and identifying the beneficiary as Allstate Funding, dba Allstate Home Loans, Inc. Notably, the O&E also reflects fourth and fifth deeds of trust, both dated June 16, 2006, in the amounts of $540,800 and $135,200, respectively, and identifying the beneficiary as Wyman Funding Group, Inc.[12] In her e-mail, Ms. Krehbiel advised Mr. McNamara that Stewart Title sent a release for the two liens that were paid off at closing, as well as the third lien. *Id*.

76.     Meanwhile, on November 2, 2006, Ocwen unsuccessfully attempted to call Allstate Funding, again at 12:25:18 p.m. Pacific Time *viz*., lunchtime. Ocwen Log. By letter dated November 3, 2006, Ocwen advised Llewellyn that it was continuing its research efforts regarding the loan, but could not meet the target 15 days. Notably, Ocwen advised Llewellyn that "[t]his communication from a debt collector attempting to collect a debt; any information obtained we use for that purpose." Llewellyn Decl., **Attachments H-16** thereto.

---

[12] The O&E further reflects a third deed of trust dated May 18, 2006 in the amount of $95,000, identifying the beneficiary as Zachary Rodgers.

77.     On November 8, 2006, Ocwen advised Ms. Saport that the loan servicing was transferred to NCC on October 20, 2006, and *after* the transfer Ocwen received the payoff funds which it transferred to the new servicer, NCC.  Ocwen Log.  (As noted above, Ocwen's Log shows that it received the payoff funds on October 18, 2006, before the transfer of the servicing rights to NCC.  Ocwen Log, October 20, 2006 entry).  Ocwen advised Ms. Saport to fax a research request to NCC.  (Ocwen Log, November 8, 2006 entry).

78.     By letter dated November 13, 2006, Ocwen thanked Llewellyn for his "recent correspondence regarding the above-referenced loan."  Ocwen advised Llewellyn that it had reviewed the loan and noted that Llewellyn had provided Ocwen with a copy of the Settlement Statement indicating that the loan was paid in full with Equity Pacific on June 1, 2006. Ocwen advised Llewellyn, however, that "the proof provided is insufficient for [Ocwen] to research the issue.  Therefore, it is suggested that you provide us with the front and back copy of the cash payoff check, source of receipt along with the letter from your prior servicer stating that the loan was paid in full with them.... This will enable us to research further and update your credit report accordingly."  Ocwen further advised Llewellyn that "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose." Llewellyn Decl., **Attachment H-17** thereto.

## Acting As A Debt Collector, Castle Receives Proof That the Loan Was Paid Off from the Refinance Proceeds.

79.     By letter dated November 10, 2006, Mr. McNamara advised Castle that the Loan was fully paid from the proceeds of a refinance of the property in June 2006. He further advised Castle that he had requested Ms. Krehbiel to send Castle proof of this

fact. McNamara Decl., **Attachment C-9** hereto.  By e-mail dated November 10, 2006,

Ms. Krehbiel sent Castle, as proof that the Loan was paid off from the proceeds of the

refinance, copies of the HUD settlement statement, the payoffs and the wire transfer log

reflecting the wire transfer to payoff Equity Pacific. Krehbiel Dep., at 152:8-14,156:6-25,

**Exhibit 34** thereto (**Exhibit F-12** hereto).[13]

### Acting As a Debt Collector, Ocwen Continues Attempting to Collect on the Loan and Continues Reporting Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.

80.     Although Ocwen transferred the servicing rights to the Loan to NCC

effective October 20, 2006, Ocwen, acting as a debt collector, continued attempting to

collect on the Loan.  Moreover, Ocwen continued reporting negatively, and incorrectly,

on Llewellyn to the Credit Bureaus.  Specifically, on November 17, 2006, Ocwen

reported to the Credit Bureau that Llewellyn's account was delinquent and that Llewellyn

had made no monthly payments.  Ocwen Log.  Again, on November 20, 2006, Ocwen

reported to the Credit Bureau that the account was transferred to another office as of

October 20, 2006, and gave the payment rating: 120-149 days past due.  Ocwen Log.

81.     The next day, on November 21, 2006, Ms. Krehbiel provided Ocwen the

wiring log she had previously sent to Ocwen's attorneys and to NCC, showing the payoff

to Equity Pacific. Krehbiel Dep., at 150:19-151:9, **Exhibit 31** thereto (**Exhibit F-13**

hereto).  Notwithstanding receipt of the wiring log, on November 30, 2006, Ocwen again

reported to the Credit Bureau that the account was transferred to another office as of

October 20, 2006, and that the account was 120-149 days past due as of September 30,

2006.  Ocwen Log.

---

[13]  Although Ms. Krehbiel pulled an O&E on November 6, 2006, she did not send this to Castle as they are public records. Krehbiel Dep., at 158:17-22.

**Acting As a Debt Collector, Castle Represents, On Behalf Of His Clients, Ocwen and NCC, That the Loan Should Have Been Paid in Full and That Llewellyn's Credit Report Will Be Reversed.**

82.     By letter dated December 5, 2006, Castle advised Mr. McNamara that it's "client has indicated that this loan should have been paid-in-full.  As such, our client has advised us to close and bill our foreclosure file on this case."  Moreover, Castle advised Mr. McNamara that its "client has indicated that Mr. Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action."  Castle noted that it takes time to reverse the credit reports, and advised McNamara that if its client has not fully done so, "please feel free to contact me and I will ensure that the problem is addressed."  In the transmittal page to the December 5, 2006 letter, Castle advised McNamara **"PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE."**  McNamara Decl., **Attachment C-10** thereto.(Emphasis in original).[14]

**Notwithstanding Its Debt Collecting Agent Castle's Representation That Ocwen Would Reverse Llewellyn's Credit Report, Ocwen Continues Reporting Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.**

83.     Although Ocwen's debt collecting agent, Castle admitted, on behalf of Ocwen, that the "loan should have been paid-in-full" and that "Llewellyn's credit report will be reversed," Ocwen improperly continued to report negatively and incorrectly, on Llewellyn to the Credit Bureaus.  Thus, on December 15, 2006, Ocwen reported to the Credit Bureau that Llewellyn's account was transferred to another office as of October 20,

---

[14]Notably, Mr. Llewellyn viewed this letter containing the debt collector language as a continued threat of foreclosure.  Llewellyn Dep., 368:16-369:11.

2006 and that the account was 120-149 days past due as of September 30, 2006.  Ocwen

Log.

**Mr. Barron Acknowledges, on Behalf of Allstate, That the Loan Was Paid Off.**

84.    By letters dated January 8 and 11, 2007, Mr. Barron, on behalf of Allstate,

advised Mr. McNamara that the Loan was paid in full in June 2006, and that any adverse

reporting to credit agencies by parties other than Allstate would be erroneous and

completely without merit.  Barron Dep., at 153:5-18, 154:20-155:1, 192:17-22, 194:19-

195:12-15, **Exhibits 12** and **17** (**Exhibits D-5** and **D-6** hereto).[15]

**Contrary to its Agent Castle's Representation That Llewellyn's Adverse Credit
Reporting Will Be Reversed, NCC Advises Llewellyn That He Is in Default and
Threatens, among Other Things, to Foreclose on the Coolidge Property.**

85.    Although Castle, acting as a debt collecting agent on behalf of both

Ocwen and NCC, advised McNamara on December 5, 2006 that Llewellyn's credit report

would be reversed, by letter dated January 9, 2007, NCC advised Llewellyn that he was

in default on the Loan.  NCC Servicing also threatened Llewellyn that if he did not pay

the full amount of the default, it would invoke any remedies, including foreclosure of the

property.  NCC further threatened to assess Llewellyn with legal expenses incurred by

NCC to protect its lien position, noting that these fees would be added to the total amount

necessary to cure the default.  Llewellyn Decl., **Attachment H-18** thereto.

86.    Notably, in its January 9, 2007 letter, NCC advised Llewellyn that the

amount of debt it was seeking to collect was $9,783.67, which includes the sum of the

payments that have come due on and after the date of default June 1, 2006, and late

charges, and other charges that may vary from day to day.  In calculating the amount

---

[15] On January 22, 2007, Mr. Barron signed the note securing the Loan as "paid in full." Barron Dep., at 210:8-211:8, **Exhibit 19** thereto (**Exhibit D-7** hereto).  On January 24, 2007, the release of the deed of trust for Loan was recorded. Barron Dep., 220:13-221:22, **Exhibit 21** (**Exhibit D-8** hereto).

purportedly due, NCC deducted the $10,876.38 payment made by Allstate back on October 18, 2006.  Like Ocwen, and Ocwen and NCC's attorney Castle, NCC admonished Llewellyn that "YOU SHOULD CONSIDER THIS LETTER AS COMING FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR.  ANY INFORMATION PROVIDED BY YOU WILL BE USED TO COLLECT THIS DEBT.  *supra.*

**Castle, Acting As a Debt Collector for NCC, Again Advises McNamara That the Loan Should Have Been Paid in Full and That Any Adverse Credit Reporting Was in Error.**

87.     By letter dated January 18, 2007, Castle, acting on behalf of NCC, once again advised Mr. McNamara that his client has informed him that the Loan should have been paid in full, and any adverse credit reporting was an error.  Castle's fax transmittal states that ""**PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE.**" (Emphasis in original). McNamara Decl., **Attachment C-11** thereto.

88.     Castle's intervention on behalf of its clients, NCC and Ocwen, however, did not cause the reversal of Llewellyn's bad credit marks.  Thus, by letter dated January 22, 2007, Mr. McNamara advised Castle that Llewellyn's credit report still showed Ocwen reporting Llewellyn in foreclosure/default.  McNamara requested that Castle have his clients reverse the bad credit marks.  McNamara Decl., **Attachment C-12** thereto.

89.     By letter dated January 23, 2007, Mr. McNamara also advised NCC that the Loan was not in default, pointing NCC to Castle's January 18, 2007 letter.  Mr.

McNamara also enclosed copies of the paid notes that NCC claimed to be servicing and a letter from Allstate stating that the notes were paid in full.  Mr. McNamara advised NCC that Llewellyn has suffered great financial ruin from Ocwen, and that his credit has been ruined.  McNamara Decl., **Attachment C-13** thereto.

### NCC and Ocwen Advise Their Debt Collecting Attorney, Castle, and Mr. Llewellyn and Mr. McNamara That They Have Requested a Correction to Llewellyn's Credit Bureau Report.

90.     By letter dated January 29, 2007, Mr. George, NCC Servicing, writing on behalf of defendants NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that we have requested a correction to [Llewellyn's] credit bureau report as a result of your *recent* inquiry." (emphasis added). McNamara Decl., **Attachment C-14** thereto.  Mr. George further stated, on behalf of NCC, Ocwen and NCCI, that"[a]lthough *we* are still attempting to resolve this matter *we* have received confirmation that this error was not a direct result of any wrongdoing on the part of Glenn Llewellyn." *Id.* (emphasis added).

### Ocwen Fails to Request the Credit Bureaus to Correct Llewellyn's Credit Report As Promised until Instructed to do so by Castle.

91.     Although Ocwen promised, in Mr. George's January 29, 2007 letter, to request a correction to Llewellyn's credit bureau report, Ocwen did not make the request until instructed by its debt collecting attorney, Castle, to do so.  Ocwen's Log shows that Ms. Saport telephone Ocwen on February 2, 2007, again advising Ocwen that the account had been paid off with the prior servicer and somehow was reported in foreclosure. Incredibly, Ocwen advised Ms. Saport "to fax the proof to RSHS so they could look into the same."  Ocwen's February 2, 2007 log reflects that "caller was upset as she wanted something today."  Ocwen Log.  Ocwen's February 2, 2007 Log entry also shows that

Ms. Irene from Credit Plus[16] telephoned Ocwen requesting a letter that the account should not have been placed in foreclosure.  Ocwen Log.

92.    By letter dated February 8, 2007 Mr. McNamara chastised Castle for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report.  Mr. McNamara reminded Castle of its December 5, 2006 letter indicating that the credit report would be reversed, and then advised Castle that Mr. Llewellyn was unable to close several loans the previous week that he needed to keep his business going.  McNamara Decl., **Attachment C-15** thereto.

93.    By facsimile dated February 8, 2007, Castle sent to Mr. George the February 8, 2007 McNamara letter requesting a letter from Ocwen that afternoon. McNamara Decl., **Attachment C-16** thereto.

94.    That same day Mr. George advised Ms. Boxill of Ocwen by e-mail dated February 8, 2006 that "we are in desperate need of a letter from Ocwen stating that this will be corrected on the borrower's credit report." McNamara Decl., **Attachment C-17** thereto.

95.    Later that day, by e-mail, Mr. George advised Ms. Boxill that the Loan "was paid off in June but due to an error in processing was never recorded correctly. Therefore, this is still showing on the borrower's CBR report by Ocwen as a delinquency and he needs ASAP a letter advising that this will be corrected by Ocwen."  Referencing his conversation with Ms. Boxill the previous week, Mr. George enclosed: "proof of payoff, a copy of the CBR report showing Ocwen reporting this delinquency and correspondence from his attorney threatening a lawsuit."  Mr. George strongly advised

---

[16] Credit Plus is a credit reporting agency that supplies the credit report that is used for the mortgage loan. Ms. Saport used Credit Plus exclusively for all of her credit reports.  Ms. Saport also used Credit Plus for credit repair.  Saport Dep., at 60:2-61:18.

Ms. Boxill that her "immediate attention to this matter would be greatly appreciated. Urgent !!! 911."  McNamara Decl., **Attachment C-18** thereto.  Castle's attorney Chris Alber, Esq., assured Mr. McNamara that the Castle firm would itself correct the bed credit marks in discussions with occurred in February, 2007.  McNamara Decl.

96.     In the meantime, Mr. McNamara persisted with his demands on Castle, Ocwen's debt collecting agent.  By letter dated February 9, 2007, Mr. McNamara advised Castle that Llewellyn's credit scores dropped 100 points from the prior week because he was now 30 days late on a number of his property loans, all caused by his inability to obtain construction loans as a result of Ocwen's erroneous credit reporting on Llewellyn. McNamara Decl., **Attachment C-19** thereto.

97.     While Mr. McNamara was making demands on Castle, Mr. George of NCC was continuing his efforts to persuade Ms. Boxill of Ocwen that the loan was paid off.  Thus, by e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with "another copy of the CBR report the mortgagor has sent which gives more detail of the information reported by Ocwen."  McNamara Decl., **Attachment C-20** thereto.  In a separate e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with the settlement information she requested. McNamara Decl., **Attachment C-21** thereto.

98.     Finally, Ms. Boxill saw the light and, by e-mail dated February 12, 2007, Ms. Boxill advised Mr. Nelson Samuel of Ocwen that Llewellyn had paid off the loan prior to service transfer and that Ocwen reported him negatively to the Credit Bureau. She instructed Mr. Samuel to correct all negative reporting and provide a letter stating that Ocwen corrected it. McNamara Decl., **Attachment C-22** thereto.  By e-mail dated February 14, 2007, Mr. Samuel advised Ms. Boxill that he was having Llewellyn's credit

updated that day.  McNamara Decl., **Attachment C-23** thereto.  In a separate e-mail also dated February 14, 2007, Mr. Samuel of NCC advised Ms. Boxill that "if this loan was paid off prior to the loan being transferred to Ocwen, we should be deleting the entire trade line of the borrower's credit report."  Moreover, Mr. Samuel observed that "this loan should not have been boarded in the first place as the loan was paid off prior to the loan being transferred to Ocwen."  McNamara Decl., **Attachment C-24** thereto; *see also*, Ocwen Log.

99.     Ocwen's February 14, 2007 Log entry shows that "Research Priority Form Submitted: Details: delete entire trade line and send out a letter to the bwr."  Ocwen Log.

