# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No.08-cv-00179-MSK-KLM

GLEN LLEWELLYN,

        Plaintiff,

v.

ALLSTATE HOME LOANS, INC., d/b/a ALLSTATE FUNDING;

OCWEN LOAN SERVICING, LLC;

NOMURA CREDIT AND CAPITAL, INC.;

NNC SERVICING, LLC

CASTLE, MEINHOLD & STAWIARSKI, LLC,

        Defendants.

---

## PLAINTIFFS RESPONSE TO DEFENDANT CASTLE MEINHOLD & STAWIARSKI'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff, Glen Llewellyn ("Mr. Llewellyn" or "Llewellyn") by Counsel John N. McNamara, Jr., of McNamara Law Firm, P.C., hereby respectfully submits his response to Defendant Castle Meinhold & Stawiarski's ("Castle") Motion for Summary Judgment, as follows:

## I.  PRELIMINARY STATEMENT

A reading of Castle's motion reminds one of an undertaker, calmly rubbing his hands together, coldly and falsely -- grieving the loss. They say, in effect, "all we did was open a foreclosure file, close it and stop billing the file. Oh hum. "Oh, by the way [pointing to the corpse], he must pay our invoice."

By contrast, in truth, Castle's actions gutted Mr. Llewellyn in every way a person can be gutted -- financially, emotionally and physically. Castle, who aided and abetted the Ocwen Defendants in completely destroying Llewellyn, should be ashamed of themselves. They flexed their legal muscles at Llewellyn and scared him to the point of despair, all with no legal basis for what they did to him. They repeatedly threatened him in an extremely forceful "legal" way with absolutely no basis to do so, and no American court or American jury should let them get away with it. After all, they are lawyers, and average citizens are frightened of lawyer pointing their legal fingers at them. And, Castle should have known better. It is a good thing for Castle this is not a legal malpractice action because Castle's "work" on this foreclosure matter is deceptive, pathetic and unforgivable.

As discussed at length below, the highlights of Castle's egregious, outrageous and illegal behavior toward Llewellyn are:

1. Castle repeatedly threatened collection/foreclosure on a debt that had been paid, from August 2006 up to at least December 5, 2006.

2. Castle aided and abetted the Ocwen Defendants by concealing from Llewellyn that Ocwen had been paid $10,876.38 by Allstate on October 18, 2006.

3. By August 27, 2006, Castle received and reviewed the title work on this foreclosure and recklessly missed the fact that on June 16, 2006, Stewart Title publicly

recorded the two new refinance mortgages in favor of Wyman Funding for the exact amounts which were in the HUD Settlement Statement, namely, $540,800 and $135,200, which were repeatedly sent to Ocwen and Castle over a course of many months.  Even a cursory review of the title work by any legal intern would cause great concern.  Why are there two new mortgages on the Coolidge Property which fit –exactly -- Llewellyn's written plea to Castle on October 10, 2006 that the Allstate Loan had been refinanced and paid off?  Why did Castle send the foreclosure letter to Llewellyn on September 7, 2006, just a few days after the title "review?"

4.      Castle's legally baseless threat of foreclosure against Llewellyn loomed from Castle's letter of September 7, 2006 until at least December 5, 2006, almost 3 months, and, until counsel for Llewellyn threatened a lawsuit in February 2007.  Castle did absolutely nothing to allay Llewellyn's fears of its and Ocwen's threats against him.  Laziness is one thing, but deception is another in the legal framework of this case.  Repeatedly in February 2007 (well within the statue of limitations) Castle's lawyer, Chris Alber, promised Llewellyn's counsel that the Castle law firm itself would remove Ocwen's adverse reporting on Llewellyn's credit report.  Yet now, in its Motion, Castle claims it does not do that and has no legal authority to correct credit reports.

In summary, Castle aided and abetted Ocwen's false reporting to the Credit Bureaus, and in the process ruined Llewellyn financially, physically and emotionally.  Mr. Llewellyn does not wish to be unkind, but Castle's legal work in connection with its debt collection and foreclosure activities raises doubts as to whether it is intelligent enough to form a *mens rea*.  But, under the law applicable to this case, Castle's activities were purposefully and intentionally undertaken against Llewellyn.  For these reasons and

the reasons discussed below, a host of issues of material fact exist in this case which warrant a rejection of Castle's motion outright.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

**Llewellyn's Military Career Is Cut Short by Crohn's Disease.**

1.      Long before he began building his successful home real estate investment portfolio, Llewellyn served his country in the military.  Specifically, Llewellyn proudly enlisted in the United States Marine Corps in December 1979.  Deposition of Glen Llewellyn, "Llewellyn Dep.," at 28:1-8, 123:9-16.[1]  Llewellyn's service as a Marine, however, was unfortunately cut short after Llewellyn was diagnosed with Crohn's disease, and he was honorably discharged from the Marine Corps in August 1981. Llewellyn Dep., at 28:9-12, 123:17-23.  The debilitating effect of Crohn's disease not only adversely impacted Llewellyn physically, but mentally as well, and Llewellyn suffered depression associated with Crohn's disease.  Llewellyn Dep., at 287:4-9, 245:10-11, 246:1-3.

2.      Unfortunately, Llewellyn's health related problems did not end with Crohn's disease, and he developed testicular cancer in or about 1997.  The testicular cancer moved into his lungs, and Llewellyn received chemotherapy in 1998 and 1999. Llewellyn Dep., at 244:24-246:9, 284:19-23.  During these nauseating chemotherapy sessions throughout 1998 and 1999, Llewellyn, predictably, suffered depression and was prescribed psychiatric medication.  Llewellyn Dep., at 246:10-20, 247:11-13.  Llewellyn ultimately triumphed over his two-year cancer battle.  Llewellyn's cancer-related

---

[1] A copy of the pages and Exhibits of Llewellyn's Deposition cited to herein are attached hereto as **Exhibit A**.

depression abated, and he ceased taking psychiatric medication -- until Ocwen destroyed both his credit and real estate investments in 2006, discussed *infra*. Llewellyn Dep., at 246:10-247:18.  Also as discussed *infra*, 247:9-18, the depression resulting from Ocwen's destruction of Llewellyn's credit and realty investments, in turn, caused Llewellyn to suffer deleterious physical health consequences *viz*., dangerous flare-ups of his Crohn's disease and diabetes.

**Llewellyn Overcomes His Health-Related Problems and Creates a Thriving Realty Investment Portfolio.**

3.      As noted above, before Ocwen, Llewellyn's Crohn's disease stabilized, and he overcame testicular cancer.  Llewellyn's depression resulting from the chemotherapy and testicular cancer abated, and he ceased taking psychiatric medication.  Llewellyn overcame his health-related problems and, without looking back, he became successful through his real estate investment portfolio.

**Llewellyn's Contracting Experience.**

4.      Llewellyn acquired his first contracting experience at an early age. Specifically, Llewellyn performed construction work in high school working for apartment buildings.  During this experience, Llewellyn did "a little bit of everything.  It was from the ground up except for the concrete." Llewellyn Dep., at 130:1-9.  Llewellyn ultimately became a foreman. Llewellyn Dep., at 130:10-15.

**Llewellyn Joins Castlebrook Construction.**

5.      In or about 1996, after his stint in the Marine Corps, and after working a number of different jobs, including work in an elevator business, a tire business, and a furniture business, Llewellyn began working for Castlebrook Construction, a home construction company formed by his brother in 1995.  Llewellyn Dep., at 61:7-21, 124:1-

25, 126:20-25, 128:22-129:16, 246:13-14.  At Castlebrook Construction, Llewellyn, who had a number of certifications for construction, started off managing the construction crews.  Llewellyn Dep., 23:19-25:24, 131:8-132:16.

6.    When Llewellyn joined Castlebrook Construction, its projects were investor owned, as Llewellyn's brother did not have the financial wherewithal and credit to purchase the properties on his own. Llewellyn Dep., at 133:13-134:11.  Castlebrook Construction's investors would generally give Castlebrook Construction 50% of the profits. Llewellyn Dep., at 134:19-21.  Llewellyn's brother, however, wanted to discontinue the investor approach and, instead, use Llewellyn, who had financial clout and good credit, to purchase the various properties. Llewellyn Dep., at 135:12-136:25.  Indeed, it was chiefly because of Llewellyn's exemplary credit that Castlebrook Construction hired Llewellyn. Llewellyn Dep., at 134:9-11,137:19-138:23.

7.    In or about 2004, Castlebrook Construction began operating without investors, relying on Llewellyn to purchase the properties. Llewellyn Dep., at 137:6-10. In 2004, Llewellyn received his general contractor license in the State of Colorado and became President of Castlebrook Construction. Llewellyn Dep., at 24:10-25:21, 137:11-13, 197:3-4.  Llewellyn quickly rose to the top of Castlebrook Construction largely because he was able to obtain financing through his strong credit. Llewellyn Dep., at 133:17-22, 137:19-138:11.

**Llewellyn Acquires Properties Under Construction and Begins Building Equity.**

8.    Llewellyn, armed with his strong credit, began building his financing portfolio and equity. Llewellyn Dep., at 137:2-138:9, 151:7-152:18.  Llewellyn's projects consisted of homes under construction, with the exception of two new builds which had

6

unfinished basements that Llewellyn would finish and, thus, considerably increase the price per square foot.  Llewellyn Dep., at 152:9-18.  Between 2003 and 2007, in addition to a property on Coolidge Avenue in Denver, Colorado ("Coolidge Property") that Llewellyn purchased on March 7, 2006, Llewellyn also purchased eight properties in his own name, located in Denver, Colorado.[2]  Llewellyn was personally liable for the debt associated with the purchase of each of these properties.  Llewellyn Dep., at 195:14-196:2.  The equity in all of the properties Llewellyn purchased exceeded one half million dollars.  Llewellyn Dep., at 151:7-10.[3]  Prior to purchasing the Coolidge Property, the property at issue in this case, Llewellyn had purchased four other properties in Colorado.  Deposition of Candace Saport, "Saport Dep.," at 63:8-64:7; a copy of the pages and Exhibits of Ms. Saport's Deposition cited to herein and attached hereto as **Exhibit B**.  At this time, Llewellyn was attempting to acquire investment/rental income properties.  Saport Dep., at 63:23-64:1.

**Llewellyn's Credit History Is Exemplary before Ocwen Torpedoes Both It and Llewellyn's Real Estate Investment Portfolio.**

---

[2] These eight properties were located at 651 Race Street (Llewellyn Dep., at 219:12-221:20, 224:1-225:10, **Exhibit 30** thereto (**Exhibit A-2** hereto) (warranty deed dated December 1, 2003 (Llewellyn purchased this property with his brother, but bought his brother out during the refinance on May 26, 2005)); 7329 S. Ukraine Street (Llewellyn Dep., at 210:8-211:6, **Exhibit 23** thereto (**Exhibit A-3** hereto) (warranty deed dated December 19, 2005); 720 S. Gaylord Street (Llewellyn Dep., at 229:1-230:8, **Exhibit 35** thereto (**Exhibit A-4** hereto) (warranty deed dated December 21, 2005); 6627 Gallup St. (Llewellyn Dep., at 237:13-239:4, **Exhibit 44** thereto (**Exhibit A-5** hereto) (warranty deed dated March 10, 2006); 572 Adams Street (Llewellyn Dep., at 198:5-199:25, **Exhibit 15** thereto (**Exhibit A-6** hereto)  (warranty deed dated January 20, 2006); 502 South Franklin (Llewellyn Dep., at 232:9-24, **Exhibit 38** thereto (**Exhibit A-7** hereto) (warranty deed dated March 29, 2006);  777 S. High Street (Llewellyn Dep., at 315-317, **Exhibit 51** thereto (**Exhibit A-8** hereto) (warranty deed dated March 31, 2006); and 2122 S. Franklin Street (Llewellyn Dep., at 240:12-241:18, **Exhibit 46** thereto (**Exhibit A-9** hereto) (warranty deed dated September 15, 2006); *see also*, Llewellyn Dep., at 180:12-23.

[3] Before 2004, Llewellyn also purchased properties outside of Colorado, including four properties in Galveston, Texas.  Llewellyn Dep., at 183:1-24.  Llewellyn also 10 acres of recreational use property located in Plantersville, Texas. Llewellyn Dep., at 190:10-192:6.

9.      Between 2004 and March 2006, when Llewellyn had purchased the five

Denver properties culminating with the purchase of the Coolidge Property, Llewellyn's

credit was exemplary.  During this period, the three major credit bureaus reported on

Llewellyn's credit score as follows:

- February 15, 2006

  o   Equifax:       637

  o   Transunion:   702

  o   Experian:     698

      ▪   Notes:

          •   Ocw 435, "Collection Accounts" – No Record Found

          •   Ocw 436, "Derogatory Summary" – nothing negative

- February 24, 2006

  o   Equifax:       637

  o   Transunion:   702

  o   Experian:     698

      ▪   Notes:        Nothing of interest

- July 19, 2006

  o   Equifax:       744 and 628

  o   Transunion:   708

  o   Experion:     684

Copies of the credit reports pertaining to Mr. Llewellyn are attached as

**Attachment C-2** to the Declaration of John McNamara, **Exhibit C**, hereto.

**Llewellyn Purchases the Coolidge Property in March 2006.**

10.     On March 7, 2006, Llewellyn purchased the Coolidge Property as an investment for $559,980.  (*See*, Warranty Deed, dated March 7, 2006, Llewellyn Dep., at 159:6-11, **Exhibit 1** thereto (**Exhibit A-10** hereto); Saport Dep., at 127:14-16.  In connection with this purchase, Llewellyn executed an adjustable rate note dated March 7, 2006, in the amount of $447,984 (the "First Mortgage Loan" or "Loan") (Llewellyn Dep., at 49:5-12, 160:18-23, **Exhibit 2** thereto) (**Exhibit A-11** hereto), securing a first deed of trust (Llewellyn Dep., at 38:2-13, **Exhibit 3** thereto) (**Exhibit A-12** hereto); and an adjustable rate note dated March 7, 2006, in the amount of $111,996 ("Second Mortgage Loan"), securing a second deed of trust (Llewellyn Dep., at 49,:13-20161:10-18, **Exhibit 11** thereto) (**Exhibit A-13** hereto).  The Coolidge Property, which had an unfinished basement and lacked landscaping, was priced under market by approximately $100,000. Llewellyn Dep., at 162:3-163:10.

**In Purchasing the Coolidge Property, Llewellyn Uses the Mortgage Brokerage Services of Ms. Saport, Silver Creek Mortgage.**

11.     In purchasing the Coolidge Property, Llewellyn used the loan originating services of Ms. Candace Saport, a mortgage broker who, along with her husband, owned Silver Creek Mortgage and Financial Services, Inc., a mortgage brokerage company, ("Silver Creek") which, at the time, was closing approximately 40 loans a month. Llewellyn Dep., at 44:1-5, Saport Dep., at 32:3-4, 38:15-24, 43:4-13.  Ms. Saport had previously closed the four Colorado property loans for Llewellyn between 1999 and 2004. Saport Dep., at 63:8-13.

**Allstate Is the Lender on the Coolidge Property First and Second Mortgage Loans, and Equity Pacific Has the Servicing Rights to These Loans.**

12.     As reflected in the two adjustable rate notes and corresponding deeds of trust (Llewellyn Dep., **Exhibits 2**, **3** and **11** thereto) (**Exhibits A-11, A-12** and **A-11** hereto), the lender for the First and Second Mortgage Loans on the Coolidge Property was Allstate Home Loans, Inc., dba Allstate Funding ("Allstate").  The notes further reflect that payments under the notes were to be made to Equity Pacific Mortgage, Inc.  In connection with the First Mortgage Loan, Llewellyn and Allstate signed a RESPA Servicing Disclosure dated March 7, 2006.  The RESPA Servicing Disclosure sets forth the "Transfer Practices and Requirements" in connection with the securing of the Loan, and provides, *inter alia*, that, "[i]f the servicing of the loan is assigned, sold, or transferred to a new servicer you must be given written notice of that transfer."  The Disclosure further provides that, "Notices must contain certain information.  They must contain the effective date of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone number of a person or department for both your present servicer and your new servicer to answer your questions."  Of particular significance here, the Disclosure provides that "[d]uring the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you."  A copy of the RESPA Servicing Disclosure is attached hereto as **Attachment C-3** to the Declaration of Mr. McNamara.

13.     Allstate Funding was the mortgage banking component of Allstate Home Loans.  Deposition of Michael Barron "Barron Dep.," at 35:7-15; a copy of the pages and Exhibits of Mr. Barron's Deposition cited to herein are attached hereto as **Exhibit D**.

Allstate Funding funded loans through its warehouse lines of credit *viz.*, IndyMac Bank and Impac Companies, as opposed to through its own capital or cash reserves. Barron Dep., at 39-40; Deposition of Kevin Rider, "Rider Dep.," at 39:19-23, a copy of the pages and Exhibits of Mr. Rider's Deposition cited to herein are attached hereto as **Exhibit E**. Allstate Funding would then pool the mortgage loans and sell the pooled loans to investors on the secondary market. Barron Dep., at 38:11-15. Allstate Home Loans, in contrast, was the retail origination side of the Allstate companies, and would broker the loan. Barron Dep., at 35:9-15. Allstate Home Loans also was an interim service provider, meaning that it would only service the mortgage loans while they were on the warehouse line, that is, before Allstate Funding pooled its loans, and would not service the loans after they were sold to investors on the secondary market. Barron Dep., at 45:25-46:10; 105:12-23.

14.     In April 2005, Allstate acquired Equity Pacific, Inc., a wholesale lender formed by Kevin Rider to serve as the marketing arm for Allstate Funding. Rider Dep., at 23:18-24:15, 33:8-34:3, 35:3-10, 41:1-42:17.[4] Specifically, Equity Pacific, Inc. generated business relationships with mortgage brokers on behalf of Allstate; performed underwriting, processing and funding services; and sold loans on the secondary market. Rider Dep., at 23:23-25:5; 41:10-42:1. Equity Pacific, Inc. would serve as a platform to fund loans generated by mortgage brokers. Rider Dep., at 27:21-25. Equity Pacific, Inc.'s funding source was Allstate Funding's warehouse lines of credit, and all loans generated

---

[4] Barron testified that he did not believe that Allstate acquired Equity Pacific, Inc. Instead, he believes that Equity Pacific, Inc. was a net branch of Allstate. Barron. Dep., at 55:2-58:8. A net branch, according to Mr. Barron, is actually owned by the operator itself (in this case, Rider) and uses the capital facilities, such as the warehouse lines of credit, to fund its loans. Barron. Dep., at 58:5-14.

by Equity Pacific, Inc. were closed in Allstate Funding's name. Rider Dep., at 39:19-23, 42:13-43:16.

15.     Rider also owned Equity Pacific Mortgage LLC ("Equity Pacific"), a company that provided interim servicing (servicing of the loan from the time it is funded until the time it is sold to the end investor). Rider Dep., at 28:1-29:1.  Allstate did not acquire Equity Pacific. Rider Dep., at 31:8-34:10. Equity Pacific provided the interim servicing for the First and Second Mortgage Loans.  Rider Dep., at 96:17-25, 150:5-25, **Exhibit 5** thereto (**Exhibit E-2** hereto) (Allstate servicing disclosure).

**Shearson Financial Network, Inc. Acquires Allstate.**

16.     In June 2006, Shearson Financial Network, Inc. ("Shearson"), a mortgage banker (a company that originates mortgage loans to borrowers and then sells those loans to investors on Wall Street), acquired Allstate Funding.  Rider Dep., at 36:13-25, 37:18-38:4; Barron Dep. at 24:2-15.  Barron was the CEO of Shearson from 2003 through July 2007. Barron Dep. at 23:12-24:5, 52:11-12.Shearson Home Loans was a mortgage broker and subsidiary of Shearson. Barron Dep., at 52:22-54:24.  As a mortgage broker, Shearson Home Loans originated loans from borrowers and then brokered them to various lending institutions in consideration for a brokerage fee. Barron. Dep., at 54:12-17.

