**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No.  08-cv-00179-WJM-KLM

GLEN LLEWELLYN,

      Plaintiff,

v.

ALLSTATE HOME LOANS, INC. d/b/a ALLSTATE FUNDING,
OCWEN LOAN SERVICING, LLC.,
NOMURA CREDIT AND CAPITAL, INC.,
NCC SERVICING, LLC., and
CASTLE, MEINHOLD & STAWIARSKI, LLC.,

      Defendants.

---

## OPINION AND ORDER

---

      This matter is before the Court on (1) Defendants Ocwen Loan Servicing, LLC

("Ocwen") and Nomura Credit and Capital, Inc.'s ("NCCI's") Motion for Summary

Judgment (ECF No. 247); (2) Ocwen and NCCI's Amended Motion to Strike

Declarations (ECF No. 264); and (3) Defendant Castle Meinhold & Stawiarski, LLC's

("CMS's") Motion for Summary Judgment (ECF No. 182).  The motions are fully briefed

and ripe for disposition.  (*See also* ECF Nos. 251, 252, 259, 260, 265.)  For the

following reasons, Ocwen and NCCI's Motion for Summary Judgment is GRANTED,

Ocwen and NCCI's Amended Motion to Strike is GRANTED IN PART and DENIED IN

PART, and CMS's Motion for Summary Judgment is GRANTED.

# I.  BACKGROUND

## A.    FACTUAL BACKGROUND

This is a case about an individual – Plaintiff Glen Llewellyn – who refinanced a mortgage loan, but the company servicing the original loan, Ocwen, did not receive the refinancing proceeds intended to pay off the loan.  When Plaintiff understandably stopped making monthly payments on the original loan, Ocwen understandably began treating the original loan as in default.  The entity allegedly responsible for taking receipt of the refinancing funds has been named as a defendant but has not appeared in the action.  Plaintiff's claims against Ocwen and NCCI, Ocwen's parent, relate to Ocwen's negative reporting of Plaintiff to consumer reporting agencies ("CRAs").  Plaintiff's claims against CMS relate to its initiation of foreclosure proceedings on the underlying property on behalf of Ocwen.

Unless otherwise noted, the following facts are not in dispute.  On March 7, 2006, Plaintiff purchased the property located at 7915 South Coolidge Way, Aurora, Colorado, executing two notes with Allstate Home Loans, Inc. d/b/a Allstate Funding ("Allstate") totaling $559,980.00.  (ECF No. 247, at 5 ¶¶ 1-3; *id.* Exs. A-4, A-6; ECF No. 251, at 7 ¶ 9.)  Plaintiff was required to make monthly payments on the loan to Equity Pacific Mortgage, Inc. ("EPMI"), the loan servicer, and Plaintiff made the first monthly payment for May 2006.  (ECF No. 247, at 6 ¶¶ 4, 8-9; ECF No. 251, at 3[1], 7 ¶ 11).)

On May 15, 2006, the right to service the loan was transferred from EPMI to

---

[1] Citations to "ECF No. 251, at 3" (without any specific paragraph number listed) refers to the list of "Undisputed Material Facts" from Ocwen and NCCI's motion to which Plaintiff admits on page 3 of his Response.

Ocwen.  (ECF No. 247, at 7 ¶ 10; *id.* Ex. A-16; ECF No. 251, at 3.)  Ocwen serviced the

loan as the attorney-in-fact for NCCI, the investor that purchased the loan on the

secondary market.  (ECF No. 247, at 7 ¶ 12; *id.* Ex. A-12 ¶ 7; ECF No. 251, at 3 ¶ 12.)

Plaintiff does not appear to dispute that he knew of this transfer.  (ECF No. 247, at 7-8

¶¶ 15-21, 23; ECF No. 251, at 3.)  Plaintiff's next payment was due to Ocwen by June 1,

2006.  (ECF No. 247, at 7 ¶ 16; ECF No. 251, at 3.)

On June 1, 2006, Plaintiff closed on a refinancing of the loan.  (ECF No. 247, at 9

¶ 29; ECF No. 251, at 8 ¶ 18.)  Plaintiff did not inform the closing agent, Staci Krehbiel,

that servicing of the loan had been transferred from EPMI to Ocwen.  (ECF No. 247, at

9 ¶ 29; ECF No. 251, at 3.)  Krehbiel prepared a HUD Settlement Statement, which

listed EPMI as the entity to whom the refinancing funds were to be disbursed.  (ECF No.

251, at 9 ¶ 22; *id.* Ex. C-1.)  On June 5, 2006, Plaintiff told an Ocwen representative by

telephone that the loan had been refinanced, but did not provide any details about the

refinancing.  (ECF No. 247, at 9-10 ¶¶ 30-32; ECF No. 251 at 3 ¶¶ 31-32, *id.* Ex. B at

19.)

On June 14, 2006, the title company wired the refinancing funds to Washington

Mutual Bank, identifying EPMI as the beneficiary.  (ECF No. 247, at 11 ¶ 39; ECF No.

251, at 10 ¶ 29.)  On July 11, 2006, Kevin Rider at EPMI wired the funds to Allstate.

(ECF No. 247, at 11 ¶ 42; *id.* Ex. A-26; ECF No. 251, at 10 ¶ 31.)  The record does not

suggest that Ocwen or NCCI ever received the refinancing funds from Allstate.

On July 17, 2006, Ocwen issued Plaintiff a past-due notice on the loan.  (ECF

No. 251, at 10 ¶ 33; *id.* Ex. B at 19; ECF No. 260, at 11[2].)  On August 1, 2006, Ocwen

sent Plaintiff a letter discussing foreclosure and its alternatives.  (ECF No. 251, at 10-11

¶ 35; *id.* Ex. D-3; ECF No. 260, at 7 ¶ 35.)  On August 6, 2006, Ocwen provided a

negative credit report regarding Plaintiff to a CRA.  (ECF No. 251, at 11 ¶ 42; *id.* Ex. G-

1 at 85.)[3]

On August 7, 2006, Plaintiff again spoke with an Ocwen representative over the

telephone.  (ECF No. 247, at 12 ¶ 46-48; ECF No. 251, at 11 ¶ 36; *id.* Ex. B at 18.)

Plaintiff told the representative that Plaintiff had refinanced the loan with Kevin Rider (at

EPMI) and that the loan was with Washington Mutual, but the representative told

Plaintiff that no one had sent any payoff funds to Ocwen and advised Plaintiff to contact

Washington Mutual to get details about the refinancing.  (*Id.*)

After sending Plaintiff another past due notice on August 9, 2006 (ECF No. 251,

at 11 ¶ 38; *id.* Ex. D-5; ECF No. 260, at 7 ¶ 38), Ocwen initiated foreclosure on the

property on August 29, 2006 (ECF No. 251, at 11 ¶ 41; *id.* Ex. B at 18; ECF No. 260, at

7[4]).  On September 7, 2006, Defendant CMS sent Plaintiff a letter stating that it had

---

[2] Citations to "ECF No. 260, at 11" (without any specific paragraph number listed) refers to the list of "Undisputed Material Facts" from Plaintiff's Response to which Ocwen and NCCI admit on page 11 of their Reply.

[3] Ocwen and NCCI dispute this (ECF No. 260, at 7 ¶ 42), but the Court accepts it as true given that, at this stage of the proceedings, the Court must view the evidence in a light most favorable to Plaintiff (*see infra*).

[4] Ocwen and NCCI do not list this fact ("Undisputed Material Fact" ¶ 41 from Plaintiff's Response) as admitted on page 11 of their Reply, but also do not specifically deny the fact on pages 6-11 of their Reply.  Therefore, the Court will treat this fact as admitted.  The same is true for the "Undisputed Material Facts" ¶¶ 45, 97, and 99 of Plaintiff's Response, which are cited *infra* in this factual background section.

been retained by Ocwen and NCCI to initiate foreclosure proceedings.  (ECF No. 251, at 12 ¶ 44; *id.* Ex. D-6; ECF No. 260, at 11.)  On September 21, 2006, Ocwen provided another negative credit report about Plaintiff to a CRA.  (ECF No. 251, at 12 ¶ 46; *id.* Ex. B at 17; ECF No. 260, at 11.)

On September 25, 2006, Plaintiff faxed to CMS a copy of the HUD Settlement Statement (showing that EPMI was to receive the refinancing funds) and a letter from Washington Mutual to Plaintiff stating, "If Ocwen was to be paid off during the refinance and was not, please contact your closing agent for research on the payoff wire."  (ECF No. 251, at 12 ¶ 45; *id.* Ex. D-4; ECF No. 260, at 7.)  During October 2006, Plaintiff began increasing the frequency of his complaints to Ocwen and CMS, while also getting his oft-used mortgage broker Candace Saport to call Ocwen on his behalf.  (*See* ECF No. 251, at 12-16 ¶¶ 51, 54-57, 61, 82, 85; ECF No. 260, at 8, 11.)