100.     By facsimile dated February 15, 2007, Castle provided McNamara with a letter dated February 15, 2007, from Ocwen to Llewellyn regarding Llewellyn.  The facsimile first admonishes Mr. McNamara "**PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE.**"  (Emphasis in original). McNamara Decl., **Attachment C-25** thereto.

101.     In the February 15, 2007 letter from Ocwen to Llewellyn in response to what Ocwen characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan. Specifically, Ocwen states, in pertinent part:

Ocwen would like to take this opportunity to thank you for your *recent* correspondence regarding the above referenced loan.  We appreciate the time and effort on your part to bring your concern to our attention.  Pursuant to your

concern, we have reviewed the loan and below is the recap of our response to the concern raised:

Concern: you requested that Ocwen remove the credit reporting done on your name as your loan was paid off prior to the loan being serviced transferred to Ocwen.

Response: Pursuant to your request, Ocwen has requested an update to your credit report.  We have requested that the entire reporting trade line be deleted on the loan.  Please allow sufficient time for the credit bureaus to reflect these changes in your credit report.  We sincerely apologize for any inconvenience caused.

We report to Equifax Credit Information, Trans Union National Maintenance Center, Experian and Innovis.  These listed credit bureaus are the only credit bureaus reported to by us. These major credit bureaus may also provide information regarding your credit to other local credit bureaus.  The local credit bureaus will update and correct your credit file with information obtained from the above credit bureaus.

We trust the information provided is fully addressed your concern....

This communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose.... [emphasis added].

102.    Incredibly, after this nine-month long drawn out nightmare in which Ocwen destroyed both Llewellyn's credit and real estate investments, Ocwen cavalierly and disingenuously asserts in its Answer that "[Ocwen] and NCCI state that in an abundance of caution upon receipt of plaintiff's correspondence, and before completing an independent investigation, Ocwen requested that the trade line with the credit bureaus relating to plaintiff's mortgage loan be deleted." Ocwen Answer at ¶ 20, attached hereto as **Exhibit J**.

**Llewellyn Is Unable to Obtain Loans to Support His Home Construction Business As a Result of Ocwen and Castle's Maligning His Credit.**

103.    Ms. Saport, who had brokered approximately six other loans for Llewellyn, attempted to broker an additional loan after the closing on the Coolidge Property. Saport Dep., at 17:22-24, 23:19-23.  Llewellyn's credit report, however, showed an Ocwen one times 30 days late, causing Mr. Llewellyn's credit score to fall from 782 down below 600. Saport Dep., at 23:19-23, 69:13-70:1. The Coolidge Property was the last property Llewellyn purchased or refinanced after Ocwen's misconduct because his credit "blew up" and Ms. Saport "couldn't get anything else done."[17]  Saport Dep., at 67:2-6.  Ms. Saport then worked with Llewellyn for several months trying to get his credit straightened out. Saport Dep., at 66:8-11.  Ms. Saport testified that she would call Ocwen and that she sent them all the paperwork and that "this went on and on."  She tried "to get the late off of Glen's credit report because it was totally screwing his credit.  He couldn't get anything." Saport Dep., at 70:9-15.

---

[17] Llewellyn closed on three loan refinancings after Ocwen destroyed his credit (*viz.*, **2122 S. Franklin** on September 15, 2006; 651 Race on November 22, 2006, and 572 Adams on January 19, 2007), but these loans had already been in the works for quite some time prior Ocwen's misconduct.  Llewellyn Decl.; *See, also*, Saport Decl., at ¶ **6**.

104.    In late 2006 or early 2007, Mr. McNamara approached Mr. Barron (who was still the CEO of Shearson) seeking Mr. Barron's assistance in refinancing a loan for Llewellyn. Barron Dep., at 126:8-128:5, 130:3-5, 131:7-20. Mr. Barron then telephoned Mr. Lawrence who was running Shearson Home Loans and requested him to run a credit check on Mr. Llewellyn.  Mr. Lawrence did so and discovered that Mr. Llewellyn's credit was terrible and there was nothing Shearson Home Loans could do to help him refinance the loan.  Barron Dep., at 128:7-22.  There was simply no way Mr. Llewellyn could refinance any of the loans on his properties. Barron Dep., at 131:9-16, 276:21-279:13, **Exhibit 31** thereto (**Exhibit D-9** hereto) (February 26, 2007 e-mail from Sherry Karr to Joe Cosio-Barron (forwarded to Mr. McNamara on February 27, 2007) (unable to make 100% CLTV loan to pay off liens on Llewellyn's properties due to, *inter alia*, multiple 30 day lates and current FICO score)).

III.    **THIS COURT SHOULD DENY THE OCWEN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON LLEWELLYN'S CLAIMS, AND ON THEIR STATUE OF LIMITATIONS AFFIRMATIVE DEFENSE.**

The Ocwen Defendants seek summary judgment on Llewellyn's claims for violations of the FCRA, outrageous conduct, and violations of the FDCPA.  They also seek summary judgment on their statute of limitations affirmative defense in connection with Llewellyn's FDCPA.  As shown herein, several issues of material fact are in dispute with respect to each of these claims and the affirmative defense, and this Court should deny the Ocwen Defendants' Motion.

A.      **THIS COURT SHOULD DENY THE OCWEN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT IV: VIOLATION OF THE FCRA.**

1.      **Burden of proof and elements:**

.                      Llewellyn agrees with the Defendants' recitation of the burden of proof and elements on this claim.

2.    **Elements Challenged by the Ocwen Defendants.**

**Element 3:**  Mr. Llewellyn can demonstrate a triable issue of fact as to whether Ocwen failed to conduct an investigation regarding the disputed information and/or failed to report the results of the investigation to the Consumer Reporting Agency.

A.      Ocwen contends in its Motion that Llewellyn's claim under the FCRA should be summarily dismissed because Ocwen provided only correct information to the consumer reporting agencies.  Ocwen further asserts in its Motion that is undisputed that Ocwen investigated the status of the First Mortgage Loan and reported to the consumer reporting agencies the true and correct status of this Loan.

B.      Ocwen is wrong on both counts.  Ocwen misrepresented to the Credit Bureaus that the Loan was in default when, in fact, it was not in default under the 60 day grace period set forth in the Federal Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C.§ 2601, *et. seq.,* a consumer protection statute, 60 day grace period. Even if the RESPA grace period did not apply here, Ocwen still misrepresented to the Credit Bureaus in October 2006 that the loan was 90 days past due as of September 30, 2006, ignoring a $10,876.38 payment (constituting three monthly mortgage payments under the Loan) made by Allstate on the Loan.  Moreover, Ocwen's investigation of the dispute was abysmal, if not entirely nonexistent.  Ocwen knew, or should have known, early on that Llewellyn refinanced the First Mortgage Loan and that the proceeds of the

refinancing were paid to Allstate, the prior servicer on the Loan.  Ocwen had in its

possession documents supporting this fact in August 2006, and still more supporting

documents in October 2006.  Nevertheless, Ocwen negatively reported on Llewellyn to

the Credit Bureaus in October 2006 through December 2006, and left these negative

remarks on the Credit Reports into February 2007.  Four months after conducting its

investigation commencing in October 2006, Ocwen finally deleted the negative trade

reporting on Llewellyn in February 2007, relying on the same information available to it

back in October 2006.  Put simply, Ocwen's "investigation" is a textbook example of a

failure to investigate and report under the FCRA.

> ### *From both a contractual standpoint, and as a matter of law, the First Mortgage Loan was never in default.*

C.        Ocwen asserts that it truthfully reported to the major credit bureaus

that the First Mortgage Loan was in various stages of delinquency until Ocwen removed

the trade line in early 2007. Ocwen further asserts that it was accurate for it to have

reported that loan as delinquent during the period when no payments had been received

by Ocwen.  Ocwen is mistaken.

D.        From both a contractual standpoint, and as a matter of law, the

First Mortgage Loan was never in default because the refinance proceeds were paid to the

prior loan servicer within the 60 day window set forth in the RESPA Servicing

Disclosure signed by Llewellyn and Allstate, and as mandated by RESPA.  Specifically,

Ocwen, as a loan servicer, is subject to the requirements contained in RESPA, a

consumer protection statute principally concerning costs and settlement procedures at

closing when purchasing a home. *See, Seelbach v. Wells Fargo Home Mortgage*, 2010

U.S. Dist. LEXIS 27841, at *9-10 (E.D.Tex.) (Citing 12 U.S.C. § 2601(b)).  Section

2605(d) of RESPA prohibits treating a loan payment as late for any purpose, during the 60-day period beginning on the effective date of transfer of the servicing of the loan, if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment. *See*, *Marks v. Ocwen Loan Servicing*, 2009 U.S. Dist. LEXIS 35251, *8-9 (N.D.Cal.).[18]

E.       Here, Llewellyn, through the refinancing of the First Mortgage Loan, paid Allstate, the prior servicer, the payout on the Loan on June 14, 2006, well within the 60 day grace period under RESPA, and prior to the June 1, 2006 payment due date, taking into consideration the 15 day grace period under the First Mortgage Loan.

F.       The facts surrounding the First Mortgage Loan, its refinancing, and the payout on the Loan, as well as the facts leading up to Ocwen's investigation under the FCRA commencing in October 2006, are significant not only to show that the Loan was never in default under RESPA and the First Mortgage Loan documents, but to illustrate what Ocwen knew or should have known with respect to the refinancing and payoff of the Loan.  Although these latter facts predate Ocwen's investigation of Llewellyn's dispute under the FCRA, they directly bear on the reasonableness of Ocwen's four month investigation of the dispute, particular considering that Ocwen had information available

---

[18]Section 2605(d) provides:

> During the *60-day period beginning on the effective date of transfer* of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, *if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment*.

12 U.S.C. § 2605(d) (emphasis added).

to it prior to its investigation conclusively establishing that the Loan was refinanced and that a payout was made to Allstate, the prior servicer on the Loan.[19]

G.      On March 7, 2006, Llewellyn purchased the Coolidge Property for $559,980. SOF 10; Warranty Deed, dated March 7, 2006, Llewellyn Dep., at 159, **Exhibit 1** thereto (**Exhibit A-10** hereto); Saport Dep., at 127:14-16).  In connection with this purchase, Llewellyn executed an adjustable rate note dated March 7, 2006, in the amount of $447,984 (the "First Mortgage Loan" or "Loan") (Llewellyn Dep., at 49:5-12, 160:18-23, **Exhibit 2** thereto) (**Exhibit A-11** hereto), securing a first deed of trust (Llewellyn Dep., at 38:2-13, **Exhibit 3** thereto) (**Exhibit A-12** hereto); and an adjustable rate note dated March 7, 2006, in the amount of $111,996 ("Second Mortgage Loan"), securing a second deed of trust (Llewellyn Dep., at 49:13-20, 161:10-18, **Exhibit 11** thereto) (**Exhibit A-13** hereto).  The payment due date under the First Mortgage Loan is the first of each month, subject to a 15 day grace period, thus making the actual due date the 15th of each month.

H.      As reflected in the two adjustable rate notes and corresponding deeds of trust (Llewellyn Dep., **Exhibits 2**, **3** and **11 thereto**) (**Exhibits A-11, A-12** and **A-13** hereto), the lender for the First and Second Mortgage Loans was Allstate Home Loans, Inc., dba Allstate Funding ("Allstate").  The notes further reflect that payments under the notes were to be made to Equity Pacific Mortgage, Inc. SOF 12.  Equity Pacific provided the interim servicing for the First and Second Mortgage Loans.  Rider Dep., at

---

[19] In accordance with this Court's General Order, Llewellyn provides factual statements and pinpoint citations to those statements in connection with each element.  Llewellyn has also provided *supra*, a complete chronological factual background supported by pinpoint citations, and the paragraphs of this factual background are numbered.  For the Court's convenience, Llewellyn has cross-referenced these "statements of fact" or "SOF" to the factual statements set forth in connection with each element in dispute.

96, 150:5-25, **Exhibit 5** thereto (**Exhibit E-2** hereto) (Allstate Servicing Disclosure).SOF 15.

I.      In connection with the First Mortgage Loan, Llewellyn and Allstate signed a RESPA Servicing Disclosure dated March 7, 2006.  The RESPA Servicing Disclosure sets forth the "Transfer Practices and Requirements" in connection with the servicing of the Loan, and provides, *inter alia*, that "[i]f the servicing of the loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer."  The RESPA Servicing Disclosure further provides that "[n]otices must contain certain information.  They must contain the effective date of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions."  Of particular significance here, the RESPA Servicing Disclosure provides that "[d]uring the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you."  SOF 12; RESPA Servicing Disclosure, McNamara Decl., **Attachment C-3**, thereto.

J.      Allstate sold the First Mortgage Loan to Nomura Credit and Capital, Inc. ("NCCI").  On or about May 15, 2006, the servicing rights to the First Mortgage Loan were transferred from Equity Pacific to Ocwen.  Saport Dep., **Exhibit 53** thereto (**Exhibit B-2** hereto)(May 17, 2006 letter from Ocwen to Llewellyn, Notice of Assignment, Sale or Transfer of Servicing Rights).  In its May 17, 2006 letter to

Llewellyn, Ocwen notes that Llewellyn's present servicer is Allstate Funding, and provides Allstate Funding's customer service department telephone number.  SOF 17.

K.      On or about April 18, 2006, Llewellyn, using Ms. Saport's mortgage broker services, initiated the refinancing of the First and Second Mortgage Loans. Saport Dep., at, 181:17-182:11, **Exhibit 17** thereto (**Exhibit B-3** hereto) (Borrower Signature Authorization); SOF 18.  In connection with the refinancing of the First and Second Mortgage Loans, by letter dated May 16, 2006, Equity Pacific provided Llewellyn a payoff demand for the First and Second Mortgage Loans in the amount of $468,952.60, and $120,384.28. Saport Dep., at 175:15-24, **Exhibit 16** thereto (**Exhibit B-4** hereto). The payoff demand instructed that the payoff funds be wired to USB AG New York, account name UBS Real Estate Securities, Inc. *Id.*[20] SOF 18, 20.

L.      Ms. Krehbiel, an escrow officer of Stewart Title, prepared a HUD Settlement Statement containing, *inter alia*, the payoff information, the fees to be collected from Llewellyn, and the title insurance fees.  Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (HUD Settlement Statement). In preparing the HUD Settlement Statement, Ms. Krehbiel determined, through the information provided

---

[20] Llewellyn had provided the Ocwen Notice of Assignment, Sale or Transfer of Servicing to Silver Creek Mortgage, and a May 23, 2006 e-mail from Tim Wyman, of Wyman Funding, to Hanna Weaver, Silver Creek Mortgage head processor, contains Ms. Moskowitz (Mr. Llewellyn's secretary) handwritten notes, inserted on or about May 26 or 27, 2006, stating "Ocwen transfer letter on 1st." Saport Dep., at 192, 235-36, **Exhibit 51** thereto (**Exhibit B-9** hereto).  Moreover, in a May 25, 2006 facsimile from Ms. Moskowitz to Mr. Wyman, Ms. Moskowitz states "conditions attached: Transfer letter from Allstate to Ocwen on 7915 South Coolidge, plus the notes on the 1st & 2nd..." Saport Dep., at 237, **Exhibit 52** thereto (**Exhibit B-10** hereto).  Thus, prior to the refinancing of the First Mortgage Loan, Ms. Weaver of Silver Creek Mortgage knew that the servicing rights to that loan had been transferred to Ocwen. SOF 20, n.8. These facts illustrate that Llewellyn properly advised his mortgage broker of Ocwen.  The fact that Stewart Title mistakenly sent the refinance proceeds to Allstate, the prior servicer, does not excuse Ocwen from violating the FCRA and ruining both Llewellyn's credit and life.

by Equity Pacific in the payoff statement, the Allstate account number to wire the payoff funds on the disbursement date.  Krehbiel Dep., at 55:18-56:4.SOF 21.