**Allstate Sells the First Mortgage Loan to NCCI, and the Servicing Rights to the Loan Are Transferred from Equity Pacific to Ocwen.**

17.     On or about May 15, 2006, the servicing rights to the First Mortgage Loan were transferred from Equity Pacific to Ocwen.  Saport Dep., **Exhibit 53** thereto (**Exhibit B-2** hereto) (May 17, 2006 letter from Ocwen to Llewellyn, Notice of Assignment, Sale or Transfer of Servicing Rights).  In its May 17, 2006 letter to Llewellyn, Ocwen notes

that Llewellyn's present servicer is Allstate Funding, and provides Allstate Funding's customer service department telephone number. Notably, in its May 17, 2006 letter, Ocwen also states that it "is a debt collector attempting to collect a debt and any information obtained will be used for that purpose." [5]

**Llewellyn Refinances the Coolidge Property.**

18. On or about April 18, 2006, Llewellyn, using Ms. Saport's mortgage broker services, initiated the refinancing of the First and Second Mortgage Loans. Saport Dep., at 181:7-182:11, Exhibit 17 thereto (Exhibit B-3 hereto) (Borrower Signature Authorization). During this time, financing approval could be obtained as quickly as two weeks from the time the borrower's application materials were sent to the mortgage broker. Saport Dep., at 55:13-18; 181:10-13.

19. There is nothing sinister in refinancing mortgage loans. Mr. Barron, the CEO of Shearson during this time period, testified that people in the refinance business would routinely refinance mortgage loans in less than 90 days from the original loan because they could make money and could turn loans quickly. He further testified that there are a lot of reasons why loans are refinanced. Barron Dep., at 123:11-124:16. Here, Llewellyn refinanced the First and Second Mortgage Loans through Wyman Funding to obtain a lower interest rate and to obtain $116,000 cash proceeds which he used to purchase construction equipment from a general contractor, including scaffolding and concrete equipment. Llewellyn Dep., at 167:12-19, 169:22-171:5.[6]

---

[5] Mortgage transfers are a common part of the mortgage industry, and such transfers can happen the moment after the loan closes. Saport Dep., at 62-63; 155.

[6] A January 28, 2006 appraisal, ordered by Silver Creek Mortgage, valued the Coolidge Property at $730,000. Saport, Dep., at 163:3-164:24, **Exhibit 11** thereto (**Exhibit B-5** hereto) (Uniform Residential Appraisal Report for the Coolidge Property). Llewellyn had attempted to use the January 28, 2006 appraisal when purchasing the Coolidge property in March 2006, but Equity Pacific, in its appraisal review, valued the property at only $570,000. Saport Dep., at 162:11-17, 180:10-181:6. This appraisal was

**Equity Pacific Provides Its Payoff Demand for the First and Second Mortgage
Loans.**

20.      In connection with the refinancing of the First and Second Mortgage

Loans, by letter dated May 16, 2006 Equity Pacific provided Llewellyn a payoff demand

for the First and Second Mortgage Loans in the amount of $468,952.60, and $120,384.28.

Saport Dep., at 175:15-24, **Exhibit 16** thereto (**Exhibit B-4** hereto).  The payoff demand

instructed that the payoff funds be wired to USB AG New York, account name UBS Real

Estate Securities, Inc. *Id.*[7]

21.      Stewart Title served as the closing agent in connection with the

refinancing of the First and Second Mortgage Loans.  Ms. Staci Krehbiel, an escrow

officer for Stewart Title, handled the closing.  Deposition of Staci Krehbiel, "Krehbiel

Dep.," at 16:7-10, 20:13-18, a copy of the pages and Exhibits of Ms. Krehbiel's

Deposition cited to herein are attached hereto as **Exhibit F**.  Among other things, Ms.

Krehbiel prepared a HUD Settlement Statement containing, *inter alia*, the payoff

information, the fees to be collected from Llewellyn, and the title insurance fees.

Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (HUD Settlement

---

recertified in connection with the refinance of the Coolidge mortgage loan, valuing the property at
$676,000. Saport Dep., at 199:13-200:15, **Exhibit 24** thereto **(Exhibit B-6** hereto) (Uniform Underwriting
and Transmittal Summary for the Coolidge Property).  There is nothing ominous with the property
appraising at a greater value after only three months.  During this period, different lenders would accept
different property values.  Wyman Funding, the refinance lender, accepted the recertified appraisal at
$676,000 without question. Saport Dep., at 181:1-6.\

[7] Ms. Saport testified that when she closed on the Llewellyn refinance of the First and Second Mortgage
Loans, she was unaware that the servicing rights to the First Mortgage Loan had been transferred from
Equity Pacific to Ocwen.  Instead, she prepared a payoff the day prior to closing on the refinance after
receiving the payoff demand from Equity Pacific signed by Mr. Rider.  Saport Dep., at 6:7-13.  A May 23,
2006 e-mail from Tim Wyman, of Wyman Funding, to Hanna Weaver, Silver Creek Mortgage head
processor, contains Ms. Moskowitz (Mr. Llewellyn's secretary) handwritten notes, inserted on or about
May 26 or 27, 2006, stating "Ocwen transfer letter on 1st." Saport Dep., at 193:6-194:5, 235:23-237:13,
**Exhibit 51** thereto (**Exhibit B-9** hereto).Moreover, in a May 25, 2006 facsimile from Ms. Moskowitz to
Mr. Wyman, Ms. Moskowitz states "conditions attached... Transfer letter from Allstate to Ocwen on 7915
South Coolidge, plus the notes on the 1st & 2nd..." Saport Dep., at 237:14, **Exhibit 52** thereto(**Exhibit B-10**
hereto).Thus, prior to the refinancing of the First Mortgage Loan, Ms. Weaver of Silver Creek Mortgage
knew that the servicing rights to that loan had been transferred to Ocwen.

Statement). In preparing the HUD Settlement Statement, Ms. Krehbiel determined, through the information provided by Equity Pacific in the payoff statement, the Allstate account number to wire the payoff funds on the disbursement date. Krehbiel Dep., at 55:18-56:4.

**Llewellyn Executes the Closing Documents for the Refinancing of the First and Second Mortgage Loans.**

22.     In refinancing the First and Second Mortgage Loans, Llewellyn executed two refinance deeds of trust, each dated June 1, 2006. The first refinance deed of trust was secured by a fixed/adjustable rate note dated June 1, 2006, in the amount of $540,800, and the second refinance deed of trust was secured by a note dated June 1, 2006, in the amount of $135,200. The two notes totaled $676,000. Llewellyn Dep., **Exhibit 12 (Exhibit A-14** hereto) and **13** thereto (**Exhibit A-15** hereto) (first and second deeds of trust, respectively); Saport Dep., at 165:18-166:5, **Exhibit 12** thereto (**Exhibit B-7** hereto) (note dated June 1, 2006, in the amount of $540,800), and **Exhibit 13** thereto (**Exhibit B-8** hereto) (note dated June 1, 2006, in the amount of $135,200). Both of these deeds of trust and both of these notes show that the lender is Wyman Funding Group, Inc.

**Stewart Title and Llewellyn Execute the HUD Settlement Statement.**

23.     At the closing on June 1, 2006, Stewart Title and Mr. Llewellyn executed the HUD Settlement Statement. The HUD Settlement Statement provides that the payoffs were made to Equity Pacific in the amounts of $473,554.45 and $122,906.47 for the First and Second Mortgage Loans, respectively. Moreover, the HUD Settlement Statement identifies the lender for the refinance of both the First and Second Mortgage Loans as Wyman Funding Group. Additionally, the HUD Settlement Statement provides that Stewart Title has provided title insurance in connection with the refinance. Krehbiel

Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (June 1, 2006, HUD Settlement Statement). Thus, the HUD Statement shows the new loans taken by Llewellyn as $540,800, and $135,200, respectively, which figures exactly match the recorded Wyman two new deeds of trust.

## Stewart Title Executes the First Lien Title Clearance Letter and Issues a Title Policy.

24.     On June 1, 2006, Stewart Title executed its First Lien Title Clearance Letter in connection with the refinance of the First and Second Mortgage Loans, providing, *inter alia*, "we have closed and completely dispersed the above-captioned mortgage in the amount of $540,800. This mortgage is a valid first lien on the captioned property..." Stewart Title further notes that "[t]he usual title policy will be issued in the next few days." McNamara Decl., **Attachment C-4** hereto.

25.     Stewart Title issued an insurance policy after the refinance of the First and Second Mortgage Loans. Krehbiel Dep., at 82:4-6, **Exhibit 14** thereto (**Exhibit F-3** hereto) (insurance policy dated June 16, 2006). The insurance policy is in the amount of $540,800, and identifies the insured as Wyman Funding in connection with a June 1, 2006 deed of trust executed by Llewellyn to secure an indebtedness of $540,800 in favor of Wyman, recorded on June 16, 2006. Stewart Title treated as an exception the June 1, 2006 deed of trust securing the refinance second mortgage loan in the amount of $135,200. *Id*. at Schedule B. Stewart Title did not treat as an exception either the Allstate First Mortgage Loan or the Second Mortgage Loan. Krehbiel Dep., at 162:23-163:19. As of the date of issuance of the title policy, Stewart Title believed that the Allstate First Mortgage Loan and the Second Mortgage Loan had been paid off. Krehbiel Dep., at 163:6-10.

**Stewart Title Experiences Problems in Wire Transferring the Payoff Amount on the First Mortgage Loan to Equity Pacific.**

26.     The closing date for the refinancing of the First and Second Mortgage Loans was June 1, 2006, and Llewellyn signed the loan closing documents on that date. The scheduled disbursement date was June 6, 2006. On June 6, 2006, Stewart Title received the loan proceeds from Wyman Funding, the refinance lender.  Krehbiel Dep., at 81:3-5, 87:10-24, **Exhibit 16** thereto (**Exhibit F-4** hereto) (incoming wire for receipts for the first and second mortgage refinance). Llewellyn, however, did not bring the required $372 payment for the closing fees until June 7, 2006. Krehbiel Dep., at 79:19-81:12. Thus, Stewart Title did not cut the payoff checks and wire the payoff funds until June 7, 2006. Krehbiel Dep., at 79:19-81:15. Ms. Krehbiel, who handles all of Stewart Title's wire transfers, wired the payoff funds to Equity Pacific solely to pay off the First and Second Mortgages. Krehbiel Dep., at 16:7-10,166:12-168:16.

27.     The wire transfer for the Second Mortgage Loan in the amount of $122,906.47 went through, but the wire transfer for the First Mortgage Loan in the amount of $473,554.45 did not.  Krehbiel Dep., at 89:20-90:2, 94:20-95:24, 105:4-5, 12-17, 166:12-24, **Exhibit 17** thereto (**Exhibit F-5** hereto), pp. 1012-1013 (First National Bank wire transfer log).  The wire was returned and credited back into Stewart Title's account on June 9, 2006. Krehbiel Dep., at 103:24-104:7, **Exhibit 19** thereto (**Exhibit F-6** hereto) (Stewart Title Batch Detail Report); *see also*, Krehbiel Dep., at 102:2-17, **Exhibit 18** thereto (**Exhibit F-7** hereto) (First National Bank document showing that the returned wire came back into Stewart Title's account on June 7, 2006, "BENEFICIARY IS UNABLE.").  Ms. Krehbiel testified at her deposition that wire transfers are sent back frequently. Krehbiel Dep., at 100:15-17,105.

28.     When Ms. Krehbiel learned that the wire transfer attempt for the First

Mortgage Loan did not go through, she telephoned Equity Pacific, and a representative of

Equity Pacific advised her to resend the wire transfer. Krehbiel Dep., at 100:5-7, 105:2-

11, 106:9-14.  On June 12, 2006, Ms. Krehbiel attempted again to send the wire transfer,

and it, too, was returned and the funds were again sent back to Stewart Title and credited

into its account.  Krehbiel Dep., at 106:19-107:9, **Exhibit 17** thereto (**Exhibit F-5**

hereto), pp. 116-117 (First National Bank wire transfer log, (reflecting that the wire was

returned "second return"))

29.     Ms. Krehbiel was concerned that the rejection of the wire transfer would

result in extra per diem interest on the unpaid First Mortgage Loan. Krehbiel Dep., at

106:9-14,109:20-25.  Therefore, she again telephoned Equity Pacific to advise it that the

wire was sent and returned a second time.  Krehbiel Dep., at 106, 109:3-9.  By facsimile

dated June 13, 2006, Equity Pacific provided Ms. Krehbiel new wire instructions.

Krehbiel Dep., at 110:11-111:3, **Exhibit 20** thereto (**Exhibit F-8** hereto).  On June 14,

2006 in accordance with Equity Pacific's June 13, 2006 facsimile, Ms. Krehbiel sent the

third wire in the amount of $473,554.45 to Washington Mutual Bank identifying Equity

Pacific as the beneficiary. Krehbiel Dep., at 115:14-17, 121:1-15, **Exhibit 17** thereto

(**Exhibit F-5** hereto), p. 1008 (First National Bank wire transfer log).  The third wire

transfer went through. Krehbiel Dep., at 121:20-23.  Payments are not deemed late until

after the fifteenth of each month.  Rider Dep., at 111:11-16.

**Equity Pacific Wire Transfers the Payoff Funds from the Refinance of the First
Mortgage Loan to Allstate.**

30.     After Equity Pacific received the wire transfer on June 14, 2006, Mr.

Rider, a vice president of Allstate Funding, and the owner of Equity Pacific, LLC, asked

Ms. Maria Osorio, Senior Accountant of Allstate Funding, where he should wire the money he received from Stewart Title in connection with the Llewellyn refinance of the First Mortgage Loan. Rider Dep., at 44:4-6,120:23-121:15. By e-mail dated July 10, 2006, Ms. Osorio instructed Mr. Rider to wire the money to Allstate Home Loans, dba Allstate Funding's trust account and provided him with the wire information. Rider Dep., at 120:23-121:15, **Exhibit 8** thereto (**Exhibit E-4** hereto). Ms. Osorio copied Mr. Doug Lawrence, the person in charge of Allstate (Barron Dep., at 88:4-15), with her July 8, 2006 e-mail. Mr. Rider then followed Ms. Osorio's instructions and, on July 11, 2006, wired the money to Allstate's bank account. Rider Dep., at 123:15-20, Barron Dep., at 228:3-12, **Exhibit 23** thereto (**Exhibit D-2** hereto) (July 11, 2006 Washington Mutual confirmation of domestic wire transfer order, identifying the beneficiary bank as Wells Fargo Bank, and the beneficiary as Allstate Home Loans, Inc. dba Allstate Funding, wire amount $431,251, by order of Equity Pacific Mortgage, Inc.). Mr. Rider then advised Mr. Lawrence that the wire went out the morning of July 11, 2006. Rider Dep., at 124:2-5.[8]

**Stewart Title Records the First and Second Deeds of Trust.**

31.     On June 16, 2006, Stewart Title recorded, *via* June 15, 2006 UPS, the first deed of trust in the amount of $540,800 pertaining to the refinanced First Mortgage Loan, and second deed of trust in the amount of $135,000 pertaining to the refinanced Second Mortgage Loan, thus making it a matter of public record that the lender was Wyman Funding, and that Wyman appeared to be obtaining a priority first lien on the Coolidge

---

[8] Mr. Rider testified that between the time he received the wire from Stewart Title in June 2006 and sent the wire to Allstate in July 2006, the money was "just sitting there." Rider Dep., at 124:6-9. The lag between Stewart Title sending the money to Equity Pacific and Equity Pacific sending the money to Allstate resulted from "trying to find who's supposed to get the money." Rider Dep., at 120:20-22.

Property.  Wyman Funding subsequently assigned the first and second deed of trust to

Long Beach Mortgage Company, and these assignments were recorded on July 10, 2006.

McNamara Decl., **Attachment C-5** thereto.

**Llewellyn Advises Ocwen That the First Mortgage Loan Has Been Refinanced, but Ocwen Issues a 30 Day Past Due Notice.**

      32.      On June 1, 2006, Llewellyn advised Ocwen that the First Mortgage Loan

had been refinanced. *See*, Ocwen's Comments/History Log for the First Mortgage Loan

("Ocwen Log") June 5, 2006 entry.[9]

      33.      On July 17, 2006, Ocwen issued Llewellyn a past due notice on the First

Mortgage Loan.  *See*, Ocwen Log, **Exhibit H**, *supra* ("as of 07/17/2006 Past Due

7,432.19 Curr Due 3,625.46 Total Due 11,057.65 'Loan Reviewed for Late Charge'

181.27 Assessed REQUESTED 3O DAY DEMAND BE SENT").

      34.      An October 10, 2006, credit report by Experian provides that in July 2006,

Ocwen reported the Llewellyn Coolidge Property first mortgage "account delinquent 60

days past due date $7,432."  McNamara Decl., **Exhibit C**, *supra*, **Attachment C-6**

thereto.

**Ocwen Threatens Llewellyn with Foreclosure of the Coolidge Property, and Then Initiates Foreclosure.**

      35.      By letter dated August 1, 2006 Ocwen referenced its previously sent

Notice of Default, and advised Llewellyn of the following alternatives to foreclosure:

repayment plans, and listing your property for sale.  Ocwen further threatened Llewellyn

as to the following consequences of foreclosure: loss of property, damaged credit rating,

deficiency liability, and tax ramifications.  Ocwen advised Llewellyn that "[t]his

---

[9] The Ocwen Log is attached as Tab A to Gina Johnson's Declaration, Exhibit A-12 to Ocwen's Motion. For the convenience of the Court, the Ocwen Log is attached hereto as **Exhibit G**.  Unless otherwise specified, the citation to the Ocwen Log is to the respective date referred to in the SOF.

communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose." Declaration of Glen Llewellyn "Llewellyn Decl.," attached hereto as **Exhibit H-1,** and **Attachment H-2**.

36.    Ocwen's Log reflects that on August 4, 2006, Ocwen reported that it had sent its credit bureau report request regarding the Coolidge Prop.  Ocwen Log.

37.    Ocwen's Log further reflects that on August 7, 2006, Llewellyn advised Ocwen that he refinanced the mortgage through Kevin Rider and the account was with Washington Mutual.  Ocwen advised Llewellyn that no one asked for a payoff quote or sent any payoff funds on the account.  Ocwen further advised Llewellyn to call Washington Mutual to get details about who sold the mortgage to them and to ask that person to contact Ocwen.  Ocwen Log.

38.    Llewellyn contacted Washington Mutual inquiring as to the payout in connection with the refinancing of the First Mortgage Loan.  By letter dated August 9, 2006, Washington Mutual advised Llewellyn that the loan was closed on June 6, 2006, and the lender was Wyman Funding Group, with the first payment due on August 1, 2006.  Washington Mutual enclosed a copy of a Settlement Statement, and noted that the payoffs were sent to Equity Pacific.  Washington Mutual advised Llewellyn to contact his closing agent for research on the payoff wire if Ocwen was to be paid off during the refinancing and was not paid off.  Llewellyn Decl., **Attachment H-3** thereto (August 9, 2006 letter from Washington Mutual to Llewellyn).

39.    By letter dated August 9, 2006 Ocwen gave Llewellyn a Notice of Default, advising Llewellyn that $7,250.92 was due.  Ocwen further threatened Llewellyn that "[f]ailure to bring your account current may result in our election to exercise our right to

foreclose on your property."  Additionally, Ocwen threatened Llewellyn that "[i]n foreclosure proceedings, [Ocwen] is entitled to collect your total arrearage in addition to any expenses of foreclosure, including but not limited to reasonable attorney' s fees and costs."  Moreover, Ocwen threatened: "Please be aware that, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by Ocwen to enforce the mortgage in addition to the overdue amount on the mortgage.  Any payment to reinstate the mortgage loan after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred.  Payments received that are less than the amount required to reinstate the mortgage will be returned, and will not stop any foreclosure proceedings that have begun."  Finally, Ocwen advised Llewellyn that "[t]his communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose. Llewellyn Decl., **Attachment H-4** thereto.

40.     On or about August 27, 2006, Ocwen initiated foreclosure proceedings. Ocwen's Log shows that on August 27, 2006, Ocwen requested a copy of the title policy, settlement statement, note and mortgage, and then completed section A and B foreclosure review.  Ocwen Log.  On August 29, 2006, the bailee documents were sent to foreclosure counsel, and a FCL was sent to the timeline department.  Ocwen Log.  The Ocwen Log further shows that NCCI initiated foreclosure on August 29, 2006.  Ocwen Log.  On September 19, 2006, Ocwen completed its pre-foreclosure QC.  Ocwen Log.