On October 19, 2006, Ocwen initiated an investigation into Plaintiff's concerns, and CMS informed Plaintiff that it had been directed by Ocwen to place its foreclosure file on hold.  (ECF No. 251, at 14-15 ¶¶ 69-70; *id.* Exs. D-9, D-10; ECF No. 260, at 11.)  Despite transferring its servicing rights over the loan to NCC Servicing, LLC on October 20 (ECF No. 247, at 14 ¶ 65; ECF No. 251, at 3), Ocwen continued investigating the issue, requesting various documents from Plaintiff to prove that the refinancing funds had been sent to EPMI.  (ECF No. 247, at 15 ¶¶  69, 71; ECF No. 251, at 3, 17 ¶ 90; *id.* Exs. D-13, D-14, D-15; ECF No. 260, at 11.)  During this investigation, Ocwen continued to report to CRAs that the account was past due as of September 30, 2006.

(ECF No. 251, at 15-19 ¶ 77, 80, 95, 98, 101; *id.* Ex. B at 6-7[5], 11-12; ECF No. 260, at 9-11.)  On November 10, 2006, Krehbiel sent CMS some documentation regarding the refinancing (ECF No. 251, Ex. C-10), and on November 21, 2006 provided Ocwen with the wiring log showing the payoff to EPMI (ECF No. 251, at 18 ¶ 97; *id.* Ex. C-3).  On December 5, 2006, CMS sent Plaintiff a letter stating,

> This letter is intended to inform you that our client has indicated that this loan should have been paid-in-full.  As such, our client has advised us to close and bill our foreclosure file on this case.  Our client has also indicated that Mr. Llewellyn's credit report will be reversed as it has been negatively effective [sic] by this action.  As it takes some time to reverse the credit reports, if our client has not fully done so, please feel free to contact [CMS] and [we] will ensure that the problem is addressed.

(ECF No. 251, at 18 ¶ 99; *id.* Ex. G-71.)

Plaintiff's attorney made attempts throughout January and early February 2007 to get Ocwen to reverse its previous negative reports to CRAs.  (*See, e.g.*, ECF No. 251, at 19-21 ¶¶ 105, 110, 115; ECF No. 260, at 10-11.)  On February 15, 2007, Ocwen finally "requested that the [CRAs] delete all of Ocwen's credit reporting."  (ECF No. 247, at 17 ¶ 78; ECF No. 251, at 21-22 ¶¶ 120-121; *id.* Ex. G-19.)

## B.   PROCEDURAL BACKGROUND

Plaintiff filed this action on January 29, 2008, and filed the operative Second Amended Complaint on June 23, 2009.  (ECF No. 1, 149.)  He brings two sets of claims.  The first are claims for theft and conversion against Allstate, based on the

---

[5] The November 20 and 30, 2006 and December 15, 2006 reports to CRAs are inconclusive as to whether, on those dates, Ocwen reported the account as past due (as of September 30, 2006).  Viewing the evidence in a light most favorable to Plaintiff (*see infra*), the Court will assume that Ocwen did report the account as past due on those dates.

alleged theft of the refinancing funds.  (ECF No. 149, at 7.)[6]  Those claims are not at issue in the pending motions.

The second set of claims are brought against Ocwen, NCCI, and CMS, the movants here.  Specifically, Plaintiff brings claims against Ocwen and NCCI under the Fair Credit Reporting Act ("FCRA," 15 U.S.C. § 1681s-2(b)) and Fair Debt Collection Practices Act ("FDCPA," 15 U.S.C. § 1692e), and a claim for outrageous conduct, based on Ocwen and NCCI's negative reporting of Plaintiff to CRAs.  (*Id.* at 7-10.)[7] Plaintiff also brings an FDCPA claim and outrageous conduct claim against CMS based on its initiation of foreclosure on the property.  (*Id.* at 7-8, 10-11.)

On March 18, 2011, Ocwen and NCCI filed their pending motion for summary judgment.  (ECF No. 247.)  Plaintiff has filed his Response (ECF No. 251), and Ocwen and NCCI have filed a Reply (ECF No. 260).  Ocwen and NCCI also filed an Amended Motion to Strike Declarations (declarations filed by Plaintiff in response to Ocwen and NCCI's motion for summary judgment) (ECF No. 264), to which Plaintiff has filed a Response (ECF No. 265).

───────────────

[6] The original complaint also brought these claims against Kevin Rider, EPMI, and Shearson Financial Network, Allstate's parent company.  (ECF No. 1.)  Plaintiff has voluntarily dismissed those three defendants from the action.  (ECF No. 134, 149.)
Default has been entered against Allstate.  (ECF No. 69.)  Plaintiff subsequently filed a motion for default judgment.  (ECF No. 94, 95.)  U.S. District Judge Marcia S. Krieger, to whom this action was previously assigned, denied the motion without prejudice on the ground that it was premature.  (ECF No. 110.)

[7] The claims against Ocwen and NCCI are also brought against NCC Servicing, LLC (ECF No. 149, at 7-10), an entity that has not appeared in the action and thus has not filed or joined in the pending motions for summary judgment.
Plaintiff also originally brought these claims against Ocwen Financial Corp. and Nomura Securities International, Inc.  (ECF No. 1.)  Plaintiff has voluntarily dismissed those two defendants from the action.  (ECF No. 56, 57, 73, 74.)

CMS has also filed a motion for summary judgment (ECF No. 182), to which

Plaintiff filed a Response (ECF No. 252), and CMS filed a Reply (ECF No. 259).

On February 9, 2011, this action was reassigned to the undersigned.  (ECF No.

232.)

## II.  ANALYSIS

The Court will first address Ocwen and NCCI's Amended Motion to Strike

Declarations, which will resolve what evidence will be considered by the Court on

Ocwen and NCCI's motion for summary judgment.  The Court will then proceed to

analyze the pending motions for summary judgment.

## A.    Amended Motion to Strike

In the Amended Motion to Strike, Ocwen and NCCI move the Court to strike four

declarations filed by Plaintiff in response to their motion for summary judgment:  the

declarations of William Stollar (Plaintiff's accountant), John M. McNamara, Jr. (Plaintiff's

counsel), Candace Saport (Plaintiff's former mortgage broker), and Plaintiff himself.

(*See* ECF No. 264.)

"Motions to strike are disfavored, particularly in the context of motions for

summary judgment."  *Lobato v. Ford*, No. 05-cv-01437, 2007 WL 2593485, *11 (D.

Colo. Sept. 5, 2007); *see also Alexander v. Archuleta Cnty.*, No. 08-cv-00912, 2009 WL

3245915, at *4 (D. Colo. Oct. 2, 2009) ("[S]triking affidavits is disfavored in the context

of a summary judgment motion. . . .  [L]itigation should promote the finding of the truth,

and, wherever possible, the resolution of cases on their merits.") (internal citations and

quotation marks omitted).  A decision whether to grant or deny a motion to strike lies

"within the sound discretion of the district court."  *Fed. Deposit Ins. Corp. v. Isham*, 782

F. Supp. 524, 530 (D. Colo. 1992).

      **1.**    **Stollar Declaration**

      Ocwen and NCCI argue that the Declaration of William Stollar (ECF No. 251, Ex.

E) should be stricken because Stollar was not previously formally disclosed as a fact

witness in the action, nor was he disclosed in Plaintiff's discovery responses.  (ECF No.

264, at 3-6.)  Plaintiff appears to concede that he did not formally disclose Stollar as a

fact witness, but argues that Stollar was disclosed during Plaintiff's deposition in the

case.  (ECF No. 265, at 2-5.)  Thus, he argues that Ocwen and NCCI knew Stollar had

discoverable information, but failed to depose him and in bad faith waited until the

summary judgment briefing to seek to exclude him.  (*Id.*)

      Federal Rule of Civil Procedure 37(c)(1) provides, "If a party fails to . . . identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness

. . . unless the failure was substantially justified or is harmless."  "The determination of

whether a Rule 26(a) violation is justified or harmless is entrusted to the broad

discretion of the district court."  *Woodworker's Supply, Inc. v. Principal Mut. Life Ins.*

*Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (discussing factors relevant to whether failure

was justified or harmless).

> The obligation to supplement disclosures and discovery responses applies
> whenever a party learns that its prior disclosures or responses are in
> some material respect incomplete or incorrect.  There is, however, no
> obligation to provide supplemental or corrective information that has been
> otherwise made known to the parties in writing or during the discovery
> process, *as when a witness not previously disclosed is identified during*
> *the taking of a deposition*.