M.     In refinancing the First and Second Mortgage Loans, Llewellyn executed two refinance deeds of trust, each dated June 1, 2006.  The first refinance deed of trust was secured by a fixed/adjustable rate note dated June 1, 2006, in the amount of $540,800, and the second refinance deed of trust was secured by a note dated June 1, 2006, in the amount of $135,200.  The two notes totaled $676,000.  Llewellyn Dep., **Exhibit 12** and **13** thereto (**Exhibit A-14** and **A-15** hereto (first and second deeds of trust, respectively); Saport Dep., at 165:18-166:5, **Exhibit 12** thereto (**Exhibit B-7** hereto) (note dated June 1, 2006, in the amount of $540,800), and **Exhibit 13** thereto (**Exhibit B-8** hereto) (note dated June 1, 2006, in the amount of $135,200).  Both of these deeds of trust and both of these notes show that the lender is Wyman Funding Group, Inc. SOF 22.

N.     At the closing on June 1, 2006, Stewart Title and Llewellyn executed the HUD Settlement Statement.  The HUD Settlement Statement provides that the payoffs were made to Equity Pacific in the amounts of $473,554.45 and $122,906.47 for the First and Second Mortgage Loans, respectively.  Moreover, the HUD Settlement Statement identifies the lender for the refinance of both the First and Second Mortgage Loans as Wyman Funding Group.  Additionally, the HUD Settlement Statement states that Stewart Title has provided title insurance in connection with the refinance.  Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (June 1, 2006, HUD Settlement Statement); SOF 23.

O.     On June 1, 2006, Stewart Title executed its First Lien Title Clearance Letter in connection with the refinance of the First and Second Mortgage

Loans, providing, *inter alia*, "we have closed and completely dispersed the above-captioned mortgage in the amount of $540,800.  This mortgage is a valid first lien on the captioned property..." McNamara Decl., **Attachment C-4** thereto. SOF 24.

   P. Stewart Title issued an insurance policy after the refinance of the First and Second Mortgage Loans.  Krehbiel Dep., at 82:4-6, **Exhibit 14** thereto (**Exhibit F-3** hereto) (insurance policy dated June 16, 2006).  The insurance policy is in the amount of $540,800, and identifies the insured as Wyman Funding in connection with a June 1, 2006 deed of trust executed by Llewellyn to secure an indebtedness of $540,800 in favor of Wyman, recorded on June 16, 2006.  Stewart Title did not treat as an exception either the Allstate First Mortgage Loan or the Second Mortgage Loan. Krehbiel Dep., at 162:23-163:19. SOF 25.

   Q. The closing date for the refinancing of the First and Second Mortgage Loans was June 1, 2006, and Llewellyn signed the loan closing documents on that date.  The scheduled disbursement date was June 6, 2006.  On June 6, 2006, Stewart Title received the loan proceeds from Wyman Funding, the refinance lender.  Krehbiel Dep., at 87, **Exhibit 16** thereto (**Exhibit F-4** hereto) (incoming wire or receipts for the first and second mortgage refinance).  Llewellyn, however, did not bring the required payment for the closing fees until June 7, 2006.  Krehbiel Dep., at 80:9-81:12.  Thus, Stewart Title did not cut the payoff checks and wire the payoff funds until June 7, 2006. Krehbiel Dep., at 80:9-81:15. Ms. Krehbiel, who handles all of Stewart Title's wire transfers, wire transferred the payoff funds to Equity Pacific solely to pay off the First and Second Mortgages.  Krehbiel Dep., at 16:7-10, 166:12-168:16. SOF 26.

R.      The wire transfer for the Second Mortgage Loan in the amount of

$122,906.47 went through, but not the wire transfer for the First Mortgage Loan in the

amount of $473,554.45. Krehbiel Dep., at 89:20-90:2, 94:20-95:24, 105:4-5, 12-17,

166:12-24, **Exhibit 17** thereto (**Exhibit F-5** hereto), pp. 1012-13 (First National Bank

wire transfer log); SOF 27.  After several subsequent attempts, and following the revised

wiring instructions received from Equity Pacific, on June 14, 2006 Ms. Krehbiel

successfully sent the $473,554.45 wire transfer to Washington Mutual Bank identifying

Equity Pacific as the beneficiary. Krehbiel Dep., at 106, 109:3-9, 110:11-111:3, 115:14-

17, 121:1-15, 20-23, **Exhibit 17** thereto (**Exhibit F-5** hereto), p. 1008 (First National

Bank wire transfer log); SOF 27-29.  Under the First Mortgage Loan, payments are not

deemed late until after the 15th of each month.  Rider Dep., at 111:11-16; SOF 29.

S.      On June 16, 2006, Stewart Title recorded the first deed of trust in

the amount of $540,800 pertaining to the refinanced First Mortgage Loan, and second

deed of trust in the amount of $135,000 pertaining to the refinanced Second Mortgage

Loan, thus making it a matter of public record that the lender was Wyman Funding, and

that Wyman appeared to be obtaining a priority first lien on the Coolidge Property.

McNamara Decl., **Attachment C-5** thereto; SOF 31.

T.      The First Mortgage Loan was paid off on June 14, 2006 -- well

within the 60 day grace period under RESPA -- *via* wire transfer to Equity Pacific, the

transferor servicer.  And, under the RESPA Servicing Disclosure and RESPA, Ocwen

could not treat the loan late or in default for any reason, including reporting the loan late

or in default to the Credit Bureau Agencies.  In doing so, Ocwen misrepresented the status of the Loan and violated, among other things, the FCRA.[21]

> *Although Llewellyn advised Ocwen on June 1, 2006, that the First Mortgage Loan was refinanced, Ocwen nevertheless initiates foreclosure and advises the Credit Bureaus of this fact.*

U.     On June 1, 2006, Llewellyn advised Ocwen that the First Mortgage Loan had been refinanced.  *See*, Ocwen Log, June 5, 2006 entry; SOF 32.  As shown above, Ocwen could readily confirm this fact.  Ocwen knew that the transferor servicer was Allstate and knew how to contact Allstate.  A recorded deed of trust shows that Wyman Funding was the lender with a purported first lien on the Coolidge Property. Ocwen could readily determine that Stewart Title was the title company involved in the transaction, and could readily obtain the HUD Settlement Statement, the wire payoff log, and even the insurance policy in connection with the refinancing.  Ocwen also knew of the RESPA Servicing Disclosure (indeed Ocwen produced this document to Llewellyn in discovery), and it knew that it was subject to RESPA and the RESPA Servicing Disclosure, including RESPA's 60 day grace period.

V.     Instead of simply confirming Llewellyn's representation that the First Mortgage Loan had been refinanced (confirmation that could be readily obtained by a telephone call to Allstate), Ocwen opted to place the onerous burden on Llewellyn to prove that the payout was made.  As shown herein, however, in the end, Ocwen did not

---

[21] Section 1681s-2(a) imposes on furnishers of information the duty to provide accurate information to consumer reporting agencies. *Ruff v. America's Servicing Company*, 2008 U.S. Dist. LEXIS 33447, at *11 (W.D.Pa.) (citing, 15 U.S.C. § 1681s-2(a)). Section 1681s-2(a), however, is enforceable only by a governmental body and not through a private right of action. *Id*. On the other hand, as shown *infra*, section 1681s-2(b) of the FCRA does provide a private right of action, but applies only after a consumer reporting agency notifies the furnisher of information of a dispute. *See*, 15 U.S.C. § 1681s-2(b). Also as discussed *infra*, in providing inaccurate information to consumer reporting agencies, Ocwen violated the FDCPA.

really care that the payout was made to Allstate through refinancing, as evidenced by Ocwen ignoring all of the documents pointing to this inescapable conclusion, including the title work it had ordered and received, the payoffs, the HUD and copies of the outgoing wires that were sent to pay off the lender.  Ocwen cared only that it had not been paid.  And, until it received payment under the First Mortgage Loan, Ocwen was determined to ruin Llewellyn's credit.  Nothing Llewellyn, or anyone else for that matter (including, as shown herein, Ocwen's own attorneys and defendant, NCC Servicing) could do, short of paying Ocwen the payout on the Loan -- a task totally out of Llewellyn's hands -- could convince Ocwen to delete the entire trade line of Llewellyn's credit report.

W.      Thus, from very beginning, Ocwen ignored Llewellyn's statements that the First Mortgage Loan had been refinanced and, on July 17, 2006, issued Llewellyn a past due notice on the First Mortgage Loan. *See*, Ocwen Log; SOF 33.  In July 2006, Ocwen reported the Llewellyn Coolidge Property first mortgage "account delinquent 60 days past due date $7,432."  McNamara Decl., **Exhibit C**, *supra,* **Attachment C-6** thereto; SOF 34.

X.      Moreover, by letter dated August 1, 2006, Ocwen referenced its previously sent Notice of Default, and advised Llewellyn of the following alternatives to foreclosure: repayment plans, and listing his property for sale.  Ocwen further threatened Llewellyn as to the following consequences of foreclosure: loss of property, damaged credit rating, deficiency liability, and tax ramifications.  Llewellyn Decl., **Attachment H-2** thereto; SOF 35.

Y.    On August 7, 2006, Llewellyn spoke on the telephone with an Ocwen representative regarding the First Mortgage Loan.  During this phone call, Llewellyn stated that the loan had been refinanced. Ocwen Log; Ocwen Motion, at p. 12, ¶ 42-43; SOF 37.

Z.    By letter dated August 9, 2006, Ocwen gave Llewellyn a Notice of Default, advising Llewellyn that $7,250.92 was due.  Ocwen further threatened Llewellyn that "[f]ailure to bring your account current may result in our election to exercise our right to foreclose on your property."  Additionally, Ocwen threatened Llewellyn that he would be liable for any expenses of foreclosure including, but not limited to, reasonable attorney' s fees and costs.  Llewellyn Decl., **Attachment H-4** thereto; SOF 39.

AA.    Ocwen's Log shows that on or about August 27, 2006, Ocwen initiated foreclosure proceedings against Llewellyn and, among other things, requested a copy of the title policy, settlement statement, note and mortgage, and then completed section A and B foreclosure review.  Ocwen Log; SOF 40.  On August 29, 2006, the bailee documents were sent to foreclosure counsel, defendant Castle, and a FCL was sent to the timeline department.  Ocwen Log; SOF 40.  The Ocwen Log further shows that NCCI initiated foreclosure on August 29, 2006.  Ocwen Log; SOF 40.  On September 19, 2006, Ocwen completed its pre-foreclosure QC.  Ocwen Log; SOF 40.  An October 10 credit report references Ocwen's August reporting of foreclosure on the Coolidge Property, and provides that "foreclosure process started," last report on August 2006, 90 days past due, $11,363.  McNamara Decl., **Attachment C-6** thereto (credit reports from Equifax and Trans Union). SOF 41.

BB.     By letter dated September 7, 2006, Castle, acting as Ocwen's debt collecting agent, advised Llewellyn that it had been paid to initiate foreclosure proceedings. Castle further advised Llewellyn that the amount of the debt was $447,901.35, excluding interest, late charges and other charges. SOF 42.

CC.     Ocwen's Log shows that on September 21, 2006, Ocwen again reported Llewellyn's account to the Credit Bureau, noting that as of August 31, 2006, $11,363 was past due, and that the account was delinquent three payments.  Ocwen Log; SOF 44.

DD.     Llewellyn again tried to convince Ocwen, and its debt collecting agent, Castle, that the Loan had been paid out to the refinancing proceeds.  Thus, by facsimile dated September 25, 2006, Llewellyn provided Castle with a copy of the August 9, 2006 letter he received from Washington Mutual, along with the accompanying HUD Settlement Statement.  Llewellyn Decl., **Attachment H-6** thereto; SOF 43.

*Ocwen continues reporting to the Credit Bureau Agencies that Llewellyn is 90 days past due as of September 6, even though Allstate has made two monthly payments on the loan.*

EE.     On September 29, 2006, Ocwen received a check from Allstate dated October 28, 2006, in the amount of $7,250.92 in payment toward the First Mortgage Loan.  Ocwen Log, October 2, 2006 entry.  Barron Dep., at 172:3-173:25, 175:1-13.**Exhibit 13** thereto (**Exhibit D-3** hereto) (Allstate's $7,250.92 check). Ocwen's Log, however, notes that on September 29, 2006, Ocwen rejected this check because Ocwen was foreclosing on the Coolidge Property. Ocwen Log.  SOF 47.

FF.     Meanwhile, while Allstate was attempting to make payments on the loan, Llewellyn struggled to persuade Castle not to foreclose on the Coolidge

Property and to cease collection efforts.  SOF 47.By letter dated October 1, 2006, Llewellyn again advised Castle that the $447,554.45 Loan was paid off to Equity Pacific on June 1, 2006, and again enclosed a copy of the HUD Settlement Statement. Llewellyn Decl., **Attachment H-7** thereto; SOF 47.

GG.    Llewellyn's pleas, however, fell on deaf ears.  On October 6, 2006, notwithstanding its receipt of the $7,250.92 check from Allstate (representing two mortgage payments), Ocwen reported to the Credit Bureaus that it had started foreclosure process and that the account was 90 days past due.  McNamara Decl., **Attachment C-7** thereto (January 22, 2007 Credit Plus report). SOF 48.  Moreover, Ocwen continued initiating and threatening foreclosure. Ocwen's Log, October 5, 2006 entry; SOF 48.  By letter dated October 5, 2006, Ocwen presented Llewellyn with alternatives to foreclosure, and threatened Llewellyn with consequences of foreclosure, including property loss, damage credit rating, deficiency liability, tax ramifications. Llewellyn Decl., **Attachment H-8** thereto; SOF 48.

HH.    While Ocwen continued threatening foreclosure, Llewellyn persisted in his efforts to convince both Ocwen and Castle that the First Mortgage Loan had been paid off to Allstate funding.  Llewellyn telephoned Ocwen on October 9, 2006, and Ocwen submitted a research investigation request that day.  Ocwen Log, October 9, 2006 entry; SOF 49.

### *Llewellyn advises the Credit Bureaus that Ocwen's adverse credit reporting is erroneous.*

II.    By letters dated October 10, 2006, Llewellyn advised, *inter alia*, both Ocwen and Castle, as well as Experian, Equifax and Trans Union, that the First Mortgage Loan had been paid in full and that the adverse credit reporting was erroneous.

Llewellyn again explained that the loan was refinanced and that a payoff was made to Equity Pacific.  Llewellyn included as attachments to his letter the following documents:

- August 9, 2006, Ocwen notice of default letter;

- August 9, 2006, foreclosure letter from Ocwen;

- September 7, 2006, letter from Castle threatening foreclosure;

- Ocwen's most recent account statement received;

- October 3, 2006, letter of sale from Ocwen to NCC servicing, LLC;

- August 9, 2006, letter from Washington Mutual;

- Llewellyn's FICO scores from all three credit bureaus;

- June 1, 2006, HUD settlement statement on refinance.

Llewellyn Decl., **Attachment H-9** thereto. SOF 50.

JJ.     Also, on October 10, 2006, Ms. Saport telephoned Ocwen advising it that the Loan was paid off in June 2006 and that the funds were transferred to Allstate Funding. Ocwen Log; SOF 51.