41.     An October 10, 2006 credit report references Ocwen's August reporting of foreclosure on the Coolidge Property, and provides that "foreclosure process started, "last report on August 2006, 90 days past due, $11,363. McNamara Decl., **Attachment C-6**

thereto (credit reports from Equifax and TransUnion).  On August 29, 2006, Ocwen

ordered a title search on the Coolidge Property.  Ocwen Log.

**Castle, Acting As Ocwen's Debt Collecting Agent, Threatens Llewellyn with**
**Foreclosure Proceedings on the Coolidge Property.**

      42.      By letter dated September 7, 2006, Defendant Castle, Meinhold &

Stawiarski, LLC ("Castle"), acting as Ocwen's debt collecting agent, advised Llewellyn

that it had been paid to initiate foreclosure proceedings. Castle further advised Llewellyn

that the amount of the debt was $447,901.35, excluding interest, late charges and other

charges.  Castle advised Llewellyn that the current creditor was NCCI, and that the loan

was serviced by Ocwen.  Castle also advised Llewellyn that, pursuant to the Fair Debt

Collection Practices Act, Castle is deemed to be a debt collector attempting to collect a

debt and any information obtained will be used for that purpose.  Llewellyn Decl.,

**Attachment H-5** thereto.

      43.      By facsimile dated September 25, 2006, Llewellyn advised Castle that he

was giving his secretary, Heather Moskowitz, permission to exchange information with

Castle regarding the debt dispute with Ocwen.  Llewellyn attached a copy of the August

9, 2006 letter he received from Washington Mutual, along with the accompanying

Settlement Statement.  Llewellyn Decl., **Attachment H-6** thereto.

**Ocwen Advises the Credit Bureaus That Llewellyn Is 90 Days Delinquent on the**
**Coolidge Property First Mortgage Loan and That It Has Commenced Foreclosure**
**on the Coolidge Property.**

      44.      As noted above, in August 2006, Ocwen reported to Equifax and

TransUnion that Llewellyn was 90 days past due, or $11,363, and that the "foreclosure

process started. "Ocwen's Log shows that on September 21, 2006, Ocwen again reported

Llewellyn's account to the credit bureau, noting that as of August 31, 2006, $11,363 was

past due, and that the account was delinquent three payments.  Ocwen Log.

45.     Shortly thereafter, Llewellyn received a letter from the Credit Bureau alerting Llewellyn of a negative credit entry. Saport, Dep., at 69:13-70:8.  Llewellyn advised Ms. Saport of this letter from the Credit Bureau, and she immediately pulled Llewellyn's credit report, which revealed that Ocwen had reported Llewellyn negatively. Saport Dep., at 69:13-71:4; Declaration of Candace Saport, ("Saport Decl".)., at ¶ 4, 5, attached hereto as **Exhibit I**, and **Attachment I-2** thereto (September 23, 2006 facsimile from Ms. Saport to Ms. Moskowitz showing that a credit bureau reported the Coolidge Property as late payment).  Ms. Saport testified that she then spoke with Ocwen several times over the telephone relating to Llewellyn's loan.  Saport Dep., at 70:2-15,243:11-23, Saport Decl., at ¶ 5, 9.

**Ocwen Rejects Two Payments Made by Allstate on the Coolidge First Mortgage Loan and Continues Initiating Foreclosure Proceedings on the Coolidge Property, Using Castle As Its Debt Collecting Agent.**

46.     On September 29, 2006, Ocwen received a check from Allstate dated October 28, 2006, in the amount of $7,250.92 in payment toward the First Mortgage Loan.  Ocwen Log, October 2, 2006 entry.  The face of the check contains a handwritten notation "Llewellyn 6328389." Barron Dep., at 172:3-173:25; 175:1-13, **Exhibit 13** thereto (**Exhibit D-3** hereto) (Allstate's $7,250.92 check). Ocwen's Log, however, notes that on September 29, 2006, Ocwen rejected this check because Ocwen was foreclosing on the property-- "Payment fund rejected because of stop conditions.  Account is under review.  Stop codes on loan are: FC." Ocwen Log.  Ocwen's Log further provides that on October 2, 2006, Ocwen returned the $7,250.92 to Allstate, noting "INSUFFICIENT TO CURE," and "Pmtrecd $7,250.92 on 09/29/06 is rejected as loan in fc and uncertified load source."  Ocwen Log.

47.     While Allstate was attempting to make payments on the loan,[10] Llewellyn struggled to persuade Castle not to foreclose on the Coolidge Property and to cease collection efforts.  By letter dated October 1, 2006, Llewellyn advised Castle that the $447,554.45 loan was paid off to Equity Pacific on June 1, 2006, and enclosed a copy of the HUD Settlement Statement.  Llewellyn further advised Castle that Ocwen had completely destroyed his credit and that he could not obtain construction financing required to conduct his business.  Moreover, Llewellyn noted his multitude of telephone calls to Ocwen which proved futile, and observed that Ocwen seldom returned his telephone calls for weeks at a time.  Llewellyn pleaded for Castle to take care of the issue immediately and that time was of the essence.  Llewellyn Decl., **Attachment H-7** thereto.

48.     Meanwhile, on October 6, 2006, notwithstanding its receipt of the $7,250.92 check from Allstate (representing two mortgage payments), Ocwen reported to the credit bureaus that it had started foreclosure process and that the account was 90 days past due.  McNamara Decl., **Attachment C-7** thereto (January 22, 2007 Credit Plus report).  Moreover, Ocwen continued initiating and threatening foreclosure.  Ocwen's Log shows that on October 5, 2006, Ocwen's foreclosure title search bill was approved and sent to accounting.  Ocwen Log.  By letter dated October 5, 2006, Ocwen presented Llewellyn with alternatives to foreclosure, including repayment plans and listing his property for sale.  Ocwen also threatened Llewellyn with consequences of foreclosure, including property loss, damage credit rating, deficiency liability, tax ramifications.

---

[10]Mr. Rider testified that when Shearson Financial acquired Allstate, the loan proceeds were transferred from Allstate to Shearson Financial's bank account.  Mr. Barron used the loan proceeds to pay off his personal accounts.  Mr. Barron then made the payments to Ocwen to buy time so that he could to replenish the monies he had spent that were needed to pay off the loan.  Specifically, Mr. Barron sent payments to Ocwen so that Ocwen would not think that the loan was paid off.  Rider Dep., at 151:16-154:23, 170:3-25.

Notably, Ocwen represented to Llewellyn that Ocwen's communications were "from a debt collector attempting to collect a debt, [and that] any information will be used for that purpose." Llewellyn Decl., **Attachment H-8** thereto.

49.     While Ocwen continued threatening foreclosure, Llewellyn persisted in his efforts to convince both Ocwen and Castle that the First Mortgage Loan had been paid off to Equity Pacific. Ocwen's Log shows that on October 9, 2006, Llewellyn telephoned Ocwen advising it again that the Loan was paid off and that a check in the amount of $573,091.59 was sent to Allstate Funding. Ocwen submitted a research investigation request. Ocwen Log. Llewellyn telephoned Ocwen again later that day advising that the loan was transferred to Washington Mutual and that Ocwen was reporting the loan past due when he had made all payments. Ocwen Log.

50.     By letters dated October 10, 2006, Llewellyn advised, *inter alia*, both Ocwen and Castle, as well as **Experian**, **Equifax** and **TransUnion**, that the First Mortgage Loan had been paid in full and that the adverse credit reporting was erroneous. Llewellyn again explained that the loan was refinanced and that a payoff was made to Equity Pacific. Llewellyn pleaded for Ocwen not to sell the loan.[11] Llewellyn emphasized that his business was being destroyed as a result of the false report on his credit from Ocwen. Llewellyn included as attachments to his letter the following documents:

- August 9, 2006, Ocwen notice of default letter;
- August 9, 2006, foreclosure letter from Ocwen;

---

[11] By letter dated October 3, 2006, Ocwen advised Llewellyn that it was selling the servicing rights to the First Mortgage Loan to NCC servicing ("NCC") effective October 20, 2006. Llewellyn Decl., **Attachment H-10** thereto.

- September 7, 2006, letter from Castle threatening foreclosure;

- Ocwen's most recent account statement received;

- October 3, 2006, letter of sale from Ocwen to NCC servicing, LLC;

- August 9, 2006, letter from Washington Mutual;

- Llewellyn's FICO scores from all three credit bureaus;

- June 1, 2006, HUD settlement statement on refinance.

Llewellyn Decl., **Attachments H-9** thereto.

51.     Ocwen's Log shows that on October 10, 2006, Ms. Saport telephoned Ocwen advising it that the Loan was paid off in June 2006 through Equity Mortgage [sic Equity Pacific] and that the funds were transferred to Allstate Funding.  An Ocwen representative advised Ms. Saport to call Equity Mortgage [sic Equity Pacific] and determine whether the funds were sent to the prior servicer or original lender.  Ocwen Log.  Ms. Saport testified that she tried calling Ocwen day in and day out in an effort to conduct credit repair on Llewellyn's behalf. Saport Dep., at 14:16-21.

52.     On October 10, 2006, while Llewellyn and Ms. Saport were busy trying to convince Ocwen that the loan was paid off in June 2006, Ocwen received yet another check from Allstate dated October 5, 2006, in the amount of $3,625.46 as payment toward the First Mortgage Loan.  Ocwen Log, October 10, 2006 entry; Barron Dep., at 172:3-173:25, **Exhibit 14**, thereto (**Exhibit D-4** hereto) (Allstate's $3,625.46 check).  Ocwen's Log shows that Ocwen rejected this payment because the loan was in foreclosure and the funds were not certified.  Ocwen Log, October 10 and 11, 2006 entries (loan in FC, LS-uncertified hence rejected).  Ocwen returned this check to Allstate on October 12, 2006.  Ocwen Log, October 12, 2006 entry.  Meanwhile, Ocwen

continued with its efforts to foreclose on the Coolidge Property. Ocwen Log, October 10, 2006 entry (October 10, Foreclosure cost fee assessed). Credit reports from Equifax and TransUnion dated October 10, 2006, show that Ocwen had started the foreclosure process and that the loan was 90 days past due. McNamara Decl., **Attachment C-6** thereto.

53.     Ocwen's Log shows that on October 13, 2006, Llewellyn again advised Ocwen that payoff funds in the amount of $573,191.59 were remitted to the prior servicer. On October 13, 2006 an Ocwen representative then inquired of Ocwen whether it had received any payoff funds from the prior servicer. Ocwen Log. Ocwen's Log further shows that on October 13 and 16, 2006, an Ocwen representative attempted to call the prior loan servicer, noting that he could not get through and that there was no option to talk to the customer representative. The calls were made at 1:11:50 and 1:15:49, Pacific Time, respectively (lunchtime). Ocwen Log.

54.     Ocwen's Log also shows that on October 18, 2006, Llewellyn again telephoned Ocwen regarding the payment and that Ocwen received written dispute correspondence. Ocwen Log.

**Ocwen Retains the $10,876.38 Received from Allstate as an Interim Payment on the First Mortgage Loan, and Recognizes That This Loan Was Paid out Prior to Being Boarded at Ocwen.**

55.     On October 18, 2006, after Ocwen returned the two checks to Allstate, an Allstate Representative telephoned Ocwen regarding "the payoff that was sent in being short." Ocwen Log. Ocwen provided bank wire information to the Allstate representative. Ocwen Log. Later that day, Ocwen received a wire transfer from Allstate in the amount of $10,876.38. Ocwen Log. That same day, according to Ocwen's log, Ocwen again spoke to Llewellyn regarding the loan. Ocwen Log.

56. Notably, Ocwen's Log further shows that on October 18, 2006, an Ocwen representative, in noting an invalid workflow request, observed that "[th]is item was paid out prior to the loan being boarded at Ocwen. Therefore, this is an IPAY issue and you should submit this to the IPAY workflow." Ocwen Log

57. Ocwen's log further shows that on October 19, 2006, Llewellyn again telephoned Ocwen, advised it that the loan had been paid in full and should not be in foreclosure, and demanded that it correct the credit reporting to the Credit Bureau. The Ocwen representative submitted a research investigation request. Ocwen Log. Later that same day, October 19, 2006, Ocwen acknowledges in its Log that:

INTERIM PAYMENT PENDING FROM PRIOR SERVICER/INV.

Payment Info: Paid to Equity Pacific $473,554.45 on 1st lien.

Date Sent, June 6, 2006.

Payment Amount $473,554.45

How was payment made: Wire.

***

Who made the payment: Stewart Title of Colorado

Where was the payment sent?: Equity Pacific Mortgage, Loan #100602061.

Interim payment pending from prior servicer/INV. Paid to Equity Pacific $122,906.47 on second lien. Date sent June 6, 2006. Payment made by wire. Stewart Title of Colorado made the payment and sent the payment to Equity Pacific Mortgage, loan #1009602062.

58. Still later that day, on October 19, 2006, Ocwen's Log shows it received written correspondence regarding the payment dispute. Ocwen Log.

**Ocwen Finally Advises Llewellyn That It Will Conduct Research Regarding Nonpayment of the First Mortgage Loan, but Continues Foreclosure Proceedings.**

59.     By letter dated October 19, 2006, and again (for whatever reason) by letter dated October 20, 2006, Ocwen advised Llewellyn that it was in receipt of Llewellyn's letter requesting Ocwen to conduct research. Ocwen noted that it has 60 days under RESPA to conduct the research, but that its policy is to perform the research in 15 days. Ocwen further noted that if the servicing of the loan was transferred to Ocwen from a prior servicer, Ocwen may be required to obtain information from the prior servicer. Notably, Ocwen admitted that "This Communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. Llewellyn Decl., **Attachment H-11** thereto.

60.     By letter dated October 19, 2006, Castle advised Llewellyn that Ocwen had instructed Castle to place its file on hold pending the outcome of Ocwen's investigation of his dispute. Llewellyn Decl., **Attachment H-12** thereto. The threat of foreclosure, however, continued, particularly in Llewellyn's mind, as the foreclosure was merely placed on hold, as opposed to abated permanently. Llewellyn Dep., at 365:7-21. And Ocwen certainly did not erase the threat of foreclosure from its mind as shown by the October 19, 2006 Ocwen Log entry stating that foreclosure proceedings were started. Ocwen Log. Ocwen's Log also contains an October 20 reference that the payoff amount for Llewellyn is $450,241.83, which includes foreclosure costs. Ocwen Log.

**The Servicing Rights to the First Mortgage Loan Are Transferred from Ocwen to NCC Servicing on October 20, 2006, and Ocwen Transfers to NCC Servicing the $10,876.38 Payoff Funds Received from Allstate.**

30

61. Ocwen's Log shows that October 18, 2006, it received a wire transfer from Allstate in the amount of $10,876.38. Ocwen log, October 20 entry. This same Log entry states that the loan is in foreclosure.

62. On October 20, 2006, the servicing rights to the First Mortgage Loan was assigned, sold and transferred from Ocwen to NCC Servicing, LLC ("NCC"). Llewellyn Decl., **Attachment H-13** thereto.

63. Ocwen's Log also shows that, even though the servicing rights to the loan were transferred on to NCC on October 20, 2006, Ocwen nevertheless posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006. Ocwen Log. Notably, Ocwen's Log reflects that on October 31, 2006, a call was made to Ocwen requesting a payoff quote, and Ocwen advised the caller that the loan was service transferred. Ocwen Log.

**After Ocwen Transfers the Servicing Rights to the First Mortgage Loan to NCC Servicing, Ocwen Reports Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.**

64. Although Ocwen was no longer servicing the First Mortgage Loan as of October 20, 2006, Ocwen nevertheless reported negatively on Llewellyn to the Credit Bureau on October 20, 2006. Specifically, Ocwen advised the Credit Bureau that as of September 30, 2006, Llewellyn was past due $14,988. Ocwen Log. Inexplicably, in an October 20, 2006 entry, Ocwen noted that it advised the Credit Bureau that $14,988 was past due, yet at the same time noted that payment in the amount of $10,876.38 was received by Ocwen on October 18, 2006. Ocwen Log, October 20, 2006 entry. Ocwen also noted that day that the First Mortgage Loan was in foreclosure. Ocwen Log,

October 20, 2006 entry.  Along these lines, Ocwen's October 23, 2006 Log entry identifies the foreclosure costs and fees.  Ocwen Log.

65.      Ocwen's October 23, 2006 Log entry also notes that Llewellyn completed and sent electronically a form expressing his concern with the credit reporting.  Ocwen Log.

66.      Again, on October 23, 2006, even though Ocwen was no longer servicing the loan, Ocwen reported to the Credit Bureau that Llewellyn's account was 120 days past the due date as of September 30, 2006.  Ocwen Log.

**Despite Transferring the Servicing Rights to the Loan, and Despite Acknowledging in Its Log That the Loan Was Paid out Prior to Being Boarded at Ocwen, Ocwen Continued Requesting Additional Information from Llewellyn Regarding the Payoff.**

67.      Notwithstanding its earlier October 19 and 20, 2006 letters advising Llewellyn that it was conducting research on the loan payout issue raised by Llewellyn, by letter dated October 23, 2006 Ocwen inexplicably again advised Llewellyn that it has reviewed his request that Ocwen perform research relative to the interim payment issue. Like its earlier two letters emphasizing the priority of his request, Ocwen again advised Llewellyn that his request was a priority.  As with its October 19 and 20, 2006 letters, Ocwen advised Llewellyn that if the servicing of the Loan was assigned, sold or transferred to Ocwen from a prior servicer, Ocwen may be required to obtain information concerning the Loan from the prior servicer.  Ocwen again advised Llewellyn that the process of obtaining this information takes time, and that Ocwen will notify him if any additional information was required.  Llewellyn Decl., **Attachment H-14** thereto.

68.      Ocwen's October 24, 2006 Log entry shows another telephone call by Llewellyn claiming that the Loan was paid in full with Equity Pacific and the payoff

amount was $447,554.45. Notably, the Log entry further provides "our records indicate that the loan was acquired on May 15, 2006 with the loan due for June 1, 2006 *payment from Allstate Funding*." Ocwen Log (emphasis added).

69. During this time, Llewellyn attempted to gather information for Stewart Title to assist it in explaining to Ocwen that the Loan had been paid off to Allstate. By letter dated October 24, 2006 in response to Ms. Krehbiel's request, Llewellyn provided "documentation for [her] to help expedite and to correct records that is ruining [his] credit and therefore destroying [his] homebuilding business." Llewellyn noted that her "hastening of this matter is imperative." Krehbiel Dep., at 122:8-124:6, **Exhibit 23** thereto (**Exhibit F-14** hereto). Ms. Krehbiel testified that the records she could help Llewellyn correct was "the proof that [she] had issued the wire and that those loans were paid off." Krehbiel Dep., at 123:21-124:3.

70. Ocwen's October 25, 2006 Log entry shows that Ms. Saport telephoned Ocwen requesting "a letter from Ocwen that his credit is not effected [sic]." Ocwen Log.

**NCC Servicing, as the Transferee of the of the Servicing Rights to the Loan, and Ocwen Double Team Llewellyn, Both Demanding Proof that the Loan was Paid Out.**

71. By e-mail dated October 27, 2006, James George, a representative of NCC, advised Ms. Krehbiel that NCC was servicing the First Mortgage Loan for Ocwen Mortgage and acknowledged that Llewellyn had refinanced the Coolidge Property on June 1, 2006, through Wyman Funding. Mr. George, however, requested from Ms. Krehbiel any pertinent information she had showing the original loan through Equity Pacific was paid off, including a copy of the payoff and payoff check as proof. Mr. George also acknowledged that "this [issue] has adversely affected [Llewellyn's] credit

and that [Llewellyn] needs this resolved ASAP."  Krehbiel Dep., at139:10-141:9, **Exhibit 28** thereto (**Exhibit F-9** hereto).