Fed. R. Civ. P. 26(e) advisory committee's note to the 1993 amendments (emphasis

added); *see also Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004) (affirming denial of motion to strike affidavit where, although defendants did not identify the affiant in their Rule 26(a) or 26(e) disclosures, plaintiffs knew of the affiant and the fact that she possessed relevant information through depositions in the case).

The evidence indicates that Ocwen and NCCI knew during Plaintiff's deposition that Stollar had discoverable information related to Plaintiff's purported damages. Indeed, during the deposition, Ocwen and NCCI *initiated* questioning regarding Stollar, questioning Plaintiff regarding a produced document that had been *created by Stollar for purposes of the litigation*. (ECF No. 265, Ex. A at 58:15-60:24, 71:20-77:24, 81:2-16.)  After not deposing Stollar, Ocwen and NCCI cannot now complain that they are somehow prejudiced by the filing of Stollar's declaration. *See Ojeda-Sanchez v. Bland Farms, LLC*, No.608CV096, 2010 WL 2382452, at *2 (S.D. Ga. June 14, 2010) ("From this [deposition testimony], Plaintiffs should have been aware that [the individual] had discoverable information. . . . [T]he Court will not strike [the] affidavit simply because Plaintiffs neglected to depose [the individual]."). The Court denies the Amended Motion to Strike to the Stollar declaration.

## 2.    McNamara Declaration

Ocwen and NCCI argue that the Declaration of John N. McNamara, Jr. (ECF No. 251, Ex. G) should be stricken because McNamara was not disclosed as a fact witness in the case, and also because McNamara's attempt to both serve as counsel in the case and provide testimony regarding underlying facts constitutes professional misconduct. (*Id.* at 3-8.)  In response, Plaintiff argues that Ocwen and NCCI have always known about McNamara's involvement in the underlying events, and argue that the declaration

does not violate rules of professional conduct because McNamara is not a necessary witness, his statements pertain to uncontested facts, and he is allowed to provide such factual testimony prior to trial.  (*Id.* at 6-10.)

As Plaintiff concedes, the information contained in paragraphs 2 through 9 of McNamara's declaration is reflected in other evidence in the case.  (ECF No. 265, at 8 & n.6.)  Specifically, McNamara's statements in paragraphs 2 through 9 of his declaration are duplicative of deposition testimony of Michael Barron of Allstate, Kevin Rider, Candace Saport, and Staci Krehbiel; and the content of documents attached to McNamara's declaration.  (*See id.*; ECF No. 251, Ex. G.)  The Court is troubled by the fact that Mr. McNamara, Plaintiff's counsel, chose to include paragraphs 2 through 9 in his declaration, which are indeed loaded with hearsay (Mr. McNamara describing deposition testimony and the contents of documents) and legal conclusions regarding Defendants' allegedly wrongful conduct.  (*See* ECF No. 251, Ex. G ¶¶ 2-9.)  The Court believes that it was entirely unnecessary, and bordering on improper, to file this document with the Court.  Therefore, the Court grants the Amended Motion to Strike as to paragraphs 2 through 9, inclusive, of the Declaration of John N. McNamara, Jr, and denies the Amended Motion to Strike as to paragraphs 1 and 10 of the McNamara Declaration, and exhibits attached to the McNamara declaration.

### 3.    Plaintiff's Declaration and the Saport Declaration

Ocwen and NCCI argue that the declarations of Plaintiff and Candace Saport (ECF No. 251, Exs. D & J, respectively) should be stricken because the declarations contradict their deposition testimony.  (*Id.* at 8-11.)  "[I]n determining whether a material issue of fact exists [at summary judgment], an affidavit may not be disregarded because

it conflicts with the affiant's prior sworn statements. . . . [H]owever, courts [should] disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986).

The Court denies the Amended Motion to Strike as to the Declaration of Glen Llewellyn.  (ECF No. 251, Ex. D.)  The most substantial example provided by Ocwen and NCCI to show that Plaintiff's declaration is inconsistent with his deposition testimony is that Plaintiff's declaration provides details regarding the various properties he purchased in the past, but during deposition he testified that he could not recall details regarding the purchases and financing of the properties.  (ECF No. 264, at 8 & n.17.)  However, importantly, the parties do not appear to actually dispute any facts regarding Plaintiff's purchasing of these properties, including the amount of the original loans, whether they were ever refinanced, and whether Plaintiff defaulted on the loans. Also, it appears that Ocwen and NCCI have had for quite some time, including during Plaintiff's deposition, the underlying documents evidencing these purchases and loans. Thus, it does not appear that Plaintiff's inclusion of this information in his declaration has in any way "sandbagged" Ocwen and NCCI, or created a "sham" factual dispute where no factual dispute actually exists.  *Cf. Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 854 (10th Cir. 1999) (holding that affidavit submitted by plaintiffs was properly struck because it represented "an attempt to create a sham issue of fact" and was submitted in an attempt to "sandbag[]" defendants); *Juarez v. Utah*, 263 F. App'x 726, 735 (10th Cir. 2008) (affirming striking of affidavit containing detailed information from the plaintiff's journal, where the plaintiff had not produced the journal and where during her previous

deposition she could not recall the contents of the journal).[8]

The Court also denies the Amended Motion to Strike as to the Saport declaration.  Ocwen and NCCI argue that Saport's declaration that Plaintiff was not able to obtain loans between September 2006 and March 2007 is contradicted by prior deposition testimony regarding three loans Plaintiff was able to close during the relevant time period.  (ECF No. 264, at 10.)  However, Saport specifically addressed this issue in her declaration, clarifying that the three loans at issue "were already approved and ready to go before Ocwen started ruining Glen's credit score."  (ECF No. 251, Ex. J ¶ 6.)  Further, Ocwen and NCCI's argument regarding inconsistencies in how far Plaintiff's credit score actually dropped is unpersuasive, because the relevant documentation only goes through December 8, 2006 (ECF No. 247, Exs. A-71, A-72), whereas Saport's declaration clearly references the time period through March 2007 (ECF No. 251, Ex. J ¶ 10).

Accordingly, in analyzing Ocwen and NCCI's motion for summary judgment, the Court will consider the Stollar, Llewellyn, and Saport declarations, as well as paragraphs 1 and 10 of, and exhibits to, the McNamara declaration.

**B.      Motions for Summary Judgment**

**1.      Standard of Review**

---

[8] The other two inconsistencies cited by Ocwen and NCCI (ECF No. 264, at 9) are inconsequential, because Plaintiff's credibility could have been questioned on these issues at trial.

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  When, as here, "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also* Fed. R. Civ. P. 56(e).

Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

### 2.    Ocwen and NCCI's Motion for Summary Judgment

#### a.    FCRA Claim

14

Plaintiff's FCRA claim against Ocwen and NCCI, brought under 15 U.S.C.

§ 1681s-2(b), alleges, *inter alia*, that Ocwen furnished inaccurate credit information to

CRAs and failed to conduct a reasonable or timely investigation after receiving notice

from CRAs that Plaintiff had disputed the credit information.  (ECF No. 149, at 8-9.)  15

U.S.C. § 1681s-2(b)(1) provides, *inter alia*,

> After receiving notice . . . of a dispute with regard to the completeness or
> accuracy of any information provided by a person to a [CRA], the person
> shall –
> (A) conduct an investigation with respect to the disputed information; . . .
> (C) report the results of the investigation to the [CRA];
> (D) if the investigation finds that the information is incomplete or
> inaccurate, report those results to all other [CRAs] to which the person
> furnished the information . . .; and
> (E) if an item of information . . . is found to be inaccurate or incomplete or
> cannot be verified after any reinvestigation . . . promptly (I) modify that
> item of information; (ii) delete that item of information; or (iii) permanently
> block the reporting of that item of information.

## I.    Violation(s) of the FCRA

In their motion for summary judgment, Ocwen and NCCI argue that the FCRA

claim should be dismissed because Ocwen accurately reported the loan as being in

default (because Ocwen was never paid), and also argue that Ocwen's investigation

complied with section 1681s-2(b)(1).  (*Id.* at 25-28.)  In response, Plaintiff argues that

the loan was never in default because he refinanced it, and that Ocwen's investigation

failed to comply with section 1681s-2(b)(1) because Plaintiff repeatedly provided Ocwen

with evidence of the refinancing.  (ECF No. 251, at 23-29.)

Ocwen's duty under section 1681s-2(b) to conduct an investigation was not

triggered until it was notified *by a CRA* of a dispute regarding information previously

furnished to the CRA; not when Plaintiff contacted Ocwen disputing the information.

15

*See Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 751 (10th Cir. 2009)

(affirming dismissal of FCRA claim where plaintiff consumers only alleged that they

themselves, and not a CRA, had notified the defendant of the dispute); *see also* Judge

Krieger's previous order in this action on motions to dismiss, ECF No. 112, at 15

("[C]ourts have nearly uniformly concluded that the duty to investigate disputes under

§ 1681-2(b) to arise only when the person furnishing the information is notified of the

dispute by a [CRA], not when the borrower directly contacts the person furnishing the

information.").