> *Ocwen receives, and rejects, another payment on the First Mortgage Loan from Allstate, and continues its foreclosure efforts.*

KK.     On October 10, 2006, Ocwen received yet another check from Allstate dated October 5, 2006, in the amount of $3625.46 as payment toward the First Mortgage Loan.  Ocwen Log, October 10, 2006 entry; Barron Dep., at 172:3-173:25, **Exhibit 14**, thereto (**Exhibit D-14** hereto) (Allstate's $3,625.46 check); SOF 52.  Ocwen rejected this payment because the loan was in foreclosure and the funds were not certified.  Ocwen Log, October 10 and 11, 2006 entries (loan in FC, LS-uncertified hence

rejected); SOF 52.[22]   Ocwen then continued its efforts to foreclose on the Coolidge

Property.  Ocwen Log, October 10, 2006 entry (October 10, Foreclosure cost fee

assessed); SOF 52.

       LL.    Ocwen's Log shows that on October 13, 2006, Llewellyn again

advised Ocwen that payoff funds in the amount of $573,191.59 were remitted to the prior

servicer.  Ocwen Log; SOF 53.  Ocwen's Log also shows that on October 18, 2006,

Llewellyn again telephoned Ocwen regarding the payment and that Ocwen received

written dispute correspondence.  Ocwen Log; SOF 54.

> ***Ocwen retains the $10,876.38 received from Allstate as an interim payment on the First Mortgage Loan, and recognizes that this loan was paid out prior to being boarded at Ocwen***
> **.**

       MM.   On October 18, 2006, after Ocwen returned the two checks to

Allstate, an Allstate representative telephoned Ocwen regarding "the payoff that was sent

in being short."  Ocwen Log; SOF 55.  Ocwen provided bank wire information to the

Allstate representative.  Ocwen Log; SOF 55.  Later that day, Ocwen received a wire

transfer from Allstate in the amount of $10,876.38.  Ocwen Log, *see also*, October 18 and

20, 2006 entries; SOF 55.  That same day, according to Ocwen's log, Ocwen again spoke

to Llewellyn regarding the Loan, but failed to disclose that Allstate had made the

$10,876.38 payment toward the Loan.  Ocwen Log; SOF 55.

---

[22] In its Motion, Ocwen states that [m]onths after the refinance transaction, on September 28, 2010 and October 10, 2010, Allstate sent checks to Ocwen in small amounts intended to cover minimum monthly payments due under the mortgage loan - presumably in hopes that Ocwen would accept them and treat the still-unpaid mortgage loan as current rather than delinquent."  Motion, at 4.  Ocwen further states in its Motion that "[c]urious why Allstate remitted checks that appeared to be certain of plaintiff's delinquent monthly payments, Ocwen attempted to call Allstate on October 13 and again on October 16, 2006.  Ocwen was unable to reach anyone at Allstate for an explanation."  Motion, at p. 44.  Through these statements, Ocwen is not being entirely candid with this Court.  As shown below, Ocwen fails to advise the Court (and failed to advise Llewellyn until compelled to do so by this Court in connection with a discovery dispute) that on October 18, 2006, Ocwen accepted a $10,876.38 wire transfer from Allstate as payment on the Loan.

NN.     Also, on that same day, after receiving the $10,876.38 wire transfer from Allstate, an Ocwen representative, in noting an invalid workflow request, observed that "[th]is item was paid out prior to the loan being boarded at Ocwen.  Therefore, this is an IPAY issue and you should submit this to the IPAY workflow."  Ocwen Log; SOF 56.

OO.     The next day, on October 19, 2006, Llewellyn again telephoned Ocwen advising it that the loan had been paid in full and should not be in foreclosure, and demanded that Ocwen correct the credit reporting to the Credit Bureau. The Ocwen representative submitted a research investigation request.  Ocwen Log; SOF 57.

PP.     Later on October 19, 2006, Ocwen acknowledges in its Log that on June 6, 2006, $473,554.45 was paid by Stewart Title to Equity Pacific by wire in connection with Loan #100602061.  Ocwen Log; SOF 57.  Still later on October 19, 2006 Ocwen's Log shows it received written correspondence regarding the payment dispute. Ocwen Log; SOF 58.

**_Ocwen finally advises Llewellyn that it will conduct research regarding nonpayment of the First Mortgage Loan, but continues foreclosure proceedings._**

QQ.     Ocwen ignored its October 18, 2006 Log entry that the Loan was paid out prior to the loan being boarded at Ocwen.  And, for whatever reason, Ocwen was not satisfied with the information contained in Ocwen's October 19, 2006 log entry showing that on June 6, 2006, Stewart Title paid $473,554.45 to Equity Pacific by wire transfer in connection with the Loan.  Thus, although Ocwen knew the prior servicer, Allstate, had made payments on the Loan, and although Ocwen retained Allstate's $10,876.38 payment while concealing this pivotal fact from Llewellyn, Ocwen

disingenuously and in bad faith continued to put Llewellyn to the task of proving that the Loan had been paid off through the refinance proceeds.

RR.    Armed with the knowledge of Wyman Funding's wire transfer of the refinance proceeds to Equity Pacific, and with its pockets lined with Allstate's $10,876.38 payment, Ocwen persisted in tormenting Llewellyn by letter dated October 19, 2006, and again (for whatever reason) by letter dated October 20, 2006, whereby Ocwen advised Llewellyn that it was in receipt of his letter requesting Ocwen to conduct research.  Ocwen noted that it had 60 days under RESPA to conduct the research, but that its policy was to perform the research in 15 days.  Ocwen further noted that if the servicing of the loan was transferred to Ocwen from a prior servicer [a fact Ocwen obviously had already known], Ocwen may be required to obtain information from the prior servicer [information that Ocwen already had].  Llewellyn Decl., **Attachment H-11** thereto; SOF 59.

SS.    As noted in Ocwen's October 19 and 20, 2006 letters, its investigation referenced in its letters was pursuant to RESPA.  RESPA directs a loan servicer, upon receiving a qualified written request, within 60 days, to either make corrections to the borrower's account, or to conduct an investigation of the borrower's account related to the borrower's inquiry.  *Carter v. Countrywide Home Loans, Inc.*, 2009 U.S. Dist. LEXIS 75247, at *13-14 (E.D.Va.) (12 U.S.C. § 2605(e)(2)(A)-(C)).  The investigation must result in either a report to the borrower which includes a statement of the reasons for which the servicer believes the account of the borrower is correct, the production of information requested by the borrower, or an explanation of why the information requested is unavailable.  *Id*.  Additionally, the loan servicer must provide

contact information "of an individual employed by, or the officer or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(B)(ii).

TT.   Ocwen's deceit and complete lack of diligence in investigating Llewellyn's dispute under RESPA evidences Ocwen's same deceit and complete lack of diligence in investigating Llewellyn's dispute under the FCRA.  Put simply, Ocwen never investigated Llewellyn's dispute under the FCRA, RESPA or any other statute or Ocwen internal guideline.  Instead, Ocwen continued with its outrageous demands and steps toward foreclosure on the Coolidge Property.  Along these lines, Ocwen's October 19, 2006 Ocwen Log entry states that foreclosure proceedings were started.  Ocwen Log. Ocwen's Log also contains an October 20, 2006 reference that the payoff amount for Llewellyn is $450,241.83, which includes foreclosure costs.  Ocwen Log; SOF 60.

*The servicing rights to the First Mortgage Loan Are transferred from Ocwen to NCC Servicing on October 20, 2006, and Ocwen transfers to NCC Servicing the $10,876.38 payoff funds received from Allstate.*
UU.   On October 20, 2006, the servicing rights to the First Mortgage Loan was assigned, sold and transferred from Ocwen to defendant NCC Servicing, LLC. Llewellyn Decl., **Attachments H-13** thereto; SOF 62.[23]

VV.   Ocwen's Log also shows that, even though the servicing rights to this Loan were transferred on October 20, 2006 Ocwen nevertheless posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006. Ocwen Log; SOF 63. Notably, Ocwen's Log reflects that on October 31, 2006, a call was made to Ocwen requesting a payoff quote, and Ocwen advised the caller that the Loan was service transferred.  Ocwen Log; SOF 63.  The fact that Ocwen failed to provide a

---

[23]Ocwen's October 20, 2006 Log entry states that the loan is in foreclosure. Ocwen Log, October 20 entry; SOF 61.

payoff quote and instead advised the caller that the Loan was service transferred did not

deter Ocwen in its efforts to obliterate Llewellyn's credit.

> ### After Ocwen Transfers the Servicing Rights to the First Mortgage Loan to NCC Servicing, Ocwen Reports Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.

WW.   Although Ocwen was no longer servicing the First Mortgage Loan

as of October 20, 2006, Ocwen nevertheless reported negatively on Llewellyn to the

Credit Bureau on October 20, 2006.  Specifically, Ocwen advised the Credit Bureau that

as of September 30, 2006, Llewellyn was past due $14,988.  Ocwen Log; SOF 64.

Ocwen's reporting was incorrect for two reasons.  First, as stated above, the Loan was

never past due under both RESPA and the RESPA Servicing Disclosure because the

refinance proceeds were timely paid to the transferor servicer under the 60 day grace

period. In any event, even if the payment of the refinance proceeds to the transferor

servicer are ignored, the First Mortgage Loan was not past due $14,988 as of September

30, 2006, because Ocwen, at the time it reported to the Credit Bureau about Llewellyn,

on October 20, 2006, had received $10,876.38 from Allstate -- a payment Ocwen

concealed from Llewellyn until it was compelled to disclose this information during a

discovery dispute in this case.

XX.    Again, on October 23, 2006, even though Ocwen was no longer

servicing the loan, Ocwen reported to the Credit Bureau that Llewellyn's account was 120

days past the due date as of September 30, 2006.  Ocwen Log; SOF 66.  In doing so,

Ocwen was acting as NCC Servicing's agent in attempting to collect the debt mistakenly

believed to be owed by Llewellyn.

> ### Ocwen fails to comply with its investigation and reporting obligations under 15 U.S.C. § 1681s-2(b).

YY.    Ocwen argues in its Motion that it dutifully complied with its investigation and reporting obligations under 15 U.S.C. § 1681s-2(b), observing that it conducted no less than four investigations into Llewellyn's mortgage loan account in response to the inquiries from the consumer reporting agencies.  Motion, at 32 (referencing investigations in connection with October 23, November 20, November 30, and December 15 inquiries).  Ocwen's investigation was woefully inadequate -- indeed, it was nonexistent.[24]

ZZ.    Ocwen's October 23, 2006 Log entry notes that a form was completed and sent electronically regarding Llewellyn's concern with Ocwen's credit reporting.  Ocwen Log; SOF 65.That same day, by letter dated October 23, 2006, Ocwen advised Llewellyn, obviously pursuant to §1681i(a)(2), that it has reviewed his request that Ocwen perform research relative to the interim payment issue.  As with its investigation pursuant to RESPA (the subject of Ocwen's October 19 and 20, 2006 letters, *supra*, to Llewellyn), Ocwen again advised Llewellyn that his request was a priority, and as with its October 19 and 20, 2006 letters, Ocwen advised Llewellyn that if the servicing of the Loan was assigned, sold or transferred to Ocwen from a prior

---

[24] In its Motion, Ocwen falsely notes that "[o]ther than Ocwen's evidence that it reported the results of its investigations to TransUnion, there is no independent evidence [indicating that] the credit reporting agency received a dispute or ever sent notification of the dispute to [Ocwen] pursuant to § 1681i(a)(2)."  As shown above, Llewellyn notified the Credit Bureaus of its dispute by letter dated October 10, 2006. Following Llewellyn's dispute, the Credit Bureaus had a duty under §1681i to convey information to Ocwen regarding Llewellyn's dispute. 15 U.S.C. § 1681i(a)(2)(A); *see also Nelson v. Chase Manhattan Mortgage Co.,* 282 F.3d 1057, 1060 (9th Cir. 2002). Once the Credit Bureaus conveyed Llewellyn's dispute to Ocwen, Ocwen had a duty to conduct an investigation regarding the disputed information, review all relevant information by the Credit Bureaus, and report the result of the investigation to the Credit Bureaus within the time period allotted under FCRA. 15 U.S.C. § 1681s-2(b).  Moreover, Ocwen's assertion is wholly disingenuous in view of the fact that Ocwen concedes, as it must, that it conducted an investigation pursuant to § 1681s-2(b) based on a notification of a dispute by TransUnion initiated by Llewellyn.  Indeed, Ocwen asserts that it "conducted no less than four investigations into plaintiff's Mortgage Loan account in response to the inquiries from the consumer reporting agencies." Motion, at p.32.  Ocwen's assertion is also irrelevant as Ocwen, in its Motion, has not identified this second element of an FCRA claim as an element that Llewellyn cannot prove.

servicer, Ocwen may be required to obtain information concerning the Loan from the prior servicer.  Ocwen again advised Llewellyn that the process of obtaining this information takes time, and that Ocwen would notify him if any additional information was required.  Llewellyn Decl., **AttachmentH-14** thereto. SOF 67.

AAA.  Ocwen, however, should have completed its investigation immediately after the investigation commenced.  Ocwen had already received from Llewellyn, among other things, the June 1, 2006 HUD Settlement Statement and the August 9, 2006, letter from Washington Mutual,  And Ocwen had already acknowledged in its October 18, 2006 Log entry that the Loan was paid out prior to being boarded at Ocwen.  Notably, Ocwen's October 24, 2006 Log entry provides "our records indicate that the loan was acquired on May 15, 2006 with the loan due for June 1, 2006 *payment from Allstate Funding*."  Ocwen Log (emphasis added). SOF 68.

BBB.  Meanwhile, while Ocwen was feigning an investigation, by e-mail dated October 27, 2006, James George, a representative of NCC Servicing, Ocwen's principal in connection with the debt allegedly owed by Llewellyn, advised Ms. Krehbiel that NCC was servicing the Loan for Ocwen Mortgage and acknowledged that Llewellyn had refinanced the Coolidge Property on June 1, 2006, through Wyman Funding.  Mr. George, however, requested from Ms. Krehbiel any pertinent information she had showing the original loan through Equity Pacific was paid off, including a copy of the payoff and payoff check as proof.  Mr. George also candidly acknowledged that"this [issue] has adversely affected [Llewellyn's] credit and that[Llewellyn] needs this resolved ASAP."  Krehbiel Dep., at 139:10-141:9, **Exhibit 28** thereto (**Exhibit F-9** hereto); SOF 71.

CCC.   By e-mail dated October 27, 2006, Ms. Krehbiel advised Mr. George that she had sent the payoff on the loan by wire transfer.  McNamara Decl., **Attachment C-8** thereto; SOF 72.  By e-mail dated November 3, 2006, Ms. Krehbiel sent to Mr. George, in response to his request for proof of the payoff, the payoffs, HUD and copies of the outgoing wires that were sent to pay off the lender.  Krehbiel Dep., at 125:17-126:13, 141:-143; SOF 74.

DDD.   While NCC Servicing sought to obtain information and documents Llewellyn had already provided to Ocwen, establishing that the Loan was paid off, Ocwen continued to ignore all of this information.  By letter dated October 31, 2006, from Ocwen to Llewellyn, Ocwen referred to Llewellyn's "recent" notification regarding the payment to the prior servicer of the Loan, and requested from Llewellyn legal documents showing how the payment was made (if by wire, Llewellyn must track down the funds with a trace number), a letter specifying which monthly payment appears to be missing or misapplied, and his Ocwen loan number.  Ocwen further advised Llewellyn that it would be unable to research the matter further unless it obtains this information.  Llewellyn Decl., **Attachments H-15** thereto; SOF 73.  Incredibly, Ocwen made this request even though it already knew, as shown by its own Log, that the Loan had been paid off at least six months earlier through the refinancing proceeds Wyman Funding sent by wire transfer to Allstate.