72.     By e-mail dated October 27, 2006 Ms. Krehbiel advised Mr. George that she had been trying to contact Mr. Rider of Equity Pacific, whom she had sent the payoff on the loan by wire transfer. Ms. Krehbiel further advised Mr. George that she would send them all of the information he had requested. McNamara Decl., **Attachment C-8** thereto.

73.     Meanwhile, by letter dated October 31, 2006, from Ocwen to Llewellyn, Ocwen referred to Llewellyn's "recent" notification regarding the payment to the prior servicer of the Loan, and requested from Llewellyn legal documents showing how the payment was made (if by wire, Llewellyn must track down the funds with a trace number), a letter specifying which monthly payment appears to be missing or misapplied, and his Ocwen loan number.  Ocwen further advised Llewellyn that it would be unable to research the matter further unless it obtains this information.  Significantly, even though Ocwen had transferred the servicing rights to the Loan to NCC, Ocwen threatened Llewellyn that if it did not hear from him, it "would consider this a closed item, which could lead to continuing phone calls and delinquency notices."  Ocwen advised Llewellyn that "[t]his communication from a debt collector attempting to collect a debt; any information obtained we use for that purpose."  Llewellyn Decl., **Attachments H-15** thereto.

74.     Shortly thereafter, by e-mail dated November 3, 2006, Ms. Krehbiel sent to Mr. McNamara, Llewellyn's counsel, the payoffs, HUD and copies of the outgoing wires that were sent to pay off the lender.  She advised Mr. McNamara that she would

send him the O&E as soon as she received it. Krehbiel Dep., at 125:17-126:13, **Exhibit 25** thereto (**Exhibit F-10** hereto). Ms. Krehbiel also sent these documents to Mr. George at NCC in response to his request for proof of the payoff. Krehbiel Dep., at 143:6-17.

75. By e-mail dated November 6, 2006, Ms. Krehbiel sent to Mr. McNamara the November 3, 2006 O&E, noting that they are "still showing two liens that were paid off through our closing." Krehbiel Dep., at 128:19-129:23, **Exhibit 26** thereto (**Exhibit F-11** hereto). Specifically, the O&E reflects the first and second deeds of trust, both dated March 15, 2006, in the amounts of $447,984 and $111,996, respectively, and identifying the beneficiary as Allstate Funding, dba Allstate Home Loans, Inc. Notably, the O&E also reflects fourth and fifth deeds of trust, both dated June 16, 2006, in the amounts of $540,800 and $135,200, respectively, and identifying the beneficiary as Wyman Funding Group, Inc.[12] In her e-mail, Ms. Krehbiel advised Mr. McNamara that Stewart Title sent a release for the two liens that were paid off at closing, as well as the third lien. *Id*.

76. Meanwhile, on November 2, 2006, Ocwen unsuccessfully attempted to call Allstate Funding, again at 12:25:18 p.m. Pacific Time *viz*., lunchtime. Ocwen Log. By letter dated November 3, 2006, Ocwen advised Llewellyn that it was continuing its research efforts regarding the loan, but could not meet the target 15 days. Notably, Ocwen advised Llewellyn that "[t]his communication from a debt collector attempting to collect a debt; any information obtained we use for that purpose." Llewellyn Decl., **Attachments H-16** thereto.

---

[12] The O&E further reflects a third deed of trust dated May 18, 2006 in the amount of $95,000, identifying the beneficiary as Zachary Rodgers.

77.     On November 8, 2006, Ocwen advised Ms. Saport that the loan servicing was transferred to NCC on October 20, 2006, and *after* the transfer Ocwen received the payoff funds which it transferred to the new servicer, NCC. Ocwen Log. (As noted above, Ocwen's Log shows that it received the payoff funds on October 18, 2006, before the transfer of the servicing rights to NCC. Ocwen Log, October 20, 2006 entry). Ocwen advised Ms. Saport to fax a research request to NCC. (Ocwen Log, November 8, 2006 entry).

78.     By letter dated November 13, 2006, Ocwen thanked Llewellyn for his "recent correspondence regarding the above-referenced loan." Ocwen advised Llewellyn that it had reviewed the loan and noted that Llewellyn had provided Ocwen with a copy of the Settlement Statement indicating that the loan was paid in full with Equity Pacific on June 1, 2006. Ocwen advised Llewellyn, however, that "the proof provided is insufficient for [Ocwen] to research the issue. Therefore, it is suggested that you provide us with the front and back copy of the cash payoff check, source of receipt along with the letter from your prior servicer stating that the loan was paid in full with them.... This will enable us to research further and update your credit report accordingly." Ocwen further advised Llewellyn that "[t]his communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose." Llewellyn Decl., **Attachment H-17** thereto.

## Acting As A Debt Collector, Castle Receives Proof That the Loan Was Paid Off from the Refinance Proceeds.

79.     By letter dated November 10, 2006, Mr. McNamara advised Castle that the Loan was fully paid from the proceeds of a refinance of the property in June 2006. He further advised Castle that he had requested Ms. Krehbiel to send Castle proof of this

fact. McNamara Decl., **Attachment C-9** hereto. By e-mail dated November 10, 2006,

Ms. Krehbiel sent Castle, as proof that the Loan was paid off from the proceeds of the

refinance, copies of the HUD settlement statement, the payoffs and the wire transfer log

reflecting the wire transfer to payoff Equity Pacific. Krehbiel Dep., at 152:8-14,156:6-25,

**Exhibit 34** thereto (**Exhibit F-12** hereto).[13]

### Acting As a Debt Collector, Ocwen Continues Attempting to Collect on the Loan and Continues Reporting Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.

80.     Although Ocwen transferred the servicing rights to the Loan to NCC

effective October 20, 2006, Ocwen, acting as a debt collector, continued attempting to

collect on the Loan. Moreover, Ocwen continued reporting negatively, and incorrectly,

on Llewellyn to the Credit Bureaus. Specifically, on November 17, 2006, Ocwen

reported to the Credit Bureau that Llewellyn's account was delinquent and that Llewellyn

had made no monthly payments. Ocwen Log. Again, on November 20, 2006, Ocwen

reported to the Credit Bureau that the account was transferred to another office as of

October 20, 2006, and gave the payment rating: 120-149 days past due. Ocwen Log.

81.     The next day, on November 21, 2006, Ms. Krehbiel provided Ocwen the

wiring log she had previously sent to Ocwen's attorneys and to NCC, showing the payoff

to Equity Pacific. Krehbiel Dep., at 150:19-151:9, **Exhibit 31** thereto (**Exhibit F-13**

hereto). Notwithstanding receipt of the wiring log, on November 30, 2006, Ocwen again

reported to the Credit Bureau that the account was transferred to another office as of

October 20, 2006, and that the account was 120-149 days past due as of September 30,

2006. Ocwen Log.

---

[13]  Although Ms. Krehbiel pulled an O&E on November 6, 2006, she did not send this to Castle as they are public records. Krehbiel Dep., at 158:17-22.

**Acting As a Debt Collector, Castle Represents, On Behalf Of His Clients, Ocwen and NCC, That the Loan Should Have Been Paid in Full and That Llewellyn's Credit Report Will Be Reversed.**

82.     By letter dated December 5, 2006, Castle advised Mr. McNamara that it's "client has indicated that this loan should have been paid-in-full.  As such, our client has advised us to close and bill our foreclosure file on this case."  Moreover, Castle advised Mr. McNamara that its "client has indicated that Mr. Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action."  Castle noted that it takes time to reverse the credit reports, and advised McNamara that if its client has not fully done so, "please feel free to contact me and I will ensure that the problem is addressed." In the transmittal page to the December 5, 2006 letter, Castle advised McNamara

**"PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE."**  McNamara Decl., **Attachment C-10** thereto.(Emphasis in original).[14]

**Notwithstanding Its Debt Collecting Agent Castle's Representation That Ocwen Would Reverse Llewellyn's Credit Report, Ocwen Continues Reporting Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.**

83.     Although Ocwen's debt collecting agent, Castle admitted, on behalf of Ocwen, that the "loan should have been paid-in-full" and that "Llewellyn's credit report will be reversed," Ocwen improperly continued to report negatively and incorrectly, on Llewellyn to the Credit Bureaus.  Thus, on December 15, 2006, Ocwen reported to the Credit Bureau that Llewellyn's account was transferred to another office as of October 20,

---

[14]Notably, Mr. Llewellyn viewed this letter containing the debt collector language as a continued threat of foreclosure.  Llewellyn Dep., 368:16-369:11.

2006 and that the account was 120-149 days past due as of September 30, 2006. Ocwen Log.

**Mr. Barron Acknowledges, on Behalf of Allstate, That the Loan Was Paid Off.**

84.     By letters dated January 8 and 11, 2007, Mr. Barron, on behalf of Allstate, advised Mr. McNamara that the Loan was paid in full in June 2006, and that any adverse reporting to credit agencies by parties other than Allstate would be erroneous and completely without merit. Barron Dep., at 153:5-18, 154:20-155:1, 192:17-22, 194:19-195:12-15, **Exhibits 12** and **17** (**Exhibits D-5** and **D-6** hereto).[15]

**Contrary to its Agent Castle's Representation That Llewellyn's Adverse Credit Reporting Will Be Reversed, NCC Advises Llewellyn That He Is in Default and Threatens, among Other Things, to Foreclose on the Coolidge Property.**

85.     Although Castle, acting as a debt collecting agent on behalf of both Ocwen and NCC, advised McNamara on December 5, 2006 that Llewellyn's credit report would be reversed, by letter dated January 9, 2007, NCC advised Llewellyn that he was in default on the Loan. NCC Servicing also threatened Llewellyn that if he did not pay the full amount of the default, it would invoke any remedies, including foreclosure of the property. NCC further threatened to assess Llewellyn with legal expenses incurred by NCC to protect its lien position, noting that these fees would be added to the total amount necessary to cure the default. Llewellyn Decl., **Attachment H-18** thereto.

86.     Notably, in its January 9, 2007 letter, NCC advised Llewellyn that the amount of debt it was seeking to collect was $9,783.67, which includes the sum of the payments that have come due on and after the date of default June 1, 2006, and late charges, and other charges that may vary from day to day. In calculating the amount

---

[15] On January 22, 2007, Mr. Barron signed the note securing the Loan as "paid in full." Barron Dep., at 210:8-211:8, **Exhibit 19** thereto (**Exhibit D-7** hereto). On January 24, 2007, the release of the deed of trust for Loan was recorded. Barron Dep., 220:13-221:22, **Exhibit 21** (**Exhibit D-8** hereto).

purportedly due, NCC deducted the $10,876.38 payment made by Allstate back on October 18, 2006. Like Ocwen, and Ocwen and NCC's attorney Castle, NCC admonished Llewellyn that "YOU SHOULD CONSIDER THIS LETTER AS COMING FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. ANY INFORMATION PROVIDED BY YOU WILL BE USED TO COLLECT THIS DEBT. *supra.*

**Castle, Acting As a Debt Collector for NCC, Again Advises McNamara That the Loan Should Have Been Paid in Full and That Any Adverse Credit Reporting Was in Error.**

87.    By letter dated January 18, 2007, Castle, acting on behalf of NCC, once again advised Mr. McNamara that his client has informed him that the Loan should have been paid in full, and any adverse credit reporting was an error. Castle's fax transmittal states that ""**PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING AS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE.**" (Emphasis in original). McNamara Decl., **Attachment C-11** thereto.

88.    Castle's intervention on behalf of its clients, NCC and Ocwen, however, did not cause the reversal of Llewellyn's bad credit marks. Thus, by letter dated January 22, 2007, Mr. McNamara advised Castle that Llewellyn's credit report still showed Ocwen reporting Llewellyn in foreclosure/default. McNamara requested that Castle have his clients reverse the bad credit marks. McNamara Decl., **Attachment C-12** thereto.

89.    By letter dated January 23, 2007, Mr. McNamara also advised NCC that the Loan was not in default, pointing NCC to Castle's January 18, 2007 letter. Mr.

McNamara also enclosed copies of the paid notes that NCC claimed to be servicing and a letter from Allstate stating that the notes were paid in full. Mr. McNamara advised NCC that Llewellyn has suffered great financial ruin from Ocwen, and that his credit has been ruined. McNamara Decl., **Attachment C-13** thereto.

## NCC and Ocwen Advise Their Debt Collecting Attorney, Castle, and Mr. Llewellyn and Mr. McNamara That They Have Requested a Correction to Llewellyn's Credit Bureau Report.

90.     By letter dated January 29, 2007, Mr. George, NCC Servicing, writing on behalf of defendants NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that we have requested a correction to [Llewellyn's] credit bureau report as a result of your *recent* inquiry." (emphasis added). McNamara Decl., **Attachment C-14** thereto. Mr. George further stated, on behalf of NCC, Ocwen and NCCI, that"[a]lthough *we* are still attempting to resolve this matter *we* have received confirmation that this error was not a direct result of any wrongdoing on the part of Glenn Llewellyn." *Id*. (emphasis added).

## Ocwen Fails to Request the Credit Bureaus to Correct Llewellyn's Credit Report As Promised until Instructed to do so by Castle.

91.     Although Ocwen promised, in Mr. George's January 29, 2007 letter, to request a correction to Llewellyn's credit bureau report, Ocwen did not make the request until instructed by its debt collecting attorney, Castle, to do so. Ocwen's Log shows that Ms. Saport telephone Ocwen on February 2, 2007, again advising Ocwen that the account had been paid off with the prior servicer and somehow was reported in foreclosure. Incredibly, Ocwen advised Ms. Saport "to fax the proof to RSHS so they could look into the same." Ocwen's February 2, 2007 log reflects that "caller was upset as she wanted something today." Ocwen Log. Ocwen's February 2, 2007 Log entry also shows that

Ms. Irene from Credit Plus[16] telephoned Ocwen requesting a letter that the account should not have been placed in foreclosure.  Ocwen Log.

92.      By letter dated February 8, 2007 Mr. McNamara chastised Castle for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report.  Mr. McNamara reminded Castle of its December 5, 2006 letter indicating that the credit report would be reversed, and then advised Castle that Mr. Llewellyn was unable to close several loans the previous week that he needed to keep his business going.  McNamara Decl., **Attachment C-15** thereto.

93.      By facsimile dated February 8, 2007, Castle sent to Mr. George the February 8, 2007 McNamara letter requesting a letter from Ocwen that afternoon. McNamara Decl., **Attachment C-16** thereto.

94.      That same day Mr. George advised Ms. Boxill of Ocwen by e-mail dated February 8, 2006 that "we are in desperate need of a letter from Ocwen stating that this will be corrected on the borrower's credit report." McNamara Decl., **Attachment C-17** thereto.

95.      Later that day, by e-mail, Mr. George advised Ms. Boxill that the Loan "was paid off in June but due to an error in processing was never recorded correctly. Therefore, this is still showing on the borrower's CBR report by Ocwen as a delinquency and he needs ASAP a letter advising that this will be corrected by Ocwen."  Referencing his conversation with Ms. Boxill the previous week, Mr. George enclosed: "proof of payoff, a copy of the CBR report showing Ocwen reporting this delinquency and correspondence from his attorney threatening a lawsuit."  Mr. George strongly advised

---

[16]  Credit Plus is a credit reporting agency that supplies the credit report that is used for the mortgage loan. Ms. Saport used Credit Plus exclusively for all of her credit reports.  Ms. Saport also used Credit Plus for credit repair.  Saport Dep., at 60:2-61:18.

Ms. Boxill that her "immediate attention to this matter would be greatly appreciated. Urgent !!! 911." McNamara Decl., **Attachment C-18** thereto. Castle's attorney Chris Alber, Esq., assured Mr. McNamara that the Castle firm would itself correct the bed credit marks in discussions with occurred in February, 2007. McNamara Decl.

96. In the meantime, Mr. McNamara persisted with his demands on Castle, Ocwen's debt collecting agent. By letter dated February 9, 2007, Mr. McNamara advised Castle that Llewellyn's credit scores dropped 100 points from the prior week because he was now 30 days late on a number of his property loans, all caused by his inability to obtain construction loans as a result of Ocwen's erroneous credit reporting on Llewellyn. McNamara Decl., **Attachment C-19** thereto.

97. While Mr. McNamara was making demands on Castle, Mr. George of NCC was continuing his efforts to persuade Ms. Boxill of Ocwen that the loan was paid off. Thus, by e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with "another copy of the CBR report the mortgagor has sent which gives more detail of the information reported by Ocwen." McNamara Decl., **Attachment C-20** thereto. In a separate e-mail dated February 9, 2007, Mr. George provided Ms. Boxill with the settlement information she requested. McNamara Decl., **Attachment C-21** thereto.

98. Finally, Ms. Boxill saw the light and, by e-mail dated February 12, 2007, Ms. Boxill advised Mr. Nelson Samuel of Ocwen that Llewellyn had paid off the loan prior to service transfer and that Ocwen reported him negatively to the Credit Bureau. She instructed Mr. Samuel to correct all negative reporting and provide a letter stating that Ocwen corrected it. McNamara Decl., **Attachment C-22** thereto. By e-mail dated February 14, 2007, Mr. Samuel advised Ms. Boxill that he was having Llewellyn's credit

updated that day. McNamara Decl., **Attachment C-23** thereto. In a separate e-mail also dated February 14, 2007, Mr. Samuel of NCC advised Ms. Boxill that "if this loan was paid off prior to the loan being transferred to Ocwen, we should be deleting the entire trade line of the borrower's credit report." Moreover, Mr. Samuel observed that "this loan should not have been boarded in the first place as the loan was paid off prior to the loan being transferred to Ocwen." McNamara Decl., **Attachment C-24** thereto; *see also*, Ocwen Log.

99. Ocwen's February 14, 2007 Log entry shows that "Research Priority Form Submitted: Details: delete entire trade line and send out a letter to the bwr." Ocwen Log.

100. By facsimile dated February 15, 2007, Castle provided McNamara with a letter dated February 15, 2007, from Ocwen to Llewellyn regarding Llewellyn. The facsimile first admonishes Mr. McNamara "**PLEASE BE ADVISED THAT CASTLE MEINHOLD & STAWIARSK, LLC IS ACTING IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION THAT YOU PROVIDE WILL BE USED FOR THAT PURPOSE.**" (Emphasis in original). McNamara Decl., **Attachment C-25** thereto.

101. In the February 15, 2007 letter from Ocwen to Llewellyn in response to what Ocwen characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan. Specifically, Ocwen states, in pertinent part:

> Ocwen would like to take this opportunity to thank you for your *recent* correspondence regarding the above referenced loan. We appreciate the time and effort on your part to bring your concern to our attention. Pursuant to your

44

concern, we have reviewed the loan and below is the recap of our response to the concern raised:

Concern: you requested that Ocwen remove the credit reporting done on your name as your loan was paid off prior to the loan being serviced transferred to Ocwen.

Response: Pursuant to your request, Ocwen has requested an update to your credit report. We have requested that the entire reporting trade line be deleted on the loan. Please allow sufficient time for the credit bureaus to reflect these changes in your credit report. We sincerely apologize for any inconvenience caused.
We report to Equifax Credit Information, Trans Union National Maintenance Center, Experian and Innovis. These listed credit bureaus are the only credit bureaus reported to by us. These major credit bureaus may also provide information regarding your credit to other local credit bureaus. The local credit bureaus will update and correct your credit file with information obtained from the above credit bureaus.

We trust the information provided is fully addressed your concern....

This communication is from a debt collector attempting to collect a debt, any information obtained will be used for that purpose.... [emphasis added].

102.     Incredibly, after this nine-month long drawn out nightmare in which Ocwen destroyed both Llewellyn's credit and real estate investments, Ocwen cavalierly and disingenuously asserts in its Answer that "[Ocwen] and NCCI state that in an abundance of caution upon receipt of plaintiff's correspondence, and before completing an independent investigation, Ocwen requested that the trade line with the credit bureaus relating to plaintiff's mortgage loan be deleted." Ocwen Answer at ¶ 20, attached hereto as **Exhibit J**.