        Thus, Ocwen's duty under the FCRA was not triggered by Plaintiff's June 5, 2006

or August 7, 2006 telephone calls with Ocwen representatives, nor by Plaintiff's

correspondence in late September 2006 and early October 2006 providing Ocwen with

copies of the HUD Settlement Statement and Washington Mutual letter.  Ocwen

concedes that its duty under the statute was triggered on October 23, 2006 when a

CRA, Transunion, notified it of the dispute.  (ECF No. 260, at 13-14.)[9]  The undisputed

evidence indicates that Ocwen proceeded to conduct an investigation, actually

voluntarily initiating the investigation a few days prior on November 19, 2006 in

response to Plaintiff's complaints.  (*See* ECF No. 251, Exs. D-9, D-10, D-12.)  Thus,

Ocwen complied with 15 U.S.C. § 1681s-2(b)(1)(A) (requiring initiation of an

investigation) as a matter of law.

        The first evidence suggesting that Ocwen's investigation may have concluded is

---

[9] Plaintiff has not pointed the Court to any evidence in the record, and the Court
is not aware of any, indicating that Ocwen or NCCI were notified of the dispute by a
CRA prior to October 23, 2006.

CMS's December 5, 2006 letter to Plaintiff's attorney stating, "[O]ur client has indicated that this loan should have been paid-in-full.  As such, our client has advised us to close . . . our foreclosure file on this case.  Our client has also indicated that Mr. Llewellyn's credit report will be reversed . . . ."  (ECF No. 251, Ex. G-7.)  In their motion, Ocwen and NCCI focus on a later date, January 24, 2007, the date on which Michael Barron of Allstate executed a satisfaction of the deed of trust on the original loan.  (ECF No. 247, at 28.)  They point out that just 22 days later, on February 15, 2007, Ocwen requested that the CRAs delete the previous negative credit reporting.  (*Id.*)  Although Ocwen's investigation may have continued through January 24, 2007, there is some evidence – CMS's December 5, 2006 letter – indicating that Ocwen was on notice as of that date that its previous negative credit reporting should be reversed.  (ECF No. 251, Ex. G-7.)  The Court views this evidence in a light most favorable to Plaintiff, and finds that this letter constitutes some evidence of conduct by Ocwen beginning on December 5, 2006 that is proscribed by the FCRA.[10],[11]

The Court agrees with Plaintiff that this evidence of conduct by Ocwen is also attributable to NCCI, as Ocwen's principal on a theory of vicarious liability, a point NCCI does not specifically dispute.  *See, e.g.*, *Jones v. Federated Fin. Reserve Corp.*, 144

---

[10] Specifically, 15 U.S.C. § 1681s-2(b)(1)(C) (requiring Ocwen to report the results of the investigation to Transunion) and 15 U.S.C. § 1681-2(b)(1)(D) (requiring Ocwen to inform all CRAs of its previous incomplete or inaccurate disclosures).

[11] Ocwen argues that it never received the refinancing funds, but nevertheless deleted the negative credit reporting in good faith.  (ECF No. 247, at 28.)  While a trier of fact could have considered such an argument, the Court here must view the evidence in a light most favorable to Plaintiff, and therefore must assume that, as of December 5, 2006, Ocwen was on notice that the negative credit history should be deleted.

F.3d 961, 964-66 (6th Cir. 1998) (holding that a principal can be vicariously liable under the FCRA its agent's acts, under common law agency principles); *Cole v. Am. Family Mut. Ins. Co.*, 410 F. Supp. 2d 1020, 1025-26 (D. Kan. 2006) (concluding that whether employer should be held liable under FCRA for acts of its employee under an agency theory was issue for the trier of fact).

Plaintiff argues that Ocwen's investigation beginning in October "should have [been] completed . . . immediately [rather than on December 5] because [Ocwen] had already received from Llewellyn, among other things, the . . . HUD Settlement Statement and . . . letter from Washington Mutual." (ECF No. 251, at 26.)  The Court disagrees.  The HUD Settlement Statement merely indicates to whom the refinancing funds were supposed to be paid.  Given that Ocwen had not been paid, it did not act unreasonably by seeking actual proof of payment to EPMI.  This is reinforced by the Washington Mutual letter itself, which directed Plaintiff to "contact [his] closing agent for research on the payoff wire."  (*Id.* Ex. D-4.)  Krehbiel finally faxed Ocwen proof of the payoff wire on November 21 (while shortly beforehand providing the information to CMS), which was just 14 days prior to CMS's December 5 letter.  The Court concludes that CMS's investigation was not unreasonably long under the FCRA.[12]

---

[12] Plaintiff also focuses on payments received by Ocwen from Allstate during October 2006, two of which were rejected and the final one of which was accepted.  The Court is not persuaded that receipt of these payments somehow put Ocwen on notice regarding Plaintiff's refinancing, or shows Ocwen's bad faith in reporting the loan as past due to CRAs.  First, these payments were not of sufficient amounts to bring the loan with Ocwen out of default.  And second, Ocwen's reporting to CRAs between October 2006 and December 2006 consistently reported the status of the loan only as of September 30, 2006 (and thus did not account for the October payment accepted by Ocwen).

Plaintiff also emphasizes an October 18, 2006 Ocwen call log entry as evidence

Plaintiff also focuses a great deal on the Real Estate Settlement Procedures Act ("RESPA"), arguing that "the Mortgage Loan was never in default because the refinance proceeds were paid to the prior loan servicer [EPMI] within the 60 day window set forth in . . . RESPA." (*Id.* at 23.)  As an initial matter, Plaintiff has not brought a legal claim under the RESPA in this action, and so cannot now argue that Ocwen and NCCI should be held directly liable for violating the RESPA.[13]  Also, the evidence does not indicate that Ocwen violated section 2605(d) of the RESPA,[14] as Plaintiff argues:  Allstate transferred the loan to Ocwen on May 15, 2006, and Ocwen did not impose a late fee until July 17, 2006, more than 60 days after the transfer.  (*See* ECF No. 251, Ex. B at 19.)  Further, as of July 17, 2006, Ocwen and NCCI were not on constructive notice that the loan had been refinanced.

_____

that Ocwen knew as of that date that the loan "was paid out prior to the loan being boarded at Ocwen."  (ECF No. 251, at 26.)  Plaintiff has not quoted the entire call log entry – the entire entry casts doubt on Plaintiff's conclusion.  (*See id.* Ex. B at 14.)  And again, Ocwen's duty under the FCRA was not even triggered until October 23 when Transunion contacted it.

Plaintiff also emphasizes an October 27, 2006 email from an NCC Servicing, LLC employee recognizing that Plaintiff's credit should be corrected.  Plaintiff's claims against NCC Servicing are not at issue in the pending motions for summary judgment, and Plaintiff has not established that Ocwen or NCCI should be held accountable for NCC Servicing's apparent knowledge.

[13] The Court's own research reveals a multitude of cases in which plaintiff lenders have brought actions against mortgage companies under both the RESPA and FCRA.

[14] 12 U.S.C. § 2605(d) provides, "During the 60-day period beginning on the effective date of transfer of the servicing of any federally related mortgage loan, a late fee may not be imposed on the borrower with respect to any payment on such loan and no such payment may be treated as late for any other purposes, if the payment is received by the transferor servicer (rather than the transferee servicer who should properly receive payment) before the due date applicable to such payment."

Plaintiff has come forward with some evidence of conduct by Ocwen between December 5, 2006 and February 15, 2007 that is proscribed by the FCRA.  However, as discussed *infra*, summary judgment is appropriate on Plaintiff's FCRA claim against Ocwen and NCCI because Plaintiff has failed to come forward with sufficient evidence showing damages caused by Ocwen and NCCI's conduct during that time period.

## ii.   Actual Damages

Ocwen and NCCI argue that Plaintiff has not created a triable issue as to whether he suffered any actual damages as a result of Ocwen's credit reporting.  (ECF No. 247, at 28-32.)  Specifically, they argue, *inter alia*, that any decline in Plaintiff's creditworthiness was not caused by Ocwen's reporting but instead on Plaintiff defaulting on sixteen mortgage loans, Plaintiff was still afforded significant credit during the relevant time period, and there is no evidence that Plaintiff was ever denied credit during the relevant time period.  (*See id.*)  In response, Plaintiff argues (notably, without *any* citations to the record) that after Ocwen's reporting

> Llewellyn's credit was terrible and he could not refinance any of the loans on his properties.  The critical refinancing – unavailable because of Ocwen's erroneous credit reporting – caused to [sic] Llewellyn to lose everything. . . . Llewellyn's credit scores plummeted into the 500s after Ocwen's erroneous credit reporting . . . .  As a result, Llewellyn could not refinance any of his properties.