EEE.   On November 2, 2006, Ocwen finally got around to calling Allstate Funding, at 12:25:18 p.m. Pacific Time *viz*., lunchtime. Predictably, the call made during the lunch hour was unsuccessful.  Ocwen Log. SOF 76.  In its Motion, Ocwen does not mention this telephone call, but instead asserts that on October 13 and

16, 2006, an Ocwen representative attempted to call the prior loan servicer, noting that he could not get through and that there was no option to talk to the customer representative. The telephone calls, however, were made at 1:11:50 and 1:15:49, Pacific Time, respectively (around lunchtime). Ocwen Log; SOF 53.

FFF.    Significantly, Ocwen fails to advise this Court that, as noted above, it spoke to Allstate on October 18, 2006, regarding "the payoff that was sent in being short," and Ocwen provided bank wire information to the Allstate representative. Ocwen Log; SOF 55. Later that day, Ocwen received a wire transfer from Allstate in the amount of $10,876.38. Ocwen Log, *see also*, October 18 and 20, 2006 entries; SOF 55. Ocwen posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006. Ocwen Log; SOF 63. Thus, Ocwen by this time knew conclusively that Allstate had received the refinance proceeds, and any additional telephone calls to Allstate to determine whether Llewellyn was responsible on the Loan were superfluous and wholly unnecessary in Ocwen's investigation under the FCRA.

GGG.  On November 8, 2006, Ocwen advised Ms. Saport that the loan servicing was transferred to NCC on October 20, 2006, and misrepresented to her that *after* the transfer Ocwen had received the payoff funds which it transferred to the new servicer, NCC. Ocwen Log; SOF 76. As noted above, Ocwen's Log shows that it received the payoff funds on October 18, 2006, before the transfer of the servicing rights to NCC. Ocwen Log, October 20, 2006 entry. Inexplicably, Ocwen requested Ms. Saport to fax a research request to NCC. Ocwen Log, November 8 entry; SOF 77.

HHH.  Ms. Krehbiel dutifully complied with Ocwen's instructions and, by e-mail dated November 10, 2006, Ms. Krehbiel sent Castle, as proof that the Loan was

paid off from the proceeds of the refinance, copies of the HUD settlement statement, the

payoffs and the wire transfer log reflecting the wire transfer to payoff Equity Pacific.

Krehbiel Dep., at 152, 156, **Exhibit 34** thereto (**Exhibit F-12** hereto). SOF 79.

III.     Ocwen uncandidly reported the status of its investigation to

Llewellyn by letter dated November 13, 2006, first thanking Llewellyn for his "recent

correspondence regarding the above-referenced loan."  Ocwen further advised Llewellyn

that it had reviewed the loan and noted that Llewellyn had provided Ocwen with a copy

of the HUD Settlement Statement indicating that the loan was paid in full with Equity

Pacific on June 1, 2006.  Without further explanation, Ocwen advised Llewellyn that "the

proof provided is insufficient for [Ocwen] to research the issue.  Therefore, it is

suggested that you provide us with the front and back copy of the cash payoff check

(EVEN THOUGH Ocwen knew the payment was made by wire), source of receipt along

with the letter from your prior servicer stating that the loan was paid in full with them....

This will enable us to research further and update your credit report accordingly."

Llewellyn Decl., **Attachment H-17** thereto. SOF 78.  Ocwen's investigation was

perfunctory and cursory at best, as Ocwen purported not to know, despite the documents

Llewellyn had already provided it back in August 2006 and throughout October, 2006,

that the payoff on the Loan through refinance proceeds was made to Equity Pacific *via*

wire transfer. Moreover, Ocwen wholly ignored the documents Ms. Krehbiel had sent to

Castle on November 10, 2006 at Ocwen's instructions.

JJJ.     Meanwhile, while signifying to Llewellyn that it would conduct an

investigation, Ocwen continued reporting negatively, and incorrectly, on Llewellyn to the

Credit Bureaus.  Specifically, on November 17, 2006, Ocwen reported to the Credit

Bureau that Llewellyn's account was delinquent and that Llewellyn had made no monthly

payments.  Ocwen Log.  Again, on November 20, 2006, Ocwen reported to the Credit

Bureau that the account was transferred to another office as of October 20, 2006, and

gave the payment rating: 120-149 days past due.  Ocwen Log. SOF 80.[25]

      KKK.      On November 21, 2006, Ms. Krehbiel provided Ocwen the

wiring log she had previously sent to Ocwen's attorneys and to NCC Servicing, showing

the payoff to Equity Pacific. Krehbiel Dep., at 150-51, **Exhibit 31** thereto (**Exhibit F-13**

hereto). SOF 83. Notwithstanding receipt of the wiring log, on November 30, 2006,

Ocwen again reported to the Credit Bureau that the account was transferred to another

office as of October 20, 2006, and that the account was 120-149 days past due as of

September 30, 2006.  Ocwen Log. SOF 81.

      LLL.      By letter dated December 5, 2006, Castle, Ocwen and NCC

Servicing's debt collecting agent, advised McNamara that its "client has indicated that

this loan should have been paid-in-full."  Moreover, Castle advised McNamara that its

"client has indicated that Mr. Llewellyn's credit report will be reversed as it has been

negatively effective [sic] by this action."  McNamara Decl., **Attachment C-10** thereto;

SOF 82.

      MMM.      Although Ocwen's debt collecting agent, Castle, admitted, on

behalf of Ocwen, that the "loan should have been paid-in-full" and that "Llewellyn's

---

[25] In negatively reporting Llewellyn to the Credit Bureaus, Ocwen violated § 2605(e)(3) of the RESPA, which provides that during the 60-day period after the date of the servicer's receipt of a QWR relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment related to the dispute to any consumer reporting agency. *Taggart v. Norwest Mortgage, Inc.*, 2010 U.S. Dist. LEXIS 2263, *13-14 (E.D.Pa.).  Ocwen's total disregard of RESPA evidences that it did not take its investigation under the FCRA very seriously.  In fact, Ocwen's investigation appears to be a sham. Moreover, as explained *infra*, Ocwen's improper reporting under RESPA violates the FDCPA in numerous respects.

credit report will be reversed," Ocwen improperly continued to report negatively and incorrectly, on Llewellyn to the Credit Bureaus. Thus, on December 15, 2006, Ocwen reported to the Credit Bureau that Llewellyn's account was transferred to another office as of October 20, 2006 and that the account was 120-149 days past due as of September 30, 2006. Ocwen Log; SOF 83.

NNN.    By letter dated January 8 and 11, 2007, Mr. Barron, on behalf of Allstate, advised Mr. McNamara that the Loan was paid in full in June 2006, and that any adverse reporting to credit agencies by parties other than Allstate would be erroneous and completely without merit. Barron Dep., at 153:5-18, 154:20-155:1, 192:17-22, 194:19-195:12-15, **Exhibits 12** and **17** (**Exhibits D-5** and **D-6** hereto).[26] SOF 84.

OOO.    As noted above, after Ocwen transferred the servicing rights to the First Mortgage Loan to NCC Servicing on October 20, 2006, Ocwen acted as NCC's Servicing's agent in its collection efforts on the Llewellyn loan and in reporting on Llewellyn to the Credit Bureaus. Castle, in turn, represented both Ocwen and NCC Servicing, and acted as their agent in its collection efforts with respect to the alleged Llewellyn debt. Although Castle, on December 5, 2006, acting as a debt collecting agent on behalf of both Ocwen and NCC, advised McNamara that Llewellyn's credit report would be reversed, by letter dated January 9, 2007, NCC Servicing advised Llewellyn that he was in default on the Loan. NCC also threatened Llewellyn that if he did not pay the full amount of the default, it would invoke any remedies, including foreclosure of the property. Llewellyn Decl., **Attachment H-18** thereto. SOF 85. In calculating the

---

[26] On January 22, 2007, Mr. Barron signed the note securing the Loan as paid in full. Barron Dep., at 210, **Exhibit19** thereto (**Exhibit D-7** hereto). On January 24, 2007, the release of the deed of trust for Loan was recorded. Barron Dep., 220-21, **Exhibit 21** (**Exhibit D-8** hereto); SOF 84, n.16.

amount purportedly due, NCC deducted the $10,876.38 payment made by Allstate back on October 18, 2006.  SOF 86.

PPP.       By letter dated January 18, 2007, Castle once again advised Mr. McNamara that his client has informed that the Loan should have been paid in full, and any adverse credit reporting was an error.  McNamara Decl., **Attachment C-11** thereto; SOF 87.

QQQ.       Castle's intervention on behalf of its clients, NCC and Ocwen, however, did not cause the reversal of Llewellyn's bad credit marks.  Thus, by letter dated January 22, 2007, Mr. McNamara advised Castle that Llewellyn's credit report still showed Ocwen reporting Llewellyn in foreclosure/default.  McNamara requested that Castle have its clients reverse the bad credit marks.  McNamara Decl., **Attachment C-12** thereto; SOF 88.  By letter dated January 23, 2007, Mr. McNamara also advised NCC that the Loan was not in default, pointing NCC to Castle's January 18, 2007 letter.  Mr. McNamara also enclosed copies of the paid notes that NCC claimed to be servicing and a letter from Allstate stating that the notes were paid in full.  McNamara Decl., **Attachment C-13** thereto; SOF 89.

RRR.       By letter dated January 29, 2007, Mr. James George, NCC Servicing, writing on behalf of defendants NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a result of your *recent* inquiry." (emphasis added). McNamara Decl.,  **Attachment C-14** thereto.  Mr. George further stated, on behalf of NCC, Ocwen and NCCI, that "[a]lthough *we* are still attempting to resolve this matter *we* have received confirmation that this error was not a

direct result of any wrongdoing on the part of Glenn Llewellyn." *Id.* (emphasis added). SOF 90.

SSS.     Ocwen's Log shows that Ms. Saport telephoned Ocwen on February 2, 2007, again advising Ocwen that the account had been paid off with the prior servicer and somehow was reported in foreclosure.  Incredibly, Ocwen advised Ms. Saport "to fax the proof to RSHS sp so they could look into the same."  Ocwen's February 2, 2007 log reflects that "caller was upset as she wanted something today."  Ocwen Log. Ocwen's February 2, 2007 Log entry also shows that Ms. Irene from Credit Plus[27] telephoned Ocwen requesting a letter that the account should not have been placed in foreclosure.  Ocwen Log; SOF 91.

TTT.     By letter dated February 8, 2007, Mr. McNamara chastised Castle for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report, and reminded Castle of its December 5, 2006 letter indicating that the credit report would be reversed.  McNamara Decl., **Attachment C-15** thereto; SOF 92.

UUU.     By facsimile dated February 8, 2007, Castle sent to Mr. George the February 8, 2007 McNamara letter requesting a letter from Ocwen that afternoon. McNamara Decl.,  **Attachment C-16** thereto.SOF 93.  That same day Mr. George advised Ms. Boxill of Ocwen by e-mail dated February 8, 2007 that "we are in desperate need of a letter from Ocwen stating that this will be corrected on the borrower's credit report."  McNamara Decl., **Attachment C-17** thereto; SOF 94.

VVV.     Later that day, by e-mail, Mr. George advised Ms. Boxill that the Loan "was paid off in June but due to an error in processing was never recorded

---

[27] Credit Plus is a credit reporting agency that applies the credit report that is used for the mortgage loan. Ms. Saport used Credit Plus exclusively for all of her credit reports.  Ms. Saport also used Credit Plus for credit repair.  Saport Dep., at  60-61; SOF 91, n.17.

correctly.  Therefore, this is still showing on the borrower's CBR report by Ocwen as a delinquency and he needs ASAP a letter advising that this will be corrected by Ocwen." Referencing his conversation with Ms. Boxill the previous week, Mr. George enclosed: "proof of payoff, a copy of the CBR report showing Ocwen reporting this delinquency and correspondence from his attorney threatening a lawsuit."  Mr. George strongly advised Ms. Boxill that her "immediate attention to this matter would be greatly appreciated.  Urgent!!! 911." McNamara Decl., **Attachment C-18** thereto; SOF 95.

WWW.     Mr. George of NCC continued attempting to persuade Ms. Boxill of Ocwen that the loan was paid off.  Thus, by e-mail dated February 9, 2006, Mr. George provided Ms. Boxill with "another copy of the CBR report the mortgagor has sent which gives more detail of the information reported by Ocwen."  McNamara Decl., **Attachment C-20** thereto.  In a separate e-mail dated February 9, 2006, Mr. George provided Ms. Boxill with the settlement information she requested. McNamara Decl., **Attachment C-21** thereto; SOF 97.

XXX.     Finally, the stubborn Ms. Boxill saw the light and, by e-mail dated February 12, 2006, Ms. Boxill advised Mr. Nelson Samuel of Ocwen that Llewellyn had paid off the loan prior to service transfer and that Ocwen reported him negatively to the Credit Bureau.  She instructed Mr. Samuel to correct all negative reporting and provide a letter stating that Ocwen corrected it. McNamara Decl., **Attachment C-22** thereto.  By e-mail dated February 14, 2006, Mr. Samuel advised Ms. Boxill that he was having Llewellyn's credit updated that day.  McNamara Decl., **Attachment C-23** thereto.  In a separate e-mail also dated February 14, 2006, Mr. Samuel advised Ms. Boxill that "if this loan was paid off prior to the loan being

transferred to Ocwen, we should be deleting the entire trade line of the borrower's credit report."  Moreover, Mr. Samuel observed that "this loan should not have been boarded in the first place as the loan was paid off prior to the loan being transferred to Ocwen."  McNamara Decl., **Attachment C-24** thereto; *see also*, Ocwen Log. SOF 98.

YYY.    Ocwen's February 14, 2006 Log entry shows that "Research Priority Form Submitted: Details: delete entire trade line and send out a letter to the bwr." Ocwen Log; SOF 99.

ZZZ.    By facsimile dated February 15, 2007, Castle provided McNamara with a letter dated February 15, 2007, from Ocwen to Llewellyn regarding Llewellyn.  In its February 15, 2007 letter, in response to what Ocwen disingenuously characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan.  Ocwen sincerely apologized for any inconvenience caused.  SOF 102-103. McNamara Decl., **Attachment C-25** thereto; SOF 100-101.

AAAA.    Incredibly, after this nine-month long drawn out nightmare in which Ocwen and Castle destroyed Llewellyn's credit, Ocwen cavalierly asserts in its Answer that "[Ocwen] and NCCI state that in an abundance of caution upon receipt of plaintiff's correspondence, and before completing an independent investigation, Ocwen requested that the trade line with the credit bureaus relating to plaintiff's mortgage loan be deleted."  Ocwen Answer at ¶ 20, attached hereto as **Exhibit K**. SOF 102.

BBBB.    Notably, after October 2006, the only new information showing that the Loan had been repaid was the January 22, 2007, note securing the Loan signed by Barron as "paid in full," and the January 24, 2007, recorded release of the deed

of trust for the Loan. *See*, Barron Dep., at 210, **Exhibit 19** thereto (**Exhibit D-7** hereto); Barron Dep., 220-21, **Exhibit 21** thereto (**Exhibit D-8** hereto).  As shown above, however, it is readily apparent from the e-mails back and forth between Ms. Boxill and Mr. George that Ms. Boxill did not even rely on these documents in ultimately deciding to delete the entire Llewellyn trade line.  Moreover, Ocwen did not need these documents to determine that the Loan had been paid off and that Ocwen should delete the adverse Llewellyn trade line.  Indeed, according to Ocwen's debt collecting agent, Castle, NCC and Ocwen determined back on December 5, 2006, that the "loan should have been paid-in-full," and that "Mr. Llewellyn's credit report [would] be reversed as it has been negatively effective [sic] by this action."December 5, 2006 letter from Castle to McNamara, McNamara Decl., **Attachment C-10** thereto; SOF 82.