**Llewellyn Is Unable to Obtain Loans to Support His Home Construction Business As a Result of Ocwen and Castle's Maligning His Credit.**

103.     Ms. Saport, who had brokered approximately six other loans for Llewellyn, attempted to broker an additional loan after the closing on the Coolidge Property. Saport Dep., at 17:22-24, 23:19-23.  Llewellyn's credit report, however, showed an Ocwen one times 30 days late, causing Mr. Llewellyn's credit score to fall from 782 down below 600. Saport Dep., at 23:19-23, 69:13-70:1. The Coolidge Property was the last property Llewellyn purchased or refinanced after Ocwen's misconduct because his credit "blew up" and Ms. Saport "couldn't get anything else done."[17]  Saport Dep., at 67:2-6.  Ms. Saport then worked with Llewellyn for several months trying to get his credit straightened out. Saport Dep., at 66:8-11.  Ms. Saport testified that she would call Ocwen and that she sent them all the paperwork and that "this went on and on."  She tried "to get the late off of Glen's credit report because it was totally screwing his credit.  He couldn't get anything." Saport Dep., at 70:9-15.

---

[17] Llewellyn closed on three loan refinancings after Ocwen destroyed his credit (*viz.*, **2122 S. Franklin** on September 15, 2006; 651 Race on November 22, 2006, and 572 Adams on January 19, 2007), but these loans had already been in the works for quite some time prior Ocwen's misconduct.  Llewellyn Decl.; *See, also*, Saport Decl., at ¶ **6**.

104.     In late 2006 or early 2007, Mr. McNamara approached Mr. Barron (who was still the CEO of Shearson) seeking Mr. Barron's assistance in refinancing a loan for Llewellyn. Barron Dep., at 126:8-128:5, 130:3-5, 131:7-20. Mr. Barron then telephoned Mr. Lawrence who was running Shearson Home Loans and requested him to run a credit check on Mr. Llewellyn.  Mr. Lawrence did so and discovered that Mr. Llewellyn's credit was terrible and there was nothing Shearson Home Loans could do to help him refinance the loan.  Barron Dep., at 128:7-22.  There was simply no way Mr. Llewellyn could refinance any of the loans on his properties. Barron Dep., at 131:9-16, 276:21-279:13, **Exhibit 31** thereto (**Exhibit D-9** hereto) (February 26, 2007 e-mail from Sherry Karr to Joe Cosio-Barron (forwarded to Mr. McNamara on February 27, 2007) (unable to make 100% CLTV loan to pay off liens on Llewellyn's properties due to, *inter alia*, multiple 30 day lates and current FICO score)).

### III. THIS COURT SHOULD DENY CASTLE'S MOTION FOR SUMMARY JUDGMENT ON LLEWELLYN'S CLAIMS  AND ON CASTLE'S AFFIRMATIVE DEFENSE.

Castle seeks summary judgment on Llewellyn's claims for outrageous conduct and for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(5).  As shown herein, genuine issues of material fact are in dispute with respect to each of these claims, and with respect to Castle's affirmative defense, and this Court should deny Castle's Motion.

### A.      The Court Should Deny Castle's Motion for Summary Judgment on Count III: <u>Outrageous Conduct</u>.

### 1.      <u>Burden of proof and elements.</u>

Llewellyn agrees with the Castle's recitation of the burden of proof and elements on this claim.

**2.      Elements Challenged by Castle.**

**Element 1**: Mr. Llewellyn can demonstrate a triable issue of fact as to whether Castle engaged in extreme and outrageous conduct.

A.      Castle engaged in extreme and outrageous conduct in ruining Llewellyn financially, and harming him both physically and mentally, when it teamed with Ocwen and aided and abetted Ocwen's false, and negative, reporting on Llewellyn's credit to the Credit Bureaus. As shown herein, Ocwen had no right to report the Loan in default, as it was paid through the refinancing proceeds. Llewellyn advised Ocwen that the Loan had been paid, and provided Ocwen with supporting documents. Ocwen, however, ignored Llewellyn's representations and proof, and threatened Llewellyn with foreclosure if he did not pay the Loan, emphasizing the adverse consequences of foreclosure, including liability for any deficiency.

B.      On the heels of Ocwen's threat of foreclosure and liability for any deficiency, Castle, who admittedly reviewed (apparently not very thoroughly) the foreclosure referral to verify the existence of the debt (Motion, at 2), also threatened Llewellyn with foreclosure. Castle's threat to foreclose was substantially more real than Ocwen's threat because Castle is a law firm specializing in foreclosure and debt collection. Ocwen, with Castle's aiding and abetting, then exploited Castle's threat of foreclosure by misrepresenting to the Credit Bureaus that it had initiated foreclosure and that Llewellyn was 90 days past due on the Loan. In doing so, Ocwen and Castle concealed from Llewellyn, and the Credit Bureaus, that Allstate had actually made a

$10,876.38 payment on the Loan (constituting three monthly payments). Although Ocwen knew the Loan had been paid off, Ocwen insisted on tormenting Llewellyn, forcing him to provide still more proof that the Loan had been paid off. Meanwhile, Ocwen's threat of foreclosure, and the negative credit report highlighting the initiation of foreclosure on the Loan, remained looming. Castle, who had aided and abetted Ocwen's reporting the initiation of foreclosure on the Loan, did nothing to cause the removal of the incorrect credit reporting until threatened with a lawsuit in February 2007 by Llewellyn's attorneys. By then it was too late.

> **a.** **Castle wrongfully threatened foreclosure on the Coolidge Property, thus aiding and abetting Ocwen's false reporting to the Credit Bureaus that foreclosure had been initiated on that Property.**

C. From both a contractual standpoint, and as a matter of law, the First Mortgage Loan was never in default because the refinance proceeds were paid to the prior loan servicer within the 60 day window set forth in the RESPA Servicing Disclosure signed by Llewellyn and Allstate, and as mandated by RESPA. Specifically, Ocwen, as a loan servicer, is subject to the requirements contained in the Federal Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.,* a consumer protection statute principally concerning costs and settlement procedures at closing when purchasing a home. *See*, *Seelbach v. Wells Fargo Home Mortgage*, 2010 U.S. Dist. LEXIS 27841, AT *9-10 (E.D.Tex.) (citing 12 U.S.C. § 2601(b)). Section 2605(d) of RESPA prohibits treating a loan payment as late for any purpose, during the 60-day period beginning on the effective date of transfer of the servicing of the loan, if the payment is received by the transferor servicer (rather than the transferee servicer who

should properly receive payment) before the due date applicable to such payment. *See*, *Marks v. Ocwen Loan Servicing*, 2009 U.S. Dist. LEXIS 35251, at *8-9 (N.D.Cal.).[18]

D.     Here, as shown below, Llewellyn, through the refinancing of the First Mortgage Loan, paid Allstate, the prior servicer, the payout on the Loan on June 14, 2006, well within the 60 day grace period under RESPA, and prior to the June 1, 2006 payment due date, taking into consideration the 15 day grace period under the First Mortgage Loan.[19]

### (i)     The loan was never in default.

E.     On March 7, 2006, Llewellyn purchased the Coolidge Property for $559,980. SOF 11; Warranty Deed, dated March 7, 2006, Llewellyn Dep., at 159:6-11, **Exhibit 1** thereto (**Exhibit A-10** hereto); Saport Dep., at 127:14-16.).  In connection with this purchase, Llewellyn executed an adjustable rate note dated March 7, 2006, in the amount of $447,984 (the "First Mortgage Loan" or "Loan") (Llewellyn Dep., at 49:5-12, 160:18-23, **Exhibit 2** the), securing a first deed of trust (Llewellyn Dep., at 38, **Exhibit 3** thereto) (**Exhibit A-12** hereto); and an adjustable rate note dated March 7, 2006, in the amount of $111,996 ("Second Mortgage Loan"), securing a second deed of trust

---

[18]Section 2605(d) provides:

> During the *60-day period beginning on the effective date of transfer* of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, *if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment.*

12 U.S.C. § 2605(d) (emphasis added).

[19] In accordance with this Court's General Order, Llewellyn provides factual statements and pinpoint citations to those statements in connection with each element.  Llewellyn has also provided *supra*, a complete chronological factual background supported by pinpoint citations, and the paragraphs of this factual background are numbered.  For the Court's convenience, Llewellyn has cross-referenced these "statements of fact" or "SOF" to the factual statements set forth in connection with each element in dispute.

(Llewellyn Dep., at 49,:13-20161:10-18, **Exhibit 11** thereto) (**Exhibit A-13** hereto). The payment due date under the First Mortgage Loan is the first of each month, subject to a 15 day grace period, thus making the actual due date the 15th of each month.

F.    As reflected in the two adjustable rate notes and corresponding deeds of trust (Llewellyn Dep., **Exhibits 2**, **3** and **11 thereto**) (**Exhibits A-11, A-12** and **A-11** hereto), the lender for the First and Second Mortgage Loans was Allstate Home Loans, Inc., dba Allstate Funding ("Allstate"). The notes further reflect that payments under the notes were to be made to Equity Pacific Mortgage, Inc. SOF 12. Equity Pacific provided the interim servicing for the First and Second Mortgage Loans. Rider Dep., at 96:17-25, 150:5-25, **Exhibit 5** thereto (**Exhibit E-2** hereto) (Allstate servicing disclosure). SOF 15.

G.    In connection with the First Mortgage Loan, Llewellyn and Allstate signed a RESPA Servicing Disclosure dated March 7, 2006. The RESPA Servicing Disclosure sets forth the "Transfer Practices and Requirements" in connection with the servicing of the Loan, and provides, *inter alia*, that "[d]uring the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you." SOF 12; RESPA Servicing Disclosure, McNamara Decl., **Attachment C-3**, thereto.

H.    Allstate sold the First Mortgage Loan to Nomura Credit and Capital, Inc. ("NCCI"). On or about May 15, 2006, the servicing rights to the First Mortgage Loan were transferred from Equity Pacific to Ocwen. Saport Dep., **Exhibit 53** thereto (**Exhibit B-2** hereto) (May 17, 2006 letter from Ocwen to Llewellyn, Notice of

Assignment, Sale or Transfer of Servicing Rights). In its May 17, 2006 letter to Llewellyn, Ocwen notes that Llewellyn's present servicer is Allstate Funding, and provides Allstate Funding's customer service department telephone number. SOF 17.

I. On or about April 18, 2006, Llewellyn, using Ms. Saport's mortgage broker services, initiated the refinancing of the First and Second Mortgage Loans. Saport Dep., at 181:7-182:11, **Exhibit 17** thereto **(Exhibit B-3** hereto) (Borrower Signature Authorization); SOF 18. In connection with the refinancing of the First and Second Mortgage Loans, by letter dated May 16, 2006, Equity Pacific provided Llewellyn a payoff demand for the First and Second Mortgage Loans in the amount of $468,952.60, and $120,384.28. Saport Dep., at 175:15-24, **Exhibit 16** thereto (**Exhibit B-4** hereto). The payoff demand instructed that the payoff funds be wired to USB AG New York, account name UBS Real Estate Securities, Inc. *Id*. SOF 20.

J. Ms. Krehbiel, an escrow officer of Stewart Title, prepared a HUD Settlement Statement containing, *inter alia*, the payoff information, the fees to be collected from Llewellyn, and the title insurance fees. Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (HUD Settlement Statement). In preparing the HUD Settlement Statement, Ms. Krehbiel determined, through the information provided by Equity Pacific in the payoff statement, the Allstate account number to wire the payoff funds on the disbursement date. Krehbiel Dep., at 55:18-56:4. SOF 21.

K. In refinancing the First and Second Mortgage Loans, Llewellyn executed two refinance deeds of trust, each dated June 1, 2006. The first refinance deed of trust was secured by a fixed/adjustable rate note dated June 1, 2006, in the amount of $540,800, and the second refinance deed of trust was secured by a note dated June 1,

2006, in the amount of $135,200. The two notes totaled $676,000. Llewellyn Dep., **Exhibit 12** (**Exhibit A-14** hereto) and **13** thereto (**Exhibit A-15** hereto) (first and second deeds of trust, respectively); Saport Dep., at 165:18-166:5, **Exhibit 12** thereto (**Exhibit B-7** hereto) (note dated June 1, 2006, in the amount of $540,800), and **Exhibit 13** thereto (**Exhibit B-8** hereto) (note dated June 1, 2006, in the amount of $135,200). Both of these deeds of trust and both of these notes show that the lender is Wyman Funding Group, Inc. SOF 22.

L.     At the closing on June 1, 2006, Stewart Title and Llewellyn executed the HUD Settlement Statement. The HUD Settlement Statement provides that the payoffs were made to Equity Pacific in the amounts of $473,554.45 and $122,906.47 for the First and Second Mortgage Loans, respectively. Moreover, the HUD Settlement Statement identifies the lender for the refinance of both the First and Second Mortgage Loans as Wyman Funding Group. Additionally, the HUD Settlement Statement provides that Stewart Title has provided title insurance in connection with the refinance. Krehbiel Dep., at 50:24-51:8, **Exhibit 8** thereto (**Exhibit F-2** hereto) (June 1, 2006, HUD Settlement Statement). SOF 24.

> **(ii)     Ocwen, with Castle's aiding and abetting, reports to the Credit Bureaus that the Loan is in default and that foreclosure has been initiated.**

M.     On June 1, 2006, Stewart Title executed its First Lien Title Clearance Letter in connection with the refinance of the First and Second Mortgage Loans, providing, *inter alia*, "we have closed and completely dispersed the above-captioned mortgage in the amount of $540,800. This mortgage is a valid first lien on the captioned property..." McNamara Decl.," **Attachment C-4** thereto. SOF 24.

N.  Stewart Title issued an insurance policy after the refinance of the First and Second Mortgage Loans. Krehbiel Dep., at 82:4-6, **Exhibit 14** thereto (**Exhibit F-3** hereto) (insurance policy dated June 16, 2006).  The insurance policy is in the amount of $540,800, and identifies the insured as Wyman Funding in connection with a June 1, 2006 deed of trust executed by Llewellyn to secure an indebtedness of $540,800 in favor of Wyman, recorded on June 16, 2006.  Stewart Title did not treat as an exception either the Allstate First Mortgage Loan or the Second Mortgage Loan. Krehbiel Dep., at 162:23-163:19. SOF 25.

O.  The closing date for the refinancing of the First and Second Mortgage Loans was June 1, 2006, and Llewellyn signed the loan closing documents on that date.  The scheduled disbursement date was June 6, 2006. On June 6, 2006, Stewart Title received the loan proceeds from Wyman Funding, the refinance lender. Krehbiel Dep., at 81:3-5, 87:10-24, **Exhibit 16** thereto (**Exhibit F-4** hereto) (incoming wire or receipts for the first and second mortgage refinance).  Llewellyn, however, did not bring the required $372 payment for the closing fees until June 7, 2006. Krehbiel Dep., 79:19-80:5; **Exhibit 13**.  Thus, Stewart Title did not cut the payoff checks and wire the payoff funds until June 7, 2006. Krehbiel Dep., at 79:19-81:12. Ms. Krehbiel, who handles all of Stewart Title's wire transfers, wired the payoff funds to Equity Pacific solely to pay off the First and Second Mortgages. Krehbiel Dep., at 16:7-10,166:12-168:16. SOF 27.

P.  The wire transfer for the Second Mortgage Loan in the amount of $122,906.47 went through, but not the wire transfer for the First Mortgage Loan in the amount of $473,554.45. Krehbiel Dep., at 89:20-90:2, 94:20-95:24, 105:4-5, 12-17, 166:12-24, **Exhibit 17** thereto (**Exhibit F-5** hereto), pp. 1012-1013 (First National Bank

wire transfer log); SOF 27. After several subsequent attempts, and following the revised wiring instructions received from Equity Pacific, on June 14, 2006 Ms. Krehbiel successfully sent the $473,554.45 wire transfer to Washington Mutual Bank identifying Equity Pacific as the beneficiary. Krehbiel Dep., at 115, 121, **Exhibit 17** thereto, p. 1008 (First National Bank wire transfer log); SOF 28-30. Under the First Mortgage Loan, payments are not deemed late until after the 15th of each month. Rider Dep., at 111; SOF 30.[20]

   Q. On June 16, 2006, Stewart Title recorded the first deed of trust in the amount of $540,800 pertaining to the refinanced First Mortgage Loan, and second deed of trust in the amount of $135,000 pertaining to the refinanced Second Mortgage Loan, thus making it a matter of public record that the lender was Wyman Funding, and that Wyman appeared to be obtaining a priority first lien on the Coolidge Property. McNamara Decl., **Attachment C-5** thereto; SOF 32.

   R. The First Mortgage Loan was paid off on June 14, 2006 -- well within the 60 day grace period under RESPA -- *via* wire transfer to Equity Pacific, the transferor servicer. Thus, under the RESPA Servicing Disclosure and RESPA, neither Ocwen, nor its debt collecting agent, Castle, could treat the Loan late or in default for any reason, including reporting the Loan late or in default to the Credit Bureau Agencies, or threatening Llewellyn with foreclosure.

---

[20] Castle cannot be heard to argue that the 60 day grace period does not apply because the refinance proceeds were paid after the June 1 monthly payment due date. Any such argument should be summarily rejected for a number of reasons. First, such an argument would nullify the contractual 15 day grace period agreed to by Llewellyn and Allstate as set forth in the Note. Second, it is standard industry practice when closing on a loan refinancing to do so after the 1st, but before the 15th, and still fall within the confines of the RESPA 60 day grace period. Finally, any other interpretation would contravene the purposes of the 60 day grace period and lead to absurd results. Indeed, it would be wholly illogical for a loan servicer to be able to report to a credit bureau that a loan is in default and that late fees have been assessed if the payment is received on or before the 15th of the month, when it would violate the terms of the note between the lender and borrower to treat the loan in default and to assess late fees in these circumstances.

S. On June 1, 2006, Llewellyn advised Ocwen that the First Mortgage Loan had been refinanced. *See*, Ocwen Log, June 5, 2006 entry; SOF 32. As shown above, Ocwen, as well as Castle, could readily confirm this fact. Ocwen and Castle knew that the transferor servicer was Allstate and knew how to contact Allstate. A recorded deed of trust shows that Wyman Funding was the lender with a purported first lien on the Coolidge property. Ocwen and Castle could readily determine that Stewart Title was the title company involved in the transaction, and could readily obtain the HUD Settlement Statement, the wire payoff log, and even the insurance policy in connection with the refinancing. Ocwen and Castle also knew of the RESPA Servicing Disclosure (indeed Ocwen produced this document to Llewellyn in discovery), and it knew that it was subject to RESPA and the RESPA Servicing Disclosure, including RESPA's 60 day grace period.

T. Instead of simply confirming Llewellyn's representation that the First Mortgage Loan had been refinanced (confirmation that could be readily obtained by a telephone call to Allstate), Ocwen, using Castle as its debt collecting agent, opted to place the onerous burden on Llewellyn to prove that the payout was made. As shown herein, Ocwen, and Castle, ignored documents pointing to the inescapable conclusion that the Loan had been paid off, including the HUD Settlement Statement.

U. Thus, from very beginning, Ocwen ignored Llewellyn's statements that the First Mortgage Loan had been refinanced and, on July 17, 2006, issued Llewellyn a past due notice on the First Mortgage Loan. *See*, Ocwen Log; SOF 33. In July 2006, Ocwen reported the Llewellyn Coolidge Property first mortgage "account delinquent 60

days past due date $7,432." McNamara Decl., **Exhibit C**, *supra*, **Attachment C-6** thereto; SOF 34.

V.      Moreover, by letter dated August 1, 2006, Ocwen referenced its previously sent Notice of Default, and advised Llewellyn of the following alternatives to foreclosure: repayment plans, and listing your property for sale.   Ocwen further threatened Llewellyn as to the following consequences of foreclosure: loss of property, damaged credit rating, deficiency liability, and tax ramifications.  Llewellwn Decl., at ¶ **insert**, **Attachment H-2** thereto; SOF 35.

W.      On August 7, 2006, Llewellyn spoke on the telephone with an Ocwen representative regarding the Mortgage Loan.   During this phone call, Llewellyn stated that the loan had been refinanced. Ocwen Log; Ocwen Motion, at p. 12, ¶ 42-43.