(ECF No. 251, at 29.)  In so arguing, both parties focus only on actual economic harm.

A plaintiff may recover his actual damages caused by a defendant's negligent violations of the FCRA.  *See* 15 U.S.C. § 1681o(a).  Where a plaintiff fails to meet his burden of showing actual damages caused by an FCRA violation, summary judgment is appropriate.  *See Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1161 (11th

Cir. 1991) (affirming grant of summary judgment on FCRA claim because the plaintiff failed to meet his burden "of coming forward with evidence supporting his claim that [defendant's] alleged inaccurate report caused him harm"); *Birmingham v. Equifax, Inc.*, No. 2:06-cv-00702*, 2009 WL 194985, *2 (D. Utah Jan. 26, 2009) (stating that Plaintiff's FCRA claims "fail as a matter of law because Plaintiff has failed to provide evidence (a) that he suffered any damages or (b) that [Defendant] caused his alleged damages.")

The Court finds that Plaintiff's evidence of actual economic damages *caused* by Ocwen and NCCI is weak, and in particular concludes that Plaintiff has not created a triable issue as to whether he suffered actual economic damages caused by Ocwen and NCCI's conduct between December 5, 2006 and February 15, 2007.

First, the record indicates that Plaintiff did not produce during discovery, and has failed to point the Court to, a single formal credit application of his that was denied during the relevant time period.  Second, even if he had, he would still face the additional hurdle of showing that the application was denied *because of* Ocwen's negative credit reporting.  And third, even if he had made such a showing, he would face yet another hurdle of establishing that his eventual economic harm would not have occurred but for Ocwen's negative credit reporting.[15]  Further, the undisputed evidence shows that Plaintiff was able to close three mortgage loans *after* Ocwen's negative reporting had begun.  (*See* ECF No. 247, Exs. A-52, A-55, A-64, A-65.)  One of these

_____

[15] The Court does not place significant weight on Michael Barron's deposition testimony that Barron engaged in informal discussions with Plaintiff's attorney John McNamara about refinancing one of Plaintiff's loans, but declined to refinance them because of Plaintiff's poor credit.  (ECF No. 251, Ex. I at 126:6-129:11.)  Among other reasons, there is absolutely no indication that Plaintiff's economic situation would have turned out differently if Barron had agreed to refinance one of Plaintiff's loans.

loans, for *$627,000*, closed on January 19, 2007 (during the time period December 5, 2006 to February 15, 2007).  (*See* ECF No. 247, Ex. A-52.)[16]

The declarations of Plaintiff and Candace Saport do not create a triable issue as to whether Plaintiff's negative economic situation was caused by Ocwen's failure to correct his credit history from December 5, 2006 to February 15, 2007.  Plaintiff's declaration states,

> In about August 2006, Ocwen began making negative reports about me to the 3 major credit bureaus . . . .  I was no longer able to qualify for loans I was easily able to qualify for in 2005 and 2006 through my mortgage broker, Candace Saport.  When I asked her why I was unable to qualify for these loans, she told me that my credit rating was 'screwed' and it would not support any loans to buy more properties. . . .  When my credit was ruined, I could no longer borrow or acquire new properties to scrape, fix up, rent, or sell at a profit to pay the loans against the properties.

(*Id.* Ex. D ¶¶ 5, 9.)  Saport's declaration states,

> Glen and I were both under tremendous pressure, particularly during October, 2006, to about February 20, 2007, to save Glen's good credit, but it could not be saved. . . . By March, 2007 Glen's credit was ruined, he could not get any more loans to purchase more properties from at least September, 2006, through March 2007 to keep his real estate portfolio strong, and he told me he was financially ruined.

(ECF No. 251, Ex. J ¶ 10.)  Given the evidence concerning loans Plaintiff *was* able to close during the relevant time period, and given that Plaintiff has not provided *any* specific evidence of a formal loan application being denied during the relevant time

---

[16] Particularly as to this closing, occurring five months after Ocwen's negative credit reporting began, the Court is not particularly persuaded by the contention in Saport's declaration that the loan was "already approved and ready to go before Ocwen started ruining Glen's credit score."  (ECF No. 251, Ex. J ¶ 6.)

period, these vague and conclusory statements[17] are insufficient to create a triable issue

as to economic harm caused by Ocwen's failure to correct the credit history between

December 5, 2006 and February 15, 2007.  *See Adler v. Wal-Mart Stores, Inc.*, 144

F.3d 664, 674 (10th Cir. 1998) ("Vague, conclusory statements do not suffice to create a

genuine issue of material fact.").[18]

### iii.    Emotional Harm

Ocwen and NCCI also argue that Plaintiff has not created a triable issue as to

whether he suffered emotional damages caused by Ocwen's credit reporting, focusing

on the fact that the events in question took place in 2006, but Plaintiff did not seek any

psychological counseling during the entire period 2002 through 2008.  (ECF No. 247, at

32-33.)  In response, Plaintiff argues that he was diagnosed with depression and sought

psychological counseling in late 2009 as a result of Ocwen and NCCI's misconduct.

(ECF No. 251, at 30.)[19]

---

[17] (*Id.* Ex. D ¶ 5 ("I was no longer able to qualify for loans," "my credit rating was 'screwed' and it would not support any more loans"); *id.* Ex. D ¶ 9 ("I could no longer borrow or acquire new properties"); *id.* Ex. J ¶ 10 ("he could not get any more loans").)

[18] It is unreasonable to infer, without more evidence, that Ocwen's negative credit reporting over an approximately six month period, and in particular its failure to correct the negative reporting from December 5, 2006 to February 15, 2007, caused Plaintiff to default on sixteen mortgage loans.  *See Carney v. City and Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) ("Although our summary judgment standard requires us to view the facts in the light most favorable to the non-moving party, it does not require us to make unreasonable inferences in favor of the non-moving party.") (citation and internal quotation marks omitted).

[19] Defendant does not appear to dispute that "actual damages" under the FCRA include damages for emotional distress.  *See, e.g., Cooper v. Fed. Aviation Admin.*, 622 F.3d 1016, 1032 (9th Cir. 2010); *Sloane v. Equifax Info. Servs.*, 510 F.3d 495, 500 (4th Cir. 2007); *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 474 (2d Cir. 1995); *Thompson v. San Antonio Retail Merchs. Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

The only medical documentation advanced by Plaintiff in support of his claim for emotional damages are records from medical evaluations on August 25, 2009, October 13, 2009, and November 3, 2009.  (*See* ECF No. 251, Ex. D-17.)  Plaintiff argues that the records not only show the severity of his conditions, but also show that the conditions were caused by Ocwen's conduct.  (*See* ECF No. 251, at 30.)  The records do not so indicate.  *See, e.g.*, *id.* Ex. D-17, at L-Med 71 ("He is still avoiding the stressor of 'looking into the paperwork' with his legal/past business issues.  He is waiting for his attorney to get back with him on this matter."); *id.* at L-Med 81 (citing "financial loss" as an adverse life event he suffered); *id.* at L-Med 210 (stating that patient "owned own company and was previously wealthy but has had business trouble over last 2 years with associated stress").  These documents are entirely insufficient to create a triable issue as to whether Ocwen's negative credit reporting during late 2006 and early 2007, as opposed to Plaintiff's defaulting on sixteen mortgage loans, caused the medical issues Plaintiff was experiencing during the last half of 2009.[20]

Plaintiff also advances his own declaration to support his claim for emotional damages caused by Ocwen's negative credit reporting.  A plaintiff's own testimony can be sufficient in itself to establish emotional damages under the FCRA, but the testimony must contain more than conclusory allegations of harm and causation.  *See, e.g.*, *Tilley v. Global Payments, Inc.*, 603 F. Supp. 2d 1314, 1325 (D. Kan. 2009) ("Actual damages under FCRA may include humiliation and embarrassment, even if the consumer suffered no out-of-pocket losses.  A plaintiff must present evidence beyond conclusory

---

[20] As the Court has noted, it is unreasonable to infer based on this record that Ocwen's negative reporting caused Plaintiff to default on the sixteen mortgage loans.

allegations; however, a plaintiff's own testimony [can be] sufficient . . . ."); *Riley v. Equifax Credit Info. Servs., Inc.*, 194 F. Supp. 2d 1239, 1244-45 (S.D. Ala. 2002) ("A claim for mental distress damages [under the FCRA] must be supported by something more than the plaintiff's own conclusory allegations.").