CCCC.    Further conclusively establishing that Ocwen really did not rely on the January 22, 2007 note signed by Barron as "paid in full" and the January 24, 2007 recorded release of the deed of trust is Ocwen's own assertion, however misguided, that the note signed "paid in full" was "explicitly false in stating that the loan had been paid in full when in fact it had not been," and the release of the deed of trust "was implicitly false in its implication that Mr. Barron and Allstate had any legal authority to release the lien." (Motion at 4).  Ocwen's statements in its Motion show, assuming Ocwen relied on these documents in deciding to delete the entire trade line on Llewellyn's credit, which it did not, such reliance would be subjectively unreasonable in Ocwen's mind.  Tellingly, Ocwen's assertion in its Motion shows that Ocwen, or at least its attorneys, are still stubbornly insisting that the Loan was never paid off, and that Llewellyn is still somehow at fault.  This position smakes of bad faith particularly considering Castle's December 5,

2006 letter, and Ocwen's February 15, 2007 letter (all agreeing that Llewellyn was not at fault), or NCC Servicings' January 29, 2007 letter, together with all of the anguish Ocwen put Llewellyn through.

DDDD.    Thus, in the end, after its four-month pathetic excuse of an "investigation" of Llewellyn's dispute under the FCRA, Ocwen deleted the entire Llewellyn trade line based on information it had in its possession from the outset, but which it chose to ignore.

EEEE.    Ocwen's investigation was unreasonable, if not nonexistent.  At a minimum, "[t]here remain material issues of fact in dispute as to whether [Ocwen] undertook reasonable (or any) investigations with respect to complaints plaintiff made to CRA's at different times." *Okocha v. HSBC Bank USA, N.A.*, 700 F.Supp.2d 369, (S.D.N.Y. 2010), 2010 U.S.Dist. Lexis 33248, *9 and n. 11 (citing authorities construing the phrase "conduct an investigation with respect to the disputed information" as assuming a reasonableness standard for judging the adequacy of the required investigation).

FFFF.    Although Ocwen, in its Motion, does not advance any arguments with respect to NCCI's liability on the FCRA claim, NCCI, as the principal of Ocwen (and NCC Servicing), is vicariously liable for Ocwen's FCRA violations.  Ocwen violated the FCRA directly, and as an agent of NCCI, as well as NCC Servicing (who also acted as an agent of NCCI).  As noted above, by letter dated January 29, 2007, Mr. George, of NCC Servicing, LLC, writing on behalf of NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a result of your

*recent* inquiry." (emphasis added). McNamara Decl., **Attachment C-14** thereto.  Mr.

George further stated, on behalf of NCC, Ocwen and NCCI, that "[a]lthough *we* are still

attempting to resolve this matter *we* have received confirmation that this error was not a

direct result of any wrongdoing on the part of Glenn Llewellyn."*Id*. (emphasis added).

SOF 90.  Moreover, as noted above, NCC Servicing instructed Ocwen to delete the entire

trade line on Llewellyn's credit. *See*, **Attachment C-14**, *supra*.

　　　　　GGGG.　　FCRA does not eliminate agency principles such as vicarious

liability, and courts have held that corporations can be vicariously liable for FCRA

violations committed by their agents under common law agency principles, such as on a

theory of apparent authority.  *Patterson v. Denny's Corporation*, 2008 U.S. Dist. LEXIS

6747, at *5, n.7 (W.D.Pa.) (citing, *Jones v. Federated Financial Reserve Corp.,* 144 F.3d

961, 964-966 (6th Cir. 1998); *Yohay v. City of Alexandria Employees Credit Union, Inc.,*

827 F.2d 967, 972-973 (4th Cir. 1987); and in a FACTA case, *Edwards v. Toys "R" Us,*

527 F. Supp. 2d 1197, 2007 U.S. Dist. LEXIS 94448, 2007 WL 4305928, *8-*10

(C.D.Cal., Nov. 5, 2007)).

　　　Element 4:　Mr. Llewellyn can demonstrate a triable issue of fact as to whether

Ocwen caused Llewellyn to suffer actual damages.

　　　　　A.　　Ms. Saport, who had brokered approximately six other loans for

Llewellyn, attempted to broker an additional loan after the closing on the Coolidge

Property. Saport Dep., at 17, 24; SOF 103.  Llewellyn's credit report, however, showed

an Ocwen reporting Llewellyn 30 days late, causing Mr. Llewellyn's credit score to fall

from 782 down below 600.  Saport Dep., at 24, 69; SOF 103. The Coolidge Property was

the last property Llewellyn purchased or refinanced after Ocwen's misconduct because

his credit "blew up" and Ms. Support could not get anything done.[28]   Saport Dep., at 67; SOF 103.

B.      Ms. Saport then worked with Llewellyn for several months trying to get his credit straightened out. Saport Dep., at 66; SOF 103.  Ms. Saport testified that she would call Ocwen and that she sent them all the paperwork and that "this went on and on."  She tried to get the late off references of Llewellyn's report "because it was totally screwing his credit.  He could not get anything."  Saport Dep., at 70; SOF 103.

C.      In late 2006 or early 2007, Mr. McNamara approached Mr. Barron (who was still the CEO of Shearson, successor to Allstate) seeking Mr. Barron's assistance in refinancing a loan for Llewellyn.  Barron Dep., at 128, 130, 131; SOF 104. Mr. Barron then telephoned Mr. Lawrence, who was running Shearson Home Loans, and requested him to run a credit check on Mr. Llewellyn.  Mr. Lawrence did so and discovered that Mr. Llewellyn's credit was terrible and there was nothing Shearson Home Loans could do to help him refinance the loan.  Barron Dep., at 126:8-125:5, 130:3-5, 131:7-20; SOF 104.  There was simply no way Mr. Llewellyn could refinance any of the loans on his properties. Barron Dep., at 131:9-16, 276:21-279:13, **Exhibit 31** thereto (**Exhibit D-9** hereto)  (February 26, 2007 e-mail from Sherry Karr to Joe Cosio-Barron (forwarded to Mr. McNamara on February 27, 2007) (unable to make 100% CLTV loan to pay off liens on Llewellyn's properties due to, *inter alia*, multiple 30 day lates and current FICO score); SOF 104.

D.      Mr. Llewellyn's financial losses are massive, all caused by Ocwen and Castle teaming up to destroy his credit and his entire real estate investment portfolio.

---

[28] Llewellyn closed on three loan refinancings after Ocwen destroyed his credit (*viz.*, **2122 S. Franklin** on September 15, 2006, 651 Race on November 22, 2006, and 572 Adams on January 19, 2007), but these loans had already been in the works for quite some time prior Ocwen's  misconduct.  Llewellyn Decl.

*See,* Llewellyn Decl., and the Declaration of William Stollar, attached hereto as **Exhibit K** ("Stollar Decl."), Mr. Llewellyn's accountant.

**Element 4**: Mr. Llewellyn can demonstrate a triable issue of fact as to whether Ocwen willfully violated the FCRA in order to merit statutory or punitive damages.

A. Although Llewellyn's financial and emotional losses are real and massive, the FCRA's private right of action does not require proof of actual damages as a prerequisite to the recovery of statutory damages for a willful violation of the FCRA. *Beaudry v. Telecheck Services, Inc., Telecheck International, Inc.*, 579 F.3d 702, 705 (6th Cir. 2009) (Section 1681n, which creates the cause of action for willful violations, also does not impose a consequential-damages requirement).[29] The word "willful" in this context includes conduct that shows a "reckless disregard of a statutory duty." *Roybal v. Equifax*, 2008 U.S. Dist. LEXIS 79789, *20-21 (E.D.Cal.) (citing, *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 127 S. Ct. 2201, 2208, 167 L. Ed. 2d 1045 (2007)).

B. It is beyond peradventure that Ocwen recklessly disregarded a host of statutory duties in connection with its wrongful misconduct in this case. Specifically, Ocwen recklessly disregarded Section 1681s-2(a) of the FCRA when it inaccurately reported to the Credit Bureaus that the Loan was in default at all (also a violation of §

---

[29] The Court in *Beaudry* observed that other courts have reached the same conclusion when considering §1681n statutory damages suits premised on violations of other provisions of the FCRA. *Id*. at 706 (citing, *Ashby v. Farmers Ins. Co. of Or.*, No. CV 01-1446-BR, 2004 U.S. Dist. LEXIS 21053, 2004 WL 2359968, at *5 (D. Or. Oct. 18., 2004) (holding that no "actual harm" need be proved in an action under § 1681m(a) because "Congress . . . has stated in plain terms that statutory damages are available as an alternative remedy to actual damages"); *accord Gillespie v. Equifax Info. Servs.*, No. 05 C 138, 2008 U.S. Dist. LEXIS 82483, 2008 WL 4614327, at *7 (N.D. Ill. Oct. 15, 2008) (relying on the same reasoning in determining that class treatment was appropriate for a violation of § 1681g(a)(1)'s disclosure requirements); *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 302-03 (N.D. Ill. 2005) (reaching a similar conclusion with respect to a FCRA claim premised on a violation of §1681b(e)).

2605 of RESPA), that the loan was 90 days past due, and that Ocwen had initiated foreclosure on the Coolidge Property.  *See*, Element 3, *supra*.

C. Ocwen recklessly disregarded § 2605(d) of RESPA when it threatens Llewellyn that the Loan was in default, when it threatened foreclosure on the Coolidge Property, and when it reported Llewellyn in default on the Loan to the Credit Bureaus.  Ocwen also recklessly disregarded § 2605(e)(3) of RESPA when it provided information regarding the allegedly overdue payment related to the dispute to the Credit Bureaus.  As shown *infra*, Ocwen recklessly disregarded numerous provisions of the FDCPA in its efforts to collect from Llewellyn on the Loan when it knew, or should have known, that Wyman Funding had paid the Loan through the refinancing funds sent by wire transfer to Allstate on June 14, 2006. *See*, Part, III(c) infra.  Although these statutory duties do not fall under the FCRA, they are inextricably intertwined with the statutory duties at issue here under the FCRA, and further evidence Ocwen's failure to investigate the Llewellyn dispute under the FCRA.  Put simply, Ocwen could hardly be reasonably investigating the Llewellyn dispute under the FCRA while, at the same time, violating a host of related statutory duties designed to protect consumers such as Llewellyn in these circumstances.  As such, this Court should consider Ocwen's reckless disregard for these statutory violations in assessing the willfulness of Ocwen's violations under the FCRA.

D. And, particularly egregious, even by Ocwen standards, Ocwen recklessly disregarded its statutory obligation under the FCRA when it failed to legitimately conduct an investigation of Llewellyn's dispute; concealed pivotal facts from Llewellyn, including the fact that Allstate had made a $10,876.38 payment toward the Loan; and refused to correct the Llewellyn's negative credit rating until months after its

own attorney had represented that the negative reporting was in error and that it would be reversed. *See*, Element 3, *supra*.

E.      In an effort to show that it did not willfully violate the FCRA, Ocwen states that it reported as unpaid a loan that was, in fact, not paid. Motion, at 42. The loan, however, was paid. *See*, Element 3, *supra*.

F.      Ocwen states that it repeatedly requested evidence to substantiate Llewellyn's cryptic claims that the mortgage was paid off.  Motion, at 42.  Llewellyn's claims were hardly "cryptic" and were supported by, among other things, the HUD Settlement Statement and the wire transfer log showing without question that Llewellyn's refinancing on the Coolidge property through Wyman Funding had paid off the previous lender, Allstate. *See*, Element 3, *supra*.

G.      Ocwen asserts that it asked Llewellyn for information showing that the mortgage loan was paid off, and Llewellyn refused to provide the information. Motion, at 42-43.  This assertion is totally false.  Indeed, Ocwen's attorneys, as well as NCC Servicing, agreed that the loan had been paid off and that the adverse credit reporting was in error.  *See*, Element 3, *supra*.

H.      Particularly disturbing is Ocwen's assertion that it took affirmative steps to investigate behavior from Allstate that was inconsistent with Llewellyn's contention that the loan had been paid off.  Motion, at 43-44.  More specifically, Ocwen asserts that "[c]urious why Allstate remitted checks that appeared to be certain of plaintiff's delinquent monthly payments, Ocwen attempted to call Allstate on October 13, 2006 and again on October 16, 2006.  Ocwen was unable to reach anyone at Allstate for an explanation.  Motion at 15  Ocwen, however, fails to advise the Court (and failed to

advise Llewellyn until compelled to do so by this Court in connection with a discovery dispute) that on October 18, 2006, Ocwen accepted a $10,876.38 wire transfer from Allstate as payment on the Loan.  *See*, Element 3, *supra*.  Ocwen's coy litigation tactics here are wholly consistent with Ocwen's misconduct and its utter reckless disregard of its statutory duties throughout the entire period Ocwen's adverse credit reportings on Llewellyn remained on the Credit Bureaus' reports.

I.       Finally, "Ocwen asserts that once plaintiff finally provided Ocwen with reliable evidence that the mortgage loan had been paid off, Ocwen deleted the trade line almost immediately."  Ocwen is referring to the January 22, 2007, note securing the Loan signed by Barron as "paid in full," and the January 24, 2007, recorded release of the deed of trust for the Loan.  *See*, Barron Dep., at 210, **Exhibit 19** thereto (**Exhibit D-7** hereto); Barron Dep., 220-21, **Exhibit 21** thereto (**Exhibit D-8** hereto).  Ocwen concedes that it did not delete the Llewellyn trade line until February 15, 2007, more than three weeks after the release was recorded.  Motion, at 44.

J.       More significantly, however, Ocwen did not rely on these documents in deciding to delete the entire Llewellyn trade line. *See*, Element 3, *supra*. (discussing e-mails between Ms. Boxill and Mr. George).  Moreover, Ocwen did not need these documents to determine that the Loan had been paid off and that it should delete the adverse Llewellyn trade line.  Indeed, according to Ocwen's debt collecting agent, Castle, NCC and Ocwen determined back on December 5, 2006, that the "loan should have been paid-in-full," and that "Mr. Llewellyn's credit report [would] be reversed as it has been negatively effective [sic] by this action."December 5, 2006 letter from Castle to McNamara, McNamara Decl., **Attachment C-10** thereto; SOF 82.

K.      And Ocwen's asserted reliance on the two documents is belied by its own statements in its Motion that the note signed "paid in full" was "explicitly false in stating that the loan had been paid in full when in fact it had not been," and the release of the deed of trust "was implicitly false in its implication that Mr. Barron and Allstate had any legal authority to release the lien." (Motion at 4).

L.      Accordingly, it is abundantly clear that there are triable issues of fact concerning whether Ocwen willfully violated the FCRA, and whether Llewellyn is entitled to statutory and punitive damages.

**B.      THE COURT SHOULD DENY THE OCWEN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT III: TORT OF OUTRAGEOUS CONDUCT.**

**1.      Burden of proof and elements:**

Llewellyn agrees with the Defendants' recitation of the burden of proof and elements on this claim.

**2.      Elements Challenged by the Ocwen Defendants.**

**Element 1:**  Mr. Llewellyn can demonstrate a triable issue of fact as to whether Ocwen engaged in extreme and outrageous conduct.