X.      By letter dated August 9, 2006, Ocwen gave Llewellyn a Notice of Default, advising Llewellyn that $7,250.92 was due.  Ocwen further threatened Llewellyn that "[f]ailure to bring your account current may result in our election to exercise our right to foreclose on your property."  Additionally, Ocwen threatened Llewellyn that he would be liable for any expenses of foreclosure including, but not limited to, reasonable attorney' s fees and costs.  Llewellyn Decl., **Attachment H-4** thereto; SOF 39.

Y.      Ocwen's Log shows that on or about August 27, 2006, Ocwen initiated foreclosure proceedings against Llewellyn and, among other things, requested a copy of the title policy, settlement statement, note and mortgage, and then completed section A and B foreclosure review.   Ocwen Log.   On August 29, 2006, the bailee documents were sent to foreclosure counsel, and a FCL was sent to the timeline department.  Ocwen Log.  The Ocwen Log also shows that on August 29, 2006, Ocwen

ordered a title search on the Coolidge Property. Ocwen Log. The Ocwen Log further shows that NCCI initiated foreclosure on August 29, 2006. Ocwen Log. On September 19, 2006, Ocwen completed its pre-foreclosure QC. Ocwen Log. SOF 40. An October 10 credit report references Ocwen's August reporting of foreclosure on the Coolidge Property, and provides that "foreclosure process started," last report on August 2006, 90 days past due, $11,363. McNamara Decl., **Attachment C-6** thereto (credit reports from Equifax and Trans Union). SOF 41.

Z.     Castle admits that it conducted a review of the foreclosure referral to confirm the existence of a debt. Thus, Castle had in his possession the title work on the Coolidge Property, and knew that Wyman Funding was the lender with a purported first lien on the Coolidge property. Castle could readily determine that Stewart Title was the title company involved in the transaction, and could readily obtain the HUD Settlement Statement, the wire payoff log, and even the insurance policy in connection with the refinancing. Castle also should have known of the RESPA Servicing Disclosure and of RESPA's 60 day grace period.

AA.     Nevertheless, undeterred by the foregoing telling information, by letter dated September 7, 2006, Castle, acting as Ocwen's debt collecting agent, threatened Llewellyn that it had been paid to initiate foreclosure proceedings. Castle further threatened Llewellyn that the amount of the debt was $447,901.35, excluding interest, late charges and other charges. SOF 42. In fact, as Castle knew, or should have known at this time, the Loan was never in default. Castle advised Llewellyn that, pursuant to the Fair Debt Collection Practices Act, Castle is deemed to be a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

Castle was careful in its September 7 Letter to advise Llewellyn of all facts that debt collectors are required to provide to debtors pursuant to 15 U.S.C. § 1692g.

BB.    Ocwen's Log shows that on September 21, 2006, Ocwen again reported Llewellyn's account to the Credit Bureau, noting that as of August 31, 2006, $11,363 was past due, and that the account was delinquent three payments. Ocwen Log. DOF 44.

CC.    Llewellyn again tried to convince Ocwen, and its debt collecting agent, Castle, that the Loan had been paid out to the refinancing proceeds. Thus, by facsimile dated September 25, 2006, Llewellyn provided Castle with a copy of the August 9, 2006 letter he received from Washington Mutual, along with the accompanying HUD Settlement Statement. Llewellyn Decl., **Attachment H-6** thereto. SOF 43-45. The HUD Settlement Statement, along with other documents received by Castle, including the title search[21] on the Coolidge Property, showed that the Loan had been paid off. At a minimum, it put Castle on inquiry notice.

**b.    Ocwen continues reporting to the Credit Bureau Agencies that Llewellyn is 90 days past due as of September 6, even though Allstate has made two monthly payments on the loan.**

DD.    On September 29, 2006, Ocwen received a check from Allstate dated October 28, 2006, in the amount of $7,250.92 in payment toward the First Mortgage Loan. Ocwen Log, October 2, 2006 entry. Barron Dep., at 172:3-173:25; 175:1-13, **Exhibit 13** thereto (**Exhibit D-3** hereto) (Allstate's $7,250.92 check). Ocwen's

---

[21]   The title search would have posed grave concerns to any responsible foreclosure attorney, including Castle, as it would have made it abundantly clear that the Loan had been refinanced precisely as represented by Llewellyn. Specifically, the title search would readily reveal two first loans and two second loans related to the property. Not surprisingly, the amount of the first and second refinancing added up to the same amount shown on the HUD Settlement Statement Llewellyn provided to Castle in August 2006 -- well before Castle threatened Llewellyn with foreclosure in its September 7, 2006 letter. Castle's conduct in these circumstances is nothing less than unconscionable.

Log, however, notes that on September 29, 2006, Ocwen rejected this check because Ocwen was foreclosing on the Coolidge Property. Ocwen Log.  SOF 46.

        EE.     Meanwhile, while Allstate was attempting to make payments on the loan, Llewellyn struggled to persuade Castle not to foreclose on the Coolidge Property and to cease collection efforts.  SOF 47. By letter dated October 1, 2006, Llewellyn again advised Castle that the $447,554.45 loan was paid off to Equity Pacific on June 1, 2006, and again enclosed a copy of the Settlement Statement. Llewellyn Decl., **Attachment H-7** thereto. SOF 47.

        FF.     Llewellyn's pleas, however, fell on deaf ears.  With Castle in its corner as its debt collecting litigation sword retained to threaten Llewellyn with foreclosure, Ocwen could safely report that it had initiated foreclosure on the Coolidge Property.  Such reporting, backed by Castle's very real threat of foreclosure, would, in Ocwen's view, intimidate Llewellyn into paying off the Loan.  Notwithstanding its receipt of the $7,250.92 check from Allstate (representing two mortgage payments), on October 6, 2006, Ocwen reported to the Credit Bureaus that it had started foreclosure process and that the account was 90 days past due.  McNamara Decl., **Attachment C-7** thereto (January 22, 2007 Credit Plus report).  Moreover, Ocwen continued initiating and threatening foreclosure.  Ocwen's Log, October 5, 2006 entry.  By letter dated October 5, 2006, Ocwen presented Llewellyn with alternatives to foreclosure, and threatened Llewellyn with consequences of foreclosure, including property loss, damage credit rating, deficiency liability, tax ramifications. Llewellyn Decl., **Attachment H-8** thereto; SOF 48.

GG.    While Ocwen continued threatening foreclosure, Llewellyn persisted in his efforts to convince both Ocwen and Castle that the First Mortgage Loan had been paid off to Allstate funding.  Llewellyn telephoned Ocwen on October 9, 2006, and Ocwen submitted a research investigation request that day.  Ocwen log, October 9, 2006 entry; SOF 49.

### c.    Llewellyn advises Castle, Ocwen and the Credit Bureaus that Ocwen's adverse credit reporting is erroneous.

HH.    By letters dated October 10, 2006, Llewellyn advised, *inter alia*, both Ocwen and Castle, as well as Experian, Equifax and Trans Union, that the First Mortgage Loan had been paid in full and that the adverse credit reporting was erroneous. Llewellyn again explained that the loan was refinanced and that a payoff was made to Equity Pacific.  Llewellyn included as attachments to his letter the following documents:

- August 9, 2006, Ocwen notice of default letter;
- August 9, 2006, foreclosure letter from Ocwen;
- September 7, 2006, letter from Castle threatening foreclosure;
- Ocwen's most recent account statement received;
- October 3, 2006, letter of sale from Ocwen to NCC servicing, LLC;
- August 9, 2006, letter from Washington Mutual;
- Llewellyn's FICO scores from all three credit bureaus;
- June 1, 2006, HUD settlement statement on refinance.

Llewellyn Decl., **Attachments H-9** thereto.

II.    Also, on October 10, 2006, Ms. Saport telephoned Ocwen advising it that the Loan was paid off in June 2006 and that the funds were transferred to Allstate Funding. Ocwen Log; SOF 51.

### d.    Ocwen receives, and rejects, another payment on the First Mortgage Loan from Allstate and, with the assistance of Castle's continuing threat of foreclosure, continues its foreclosure efforts.

JJ.    On October 10, 2006, Ocwen received yet another check from Allstate dated October 5, 2006, in the amount of $3625.46 as payment toward the First Mortgage Loan.  Ocwen Log, October 10, 2006 entry; Barron Dep., at 172:3-173:25, **Exhibit 14**, thereto (**Exhibit D-4** hereto) (Allstate's $3625.46 check); SOF 52.  Ocwen rejected this payment because the loan was in foreclosure and the funds were not certified.  Ocwen Log, October 10 and 11, 2006 entries (loan in FC, LS-uncertified hence rejected); SOF 52.  Ocwen then continued its efforts to foreclose on the Coolidge Property.  Ocwen Log, October 10, 2006 entry (October 10, Foreclosure cost fee assessed); SOF 52.

KK.    Ocwen's Log shows that on October 13, 2006, Llewellyn again advised Ocwen that payoff funds in the amount of $573,191.59 were remitted to the prior servicer. Ocwen Log; SOF 53.  Ocwen's Log also shows that on October 18, 2006, Llewellyn again telephoned Ocwen regarding the payment and that Ocwen received written dispute correspondence.  Ocwen Log; SOF 54

> **e.    Ocwen retains the $10,876.38 received from Allstate as an interim payment on the First Mortgage Loan, and recognizes that this Loan was paid out prior to being boarded at Ocwen.**

LL.    On October 18, 2006, after Ocwen returned the two checks to Allstate, an Allstate Representative telephoned Ocwen regarding "the payoff that was sent in being short." Ocwen Log; SOF 55.  Ocwen provided bank wire information to the Allstate representative.  Ocwen Log; SOF 55.  Later that day, Ocwen received a wire transfer from Allstate in the amount of $10,876.38.  Ocwen Log; *see also*, October 18 and 20 entries; SOF 55.  That same day, according to Ocwen's log, Ocwen again spoke to

Llewellyn regarding the loan, but failed to disclose that Allstate had made the $10,876.38 payment toward the loan. Ocwen Log; SOF 55.

MM. That same day, after receiving the $10,876.38 wire transfer from Allstate, an Ocwen representative, in noting an invalid workflow request, observed that "[th]is item was paid out prior to the loan being boarded at Ocwen. Therefore, this is an IPAY issue and you should submit this to the IPAY workflow." Ocwen Log; SOF 56.

NN. The next day, on October 19, 2006, Llewellyn again telephoned Ocwen, advised it that the loan had been paid in full and should not be in foreclosure, and demanded that it correct the credit reporting to the Credit Bureau. The Ocwen representative submitted a research investigation request. Ocwen Log; SOF 57.

OO. Later that day, on October 19, 2006, Ocwen acknowledges in its Log that on June 6, 2006, $473,554.45 was paid by Stewart Title of Colorado to Equity Pacific by wire in connection with Loan #100602061. Ocwen Log; SOF 57. Still later that day, on October 19, Ocwen's Log shows it received written correspondence regarding the payment dispute. Ocwen Log; SOF 58.

PP. By letter dated October 19, 2006, Castle advised Llewellyn that Ocwen had instructed Castle to place its file on hold pending the outcome of Ocwen's investigation of the dispute. Llewellyn Decl., **Attachment H-11** thereto. SOF 60. The threat of foreclosure however, continued, particularly in Llewellyn's mind, as the foreclosure was merely placed on hold, as opposed to abated permanently. Llewellyn Dep., at 365:7-21. Ocwen, knowing that the Castle threat of foreclosure was still looming, stated in its October 19 Log entry that foreclosure proceedings were started.

Ocwen Log. Ocwen's Log also contains an October 20 entry that the payoff amount for Llewellyn is $450,241.83, which includes foreclosure costs. Ocwen log. SOF 60.

   **f.**    **Ocwen finally advises Llewellyn that it will conduct research regarding nonpayment of the First Mortgage Loan, but continues foreclosure proceedings with Castle's threat of foreclosure still looming.**

   QQ.    Ocwen ignored its October 18, 2006 Log entry that the Loan was paid out prior to the loan being boarded at Ocwen. And, despite clear information to the contrary, for whatever reason, Ocwen was unsatisfied with the information contained in Ocwen's October 19, 2006 log entry showing that on June 6, 2006, Stewart Title paid $473,554.45 to Equity Pacific by wire transfer in connection with the Loan. Thus, although it knew the prior servicer, Allstate, had made payments on the Loan, and although it retained Allstate's $10,876.38 payment while concealing this pivotal fact from Llewellyn, Ocwen honestly and in bad faith, continued to put Llewellyn to the task of proving that the Loan had been paid off through the refinance proceeds.

   RR.    Armed with the knowledge of Wyman Funding's wire transfer of the refinance proceeds to Equity Pacific, and with its pockets lined with Allstate's $10,876.38 payment, Ocwen persisted in continuing to torment Llewellyn by letter dated October 19, 2006, and again (for whatever reason) by letter dated October 20, 2006, whereby Ocwen advised Llewellyn that it was in receipt of his letter requesting Ocwen to conduct research. Ocwen noted that it has 60 days under RESPA to conduct the research, but that its policy is to perform the research in 15 days. Ocwen further noted that if the servicing of the loan was transferred to Ocwen from a prior servicer [a fact Ocwen obviously had already known], Ocwen may be required to obtain information from the

prior servicer [information Ocwen already had]. Llewellyn Decl., **Attachments H-11** thereto; SOF 59.

SS.    As noted in Ocwen's October 19 and 20, 2006 letters, its investigation referenced in its letters was pursuant to RESPA.  RESPA directs a loan servicer, upon receiving a qualified written request, within sixty days, to either make corrections to the borrower's account, or to conduct an investigation of the borrower's account related to the borrower's inquiry. *Carter v. Countrywide Home Loans, Inc.*, 2009 U.S. Dist. LEXIS 75247, at *13-14 (E.D.Va.) (12 U.S.C. § 2605(e)(2)(A)-(C)).   The investigation must result in either a report to the borrower which includes a statement of the reasons for which the servicer believes the account of the borrower is correct, the production of information requested by the borrower, or an explanation of why the information requested is unavailable. *Id*. Additionally, the loan servicer must provide contact information "of an individual employed by, or the officer or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(B)(ii).

TT.    Ocwen's deceit and complete lack of diligence in investigating Llewellyn's dispute under RESPA evidences Ocwen's same lie and complete lack of diligence in investigating Llewellyn's dispute under the FCRA.  Put simply, Ocwen never investigated Llewellyn's dispute under the FCRA, RESPA or any other statute or Ocwen internal guideline.   Instead, Ocwen continued with its outrageous demands and steps toward foreclosure on the Coolidge Property.   Along these lines, Ocwen's October 19, 2006 Ocwen Log entry states that foreclosure proceedings were started.   Ocwen Log. Ocwen's Log also contains an October 20, 2006 reference that the payoff amount for Llewellyn is $450,241.83, which includes foreclosure costs.  Ocwen Log; SOF 60.

UU.    Meanwhile, Ocwen's false reporting to credit bureaus, including the false reporting that foreclosure was initiated continued -- neither Ocwen nor its agent Castle, whose aiding and abetting lent credence to the reporting, took any steps to remove these false and damaging credit remarks.

**g.    The servicing rights to the First Mortgage Loan Are transferred from Ocwen to NCC Servicing on October 20, 2006; Ocwen transfers to NCC Servicing the $10,876.38 payoff funds received from Allstate; and Castle represents NCC Servicing in collecting on the Loan.**

VV.    On October 20, 2006, the servicing rights to the First Mortgage Loan was assigned, sold and transferred from Ocwen to NCC Servicing, LLC. Llewellyn Decl., **Attachments H-13** thereto; SOF 62.[22]

WW.   Ocwen's Log also shows that, even though the servicing rights to the Loan were transferred on October 20, 2006 Ocwen nevertheless posted the $10,876.38 received from Allstate to Llewellyn's Account 632839 on October 23, 2006. Ocwen Log; SOF 63. Notably, Ocwen's Log reflects that on October 31, 2006, a call was made to Ocwen requesting a payoff quote, and Ocwen advised the caller that the loan was service transferred.  Ocwen Log; SOF 63.  The fact that Ocwen failed to provide a payoff quote and instead advised the caller that the loan was service transferred did not deter Ocwen in its efforts to obliterate Llewellyn's credit.

**h.    After Ocwen Transfers the Servicing Rights to the First Mortgage Loan to NCC Servicing, Ocwen Reports Negatively, and Incorrectly, on Llewellyn to the Credit Bureaus.**

---

[22] Ocwen's October 20, 2006 Log entry states that the loan is in foreclosure. Ocwen Log, October 20 entry; SOF 61.

XX.     Although Ocwen was no longer servicing the First Mortgage Loan as of October 20, 2006, Ocwen still nevertheless reported negatively on Llewellyn to the Credit Bureau on October 20, 2006.  Specifically, Ocwen advised the Credit Bureau that as of September 30, 2006, Llewellyn was past due $14,988.  Ocwen Log; SOF 64.  Ocwen's reporting was incorrect for two reasons.  First, as stated above, the Loan was never past due under both RESPA and the RESPA Servicing Disclosure because the refinance proceeds were timely paid to the transferor servicer under the 60 day grace period.  In any event, even if the payment of the refinance proceeds to the transferor servicer are ignored, the First Mortgage Loan was not past due $14,988 as of September 30, 2006 because Ocwen, at the time it reported to the Credit Bureau on October 20, 2006 had received $10,876.38 from Allstate -- a payment Ocwen concealed from Llewellyn until it was compelled to disclose documents showing this information during a discovery dispute in this case.  Meanwhile, the Credit Bureau still reported that the Loan was in foreclosure.

YY.     Again, on October 23 2006, even though Ocwen was no longer servicing the loan, Ocwen reported to the Credit Bureau that Llewellyn's account was 120 days past the due date as of September 30, 2006.  Ocwen Log; SOF 66. In doing so, Ocwen was acting as NCC Servicing's agent in attempting to collect the debt mistakenly believed to be owed by Llewellyn.  The Credit Reports still reflected that the Loan was in foreclosure.

**i.      Ocwen fails to comply with its investigation and reporting obligations under 15 U.S.C. § 1681s-2(b).**

ZZ.     By letter dated October 23, 2006, Ocwen advised Llewellyn, obviously pursuant to 1681i(a)(2), that it had reviewed his request that Ocwen perform

research relative to the interim payment issue. As with its investigation pursuant to RESPA (the subject of Ocwen's October 19 and 20 letters, *supra*, to Llewellyn), Ocwen again advised Llewellyn that his request was a priority. As with its October 19 and 20, 2006 letters, Ocwen advised Llewellyn that if the servicing of the Loan was assigned, sold or transferred to Ocwen from a prior servicer, Ocwen may be required to obtain information concerning the Loan from the prior servicer. Ocwen again advised Llewellyn that the process of obtaining this information takes time, and that Ocwen would notify him if any additional information was required. Llewellyn Decl., **Attachments H-14** thereto. SOF 67. Notably, Ocwen's October 24, 2006 Log entry provides "our records indicate that the loan was acquired on May 15, 2006 with the loan due for June 1, 2006 *payment from Allstate Funding*." Ocwen Log (emphasis added). SOF 68.

AAA. Meanwhile, while Ocwen was feigning to conduct an investigation, and while the Credit Bureau reports still reflected that the Loan was in foreclosure, Mr. James George, a representative of NCC, Ocwen's principal in connection with the debt allegedly owed by Llewellyn, advised Ms. Krehbiel by e-mail dated October 27, 2006, that NCC was servicing the Loan for Ocwen Mortgage and acknowledged that Llewellyn had refinanced the Coolidge Property on June 1, 2006, through Wyman Funding. Mr. George, however, requested from Ms. Krehbiel any pertinent information she had showing the original loan through Equity Pacific was paid off, including a copy of the payoff and payoff check as proof. Mr. George also candidly acknowledged that "this [issue] has adversely affected [Llewellyn's] credit and that [Llewellyn] needs this

resolved ASAP." Krehbiel Dep., at139:10-141:9, **Exhibit 28** thereto (**Exhibit F-9** hereto); SOF 71.

BBB. By e-mail dated October 27, 2006, Ms. Krehbiel advised Mr. George that she had sent the payoff on the loan by wire transfer. McNamara Decl., **Attachment C-8** thereto; SOF 72. By e-mail dated November 3, 2006, Ms. Krehbiel sent to Mr. George, in response to his request for proof of the payoff, the payoffs, HUD and copies of the outgoing wires that were sent to pay off the lender. Krehbiel Dep., at 125:17-126:13, 143:6-17, **Exhibit 25** thereto (**Exhibit F-10** hereto). SOF 74.