There is no doubt that Plaintiff's declaration details severe physical, emotional, and psychological conditions he was experiencing during this general time period. (*See* ECF No. 251, Ex. D ¶¶ 6-8, 11.) However, given that during this same time period Plaintiff defaulted on sixteen mortgage loans, destroying his business and livelihood, the Court concludes that his unsupported statements attributing these medical conditions to Ocwen's conduct are too conclusory to show that Ocwen caused Plaintiff's emotional harm.[21]   *See Kittle v. Accredited Collection Agency Inc.*, No. 07-cv-01716, 2010 WL 2650479, at *2 (D. Colo. June 30, 2010).[22]   This failure to show causation is particularly

---

[21] (*See, e.g.*, *id.* ¶ 6 ("Due to Ocwen . . . ruining my credit, . . . my health began to rapidly deteriorate."); *id.* ¶ 7 ("I had none of these symptoms before Ocwen's [sic] wrongfully reported severe delinquency to the credit bureaus."); *id.* ¶ 8 ("I felt completely helpless as to how to manage my crumbling personal real estate investments, and felt as though everything was 'closing in.'"); *id.* ("Everything Ocwen said to the [CRAs], in spite of me, my attorney Mr. McNamara, and Candace Saport's help, was falling on Ocwen's . . . deaf ears.  By mid 2007 to late 2007, I had lost everything I owned and could not recover."); *id.* ¶ 11 ("Ocwen[ ] caused me severe strain and anxiety and related health problems described above in threatening to foreclose my . . . property. . . . I began to suffer extreme nervousness and anxiety, including anxiety attacks. . . . I was terrified that the threatened foreclosure would make my credit even worse.  This is what happened, and the reason I suffer so many health problems today.").

[22] In *Kittle*, the court stated,

[The plaintiff's] statement that, as a result of the defendants' actions, she "was extremely upset, suffered emotional distress including excessive stress, headaches, fear, sleeplessness, loss of appetite, withdrawal from social situations and depression" is not sufficient to demonstrate that the defendants' actions caused these various forms of emotional distress. . . .

true as for Ocwen's conduct in failing to reverse the negative credit reports between December 5, 2006 and February 15, 2007, and thus the Court concludes that Plaintiff has failed to raise a triable issue as to whether his emotional harm was caused by Ocwen's conduct between December 5, 2006 and February 15, 2007.

### iv.    Statutory and/or Punitive Damages

Ocwen and NCCI also argue that Plaintiff has failed to raise a triable issue as to whether they "willfully" violated the FCRA, and that therefore Plaintiff cannot recover statutory or punitive damages.  (ECF No. 247, at 34.)  In response, Plaintiff argues that Ocwen and NCCI recklessly disregarded their obligations under the FCRA, which is sufficient to justify an award of statutory and/or punitive damages.  (ECF No. 251, at 31-32.)

The Court concludes that Plaintiff has not raised a triable issue as to whether Ocwen and NCCI knowingly or recklessly violated the FCRA between December 5, 2006 and February 15, 2007.  *See* 15 U.S.C. § 1681n (allowing for statutory and/or punitive damages where person "willfully" fails to comply with the FCRA); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-60 (2007) (holding that "willful" violations of the FCRA include violations made knowingly or recklessly).  Plaintiff has come forward with no evidence of why the delay occurred in correcting the negative credit reporting.  The

---

[The plaintiff] provides no details of any kind about her claimed emotional distress, including the forms, timing, duration, and frequency of her claimed distress, or whether she sought treatment for her claimed distress.  Such conclusory, general, and uncorroborated testimony concerning emotional distress is not sufficient to support an award of damages for emotional distress.

*Id.*

Court cannot assume knowing or reckless conduct simply based on the fact that this delay occurred. This (lack of) evidence at most suggests negligence by Ocwen, which is insufficient to show an entitlement to statutory or punitive damages. *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ("The word 'willful' . . . is generally understood to refer to conduct that is not merely negligent."); *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 725-26 (7th Cir. 2008) ("[S]tatutory damages are available only for willful violations of the Act, [which] means . . . something more than negligence . . . of the law's requirements.").

Accordingly, because Plaintiff has only come forward with some evidence of conduct by Ocwen between December 5, 2006 and February 15, 2007 that is proscribed by the FCRA, and because there is no triable issue as to whether Ocwen and NCCI's conduct during this period caused Plaintiff any damages, summary judgment is appropriate on Plaintiff's FCRA claim against Ocwen and NCCI.

### b.    Outrageous Conduct Claim

Plaintiff's outrageous conduct claim against Ocwen and NCCI alleges that Defendants "engaged in extreme and outrageous conduct by knowingly providing false credit information to several credit bureaus." (ECF No. 149, at 8 ¶ 29.) Under Colorado law, the elements of the tort of outrageous conduct are: (1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) causing the plaintiff severe emotional distress. *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo. 1994). Ocwen and NCCI argue that summary judgment is appropriate as to each of these elements. (ECF No. 247, at 34-37.) The Court agrees that there is no triable issue as to whether Ocwen and

27

NCCI engaged in extreme and outrageous conduct, or whether Ocwen and NCCI acted recklessly or with the intent of causing Plaintiff severe emotional distress.[23]

"[T]he level of outrageousness required [to create liability for this tort] is extremely high: . . . the conduct [must be] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999).  "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question."  *Culpepper*, 877 P.2d at 883.  As for the intent element of the tort,

> A person acts with intent to cause severe emotional distress when he engages in conduct with the purpose of causing severe emotional distress to another person, or he knows that his conduct is certain or substantially certain to have that result.  A person acts recklessly in causing severe emotional distress in another if, at the time of the conduct, he knew or reasonably should have known that there was a substantial probability that his conduct would cause severe emotional distress to the other person.

*Culpepper*, 877 P.2d at 882-83.

Ocwen's conduct over the *entire* time period is relevant to Plaintiff's outrageous conduct claim (unlike the FCRA claim, where Ocwen and NCCI's duty to act was not triggered until October 23, 2006 when Transunion contacted Ocwen).  However, this does not change the equation very much for the following reasons.

Plaintiff emphasizes that he first informed Ocwen on June 5, 2006 that the loan had been refinanced, but on that call Plaintiff declined to give any details about the

---

[23] Because of these conclusions, the Court need not reach the issue of whether Plaintiff has raised a triable issue as to whether he suffered emotional harm.

refinancing.  Plaintiff next spoke with an Ocwen representative on August 7.  During that call, Plaintiff advised the representative that he refinanced the loan with Kevin Rider and the loan was with Washington Mutual, but the Ocwen representative told Plaintiff that Ocwen had not received the refinancing funds and that Plaintiff should contact Washington Mutual.  Plaintiff argues that Ocwen should have initiated an investigation following these two telephone calls.  Certainly, given that Plaintiff did not provide any details regarding the refinancing to Ocwen on June 5, 2006 Ocwen's inactivity following that call did not amount to extreme and outrageous conduct, or show a sufficient intent to cause severe emotional distress.  See Coors Brewing Co., 978 P.2d at 666; Culpepper, 877 P.2d at 882-83.  The same is true of the August 7, 2006 telephone call. Although the Ocwen representative would have been providing good customer service by voluntarily initiating an investigation at that point, his/her failure to do so at most amounts to negligence.  See Green v. Qwest Servs. Corp., 155 P.3d 383, 387 (Colo. App. 2006) (affirming grant of summary judgment on outrageous conduct claim because, "[w]hile reasonable people could find defendants' alleged conduct was grossly negligent," "we conclude that it was not sufficiently egregious to establish a cause of action for outrageous conduct").

The undisputed evidence indicates that Plaintiff did not attempt to make further contact with Ocwen until September 25, 2006, when Plaintiff faxed to CMS a copy of the HUD Settlement Statement and Washington Mutual letter.  Plaintiff then became much more active in October 2006 in complaining to Ocwen and CMS.  However, the evidence also indicates that Ocwen proceeded to initiate an investigation on October 19, 2006.  The Court concludes that this delay in initiating the investigation between

September 25, 2006 and October 19, 2006 at most amounts to negligence, and therefore does not rise to the level of extreme and outrageous conduct.  *See Green*, 155 P.3d at 387.  The Court has also already held that Ocwen's continuation of its investigation through December 5, 2006 was not unreasonable, and so as a matter of law did not amount to extreme and outrageous conduct.  *Coors Brewing Co.*, 978 P.2d at 666.  And finally, the Court has also already held that the (lack of) evidence of Ocwen and NCCI's intent or recklessness in failing to correct the negative reporting between December 5, 2006 and February 15, 2007 also shows at most negligence, which is insufficient to show extreme and outrageous conduct.  *See Green*, 155 P.3d at 387; *see also Schultz v. Allstate Ins. Co.*, 764 F. Supp. 1404, 1411 (D. Colo. 1991) (holding that, although fact-finder might reasonably conclude that "some of the circumstances [surrounding the insurer's conduct] support a finding of bad faith," evidence did not satisfy the more extreme standard for outrageous conduct).