A.      The record is replete with evidence establishing that Ocwen engaged in extreme and outrageous conduct. *See*, Part III(A), *supra*, showing that Ocwen incorrectly reported the loan default, failed to conduct an investigation regarding the disputed credit entry, and delayed deleting the erroneous credit entry for over one half year.  Ocwen's initial assertion that there is no dispute that the Mortgage Loan was not paid misrepresents the facts.  From both a contractual standpoint, and as a matter of law, the First Mortgage Loan was never in default because the refinance proceeds were paid to

the prior loan servicer within the 60 day window set forth in the RESPA Servicing Disclosure signed by Llewellyn and Allstate, and as mandated by RESPA. Specifically, on or about May 15, 2006, the servicing rights to the First Mortgage Loan were transferred from Equity Pacific to Ocwen. Saport Dep., **Exhibit 53** thereto (Exhibit B-2 hereto)(May 17, 2006 letter from Ocwen to Llewellyn, Notice of Assignment, Sale or Transfer of Servicing Rights). On June 14, 2006, Ms. Krehbiel successfully sent the $473,554.45 wire transfer to Washington Mutual Bank identifying Equity Pacific as the beneficiary. Krehbiel Dep., at 115, 121, **Exhibit 17**thereto (**Exhibit F-5** hereto), p. 1008 (First National Bank wire transfer log); SOF 28-30. Under the First Mortgage Loan, payments are not deemed late until after the 15th of each month. Rider Dep., at 111; SOF 30; *see also*, Part III(A), *supra*.

B.      Even if RESPA does not apply in these circumstances, Ocwen can hardly characterize the Loan as never having been paid. At worst, the payment was simply late by a couple of weeks. Ocwen does not state in its Motion if, and when, it received payment by Allstate. Ocwen's dispute, however, at all relevant times, was with Allstate, not Llewellyn. The loan was paid, as far as Llewellyn is concerned, on June 14, 2006, when Wyman Funding wire transferred $473,554.45 to Equity Pacific, the transferor servicer.

C.      Ocwen's next contention that it took affirmative steps to verify the status of the debt is readily belied by the facts. Ocwen states it attempted to speak with someone at Allstate on multiple occasions, but was unable to get through to anyone. Motion, at p. 47. Ocwen ignores that its telephone calls on October 13 and 16, 2006, were made around lunchtime. Ocwen Log; SOF 53. But even more egregious is

Ocwen's failure to advise the Court that it spoke to Allstate on October 18, 2006, regarding "the payoff that was sent in being short," and Ocwen provided bank wire information to the Allstate representative.  Ocwen Log; SOF 55. Later that day, Ocwen received a wire transfer from Allstate in the amount of $10,876.38.  Ocwen Log, *see also*, October 18 and 20 entries; SOF 56.Ocwen posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006.  Ocwen Log; SOF 64.  Thus, Ocwen by this time knew conclusively that Allstate had received the refinance proceeds. Nevertheless, Ocwen concealed this critical information from Llewellyn and, instead, forced Llewellyn to prove that the Loan was paid off through the refinance proceeds. And then Ocwen ignored, for over four months, all documents provided by Llewellyn and his representatives conclusively establishing that the Loan was paid off.

D.      Ocwen next asserts that "there is no evidence that the Mortgage Loan had been paid off or released until Mr. Barron of Allstate stamped the mortgage Note "paid in full" and executed a satisfaction of mortgage."  Ocwen further states that "[w]ithin weeks of the recorded release, Ocwen deleted the trade line."  Motion, at 48. Ocwen's assertions, in fact, support the fact that Ocwen engaged in extreme and outrageous conduct.

E.      Ocwen deceivingly, does not state that Ocwen relied on these documents in deciding to delete the trade line.  This is because Ocwen did not rely on these documents in deciding to delete the trade line, but instead relied on documents it had in its possession back in August and October 2006.  Specifically, as shown above, it is readily apparent from the emails back and forth between Ms. Boxill and Mr. George

that Ms. Boxill did not even rely on these documents in ultimately deciding to delete the entire Llewellyn trade line.  See, Part III(A), *supra*; SOF 91-99..

F.    Moreover, Ocwen did not need these documents to decide that the Llewellyn trade line should, as evidenced by Castle and its client's (Ocwen and NCC Servicing) admission back on December 5, 2006, that the "loan should have been paid-in-full," and that "Mr. Llewellyn's credit report [would] be reversed as it has been negatively effective [sic] by this action."  December 5, 2006 letter from Castle to McNamara, McNamara Decl., **Attachment C-10** thereto; SOF 82.

G.    Further conclusively establishing that Ocwen really did not rely on the January 22, 2007, note signed by Barron as "paid in full" and the January 24, 2007, recorded release of the deed of trust is Ocwen's own assertion, however misguided, that the note signed "paid in full" was "explicitly false in stating that the loan had been paid in full when in fact it had not been," and the release of the deed of trust "was implicitly false in its implication that Mr. Barron and Allstate had any legal authority to release the lien." (Motion at 4).  Ocwen's statements in its Motion show that, assuming Ocwen relied on these documents in deciding to delete the entire trade line on Llewellyn's credit, which it did not, such reliance would be unreasonable.

H.    In a claim for outrageous conduct, the "level of outrageousness required to create liability is extremely high." *Pearson v. Kancilia,* 70 P.3d 594, 597 (Colo. App. 2003).   As this Court has observed, however, "[a]n argument could be made that the high threshold of outrageousness is lowered somewhat by the fact that Ocwen occupied a position of power relative to Mr. Llewellyn, in that its reporting of false credit information had 'the power to affect [Mr. Llewellyn's] interests.'" *Llewellyn v. Shearson*

*Financial Network*, Inc., 622 F. Supp. 2d 1062, 1070, n. 6 (D.Colo. 2010) (citing,

*Pearson,* 70 P.3d at 598, citing *Farmers Group, Inc. v. Trimble*, 658 P.2d 1370, 1377

(Colo.App. 1982)).

      I.      Ocwen is wrong in asserting that "reporting a loan as delinquent

during the few months that Ocwen serviced the Mortgage Loan does not rise to the level

of outrageousness contemplated by the tort." Motion, at 46. Ocwen had no right to

report the Loan in default in the first instance. Ocwen, however, did far more than

simply erroneously report the Loan in default. Ocwen put Llewellyn through sheer hell

for over six months, refusing to reasonably investigate the dispute or accept the

indisputable proof provided it establishing that the Loan had been paid in full.

      J.      Here, Ocwen's reporting of false credit information on Llewellyn

destroyed Llewellyn financially, physically, and mentally. *See*, Llewellyn Decl. Thus,

the high threshold of outrageousness should be lowered in this case. Nevertheless, the

facts set forth above describing Ocwen's reporting of false information and failing to

investigate Llewellyn's dispute are so egregious as to meet any level of outrageousness.

Indeed, as shown above, Ocwen continued to destroy Llewellyn even after its attorneys,

and its principal, NCC Servicing, agreed that the Loan should have been paid in full and

that the entire Llewellyn credit line should be deleted.

      K.      In these circumstances, the required level of outrageousness has

readily been satisfied, and far exceeds the level of outrageousness accepted by the courts

in cases with factual scenarios far less egregious than those here. *See*, *e.g.*, *Rugg v.*

*McCarty*, 476 P.2d 753, 754 (Colo. 1970) (allegations sufficient to state a claim for

outrageous conduct where the plaintiff defaulted on a promissory note, and the defendant

"harassed her with numerous telephone calls" about the debt and wrote to her employer about garnishing her wages, despite knowing that it could not obtain a garnishment until it had reduced the debt to judgment); *Cross v. Receivables Management Solutions, Inc.*, 2006 U.S. Dist. LEXIS 8956, at *17 (D.Colo.) (observing that outrageous conduct claim sufficiently pled where allegations, among other things, support the inference that AAC knew that Mr. Cross did not owe the debt which it reported to credit bureaus and deliberately refused to take corrective action).

**Element 2:** Mr. Llewellyn can demonstrate a triable issue of fact as to whether Ocwen acted recklessly or with the intent of causing Llewellyn severe emotional distress.

A.    In its Motion, Ocwen asserts that it did not act recklessly or with the intent of causing Llewellyn severe emotional distress, stating that it "simply attempted to collect an unpaid debt, and had no intention of causing plaintiff any suffering." Motion, at 48. Ocwen further states that it "repeatedly tried to work with plaintiff to resolve the mystery of what happened to the funds intended to pay off the mortgage loan." Motion, at 48, cross-referencing Section A(4). According to Ocwen, since the mortgage loan was not paid off, plaintiff could not provide adequate evidence to Ocwen." Motion, at 48-49.

B.    As set forth in exhaustive detail, Part III(A) *supra*, Ocwen attempted to collect from Llewellyn a debt that was already paid. Moreover, all attempts by Llewellyn to convince Ocwen that the Loan had been paid off fell on deaf ears. Contrary to its statutory obligations, Ocwen conducted no real investigation of the dispute. Ocwen ignored conclusive documents establishing that Wyman Funding had paid the loan off by wire transferring $473,554.45 to Equity Pacific on June 14, 2006.

Nevertheless, Ocwen, using Castle as its debt collecting sword (Castle repeatedly threatened Llewellyn that it was a debt collector attempting to collect a debt), threatened Llewellyn with foreclosure and aided and abetted Ocwen in advising the Credit Bureaus that it had initiated foreclosure.

C.      Particularly egregious, Ocwen retained Allstate's $10,876.38 payments on the Loan and concealed this critical information from Llewellyn, yet at the same time falsely reported to the Credit Bureaus that Llewellyn was 90 days past due as of September 30, 2006.  Ocwen cruelly persisted in tormenting Llewellyn even though its own internal records revealed that the Loan was paid out prior to being boarded at Ocwen and should never have been boarded at Ocwen.

D.      Ocwen feigned an investigation under both RESPA and the FCRA. In fact, Ocwen repeatedly asked for the same information and apparently never reviewed this information as reflected by, *inter alia*, Ocwen's repeated insistence that Llewellyn provide the front and back of the payoff check when Ocwen knew, or should have known, based on documents provided it, that the payoff was sent *via* wire transfer.

E.      Ocwen continued reporting incorrectly and adversely on Llewellyn to the Credit Bureaus even after it was no longer servicing the Loan.  Indeed, under RESPA, Ocwen should never have reported adversely to the Credit Bureau during the 60-day period after the date it received Llewellyn's dispute.

F.      Although Ocwen's attorneys acknowledged that its "client has indicated that this loan should have been paid-in-full," and that its "client has indicated that Mr. Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action," Ocwen inexplicably refused to reverse the negative entries and delete the

entire trade line.  Instead, Ocwen requested additional information showing that the Loan had been paid off.  When its principal, NCC servicing, requested that Ocwen delete the entire trade line, Ocwen requested still more information.

G.      NCC Servicing, writing on behalf of itself, Ocwen and NCCI, advised Llewellyn "that *we* have requested a correction to [Llewellyn's] credit bureau report as result of your *recent* inquiry," and that "we have received confirmation that this error was not a direct result of any wrongdoing on the part of Glenn Llewellyn." Nevertheless, four days later, when Ms. Saport telephoned Ocwen and advised it that the loan had been paid off with the prior servicer, Ocwen advised her "to fax the proof to RSHS sp so they could look into the same."  Moreover, Ocwen requested information from NCC Servicing regarding the payoff on the Loan -- information it already had for many months.

H.      Finally, in its February 15, 2007 letter, in response to what Ocwen disingenuously characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan.  Ocwen sincerely apologized for any inconvenience caused. McNamara Decl., **Attachment C-25; SOF 101.**

I.      Thus, in the end, after its four-month pathetic excuse of an "investigation "of Llewellyn's dispute under the FCRA, Ocwen deleted the entire Llewellyn trade line based on information it had in its possession from the outset, but which it stubbornly and recklessly chose to ignore.

J.      Ocwen's outrageous conduct in this case is a textbook example of reckless behavior and/or actions taken with the intent of causing a Plaintiff's severe emotional distress.

K.      In engaging in the outrageous conduct described above, Ocwen was acting as an agent of NCC Servicing.  *See*, *Fry v. Air Line Pilots Association*, 1994 U.S. Dist. LEXIS 20018, *2 (D.Colo.) (recognizing vicarious liability outrageous conduct claim).  As noted above, by letter dated January 29, 2007, Mr. George, NCC Servicing, LLC, writing on behalf of NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a result of your recent inquiry." (emphasis added). McNamara Decl., **Attachment C-14** thereto.  Mr. George further stated, on behalf of NCC, Ocwen and NCCI, that "[a]lthough *we* are still attempting to resolve this matter *we* have received confirmation that this error was not a direct result of any wrongdoing on the part of Glenn Llewellyn." *Id.* (emphasis added). SOF 90.  Moreover, as noted above, NCC Servicing instructed Ocwen to delete the entire trade line on Llewellyn's credit. *See*, **Part III(A)** *supra; SOF 98.*.

**Element 3:** Mr. Llewellyn can demonstrate a triable issue of fact as to whether he can prove that he suffered severe emotional distress which was caused by Ocwen's conduct.

A.      Mr. Llewellyn's emotional distress and physical harm caused by Ocwen (as well as Castle) is fully described in Llewellyn's Declaration, **Exhibit H, Attachment H-1** hereto.

**C.    THE COURT SHOULD DENY THE OCWEN DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON COUNT V:
VIOLATION OF THE FDCPA.**

**1.    <u>Burden of proof and elements:</u>**

Llewellyn agrees with the Defendants' recitation of the burden of proof

and elements on this claim.

**2.    <u>Elements Challenged by the Ocwen Defendants.</u>**

**<u>Element 1:</u>** Mr. Llewellyn can demonstrate a triable issue of fact as to whether

Ocwen was a "debt collector" under 15 U.S.C. § 1692a(6).

A.    The FDCPA defines a "debt collector" as "any person who . . .

regularly collects or attempts to collect, directly or indirectly, debts owed or due or

asserted to be owed or due another." *Cohen v. Mortgage Electronic Registration

Systems, Inc.*, 2009 U.S. Dist. LEXIS 111188,at *6-7 (D. Minn.) (citing,15 U.S.C. §

1692a(6)). Courts have held, however, that "a debt collector does not include the

consumer's creditors, *a mortgage servicing company,* or an assignee of a debt, *as long as

the debt was not in default at the time it was assigned.*" *Id.*, (citing, *inter alia, Motley v.

Homecomings Fin., LLC,* 557 F. Supp. 2d 1005, 1009 (D. Minn. 2008) (quotation

omitted) (emphasis added by the court); *see also*, *Perry v. Stewart Title Co.,* 756 F.2d

1197, 1208 (5th Cir. 1985) ("The legislative history of section 1692a(6) indicates

conclusively that a debt collector does not include the consumer's creditors, a mortgage

servicing company, or an assignee of a debt, as long as the debt was not in default at the

time it was assigned.")).

B.    Thus, "[t]he relevant legal issue is when [the defendant] took [the]

mortgage for servicing. If [it] took the mortgage for servicing before [the] default, it is

not a debt collector subject to the FDCPA. . . . If it took the mortgage after [the] default, it would be a debt collector." *See, Castrillo v. Am. Home Mortgage Servicing, Inc.,* 670 F. Supp. 2d 516, (E.D. La. Nov. 16, 2009) (citation omitted); *Solomon v. HSBC Mortgage Corporation (USA)*, d/b/a HSBC Bank USA, 2010 U.S.App.Lexis 16659, at *3-4 (10th Cir.) (quoting, *Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985)* ("The legislative history of *section 1692a(6)* indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned.").