CCC. While NCC Servicing sought to obtain information already provided to Ocwen, Ocwen continued to ignore all of the information and documents Llewellyn had already provided Ocwen establishing that the Loan was paid off. Thus, by letter dated October 31, 2006, from Ocwen to Llewellyn, Ocwen referred to Llewellyn's "recent" notification regarding the payment to the prior servicer of the Loan, and requested from Llewellyn legal documents showing how the payment was made (if by wire, Llewellyn must track down the funds with a trace number), a letter specifying which monthly payment appears to be missing or misapplied, and his Ocwen loan number. Ocwen further advised Llewellyn that it would be unable to research the matter further unless it obtains this information. Llewellyn Decl., **Attachments H-15** thereto; SOF 73. Ocwen further threatened Llewellyn that it "would consider this a closed item which could lead to continuing phone calls and delinquency notices." SOF 73. Incredibly, Ocwen made this request even though it already knew, as shown by its own Log, that the Loan was paid off through the refinancing proceeds Wyman Funding sent by wire transfer to Allstate. Castle was representing both Ocwen and NCC Servicing

during this period, and the Credit Bureau report still reflected that the Loan was in foreclosure.

DDD. On November 2, 2006, Ocwen finally got around to calling Allstate Funding, at 12:25:18 p.m. Pacific Time *viz.*, lunchtime. Predictably, the call made during the lunch hour was unsuccessful. Ocwen Log. SOF 76.

EEE. On November 8, 2006, Ocwen advised Ms. Saport that the loan servicing was transferred to NCC on October 20, 2006, and misrepresented to her that *after* the transfer Ocwen received the payoff funds which it transferred to the new servicer, NCC. Ocwen Log. As noted above, Ocwen's Log shows that it received the payoff funds on October 18, 2006, before the transfer of the servicing rights to NCC. Ocwen Log, October 20, 2006 entry. Inexplicably, Ocwen advised Ms. Saport to fax a research request to NCC. Ocwen Log, November 8 entry; SOF 77.

FFF. Ms. Krehbiel dutifully complied with Ocwen's instructions and, by e-mail dated November 10, 2006, Ms. Krehbiel sent Castle, as proof that the Loan was paid off from the proceeds of the refinance, copies of the HUD Settlement Statement, the payoffs and the wire transfer log reflecting the wire transfer to payoff Equity Pacific. Krehbiel Dep., at 152:8-14,156:6-25, **Exhibit 34** thereto (**Exhibit F-12** hereto). SOF 79. Despite this conclusive information, Castle allowed the Credit Bureaus to continue reporting that the Loan was in default and that foreclosure proceedings were initiated.

GGG. Ocwen falsely reported the status of its investigation to Llewellyn by letter dated November 13, 2006, first thanking Llewellyn for his "recent correspondence regarding the above-referenced loan." Ocwen advised Llewellyn that it had reviewed the loan and noted that Llewellyn had provided Ocwen with a copy of the

Settlement Statement indicating that the loan was paid in full with Equity Pacific on June 1, 2006. Without further explanation, Ocwen advised Llewellyn that "the proof provided is insufficient for [Ocwen] to research the issue. Therefore, it is suggested that you provide us with the front and back copy of the cash payoff check, source of receipt along with the letter from your prior servicer stating that the loan was paid in full with them.... This will enable us to research further and update your credit report accordingly." Llewellyn Decl., **Attachments H-17** thereto. SOF 78. Ocwen's investigation was perfunctory and cursory at best, as Ocwen did not even know, despite the documents Llewellyn had already provided it back in August and throughout October, that the payoff on the Loan through refinance proceeds was made to Equity Pacific *via* wire transfer. Moreover, Ocwen wholly ignored the documents Ms. Krehbiel had sent to Castle on November 10 at Ocwen's instructions. And Castle apparently continued to ignore these documents as the Credit Bureaus still reported that the Loan was in default and that foreclosure proceedings had been initiated.

HHH. Meanwhile, while still purporting to conduct its investigation, Ocwen continued reporting negatively, and incorrectly, on Llewellyn to the Credit Bureaus. Specifically, on November 17, 2006, Ocwen reported to the Credit Bureau that Llewellyn's account was delinquent and that Llewellyn had made no monthly payments. Ocwen Log. Again, on November 20, 2006, Ocwen reported to the Credit Bureau that the account was transferred to another office as of October 20, 2006, and gave the payment rating: 120-149 days past due. Ocwen Log. SOF 80.

III. The next day, on November 21, 2006, Ms. Krehbiel provided Ocwen the wiring log she had previously sent to Castle and to NCC, showing the payoff

to Equity Pacific. Krehbiel Dep., at 150:19-151:9, **Exhibit 31** thereto (**Exhibit F-13 hereto**). SOF 81. Notwithstanding receipt of the wiring log, on November 30, 2006, Ocwen again reported to the Credit Bureau that the account was transferred to another office as of October 20, 2006, and that the account was 120-149 days past due as of September 30, 2006. Ocwen Log. SOF 81.

JJJ.    By letter dated December 5, 2006, Castle, Ocwen and NCC Servicing's debt collecting agent, advised McNamara that its "client has indicated that this loan should have been paid-in-full." Moreover, Castle advised Mr. McNamara that its "client has indicated that Mr. Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action." McNamara Decl., **Attachment C-10** thereto; SOF 84. Castle further noted that it takes time to reverse the credit reports, and advised McNamara that if its client has not fully done so, "please feel free to contact me and I will ensure the problem is addressed." Castle, who had aided and abetted Ocwen's false reporting to the Credit Bureaus, and who now knew the reporting was false, did nothing to remedy the false reporting. Notably, in its December 5 letter, Castle advised Mr. McNamara that it was acting as a debt collector and was attempting to collect a debt and any information provided would be used for that purpose.

KKK. Although Ocwen's debt collecting agent, Castle, admitted, on behalf of Ocwen, that the "loan should have been paid-in-full" and that "Llewellyn's credit report will be reversed," Ocwen inexplicably continued to report negatively, and incorrectly, on Llewellyn to the Credit Bureaus. Thus, on December 15, 2006, Ocwen reported to the Credit Bureau that Llewellyn's account was transferred to another office

as of October 20, 2006 and that the account was 120-149 days past due as of September 30, 2006. Ocwen Log; SOF 83.

LLL. By letter dated January 8 and 11, 2006, Mr. Barron, on behalf of Allstate, advised Mr. McNamara that the Loan was paid in full in June 2006, and that any adverse reporting to credit agencies by parties other than Allstate would be erroneous and completely without merit. Barron Dep., at 153:5-18, 154:20-155:1, 192:17-22, 194:19-195:12-15, **Exhibits 12** and **17** (**Exhibits D-5** and **D-6** hereto) [23] SOF 84.

MMM. As noted above, after Ocwen transferred the servicing rights to the First Mortgage Loan to NCC Servicing, Ocwen acted as NCC's Servicing's agent in its collection efforts on the Llewellyn loan and in reporting on Llewellyn to the Credit Bureaus. Castle, in turn, represented both Ocwen and NCC Servicing, and acted as their agent in its collection efforts with respect to the alleged Llewellyn debt. Although Castle, acting as a debt collecting agent on behalf of both Ocwen and NCC, advised McNamara that Llewellyn's credit report would be reversed, by letter dated January 9, 2007, NCC advised Llewellyn that he was in default on the Loan. NCC threatened Llewellyn that if he did not pay the full amount of the default, it would invoke any remedies, including foreclosure of the property. Llewellyn Decl., **Attachments H-8** thereto. SOF 85. In calculating the amount purportedly due, NCC deducted the $10,876.38 payment made by Allstate back on October 18, 2006. SOF 86.

NNN. By letter dated January 18, 2007, Castle once again advised Mr. McNamara that his client, NCC Servicing, has informed that the Loan should have been paid in full, and any adverse credit reporting was an error. McNamara Decl., at; ¶ **insert**,

---

[23] On January 22, 2007, Mr. Barron signed the note securing the Loan as paid in full. Barron Dep., at 210, **Exhibit 19** thereto. On January 24, 2007, the release of the deed of trust for Loan was recorded. Barron Dep., 220-21, **Exhibit 21**.

**Attachment C-11** thereto; SOF 87. Castle, who had aided and abetted the false reporting, still did nothing to remove the false reporting.

OOO.  By letter dated January 22, 2007, Mr. McNamara advised Castle that Llewellyn's credit report still showed Ocwen reporting Llewellyn in foreclosure/default.  McNamara requested that Castle have its clients reverse the bad credit marks. McNamara Decl., at ¶ **insert**, **Attachment C-12** thereto; SOF 88.  By letter dated January 23, 2007, Mr. McNamara also advised NCC that the Loan was not in default, pointing NCC to Castle's January 18, 2007 letter.  Mr. McNamara also enclosed copies of the paid notes that NCC claimed to be servicing and a letter from Allstate stating that the notes were paid in full.  McNamara Decl.,  at ¶ **insert**, **Attachment C-13** thereto; SOF 89.

PPP.  By letter dated January 29, 2007, Mr. George of NCC Servicing, writing on behalf of NCC, Ocwen and NCCI, advised their debt collecting attorney, Castle, and both Mr. Llewellyn and Mr. McNamara, "that *we* have requested a correction to [Llewellyn's] credit bureau report as a result of your *recent* inquiry." (emphasis added). McNamara Decl.,  at ¶ **insert**, **Attachment C-14** thereto. Mr. George further stated, on behalf of NCC, Ocwen and NCCI, that "[a]lthough *we* are still attempting to resolve this matter *we* have received confirmation that this error was not a direct result of any wrongdoing on the part of Glen Llewellyn." *Id*. (emphasis added). SOF 90.  Castle, however, still did not ensure that the credit reporting was corrected.

QQQ. Ocwen's Log shows that Ms. Saport telephoned Ocwen on February 2, 2007, again advising Ocwen that the account had been paid off with the prior servicer and somehow was reported in foreclosure.  Inexplicably, Ocwen advised Ms.

Saport "to fax the proof to RSHS sp so they could look into the same." Ocwen's February 2 log reflects that "caller was upset as she wanted something today." Ocwen Log. Ocwen's February 2 Log entry also shows that Ms. Irene from Credit Plus[24] telephoned Ocwen requesting a letter that the account should not have been placed in foreclosure. Ocwen Log; SOF 91.

RRR.    By letter dated February 8, 2007, Mr. McNamara chastised Castle for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report, and reminded Castle of its December 5 letter indicating that the credit report would be reversed.  McNamara Decl., at ¶ **insert**, **Attachment C-15** thereto; SOF 92.

SSS.    By facsimile dated February 8, 2007, Castle sent to Mr. George the February 8, 2007 McNamara letter requesting a letter from Ocwen that afternoon. McNamara Decl.,  at ¶ **insert**, **Attachment C-16** thereto. SOF 93.  That same day Mr. George advised Ms. Boxill by e-mail dated February 8, 2007 that "we are in desperate need of a letter from Ocwen stating that this will be corrected on the borrower's credit report." McNamara Decl.,  at ¶ **insert**, **Attachment C-17** thereto; SOF 964

TTT.    Later that day, by e-mail dated February 8, 2006, Mr. George advised Ms. Boxill that the Loan "was paid off in June but due to an error in processing was never recorded correctly.  Therefore, this is still showing on the borrower's CBR report by Ocwen as a delinquency and he needs ASAP a letter advising that this will be corrected by Ocwen."   Referencing his conversation with Ms. Boxill the previous week, Mr. George enclosed: "proof of payoff, a copy of the CBR report showing Ocwen reporting this delinquency and correspondence from his attorney threatening a lawsuit."

---

[24] Credit Plus is a credit reporting agency that applies the credit report that is used for the mortgage loan. Ms. Saport used Credit Plus exclusively for all of her credit reports.  Ms. Saport also used Credit Plus for credit repair.  Saport Dep., at 60-61.

Mr. George admonished Ms. Boxhill that her "immediate attention to this matter would be greatly appreciated. Urgent !! ! 911." McNamara Decl., at ¶ **insert**, **Attachment C-18** thereto; SOF 95.

UUU. Mr. George of NCC continued attempting to persuade Ms. Boxill of Ocwen that the Loan was paid off. Thus, by e-mail dated February 9, 2006, Mr. George provided Ms. Boxill with "another copy of the CBR report the mortgagor has sent which gives more detail of the information reported by Ocwen." McNamara Decl., at ¶ **insert**, **Attachment C-20** thereto. In a separate e-mail dated February 9, 2006, Mr. George provided Ms. Boxill with the settlement information she requested. McNamara Decl., at ¶ **insert**, **Attachment C-21** thereto; SOF 97.

VVV. Finally, by e-mail dated February 12, 2006, Ms. Boxill advised Mr. Nelson Samuel of Ocwen that Llewellyn had paid off the Loan prior to service transfer and that Ocwen reported him negatively to the Credit Bureau. She instructed Mr. Samuel to correct all negative reporting and provide a letter stating that Ocwen corrected it. McNamara Decl., at ¶ **insert**, **Attachment C-22** thereto. By e-mail dated February 14, 2006, Mr. Samuel advised Ms. Boxill that he was having Llewellyn's credit updated that day. McNamara Decl., at ¶ **insert**, **Attachment C-23** thereto. In a separate e-mail also dated February 14, 2006, Mr. Samuel advised Ms. Boxill that "if this loan was paid off prior to the loan being transferred to Ocwen, we should be deleting the entire trade line of the borrower's credit report." Moreover, Mr. Samuel observed that "this loan should not have been boarded in the first place as the loan was paid off prior to the loan being transferred to Ocwen." McNamara Decl., at ¶ **insert**, **Attachment C-24** thereto; *see also*, Ocwen Log. SOF 98.

WWW.    Ocwen's February 14, 2006 Log entry shows that "Research Priority Form Submitted: Details: delete entire trade line and send out a letter to the bwr." Ocwen Log; SOF 99.

XXX.  By facsimile dated February 15, 2007, Castle provided McNamara with a letter dated February 15, 2007, from Ocwen to Llewellyn regarding Llewellyn.  In its February 15, 2007 letter, in response to what Ocwen disingenuously characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan.  Ocwen sincerely apologized for any inconvenience caused.  Llewellyn Decl., **Attachment C-25** thereto; SOF 100-101.

YYY.  Significantly, after October 2006, the only new information showing that the Loan had been repaid was the January 22, 2007, note securing the Loan signed by Barron as "paid in full," and the January 24, 2007, recorded release of the deed of trust for the Loan. *See*, Barron Dep., at 210:8-211:8, **Exhibit 19** thereto (**Exhibit D-7** hereto), and Barron Dep., 220:13-221:22, **Exhibit 21** (**Exhibit D-8** hereto).  SOF 84. As shown above, however, it is readily apparent from the emails back and forth between Ms. Boxill and Mr. George that Ms. Boxill did not even rely on these documents in ultimately deciding to delete the entire Llewellyn trade line.  Moreover, Ocwen did not need these documents to determine that the Loan had been paid off and that Ocwen should delete the adverse Llewellyn trade line.  Indeed, according to Ocwen's debt collecting agent, Castle, NCC and Ocwen determined way back on December 5, 2006, that the "loan should have been paid-in-full," and that "Mr. Llewellyn's credit report [would] be reversed as it has been negatively effective [sic] by this action." December 5, 2006 letter from Castle to McNamara, McNamara Decl., at ¶ insert, **Attachment C-10** thereto; SOF 82.

ZZZ.    Further conclusively establishing that Ocwen really did not rely on the January 22, 2007, note signed by Barron as "paid in full" and the January 24, 2007, recorded release of the deed of trust is Ocwen's own assertion, however misguided, that the note signed "paid in full" was "explicitly false in stating that the loan had been paid in full when in fact it had not been," and the release of the deed of trust "was implicitly false in its implication that Mr. Barron and Allstate had any legal authority to release the lien." (Motion at 4).  Ocwen's statements in its Motion show, assuming Ocwen relied on these documents in deciding to delete the entire trade line on Llewellyn's credit, which it did not, such reliance would be unreasonable in Ocwen's mind.

AAAA.        Thus, in the end, after its four-month pathetic excuse of an "investigation" of Llewellyn's dispute under the FCRA, Ocwen deleted the entire Llewellyn trade line based on information it had in its possession from the outset, but which it chose to ignore.  And Castle, who had aided and abetted Ocwen's false reporting to the Credit Bureaus through its looming threat of foreclosure, did nothing to rectify the false reporting even though it knew at the Loan had been paid off.

BBBB.        In a claim for outrageous conduct, the "level of outrageousness required to create liability is extremely high." *Pearson v. Kancilia,* 70 P.3d 594, 597 (Colo. App. 2003).   As this Court has observed, however, "[a]n argument could be made that the high threshold of outrageousness is lowered somewhat by the fact that Ocwen occupied a position of power relative to Mr. Llewellyn, in that its reporting of false credit information had 'the power to affect [Mr. Llewellyn's] interests.'"  *Llewellyn v. Shearson Financial Network*, Inc., 622 F. Supp. 2d 1062, 1070, n. 6 (D.Colo. 2010) (citing, *Pearson,* 70 P.3d at 598, citing *Farmers Group, Inc. v. Trimble,* 658 P.2d 1370,

1377 (Colo.App. 1982)).  Here, Castle, as Ocwen's debt collecting agent and attorney, similarly occupied a position of power relative to Mr. Llewellyn, thus lowering the threshold of outrageousness.

CCCC.    Castle's aiding and abetting Ocwen's reporting of false credit information on Llewellyn destroyed Llewellyn financially, physically, and mentally.  Thus, the high threshold of outrageousness should be lowered in this case. Nevertheless, the facts set forth above describing Castle's aiding and abetting Ocwen's reporting of false information are so egregious as to meet any level of outrageousness.

DDDD.    Thus, in these circumstances, the required level of outrageousness has readily been satisfied, and far exceeds the level of outrageousness accepted by the courts in cases with factual scenarios far less egregious than those here. *See*, *e.g.*, *Rugg v. McCarty*, 476 P.2d 753, 754 (Colo. 1970) (allegations sufficient to state a claim for outrageous conduct where the plaintiff defaulted on a promissory note, and the defendant "harassed her with numerous telephone calls" about the debt and wrote to her employer about garnishing her wages, despite knowing that it could not obtain a garnishment until it had reduced the debt to judgment); *Cross v. Receivables Management Solutions, Inc.*, 2006 U.S. Dist. LEXIS 8956, at *17 (D.Colo.) (observing that outrageous conduct claim sufficiently pled where allegations, among other things, support the inference that AAC knew that Mr. Cross did not owe the debt which it reported to credit bureaus and deliberately refused to take corrective action).

**Element 2:**  Mr. Llewellyn can demonstrate a triable issue of fact as to whether Castle engaged in conduct recklessly or with the intent of causing Mr. Llewellyn severe emotional distress.

A.     In its Motion, Castle contends that Mr. Llewellyn's anger at Castle is misdirected and that Mr. Llewellyn misunderstands Castle's role.  Castle asserts that it has no role in reporting to the Credit Bureaus, nor can it have credit reporting information corrected when an error has been made.  Castle's argument ignores the fact that, as shown in Part III (A)(Element 1) *supra,* Ocwen used Castle as its debt collecting sword to gain leverage over Llewellyn and to report, albeit falsely, to the Credit Bureaus that the Loan was in default and that foreclosure had been initiated.  Thus, in these circumstances, Castle did not act simply as a conduit of information between the debtor and creditor.  Instead, Castle knowingly aided and abetted Ocwen's outrageous misconduct.