For these reasons, summary judgment is appropriate on Plaintiff's outrageous conduct claim against Ocwen and NCCI.[24]

### c.      FDCPA Claim

Plaintiff's FDCPA claim against Ocwen and NCCI, brought under 15 U.S.C. § 1692e(8), alleges, *inter alia*, that Ocwen and NCCI, as debt collectors, communicated

---

[24] In Judge Krieger's previous order ruling on Ocwen's motion to dismiss, she held that Plaintiff stated a claim of extreme and outrageous conduct by alleging that "Ocwen knowingly reported false information about the . . . loan being in default to credit reporting agencies, and later . . . willfully failed to action to correct the error."  (ECF No. 112, at 11-13.)  The Court now holds that Plaintiff has failed to come forward with evidence showing the "knowing" or "willful" conduct referenced by Judge Krieger.

false information concerning Plaintiff's creditworthiness to credit reporting agencies.

(ECF No. 149, at 10.)  15 U.S.C. § 1692e & 1692(e)(8) provide,

> A debt collector may not use any false, deceptive, or misleading
> representation or means in connection with the collection of any debt
> [including] (8) [c]ommunicating or threatening to communicate to any
> person credit information which is known or which should be known to be
> false, including the failure to communicate that a disputed debt is
> disputed.

The FDCPA applies only to "debt collectors."  *See id.*; *id.* § 1692(a)(6).  However, the

statute specifically excludes from the definition of "debt collector" "any person collecting

or attempting to collect any debt . . . which was not in default at the time it was obtained

by such person . . . ."  *Id.* § 1692(a)(6)(F).  Courts have consistently ruled that a

creditor, mortgage servicing company, or assignee of the debt is not a "debt collector"

under the FDCPA if the entity acquired the loan before it was in default.[25]  *See, e.g.*,

*Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) ("[A] debt collector

[under section 1692a(6)] does not include the consumer's creditors, a mortgage

servicing company, or an assignee of a debt, as long as the debt was not in default at

the time it was assigned"); *Lyons v. WM Specialty Mortg. LLC*, No. 08-cv-00018, 2008

WL 2811810, at *7 (D. Colo. July 18, 2008) (granting summary judgment in favor of

defendants on FDCPA claim because the loan was not in default when defendants, a

creditor and mortgage servicing company, obtained the loan).

In their motion, Ocwen and NCCI argue that they are not "debt collectors" under

the FDCPA because "Ocwen started servicing the Mortgage Loan on behalf of NCCI on

---

[25] Both parties appear to agree on this point.  (*See* ECF No. 247, at 38; ECF No. 251, at 35.)

May 15, 2006, when the loan was not in default." (ECF No. 247, at 37.)  In response,

Plaintiff first focuses on NCCI and states, "although Ocwen began servicing the Loan

effective May 15, 2006, at some unknown date the ownership of the Loan was

transferred from Allstate to NCCI.  If NCCI took ownership of the Loan after the Loan

was allegedly in default, NCCI would be deemed a debt collector." (ECF No. 251, at 35-

36.)  Plaintiff then argues that if NCCI was a "debt collector," Ocwen should also be

deemed a debt collector because it was servicing the loan for a debt collector (NCCI).

(*Id.* at 36-37.)[26]

As Plaintiff appears to concede, the undisputed evidence shows that the loan

was not in default on May 15, 2006 when Ocwen acquired the rights to service the loan.

Thus, under the case law, Ocwen is not a "debt collector" under the FDCPA (unless

Plaintiff's argument as to Ocwen, discussed *infra*, is persuasive).

As for NCCI, there are two pieces of evidence suggesting that NCCI purchased

the loan on the same date – May 15, 2006 – before the loan went into default.  First, the

Declaration of Gina Johnson, a Senior Loan Analyst with Ocwen, states, "Ocwen began

servicing the Mortgage Loan on or about May 15, 2006. . . . Ocwen serviced the

Mortgage Loan as the attorney-in-fact for [NCCI], the investor that purchased the loan

on the secondary market." (ECF No. 247, Ex. A-12 ¶¶ 5, 7.)  This evidence implies that

NCCI purchased the loan on May 15, 2006.  And lending at least slightly more support

to this premise is Ocwen's letter informing Plaintiff that "effective 5/15/2006 the servicing

---

[26] Plaintiff also argues that Defendant NCC Servicing, LLC should be treated as a "debt collector" under the FDCPA.  (*See* ECF No. 251, at 37.)  The Court declines to consider this issue because NCC Servicing, LLC has not moved for summary judgment.

of your mortgage loan . . . will be assigned, sold and transferred from Allstate [] to

Ocwen."  (ECF No. 251, Ex. F-2.)  This letter, in conjunction with the Johnson

Declaration, implies that, as of May 15, 2006, Allstate was giving up its ownership

interest in the loan to NCCI.  The Court concludes that Ocwen has satisfied its burden

of showing a lack of a genuine dispute as to when NCCI purchased the loan from

Allstate.  *See* Fed. R. Civ. P. 56(a); *Liberty Lobby, Inc.*, 477 U.S. at 248-50.

Thus, the burden shifts to Plaintiff to designate "specific facts showing that there

is a genuine issue for trial" on this issue.  *Celotex Corp.*, 477 U.S. at 324.  Plaintiff has

come forward with no evidence showing that NCCI purchased the loan from Allstate on

some date other than May 15, 2006.[27]  Therefore, Plaintiff has failed to raise a triable

issue as to whether NCCI is a "debt collector" under the FDCPA, which the undisputed

evidence shows it is not.  And because NCCI is not a "debt collector" under the FDCPA,

Plaintiff's argument that Ocwen should be treated as a "debt collector" under the

FDCPA because it was collecting a debt on behalf of a debt collector (NCCI) is

[27] Plaintiff argues that, during discovery, Defendants failed to produce the Sale Agreement relating to Allstate's sale of the Loan to NCCI.  (ECF No. 251, at 37 n.10.)  Plaintiff represents that a motion to compel was heard by U.S. Magistrate Judge Kristen L. Mix on the issue, that Ocwen represented to Magistrate Judge Mix that it did not possess the document, and on that basis Magistrate Judge Mix ruled that she could not order Ocwen to produce a document that it did not possess.  (*See id.*)  (The only evidence of a motion to compel being ruled on by Magistrate Judge Mix in this action is docket entry # 192, in which Magistrate Judge Mix heard "Plaintiff's oral Motion to Compel Production of a document."  Counsel in the case provided Judge Mix with the background and basis of the discovery dispute (which is not detailed in the minute order), and the Judge denied the oral motion without explanation.)

Plaintiff now argues that Ocwen *does* have the document in its possession.  (*Id.*)  Plaintiff is asking the Court to re-hear this discovery dispute, which it declines to do.  Further, there is no indication that Plaintiff ever propounded during discovery a simple interrogatory asking on what date NCCI purchased the loan from Allstate.

unavailing.[28]

Because neither Ocwen nor NCCI are properly treated as "debt collectors" under the FDCPA, summary judgment is appropriate as to the FDCPA claim against them.[29]

### 3.    CMS's Motion for Summary Judgment

CMS also moves for summary judgment, both as to Plaintiff's outrageous claim and FDCPA claim brought against it.  (*See* ECF No. 149, at 8, 10-11.)

### a.    Outrageous Conduct Claim

In its motion, CMS argues that it did not engage in extreme and outrageous conduct, and did not act recklessly or with the intent of causing Plaintiff severe emotional distress, because it did not even initiate a foreclosure action against Plaintiff, but instead merely followed Ocwen's instructions to initiate foreclosure, then place foreclosure on hold, and then finally close its foreclosure file.  (ECF No. 182, at 8, 11.)

In response, Plaintiff first argues that CMS knew or should have known that the debt was not owing when it sent Plaintiff its initial letter on September 7, 2006.  In so doing, Plaintiff focuses on CMS's statement in its summary judgment motion that "CMS received a foreclosure referral from Ocwen and *after review by a CMS attorney concerning the existence of a debt*, sent out [the debt validation letter]."  (ECF No. 182,

---

[28] The Court also rejects Plaintiff's implication that Ocwen should be treated as a "debt collector" under the FDCPA because it was representing itself as a "debt collector attempting to collect a debt" in its letters to Plaintiff.  *See Nwoke v. Countrywide Home Loans, Inc.*, 251 F. App'x 363, 365 (7th Cir. 2007) (rejecting the same argument advanced by Plaintiff).