C.     Here, although Ocwen began servicing the Loan effective May 15, 2006, at some unknown date the ownership of the Loan was transferred from Allstate to NCCI.  If NCCI took ownership of the Loan after the Loan was allegedly in default, NCCI would be deemed a debt collector.[30]  Ocwen, concomitantly, would become a debt collector as well since it would be servicing the Loan for a debt collector.  This issue was recognized, but not resolved (because the debtor did not raise the allegation), in *Glazer v. Case Home Finance LLC*, 2009 U.S. Dist. LEXIS 126369, at 21, n. 11  (N.D.Ohio).  There, the Court noted that, "15 U.S.C. §1692a(6)(F)(iii) explains that an owner of a debt is not immune from liability when the debt was obtained after it became defaulted.  Nonetheless, it is unclear whether a *valid* ownership assignment, made after a loan enters

---

[30] Ocwen cannot now argue that the Loan was never in default (as Llewellyn has shown herein) and, therefore, it could not be deemed a "debt collector" under the FDCPA. "[T]he correct inquiry is whether the debt collector considers the consumer to owe a debt in default based upon the manner in which the debt collector acquired the debt and the manner in which the debt collector engages in debt collection activities." *Dowling v. Litton Loan Servicing*, 2006 U.S. Dist. LEXIS 87098, at 13-14 (S.D.Ohio) (citing, *Schlosser v. Fairbanks Capital Corp.,* 323 F.3d 534, 539 (7th Cir. 2003) (holding that the exemption in *§1692a(6)(F)(iii)* for assignees of debts not in default at the time of assignment does not apply to an assignee of a mortgagee which allegedly sent mortgagors notice that incorrectly asserted that they were in default on their mortgage loan); *see also, Belin v. Litton Loan Servicing, LP,* 2006 U.S. Dist. LEXIS 47953, 2006 WL 1992410, at *3 (M.D. Fla. July 14, 2006) (finding that "the determination as to whether Litton is a debt collector turns on whether Litton acquired the loan as a debt in default and whether its collection activities were based on that understanding") (citing *Schlosser*)).

default, would transform an entity that had been servicing the loan prior to default into a debt collector within the meaning of the FDCPA." *Id.* (emphasis in original).

D.      Treating Ocwen as a "debt collector" in these circumstances would further the purposes of the FDCPA.  The "[l]egislative history of the [FDCPA] indicates that the Congress intended to target *third-party or independent collectors* of delinquent debts because unlike creditors, whose actions are often restrained by their desire to protect their good will, independent contractors will generally have no future contact with the consumer and are therefore likely to place less importance on the consumer's opinion of their debt collection tactics." *Mondonedo v. Sallie Mae, Inc.*, 2008 U.S. Dist. LEXIS 77483, at *9-10 (D.Kan.) (emphasis in original).

E.      Here, if NCCI acquired the debt as a "debt collector," its actions, unlike the actions of a creditor, would be unrestrained.  So, too, would Ocwen's actions be unrestrained, since its actions in collecting the debt were undertaken on behalf of its principal, NCCI.  Treating both NCCI and Ocwen as "debt collectors" in these circumstances is consistent with the legislative history of the FDCPA, and would advance the goals of this statute.  Notably, consistent with Ocwen's being deemed a "debt collector" under the FDCPA and acting in accordance with this statutory label, in all correspondence between Ocwen and Llewellyn, Ocwen advised Llewellyn "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose."

F.      Llewellyn requested from the Ocwen Defendants the Sale Agreement relating to Allstate's sale of the Loan to NCCI, but they refused to produce this document to Llewellyn.  On September 3, 2010, Llewellyn brought a motion to

compel Ocwen to produce this document before a Magistrate Judge Mix.  Ocwen advised

Magistrate Judge Mix that the document was not in its possession, custody or control.

Magistrate Judge Mix ruled that she could not order Ocwen to produce a document it did

not possess.

      G.     Llewellyn submits that the Loan Sale Agreement is in Ocwen's

possession, custody or control.  NCCI was Ocwen's principal.  As noted above, by letter

dated January 29, 2007, Mr. George, of NCC Servicing, LLC writing on behalf of NCC

Servicing, Ocwen and NCCI, advised Castle, and both Mr. Llewellyn and Mr.

McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a

result of your recent inquiry."  George further stated, on behalf of NCC, Ocwen and

NCCI, that "[a]lthough *we* are still attempting to resolve this matter *we* have received

cremation that this error was not a direct result of any wrongdoing on the part of Glenn

Llewellyn."  McNamara Decl., **Attachment C-14**, thereto; SOF 90.  Further establishing

that NCCI was Ocwen's principal was NCC Servicing's flurry of e-mails to Ocwen

advising it to release the entire reporting trade line on the Loan. See, Part III(A) *supra.*

SOF 91-99.

      H.     Assuming the Loan Sale Agreement is truly not in Ocwen's

possession, custody or control, notwithstanding the fact that Ocwen served as NCCI's

agent in collecting the Loan, Ocwen should not be permitted to produce this document

now to advance its argument that it is not a debt collector under the FDCPA.

Accordingly, there is a genuine issue of material fact in dispute as to whether Ocwen was

a "debt collector" under the FDCPA after NCCI purchased the Loan.

I.      Even if it is shown that NCCI purchased the Loan before it allegedly became in default, the analysis of whether Ocwen is a "debt collector" does not stop there.  Although Ocwen began servicing the Loan on May 15, 2006, it sold the servicing rights to the Loan to NCCI Servicing effective October 20, 2006.  On October 20, 2006, when NCC Servicing began servicing the Loan, both Ocwen and NCC Servicing believed the Loan was in default, and engaged in debt collecting activities accordingly.  Thus, because NCC Servicing, acquired the servicing rights to the Loan after the Loan was in default (or so it believed), it was a "debt collector" under the FDCPA.

J.      Of particular significance for purposes here, on October 20, 2006 and thereafter, Ocwen continued attempting to collect on the Loan, including reporting negatively, and incorrectly, to the Credit Bureaus.  *See*, Part III(A), *supra*; SOF 64, 66, 80, 81, 83.  Moreover, Ocwen continued requesting information from a Llewellyn to show that the Loan was paid off.  *See*, Part III(A), *supra*; SOF 73.  Indeed, by letter dated October 31, 2006, Ocwen threatened Llewellyn that if he did not provide proof that this Loan was paid off, there could be "continuing phone calls and delinquency notices." Llewellyn Decl., **Attachment H-15**.  Ocwen obviously engaged in these debt collecting activities on behalf of its principles, NCC Servicing and NCCI.  NCC Servicing was clearly a debt collector under the FDCPA, and presumably NCCI was a debt collector as well.  *See*, **Attachment C-14** January 29, 2007 letter from George to Ocwen, Castle and McNamara and Llewellyn; *see also*, **Attachments C-22, C-23** and **C-24,** e-mails between Mr. George and Boxill.  Thus, at least with respect to its debt collecting misconduct occurring on and after October 20, 2006, Ocwen was acting as a "debt

collector" under the FDCPA, because it was acting as an agent of a principal who took the mortgage for servicing after the purported default.

**D.     THE COURT SHOULD DENY THE OCWEN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THEIR AFFIRMATIVE DEFENSE OF THE STATUTE OF LIMITATIONS REGARDING CLAIM V: VIOLATION OF THE FDCPA.**

1.     Burden of proof and elements:

Llewellyn agrees with the Defendants' recitation of the burden of proof and elements on this claim.

2.     Elements Challenged by the Ocwen Defendants.

Element 1: The Ocwen Defendants cannot show that there is no genuine issue of material fact in dispute as to whether Llewellyn's FDCPA claim his untimely.

A.     As shown in Part III(C) *supra*, Ocwen was a debt collector under the FDCPA presumably when NCCI acquired the Loan, but certainly as of October 20, 2006.  Ocwen asserts that it made no attempt to collect on the Mortgage Loan after January 28, 2007. Motion, at 53. Ocwen further asserts that Llewellyn cannot demonstrate the communication of a false and misleading statement by Ocwen occurring on or after January 29, 2007, and thus Llewellyn's FDCPA claim his time-barred. Motion, at 53.  Ocwen's argument is as legally and factually flawed as all of its preceding arguments.

B.     Ocwen's analysis ignores Mr. George's January 29, 2007 letter written on behalf of defendants NCC, Ocwen and NCCI, that advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a result of your *recent*

inquiry." (emphasis added). McNamara Decl., **Attachment C-14** thereto.  Mr. George

further stated, on behalf of NCC, Ocwen and NCCI, that "[a]lthough *we* are still

attempting to resolve this matter *we* have received confirmation that this error was not a

direct result of any wrongdoing on the part of Glenn Llewellyn." *Id.* (emphasis added).

SOF 90.  Ocwen, however, failed to request a correction to Llewellyn's credit bureau

report as promised.  Instead, four days later, on February 2, 2007 when Ms. Saport

telephoned Ocwen and advised it that the loan had been paid off with the prior servicer,

Ocwen advised her "to fax the proof to RSHS sp so they could look into the same."

Ocwen Log.

      C.      By letter dated February 8, 2007, Mr. McNamara chastised Castle

for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report, and

reminded Castle of its December 5 letter indicating that the credit report would be

reversed.  McNamara Decl., **Attachment C-15** thereto; SOF 92.

      D.      By facsimile dated February 8, 2007, Castle sent to Mr. George the

February 8, 2007 McNamara letter requesting a letter from Ocwen that afternoon.

McNamara Decl., **Attachment C-16** thereto. SOF 93.  That same day, Mr. George

advised Ms. Boxill of Ocwen by e-mail dated February 8, 2007 that "we are in desperate

need of a letter from Ocwen stating that this will be corrected on the borrower's credit

report." McNamara Decl., **Attachment C-17** thereto; SOF 94.

      E.      Later that day, by e-mail, Mr. George advised Ms. Boxill that the

Loan "was paid off in June but due to an error in processing was never recorded

correctly.  Therefore, this is still showing on the borrower's CBR report by Ocwen as a

delinquency and he needs ASAP a letter advising that this will be corrected by Ocwen."

Referencing his conversation with Ms. Boxill the previous week, Mr. George enclosed: "proof of payoff, a copy of the CBR report showing Ocwen reporting this delinquency and correspondence from his attorney threatening a lawsuit." Mr. George strongly advised Ms. Boxill that her "immediate attention to this matter would be greatly appreciated. Urgent!!! 911." McNamara Decl., **Attachment C-18** thereto; SOF 95.

F.     Mr. George continued attempting to persuade Ms. Boxill of Ocwen that the loan was paid off. Thus, by e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with "another copy of the CBR report the mortgagor has sent which gives more detail of the information reported by Ocwen." McNamara Decl., **Attachment C-20** thereto. In a separate e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with the settlement information she requested. McNamara Decl., **Attachment C-21** thereto; SOF 97.

G.     Finally, by e-mail dated February 12, 2007, Ms. Boxill advised Mr. Nelson Samuel of Ocwen that Llewellyn had paid off the loan prior to service transfer and that Ocwen reported him negatively to the Credit Bureau. She instructed Mr. Samuel to correct all negative reporting and provide a letter stating that Ocwen corrected it. McNamara Decl., **Attachment C-22** thereto. By e-mail dated February 14, 2007, Mr. Samuel advised Ms. Boxill that he was having Llewellyn's credit updated that day. McNamara Decl., **Attachment C-23** thereto. In a separate e-mail also dated February 14, 2007, Mr. Samuel advised Ms. Boxill that "if this loan was paid off prior to the loan being transferred to Ocwen, we should be deleting the entire trade line of the borrower's credit report." Moreover, Mr. Samuel observed that "this loan should not have been

boarded in the first place as the loan was paid off prior to the loan being transferred to Ocwen."  McNamara Decl., **Attachment C-24** thereto; *see also*, Ocwen Log. SOF 98.

H.      In its February 15, 2007 letter, in response to what Ocwen disingenuously characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan.  Ocwen sincerely apologized for any inconvenience caused.  Ocwen finally deleted the entire Llewellyn trade line on or after February 15, 2007, based on information it had in its possession from the outset, but which it chose to ignore.

I.      Ocwen should have deleted the Llewellyn trade line long before February 15, 2007, and certainly on January 29, 2007, and each day thereafter.  Ocwen's failure to delete the Llewellyn trade line each day commencing January 29, 2007, constitutes separate violations of the FDCPA.  This is particularly so considering Ocwen knew, or should have known, at least back in October 2006 (if not August 2006 or sooner) that the Loan had been paid off.  Indeed, in its December 5, 2006 letter, Castle represented, on behalf of Ocwen, that the Loan should have been paid in full and that Ocwen had "indicated that Mr. Llewellyn's credit report [would] be reversed as it has been negatively effective [sic] by this action." McNamara Decl., **Attachment C-10** thereto; SOF 82.

J.      Indeed, this Court has previously recognized that the failure to remove inaccurate information from a credit report, as well as the failure to notify major credit bureaus that the debt was disputed and failing to substantiate the alleged debt, constitute violations of 15 U.S.C. §§1692, *et seq. Cross*, 2006 U.S. Dist. LEXIS 8956, at *10 ("In Claim 5, Mr. Cross alleges that AAC violated 15 U.S.C. §§1692, *et seq.*, by

failing to remove inaccurate information from his credit reports, failing to notify major

credit bureaus that the debt at issue was disputed, and failing to substantiate the alleged

debt. Mr. Cross has alleged sufficient facts to support such violation.  Mr. Cross has

alleged sufficient facts to support such violation.").[31]

       K.     Accordingly, because Ocwen violated the FDCPA on and after

January 29, 2007, this Court should deny Ocwen's motion for summary judgment on their

affirmative defense of the statute of limitations regarding Claim V pertaining to Ocwen's

violations of the FDCPA.

## IV.    CONCLUSION

For all the foregoing reasons, Mr. Llewellyn respectfully requests that this Court

deny the Ocwen Defendants' Motion for Summary Judgment in its entirety.

Dated:  September 8, 2010

                       McNAMARA LAW FIRM, P.C.

                       By:  *s/John N. McNamara, Jr.*
                         John N. McNamara, Jr.
                         1035 South Gaylord St., Suite 100
                         Denver, CO  80209
                         PHONE
                         FAX
                         mac@washparklaw.com

                       *Attorney for Plaintiff Glen Llewellyn*

---

[31] Reporting false information to a credit reporting agency violates §1692e of the FDCPA. *See, Sullivan v. Equifax, Inc.,* 2002 U.S. Dist. LEXIS 7884, *15 (E.D. Pa. April 19, 2002) (holding that a report of false information to a credit reporting agency could expose a debt collector to liability under *§ 1692e of the FDCPA*); *and Akalwadi v. Risk Mgmt. Alternatives, Inc.,* 336 F. Supp. 2d 492, 503 (D. Md. 2004) ("a debt collector's reporting of a consumer's debt to a credit reporting agency would be covered by *FDCPA § 1692e* if the communication is false, deceptive or misleading"). It is only logical that failing to remove inaccurate information constitutes equally culpable conduct and as this Court has already found, it, too, violates §1692e of the FDCPA.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of September, 2010, I electronically filed and served the foregoing pleading **PLAINTIFFS RESPONSE TO DEFENDANT'S OCWEN LOAN SERVICING, LLC AND NOMURA CREDIT AND CAPITAL, INC.'S MOTION FOR SUMMARY JUDGMENT** on the clerk of court using the CM/ECF system which will send notification of such filing to the following e-mail address(es):

      Mark C. Willis
      Kelly S. Kilgore
      Kutak Rock LLP
      1801 California St., Suite 3100
      Denver, CO 80202-2626
      Mark.willis@kutakrock.com
      Kelly.kilgore@kutakrock.com

      Brian P. Brooks
      Adam C. Goldstein
      O'Melveny & Myers LLP
      1625 Eye St., N.W.
      Washington, D.C. 20006
      bbrooks@omm.com
      agoldstein@omm.com

      *Attorneys for Defendant Ocwen Loan Servicing, LLC and Nomura Credit and Capital, Inc.*

      Phillip A. Vaglica
      Castle, Meinhold & Stawiarski, LLC
      999 18th St., #2201
      Denver, CO 80202
      vaglica@vaglica.com

      *Attorneys for Defendant Castle, Meinhold & Stawiarski, LLC*

                            __*s/Stewart Cables*_____
                             Stewart Cables