B.     Castle's reliance on *Culpepper v. Pearl St. Bldg, Inc.*, 877 P.2d 877, 83 (Colo. 1994) is unavailing.  In *Culpepper*, the court found that because the operator of the crematorium stopped the cremation as soon as she realized she was cremating the wrong body, her conduct was inconsistent with the intent to inflict emotional distress on the family. *Id*., at 883. Castle argues that similar to *Culpepper*, it stopped foreclosure and debt-collection activity after sending the Debt Validation Letter and being informed by Llewellyn that he disputed the debt.  Castle, however, ignores a critical distinction between its wrongful conduct here and the conduct of the defendant in *Culpepper*. In *Culpepper*, the cremation, which was unintentional, stopped and nothing more could be done.  Here, by contrast, Castle intentionally aided and abetted Ocwen's misconduct.  Ocwen wrongfully threatened foreclosure on a debt that was not owed.  Castle reviewed the foreclosure referral and, thus, knew or should have known, that the Loan had been paid and that the debt was not owed.  Nevertheless, Castle "piled on" and, it, too, threatened foreclosure -- a threat very too real in view of Castle's well known

reputation as a debt collector/foreclosure law firm. With the knowing backing of an established foreclosure law firm, Ocwen could further intimidate Llewellyn by reporting to the Credit Bureaus that foreclosure had been initiated. Because Castle knowingly aided and abetted Ocwen's reporting misconduct, it had a duty to remove, directly or indirectly, the adverse reporting. Castle, however, recklessly and/or intentionally failed to carry out its duty, thus causing Llewellyn severe emotional distress.

**B.     The Court Should Deny Castle's Motion for Summary Judgment on Count VI: <u>Fair Debt Collection Practices Act.</u>**

1.     <u>Burden of proof and elements</u>.

Llewellyn agrees with the Castle's recitation of the burden of proof and elements on this claim.

2.     <u>Elements Challenged by Castle</u>.

<u>Element 2 and 3</u>**:** Mr. Llewellyn can demonstrate a triable issue of fact as to Element 2, whether Castle is deemed a debt collector for the purposes of 15 U.S.C. § 1692e, and can demonstrate a triable issue of fact as to Element 3, that threats to foreclose on a debt that is not owed is the collection of a debt under the FDCPA.

A.     In its Motion, Castle spends considerable time analyzing whether foreclosure are covered by the FDCPA, observing that "[t]he basic dispute is whether mortgage foreclosures constitute mere enforcement of a security interest by the lender, in which case they would appear to fall outside the scope of the Act, or whether foreclosures are an attempt to collect the underlying monetary debt, in which case they would fall within the scope of the Act." Motion, at 12-13 (citing, *Rousseau v. Bank of New York,*

2009 U.S. Dist. LEXIS 90163 (2009). Castle then argues that it never took any action to collect a money judgment from the plaintiff. Motion, at 14. Castle, however, misses the point, and completely ignores the applicable holding in *Rousseau* that threatening to foreclose on a debt that is not owed is a violation of § 1692f(6) of the FDCPA.

B.      Specifically, in *Rousseau*, the court held that "even assuming that the FDCPA does not govern typical mortgage foreclosures because a foreclosure is an action on a security interest, the statute expands its reach to enforcers of security interests in one specific instance: where that party seeks to take property to which "there is no present right to possess[ ]." *Id*., at 22-23 (citing, 15 U.S.C. § 1692f(6)(A); *see also*, *id.* § 1692a(6) (defining debt collector as a person who is in the business of collecting debts owed or due, but noting that "[f]or the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests"); *Warren v. Countrywide Home Loans, Inc.,* No. 08-16171, 342 Fed. Appx. 458, 2009 U.S. App. LEXIS 18191, 2009 WL 2477764, *2 (11th Cir. Aug. 14, 2009) ("[S]everal courts have held that an enforcer of a security interest, such as a mortgage company foreclosing on mortgages of real property, falls outside the ambit of the FDCPA *except for the provisions of section 1692f(6).*") (quotations, alterations, citations omitted) (emphasis added by the Court); *Rosado v. Taylor,* 324 F. Supp. 2d 917, 924 & n.3 (N.D. Ind. 2004) (noting that security enforcement activities fall outside the FDCPA, but also noting that section 1692f(6) is an exception to this rule and "applies to security enforcement actions")).

C.     Moreover, the court in *Rousseau* further held that "even the cases that reject FDCPA foreclosure claims recognize that, if a defendant seeks to collect money apart from the foreclosure process, such action would come within the bounds of the Act." *Id*., at 23.  The court noted, as an example, that several recent decisions from courts in that circuit have recognized the difference between cases involving non-judicial foreclosures, in which FDCPA claims are often disallowed, and cases involving judicial foreclosures, in which the claims are permitted. *Id*., at 23-24 (internal citations omitted). "This distinction is based on the differing nature of each foreclosure procedure; '[i]n contrast to non-judicial foreclosures, which are intended only to enforce the lender's security interest and not to collect the underlying debt, a typical judicial foreclosure usually does involve seeking a personal judgment against the debtor for a deficiency and hence would likely amount to debt collection.'" *Id*., at 24.  (Internal quotations omitted). Thus, "in contrast to a foreclosure that is only against the property, where there is some attempt to collect money in addition to the enforcement of a security interest, an FDCPA claim will lie, at least for the conduct related to the money collection." *Id*., at 24. (Internal citations omitted).

D.     Here, Castle threatened to collect on a debt that was not owed in violation of § 1692f(6) of the FDCPA.[25]  Moreover, Castle's threat came on the heels of Ocwen's August 1 and 9, 2006, letters threatening foreclosure (the August 1 letter also

---

[25] *See*, part III(A), *supra*; the First Mortgage Loan was paid off on June 14, 2006 -- well within the 60 day grace period under RESPA -- *via* wire transfer to Equity Pacific, the transferor servicer. Krehbiel Dep., at 115:14-17, 121:1-23, **Exhibit 17** thereto (**Exhibit F-5** hereto),, p. 1008 (First National Bank wire transfer log); SOF 28-30.  Under the First Mortgage Loan, payments are not deemed late until after the 15th of each month.  Rider Dep., at 111:11-16.; SOF 29.  Regardless of RESPA, the Loan was paid off through the refinancing, and Castle's threat to foreclose was improper.

threatening the consequences of foreclosure, including a deficiency liability.)[26] Moreover, in its August 1 letter, Ocwen referenced its previously sent Notice of Default, and advised Llewellyn of the following alternatives to foreclosure: repayment plans, and listing your property for sale. Ocwen further threatened Llewellyn as to the following consequences of foreclosure: loss of property, damaged credit rating, deficiency liability, and tax ramifications. Llewellyn Decl., **Attachments H-2,** and **H-4**, thereto; SOF 35 and 39. Thus, Ocwen used Castle as leverage not only in threatening foreclosure, but also in threatening a deficiency liability. And Castle aided and abetted Ocwen's wrongful debt collection misconduct. In either case, Castle is deemed a debt collector under the FDCPA.

**Element 5:** Mr. Llewellyn can demonstrate a triable issue of fact as to whether Castle threatened to take any action that could not legally be taken or intended to be taken.

A. In its Motion, Castle argues that it did not threaten to take action against Mr. Llewellyn by sending him the September 7, 2006, letter. Specifically, Castle argues that the September 7 letter strictly complied with 15 U.S.C. § 1692g. Castle mistakenly relies on *Madonna v. Academy Collection Service, Inc.*, 1997 U.S. Dist. 13315 (D.Conn.) to support this argument.

B. In *Madonna*, the court held that a debt validation letter asserting that the creditor "may choose to pursue legal action," when the debt collector had no specific knowledge whether the creditor had affirmatively decided to sue the debtor, was not a threat of unintended action, or a false statement in violation of §1692e(5) or (10). *Id.*, at *19. Castle's September 7 letter, however, does far more than simply provide Mr.

---

[26] Llewellyn Decl., **Attachment H-2** thereto; SOF 35.

Llewellyn with the information required under §1692g. Indeed, the first sentence of the letter specifically states that Castle "has been retained to initiate foreclosure proceedings on [the Coolidge Property]. Thus, unlike *Madonna* involving a letter discussing options available to the creditor, Castle is actually threatening foreclosure in its letter. Llewellyn reasonably understood Castle's September 7 letter as a threat of foreclosure, particularly in view of his receipt of Ocwen's earlier August 1 and 9 letters threatening Llewellyn with foreclosure. Llewellyn's reasonable understanding should be controlling in these circumstances. *See*, *Madonna*, 1997 U.S. Dist. 13315, at *12 ("To determine whether § 1692g has been violated, we consider how the 'least sophisticated consumer' would interpret the notice received from the debt collector.'"); *see also*, *Glazer v. Case Home Finance LLC*, 2009 U.S. Dist. Lexis 126369, at *11 (N.D. Ohio) ("When determining whether a debt collector's practice is 'deceptive,' courts have applied an objective test based on the understanding of the 'least sophisticated consumer.'"); *North Star Capital Acquisitions, LLC v. Krig*, 611 F.Supp.2d 1324, 1334 (M.D.Fla. 2009) ("False or misleading representations under § 1692e are analyzed from the perspective of whether the least sophisticated consumer would be deceived or misled by the debt collector's practices.").

C.     And Castle's improper threat of foreclosure is consistent with Ocwen's Log repeatedly observing that foreclosure has been initiated. Ocwen Log; *see*, part III(A) *supra*. Moreover, Castle's threat of foreclosure is consistent with Ocwen's reporting to the Credit Bureaus that foreclosure had been initiated. Indeed, Castle, by its September 7 letter, aided and abetted Ocwen in misrepresenting to the Credit Bureaus that the Loan was in default and that foreclosure had been initiated.

D.     Castle's analysis of Element 5 is also fatally flawed in that it ignores the fact that Llewellyn was never in default and did not owe Ocwen anything. Consequently, Castle's September 7 letter to Llewellyn threatening foreclosure violated §§1692e(5) (The threat to take any action that cannot legally be taken or that is not intended to be taken) and 1692f(6) of the FDCPA (Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if--(A) there is no present right to possession of the property claimed as collateral through an enforceable security interest).   Castle's September 5 letter also violated §§ 1692e(2)(A) and 1692g(a)(1) of the FDCP by asserting that Llewellyn owed Ocwen $447,901.35, when Llewellyn, in fact, owed Ocwen nothing.

E.     Castle next argues that it was entitled to rely on the referral from Ocwen without an independent investigation into the facts establishing the debt.  Based on the authorities cited upon by Castle for this proposition, Castle is relying on the bona fide error affirmative defense set forth in 15 U.S.C. § 1692k(c) which requires that the debt collector show by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  Castle, however, in its Motion has failed to show, by a preponderance of the evidence or otherwise, that its error was not intentional.  Moreover, Castle has failed to show that, assuming it was a bona fide error, it was made notwithstanding the maintenance of unspecified procedures reasonably adapted to avoid any such error.  As a bona fide error defense is an affirmative defense, Castle has the burden of showing that there is no genuine issue of material fact that the defense applies here.  Castle has not, and indeed cannot, make this showing.

F.     Castle may attempt to argue later that its error was based on its misunderstanding of RESPA *viz.*, that it did not know the Loan was never in default because the refinance proceeds were paid to the prior loan servicer within the 60 day window set forth in the RESPA servicing disclosure.  To the extent this is a mistake of law, the United States Supreme Court has held that the bona fide error defense in § 1692k(c) does not apply to a violation resulting from a debt collector's mistaken interpretation of the legal requirements of the FDCPA.  *Jerman v. Carlisle, McNellie, Rini, Kremer &* Ulrich, 130 S.Ct. 1605, 1608, 2010 U.S. Dist. Lexis 3480, at *7 (2010). Moreover, Castle's argument that it is not required to investigate the validity of the debt independently from the holder of the evidence of the debt ignores the telling admission contained in its Motion that it "received a foreclosure referral from [Ocwen], and after review by a [Castle] attorney concerning the existence of a debt (1692e(3)), sent out a [FDCPA] letter ("Debt Validation Letter")."  Motion, at p. 2.  At a minimum, Castle's review should have included the results of the title search which Ocwen ordered on August 29, and which have alerted Castle to Wyman Funding's liens on the Coolidge Property.  Castle also presumably would have reviewed the HUD Settlement Statement showing that the Loan had been paid off.

G.     Castle next asserts that a complied with § 1692g(b) when it ceased further activity related to the foreclosure upon receipt of a fax from Llewellyn disputing the debt on September 26, 2006. As noted by Castle, § 1692g(b) of the FDCPA requires a debt collector, who receives from a consumer written notice disputing a debt, to cease collection of the data directly from the consumer until it is obtained either verification of the debt or a copy of a judgment and provide it to the consumer.  Motion, at 17, (citing,

*Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007)). *Guerrero* further points out, however, that § 1692e prohibits a debt collector from using false, deceptive, or misleading means to collect a debt. *Id.* As shown in part III(A), *supra*, Castle violated § 1692e by improperly threatening to foreclose on the Coolidge Property, thus aiding and abetting Ocwen's improper reporting to the Credit Bureaus that foreclosure had been initiated.

H.    Castle's assertion that it ceased further activity related to the foreclosure when it received Llewellyn's September 26 fax is misplaced. The negative reporting to the Credit Bureaus, made possible through Castle's aiding and abetting Ocwen's false reporting, remained posted and continued to damage Llewellyn. Castle did nothing to remove the false credit reporting despite advising Mr. McNamara by letter dated December 5, 2006, that the negative reporting would be removed and that Castle would "ensure the problem is addressed", and despite subsequent correspondence and communications between Castle and McNamara. *See*, McNamara Decl..

C.    **The Court Should Deny Castle's Motion for Summary Judgment on its Affirmative Defense of the Statutes of Limitations regarding Count VI: <u>Violation of the Fair Debt Collection Practices Act.</u>**

1.    **<u>Burden of proof and elements.</u>**

Llewellyn agrees with the Castle's recitation of the burden of proof and elements on this affirmative defense.

2.    **<u>Elements Challenged by Castle</u>.**

Mr. Llewellyn can demonstrate a triable issue of fact as to whether Castle violated the FDCPA on or after January 29, 2007.

A.    In its Motion, Castle argues that the accrual date for the running of the statute of limitations is either September 7, 2006 (the date Castle threatened Llewellyn with foreclosure), or December 5, 2006 (the date Castle admitted that the "loan should have been paid in full" and indicated that "Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action.").  Castle further argues that since the lawsuit was commenced on January 29, 2008, Llewellyn's claim under the FDCPA is barred by this statute's one-year statute of limitations.

B.    Castle's analysis ignores that it intentionally aided and abetted Ocwen's misconduct on January 29, 2006 and thereafter.  Ocwen wrongfully threatened foreclosure on a debt that was not owed.  Castle, reviewed the foreclosure referral and, thus, knew or should have known, that the Loan had been paid and that the debt was not owed.  Nevertheless, Castle "piled on" and, it, too, threatened foreclosure -- a threat very too real in view of Castle's well known reputation as an established debt collector/foreclosure law firm.  With the knowing backing of an established foreclosure law firm, Ocwen could further intimidate Llewellyn by reporting to the Credit Bureaus that foreclosure had been initiated.  Because Castle knowingly aided and abetted Ocwen's reporting misconduct, it had a duty to remove, directly or indirectly, the adverse reporting.  Castle, however, recklessly and/or intentionally failed to carry out its duty, thus causing Llewellyn severe emotional distress.

C.    In its December 5, 2006 letter, Castle stated that the loan should have been paid-and-full.  Moreover, Castle stated that the credit report would be reversed as Llewellyn has been negatively affected by the action.  Perhaps most significant, Castle also stated that it would "ensure the problem is addressed."  Castle, who aided and

abetted Ocwen's false reporting to the Credit Bureaus, and who now knew the reporting was false (to the extent it somehow did not know this fact back in September 2006), did nothing to remedy the false reporting.

D.     Thus, by letter dated February 8, 2007, Mr. McNamara chastised Castle for Ocwen's failure to correct the bad marks against Mr. Llewellyn's credit report, and reminded Castle of its December 5 letter indicating that the credit report would be reversed.  McNamara Decl., **Attachment C-15** thereto; SOF 92.

E.     By facsimile dated February 8, 2007, Castle sent to Mr. George the February 8 McNamara letter requesting a letter from Ocwen that afternoon. McNamara Decl.,  at ¶ **insert**, **Attachment C-16** thereto. SOF 93.

F.     Finally, on February 15, 2007, Ocwen delivered to Castle a letter from Ocwen to Llewellyn in response to what Ocwen disingenuously characterizes as Llewellyn's "recent" correspondence, Ocwen states that it has requested that the entire reporting trade line be deleted on the loan.   Ocwen sincerely apologized for any inconvenience caused.   Llewellyn Decl., **Attachment C-25** thereto; SOF 100-101. Ocwen finally deleted the entire Llewellyn trade line on or after February 15, 2007, based on information it had in its possession from the outset, but which it chose to ignore.

G.     Castle should have caused the deletion of the Llewellyn trade line long before February 15, 2007, and certainly on January 29, 2007, and each day thereafter.   Castle's failure to cause the deletion of the Llewellyn trade line each day commencing January 29, 2007, constitutes separate violations of the FDCPA.   This is particularly so considering Castle knew, or should have known, back in September 2006, and certainly by December 5, 2006, that Llewellyn was never in default on the Loan.

H.     Indeed, this Court has previously recognized that the failure to remove inaccurate information from a credit report, as well as the failure to notify major credit bureaus that the debt was disputed and failing to substantiate the alleged debt, constitute violations of 15 U.S.C. §§ 1692, *et seq.  Cross*, 2006 U.S. Dist. LEXIS 8956, at *10 ("In Claim 5, Mr. Cross alleges that AAC violated 15 U.S.C. §§ 1692, *et seq.*, by failing to remove inaccurate information from his credit reports, failing to notify major credit bureaus that the debt at issue was disputed, and failing to substantiate the alleged debt. Mr. Cross has alleged sufficient facts to support such violation.  Mr. Cross has alleged sufficient facts to support such violation.").[27]

I.     Accordingly, because Castle violated the FDCPA on and after January 29, 2007, this Court should deny Castle's motion for summary judgment on it affirmative defense of the statute of limitations regarding Claim VI pertaining to Castle's violations of the FDCPA.

### IV.     CONCLUSION

For all the foregoing reasons, Mr. Llewellyn respectfully requests that this court deny Castle's Motion for Summary Judgment in its entirety, and any additional relief this Court deems necessary and just.

Dated: September 8, 2010

McNAMARA LAW FIRM, P.C.

By:      *s/John N. McNamara, Jr.*

---

[27] Reporting false information to a credit reporting agency violates §1692e of the FDCPA. *See, Sullivan v. Equifax, Inc.,* 2002 U.S. Dist. LEXIS 7884, *15 (E.D. Pa. April 19, 2002) (holding that a report of false information to a credit reporting agency could expose a debt collector to liability under *§ 1692e of the FDCPA*); *and Akalwadi v. Risk Mgmt. Alternatives, Inc.,* 336 F. Supp. 2d 492, 503 (D. Md. 2004) ("a debt collector's reporting of a consumer's debt to a credit reporting agency would be covered by *FDCPA § 1692e* if the communication is false, deceptive or misleading"). It is only logical that failing to remove inaccurate information constitutes equally culpable conduct and as this Court has already found, it, too, violates §1692e of the FDCPA.

John N. McNamara, Jr.
1035 South Gaylord St., Suite 100
Denver, CO  80209
PHONE
FAX
mac@washparklaw.com
*Attorney for Plaintiff Glen Llewellyn*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2010, I electronically filed and served the foregoing pleading **PLAINTIFFS RESPONSE TO DEFENDANT CASTLE MEINHOLD & STAWIARSKI'S MOTION FOR SUMMARY JUDGMENT** on the clerk of court using the CM/ECF system which will send notification of such filing to the following e-mail address(es):

Phillip A. Vaglica
Castle, Meinhold & Stawiarski, LLC
999 18th St., #2201
Denver, CO 80202
vaglica@vaglica.com

*Attorneys for Defendant Castle, Meinhold & Stawiarski, LLC*

Mark C. Willis
Kelly S. Kilgore
Kutak Rock LLP
1801 California St., Suite 3100
Denver, CO 80202-2626
Mark.willis@kutakrock.com
Kelly.kilgore@kutakrock.com

Brian P. Brooks
Adam C. Goldstein
O'Melveny & Myers LLP
1625 Eye St., N.W.
Washington, D.C. 20006
bbrooks@omm.com
agoldstein@omm.com

*Attorneys for Defendant Ocwen Loan Servicing, LLC and Nomura Credit and Capital, Inc.*

*s/Stewart Cabels*
Stewart Cabels