[29] Because of this conclusion, the Court need not reach Ocwen and NCCI's argument that Plaintiff's FDCPA claim against them is barred by the applicable statute of limitations.

at 2 (emphasis added).)  Plaintiff argues, without citing any factual support, that

> Thus, [CMS] had in its possession the title work on the Coolidge Property,
> and knew that Wyman Funding was the lender with a purported first lien
> on the Coolidge property.  [CMS] could readily determine that Stewart Title
> was the title company involved in the transaction, and could readily obtain
> the HUD Settlement Statement, the wire payoff log, and even the title
> insurance work in connection with the refinancing.

(ECF No. 252, at 26.)  The Court is not aware of any factual support for these

statements.  Notably, as of the September 7, 2006 letter, Plaintiff had had *no* direct

contact with CMS, and Plaintiff's only contacts with Ocwen were the two telephone

conversations on June 5, 2006 and August 7, 2006.  Plaintiff had not even sent *Ocwen*

relevant documentation as of September 7, 2006, not to mention CMS.  There does not

appear to be any factual support for Plaintiff's assertion that CMS knew or should have

known that the debt was not owing when it sent the September 7, 2006 letter, and thus

there is no triable issue as to whether sending this letter constituted extreme and

outrageous conduct.  *See Coors Brewing Co.*, 978 P.2d at 666; *Celotex Corp.*, 477 U.S.

at 324.

Plaintiff also appears to suggest that CMS engaged in extreme and outrageous

conduct between September 7, 2006 and December 5, 2006.  (ECF No. 251, at 26-29.)

The Court is unpersuaded.  First, although Plaintiff had began providing documentation

to CMS as early as September 25, 2006, CMS's delay until October 19, 2006 to inform

Plaintiff that foreclosure was being put on hold did not amount to extreme and

outrageous conduct.[30]  The same is true of CMS's delay in closing its foreclosure file

---

[30] *Cf. Dean v. Allstate Ins. Co.*, 878 F. Supp. 1397, 1403 (D. Colo. 1993) (stating
that summary judgment was appropriate on claim that medical benefit payments were
willfully delayed by insurer where plaintiff had not come forward with any evidence that

until December 5, 2006, following Ocwen's investigation.  These conclusions are further supported by the fact that the evidence shows that Ocwen was conducting the investigation, and CMS was merely following Ocwen's (its client's) directions.  *See Turman v. Castle Law Firm, LLC*, 129 P.3d 1103, 1105 (Colo. App. 2006) ("As a general rule, attorneys have no duty to act for the benefit of those who are not clients.  Thus, absent fraudulent or malicious conduct, attorneys are not liable for negligent acts or omissions that may cause damage to third parties."); *cf. Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1174 (9th Cir. 2006) (stating that debt collector under the FDCPA did not have duty to independently investigate validity of debt and, within reasonable limits, was entitled to rely on creditor's statements to verify debt).

Finally, Plaintiff argues that CMS's failure to correct Plaintiff's credit reports between December 5, 2006 and February 15, 2007 constituted outrageous conduct. (*See* ECF No. 252, at 24, 29-31.)  The Court concludes that it is not appropriate to construe Plaintiff's outrageous conduct claim so broadly as to include allegations concerning CMS's failure to correct the credit reports.  In the operative complaint, Plaintiff's outrageous conduct claim alleges only the following as to CMS:  "[CMS] engaged in extreme and outrageous conduct by . . . pursuing foreclosure against Plaintiff's property after being repeatedly informed that Plaintiff was not in default and that the Allstate loan had been paid through refinance."  (ECF No. 149, at 8 ¶ 30.)  This allegation involves pursuing foreclosure, not failing to correct the credit reports.

---

the delay was willful); *Bucholtz v. Safeco Ins. Co. of Am.*, 773 P.2d 590, 593 (Colo. App. 1988) (holding that dismissal of outrageous conduct claim was appropriate where plaintiff did not allege facts showing that insurer acted unreasonably or recklessly in delaying the handling of Plaintiff's claim for benefits).

Notably, the preceding paragraph of the complaint alleges outrageous conduct against Ocwen and NCCI, *and not CMS*, based on their "knowingly providing false credit information to several [CRAs]." (*Id.* at 8 ¶ 21.) The Court will not construe Plaintiff's outrageous conduct claim against CMS to include allegations concerning CMS's failure to correct Plaintiff's credit reports.

Accordingly, the Court grants CMS's motion for summary judgment as to the outrageous conduct claim.[31]

### b.    FDCPA Claim

As for the FDCPA claim against CMS, the Court concludes that the claim is barred by the applicable statute of limitations.[32] 15 U.S.C. § 1692k(d) provides, "An action to enforce any liability created by [the FDCPA] may be brought in any appropriate United States district court . . . within one year from the date on which the violation occurs." *See also Johnson v. Riddle*, 305 F.3d 1107, 1113 (10th Cir. 2002) (applying one-year statute of limitations to FDCPA claim).

In its motion, CMS argues that the statute of limitations began to run no later than December 5, 2006, when it informed Plaintiff's attorney that it was closing its foreclosure file. (ECF No. 182, at 18-19.) In response, Plaintiff focuses *entirely* on CMS's alleged

---

[31] In Judge Krieger's order on the motions to dismiss, she held that dismissal of Plaintiff's outrageous conduct claim against CMS was not appropriate where Plaintiff alleged in the complaint that CMS attempted to foreclose upon property for which there was no debt owing. (ECF No. 112, at 20.) However, following discovery, Plaintiff has now failed to come forward with evidence showing that CMS acted recklessly or with the intent of causing Plaintiff severe emotional distress.

[32] Because of this conclusion, the Court need not address CMS's arguments that it is not a "debt collector" under the FDCPA, and that it did not threaten to take any action that could not legally be taken. (*See* ECF No. 182, at 12-17.)

involvement in early 2007 in correcting Plaintiff's credit reports:  "[CMS] should have

caused the deletion of the [the negative credit reports] long before February 15, 2007,

and certainly on January 29, 2007, and each day thereafter.  [CMS's] failure to cause

the deletion of the [negative credit reports] each day commencing January 29, 2007,

constitutes separate violations of the FDCPA."  (ECF No. 252, at 39-41.)

Plaintiff's argument is unavailing because, similarly, Plaintiff's FDCPA claim

against CMS is based *only* on CMS's initiation of foreclosure, *not* on CMS's involvement

in cleaning up Plaintiff's credit reports.  The FDCPA claim against CMS in the operative

complaint alleges (only) that,

> 47.    [CMS], acting as a debt collection agency, threatened a foreclosure
>         action against Plaintiff's property if Plaintiff did not make payment
>         on a non-existent debt.
> 48.    The action of foreclosure could not legally be taken at the time of
>         the threat because the debt had been paid in full.
> 49.    [CMS] was notified repeatedly that Plaintiff had paid the debt in full
>         and yet, upon information and belief, did not stop foreclosure
>         proceedings and/or rescind the threat until well after Plaintiff had
>         been irreparably damaged.

(ECF No. 149, at 10-11.)  Plaintiff has not brought a claim against CMS based on its

failure to correct negative credit reporting, and thus CMS's involvement in correcting the

credit reports in early 2007 is irrelevant to Plaintiff's claim.  Plaintiff's FDCPA claim

against CMS, based entirely on CMS's pursuit of foreclosure, accrued no later than

December 5, 2006.  Because Plaintiff filed this action on January 29, 2008, more than

one year later, Plaintiff's FDCPA against CMS is time-barred.

### III.  CONCLUSION

In accordance with the foregoing, it is therefore ORDERED as follows:

1.    Ocwen and NCCI's Motion for Summary Judgment (ECF No. 247) is GRANTED.

2.     Ocwen and NCCI's Amended Motion to Strike Declarations (ECF No. 264) is
       GRANTED IN PART and DENIED IN PART.  The Court GRANTS the Amended
       Motion to Strike as to paragraphs 2 through 9, inclusive, of the Declaration of
       John N. McNamara, Jr. (ECF No. 251, Ex. G).  Paragraphs 2 through 9,
       inclusive, of the Declaration of John N. McNamara, Jr., are hereby STRICKEN
       from the record.  The Court DENIES the Amended Motion to Strike as to the
       Declarations of William Stollar (ECF No. 251, Ex. E), Glen Llewellyn (ECF No.
       251, Ex. D), and Candace Saport (ECF No. 251, Ex. J).  The Court also DENIES
       the Amended Motion to Strike as to paragraphs 1 and 10 of the Declaration of
       John N. McNamara, Jr., and exhibits attached to the McNamara declaration
       (ECF No. 251, Ex. G).

3.     CMS's Motion for Summary Judgment (ECF No. 182) is GRANTED.

4.     In any future filings with the Court, the parties shall use an amended caption that
       lists as Defendants only the two remaining Defendants in the action, Allstate
       Home Loans, Inc. d/b/a Allstate Funding, and NCC Servicing, LLC.

Dated this 16th day of June, 2011.

BY THE COURT:

_____
William J. Martínez

United States District Judge